**ORAL ARGUMENT REQUESTED**

**No. 20-2128**

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

DANIEL LEWIS LEE,

*Petitioner-Appellant,*

*v.*

T.J. WATSON, WARDEN USP TERRE HAUTE, et al.,

*Respondents-Appellees.*

On Appeal from the United States District Court
for the Southern District of Indiana, No. 2:19-cv-00468-JPH-DLP
Before the Honorable Judge James P. Hanlon

**BRIEF FOR PETITIONER-APPELLANT**

MORRIS H. MOON
ASSISTANT FEDERAL PUBLIC DEFENDER
FEDERAL CAPITAL HABEAS PROJECT
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556

GEORGE G. KOUROS
ASSISTANT FEDERAL PUBLIC DEFENDER
FEDERAL CAPITAL HABEAS PROJECT
6411 Ivy Lance, Suite 710
Greenbelt, MD 2070
(301) 821-0855

July 7, 2020

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __20-2128__

Short Caption: ___Lee v. Watson, Warden___

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    ___Daniel Lewis Lee___

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    ___N/A___

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ___N/A___

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    ___N/A___

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    ___N/A___

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    ___N/A___

Attorney's Signature: ___/s/ Morris H. Moon___ Date: ___07/06/2020___

Attorney's Printed Name: ___Morris H. Moon___

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** [✓]  **No** [ ]

Address: ___Federal Capital Habeas Project___

    ___6411 Ivy Lane, Suite 710, Greenbelt, MD 20770___

Phone Number: ___(713) 880-3556___      Fax Number: _____

E-Mail Address: ___Morris_Moon@fd.org___

rev. 12/19 AK

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __20-2128__

Short Caption: __Lee v. Watson, Warden__

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
__Daniel Lewis Lee__
_____

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
__N/A__
_____

(3) If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

         __N/A__

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         __N/A__

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

__N/A__

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

__N/A__

Attorney's Signature: _____ Date: __07/06/2020__

Attorney's Printed Name: __George G. Kouros__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [ ]   **No** [✓]

Address: __Federal Capital Habeas Project__

__6411 Ivy Lane, Greenbelt, MD 20770__

Phone Number: __(301) 821-0855__      Fax Number: _____

E-Mail Address: __George_Kouros@fd.org__

## TABLE OF CONTENTS

Jurisdictional Statement.................................................................................1

Statement of the Issues................................................................................1

Statement of the Case..................................................................................2
    Trial Proceedings.......................................................................................2
    Post-Trial and Appellate Proceedings.......................................................6
    The §2255 Case.........................................................................................7
    Subsequent Post-conviction Proceedings..................................................8

Summary of the Argument...........................................................................11

Standard of Review......................................................................................12

Argument.....................................................................................................12

I.    The district court erred when it found Lee's trial IAC claim could
    not be raised pursuant to §2241..........................................................12

    A.    Why §2255 was inadequate and ineffective in Lee's case...................14
        1.    Lee's underlying trial IAC claim...........................................14
            a.    Trial counsel failed to meet the prevailing standard
                at the time for challenging the PCL-R..........................16
            b.    Trial counsel's deficient performance was prejudicial......19
            c.    But for trial counsel's deficient performance, there
                is a reasonable probability that the outcome of the
                sentencing proceeding would have been different..........21
        2.    Lee's court appointed §2255 counsel's ineffectiveness
            denied him the opportunity to remedy the trial error..............25
            a.    Post-conviction counsel bungled the litigation...............25
            b.    §2255 counsel's errors led the court to make a
                procedural ruling foreclosing full merits review
                of the IAC claim................................................................26
        3.    The Supreme Court crafted a remedy for prisoners whose
            post-conviction counsel bungled a substantial
            ineffectiveness claim...............................................................28
        4.    Lee, unlike Movants in other circuits, was denied access to
            Rule 60(b) as a *Trevino* remedy.............................................31

B.      Because §2255 is an inadequate and ineffective remedy under the circumstances of his case, Lee is entitled to turn to §2241............................................................................................33

    1.      This court has found §2241 jurisdiction in a range of circumstances where 28 U.S.C. §2255 has proved ineffective to vindicate the denial of a constitutional right.............................................................................................34

    2.      Because it has, under these circumstances, denied Lee his "one meaningful opportunity" to litigate his substantial claim of trial counsel's ineffectiveness, the §2255 remedy has proven inadequate in this case..............36

C.      Resort to the savings clause in Lee's case would maintain the limited nature of the remedy..........................................................38

II.     The district court erred in denying Lee's Due Process claims for lack of jurisdiction.............................................................................................41

A.      The Due Process violations...................................................41
    1.      The trial evidence..........................................................42
    2.      The truth......................................................................45

B.      Section 2255 was inadequate and ineffective to remedy these Violations.................................................................................46

C.      The district court erred in ruling that the Due Process violations are not redressable under the Savings Clause................................48
    1.      The district court improperly concluded that the vacatur of the stay foreclosed review of the claims on the merits..........50
        a.      The stay litigation in this Court was hastily in a matter of hours on an incomplete record......................51
        b.      The district court erroneously adopted the order vacating the stay, which was based on a non-applicable standard, as a substitute for full merits review.........................................................................51
    2.      The district court improperly defined fact development about whether there was "newly discovered evidence" and misconstrued the factual basis for the claim...................53

3.    The district court's application of a "diligence" requirement was erroneous……………………………………….57

    a.    *Webster* and *Shields* do not foreclose the *Brady* claims……………………………………………..57

    b.    The district court improperly ignored controlling Supreme Court precedent rejecting a "diligence" requirement………………………………………………….58

Conclusion……………………………………………………………………..62

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Thaler*, 679 F.3d 312 (5th Cir. 2012)......................................31

*Am. Nurses' Ass'n v. State of Illinois*, 783 F.2d 716 (7th Cir.1986).......................57

*Amado v. Gonzalez*, 758 F.3d 1119 (9th Cir. 2014).........................................59-60

*Babbit v. Woodford*, 177 F.3d 744 (9th Cir. 1999)......................................48

*Banks v. Dretke*, 540 U.S. 668 (2004)...................................................59

*Beason v. Marske,* 926 F.3d 932 (7th Cir. 2019)...............................................36, 40

*Boyko v. Parke,* 259 F.3d 781 (7th Cir. 2001)....................................................61

*Bracy v. Gramley*, 520 U.S. 899 (1997).........................................................56

*Brady v. Maryland*, 373 U.S. 83 (1963)..................................................10, 42

*Buck v. Davis*, 580 U.S. ___, 137 S. Ct. 759, 777 (2017)......................................23

*Cameo Convalescent Ctr., Inc. v. Percy*, 800 F.2d 108 (7th Cir. 1986)....................59

*Chazen v. Marske*, 938 F.3d 851 (7th Cir. 2019)..............................................48

*Cook v. Ryan*, 688 F.3d 598 (9th Cir. 2012).........................................................31

*Cox v. Horn*, 757 F.3d 113 (3d Cir. 2014).........................................................31

*Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263 (3d Cir. 2016)...........................59

*Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001).......................................35, 36, 38

*Gonzalez v. Crosby*, 545 U.S. 524 (2005)..............................................9, 31, 32

*Hubanks v. Frank*, 392 F.3d 926 (7th Cir. 2004)...............................................12

*In re Davenport*, 147 F.3d 605 (7th Cir. 1998).....................................35, 38, 40, 48

*In re Dorsainvil*, 119 F.3d 245 (3d Cir. 1997)...................................................36

*In re Jones*, 226 F.3d 328 (4th Cir. 2000)........................................................36

*In re Smith*, 285 F.3d 6 (D.C. Cir. 2002)..........................................................36

*Lee v. United States*, 545 U.S. 1141 (2005)......................................................7

*Lee v. United States*, 570 F.Supp.2d 142 (D.D.C. 2008)......................................59

*Lee v. United States,* 137 S. Ct. 1577 (2017)....................................................8

*Light v. Caraway*, 761 F.3d 809 (7th Cir. 2014)................................................12

*Poindexter v. Nash*, 333 F.3d 372 (2nd Cir. 2003).....................................36

*Martinez v. Ryan*, 566 U.S. 1 (2012).................................................*passim*

*Massaro v. United States*, 538 U.S. 500 (2003)..................................................37

*McGuire v. Warden*, 738 F.3d 741 (6th Cir. 2013)..............................................31

*Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765 (7th Cir. 2011).........50, 51

*Montenegro v. United States*, 248 F.3d 585 (7th Cir. 2001)................................61

*Napue v. Illinois*, 360 U.S. 264 (1959)........................................................10,47

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007)...50

*Proimos v. Fair Automotive Repair, Inc.,* 808 F.2d 1273 (7th Cir. 1987)...............53

*Purkey v. United* States, 2020 WL 3603779 (7th Cir. July 2, 2020).............30, 35, 39

*Ramirez v. United States,* 799 F.3d 845 (7th Cir. 2015)......................29, 30, 32, 33

*Richardson v. Briley*, 401 F.3d 794 (7th Cir. 2006)............................................61

*Robb v. Norfolk & Western Ry. Co.*, 122 F.3d 354 (7th Cir. 1997).........................59

*Scheuer v. Rhodes*, 416 U.S. 232 (1974)......................................................56-57

*Strickland v. Washington*, 466 U.S. 668 (1984)................................................16

*Socha v. Richardson*, 874 F.3d 983 (7th Cir. 2017)............................................47

*Taylor v. Gilkey,* 314 F.3d 832 (7th Cir. 2002)..................................................35

*Trevino v. Thaler*, 569 U.S. 413 (2013)................................................*passim*

*United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000)...............................18, 23

*United States v. Bullock*, No. 3:98-cr-00150-JRS-1 (E.D. Va. Jan. 14, 1999)..........18

*United States v. Cardena*, 842 F.3d 959 (7th Cir. 2016).....................................47

*United States v. Kehoe,* 310 F.3d 579 (8th Cir. 2002).........................................24

*United States v. Lee*, 274 F.3d 485 (8th Cir. 2001).............................................18

*United States v. Lee*, 792 F.3d 1021 (8th Cir. 2015)................................26, 32, 33

*United States v. Metro. St. Louis Sewer Dist.*, 4404 F.3d 930 (8th Cir. 2006).....26-27

*United States v. Sampson*, 335 F. Supp. 2d 166 (D. Mass. 2004).........................23

*United States v. Sheppard*, 742 Fed. Appx. 599 (3rd Cir. 2018)............................30

*United States v. Shields*, 789 F.3d 733 (7th Cir. 2015)..................................57, 58

*United States v. Tavera*, 719 F.3d 705 (6th Cir. 2013)......................................59

*University of Texas v. Camenisch*, 451 U.S. 390 (1981)..........................50, 51, 56

*Unthank v. Jett*, 549 F.3d 534 (7th Cir. 2008).................................................35

*Webster v. Daniels,* 784 F.3d 1123 (7th Cir. 2015)......................................*passim*

*West Virginia Ass'n of Community Health Centers, Inc. v. Heckler,*
    734 F.2d 1570 (D.C. Cir. 1984)...................................................................52

*Wiggins v. Smith*, 539 U.S. 510 (2003).....................................................16, 25

*Williams v. Delo*, No. 13-2058 (8th Cir. Sept. 23, 2013).....................................31

*Williams v. Taylor*, 529 U.S. 420 (2000)....................................................60, 61

## Statutes

28 U.S.C. §1291..................................................................................1

28 U.S.C. §1331..................................................................................1

28 U.S.C. §2241..................................................................................1

28 U.S.C. § 2253.................................................................................1

28 U.S.C. § 2255...........................................................................*passim*

## Rules

Fed. R. App. P. 22(b).............................................................................1

Fed. R. Civ. P. 59(e).........................................................................8, 26

Fed. R. Civ. P. 60(b).....................................................................*passim*

## Jurisdictional Statement

Daniel Lee seeks review of the district court's order denying his petition for a writ of habeas corpus under 28 U.S.C. §2241, and his motion for leave to conduct discovery. App.3.[1] Lee filed a motion pursuant to Rule 59 on April 17, 2020, Dkt. 37, which the court denied on June 26, 2020. Dkt.45.[2] App.11. Lee timely filed a Notice of Appeal on June 26, 2020. Dkt.46. Because the appeal is from a §2241 petition, there is no Certificate of Appealability ("COA") requirement. *See* 28 U.S.C. §2253; Fed. R. App. P. 22(b). The district court had jurisdiction under 28 U.S.C. §§1331 and 2241(a). This Court has jurisdiction pursuant to 28 U.S.C. §§1291 and 2241(a).

## Statement of the Issues

(1) Whether 28 U.S.C. §2241 is available to address a meritorious Sixth Amendment violation foreclosed by §2255 counsel's ineffectiveness when Rule 60(b) has been held not to apply to federal prisoners?

(2) Where suppressed evidence relevant to capital sentencing is discovered only after §2255 proceedings have concluded, is §2241 available to remedy the Government misconduct that resulted in an unconstitutional death sentence?

(3) Whether a district court may deny habeas discovery despite determining that the petitioner may, if the facts are fully developed, be able to demonstrate a

---

[1] Citations to "App." refer to Petitioner-Appellant's attached Appendix. Citations to "Supp.App." refer to Petitioner-Appellant's Supplemental Appendix.

[2] Citations to filings in the §2241 proceedings in *Lee v. Warden USP Terre Haute, et al.*, No. 2:19-cv-00468-JPH-DLP (S.D. Ind.) are cited as "Dkt." Citations to filings in the §2255 proceedings in *United States v. Lee*, No. 4:97-CR-0243-KGB-2 (E.D. Ark.) are cited as "EDARK Dkt."

constitutional violation entitling him to relief?

## Statement of the Case

Daniel Lee was sentenced to die for two reasons alone: first, because a psychological test proved he was a "psychopath" who would be a danger in the future; and second, because his jury heard he was guilty of a prior murder but had "gotten away with it." Both of these claims were false. Had trial counsel accurately challenged the test's use in his case the jury would not have heard the spurious evidence; had the prosecution not withheld the truth about the prior murder no death sentence would have ensued. So clear is that result that three federal judges found based on these two different grounds that Danny Lee's death sentence likely violates the Constitution and should be invalidated. Unfortunately, two of those jurists believed that the structure of the §2255 statute prevented them from granting the necessary relief. The third found §2241 nevertheless unavailable to Lee. This appeal arises from that third finding.

### Trial Proceedings

Lee and his co-defendant Chevie Kehoe were jointly tried before the late Honorable G. Thomas Eisele in the Eastern District of Arkansas in 1999 and convicted of participating in a pattern of racketeering activity under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Supp.App.1. Although the jury acquitted on numerous alleged racketeering acts, Supp.App.42, it convicted them of the 1996 murders of William Mueller, his wife Nancy Mueller, and her daughter Sarah Powell. From the outset, the Government recognized Kehoe as the instigator

of the offense and the far more culpable actor. Supp.App.21. The RICO charges

alleged that Kehoe sought to create a white separatist organization. He was

indicted as the "leader" of this attempt, the "primary planner and decision maker"

while Lee was his subordinate (in the prosecutor's words, his "faithful dog").

Supp.App.65. Kehoe was indicted for a string of violent offenses, including two

murders, the attempted murder of two police officers, and an armed robbery, as well

as for purchasing land for his "enterprise" and transporting stolen goods,

Supp.App.44-46; Lee was accused of assisting him in one other offense, and was

acquitted of it. Supp.App.42. The guilt phase of the joint trial was largely about the

white supremacist beliefs held by Kehoe and his felonious family, with a constant

focus on Kehoe's acts and aspirations. Supp.App.21. This is no gloss by Lee's

counsel: it was the case the FBI investigated and the prosecution presented. In the

words of the trial judge:

> All who review the record will recognize the unequal and disparate
> roles that Kehoe and Lee played in their horrific crime spree, which
> Kehoe directed and Lee joined intermittently. Kehoe recruited Lee.
> Kehoe was the charismatic leader; Lee the obedient follower. Lee
> "participated in the murder of the adults, *but would have no part in
> the killing of [8-year-old] Sarah Powell so Kehoe had done it alone.*"

Supp.App.184-85. There was no question that Kehoe was the more culpable of the

two.

When jurors returned a life verdict in Kehoe's case, everyone—including the

victims' family members, the U.S. Attorney, the line prosecutors, the Department of

Justice attorneys who were assisting in the prosecution, and the law enforcement

agents who were working the case—agreed that Lee's case should also be resolved

3

with a life sentence. Dkt.1 at 8; Supp. App.13. But the decision of the local U.S. Attorney was overruled by Main Justice in Washington, and the Government was forced to proceed to a penalty phase against Lee. *Id.*

The centerpiece of the Government's case for a death sentence was that Lee was a clinically-diagnosed "psychopath" who would be a future danger in prison if sentenced to life without possibility of release. Supp.App.4-13. To support this argument, the prosecution told the jury about a psychological test that the Government's expert had given Lee known as the Hare Psychopathy Checklist-Revised ("PCL-R"). Supp.App.7-8. According to the Government, the results "diagnosed" Lee as an incurable psychopath whose "condition" virtually guaranteed that he would be a danger to others in the future if not executed. Supp.App.8-11, 117.

The prosecution used the defendant's own expert to bring these facts before the jury. Supp.App.6-10. Instead of presenting its expert, Dr. Thomas Ryan, in its case-in-chief, it used the cross-examination of defense expert Dr. Mark Cunningham to showcase both the PCL-R and Dr. Ryan. Dkt.1 at 14. Nearly the entire case for future dangerousness was offered through the defense expert, demonstrating to the jury that Daniel Lee was a "psychopath" who would remain a violent and dangerous person if allowed to live.[3]

---

[3] The presiding judge noted after the trial, in hindsight:

> [It was] now apparent from the Government's opening statement and the brevity of its own direct case on the issue of future dangerousness that the Government intended from the beginning to make its most

Trial counsel recognized the power of the psychological tool and tried at times to minimize it. They made an evidentiary objection, for example, to the prosecutor's elicitation of the PCL-R findings as going beyond the scope of the defense's direct examination. Supp.App.5. But they never disputed the test's probity. Dkt.1 at 15. They did not research the professional literature on the test to see whether its use to establish future dangerousness in prison was subject to challenge. The case instead proceeded as if the PCL-R was a sound and reliable instrument for consideration at a capital sentencing.

Bolstering the purported accuracy of the psychopathy test was the second pillar on which Lee's sentence rests: his guilt of a prior murder. Dkt.1 at 46. Here the Government informed the jury that Danny Lee had committed a murder as a teenager, but that he had "gotten away" with it because the Oklahoma state prosecutors at the time gave him a "gift" by allowing him to plead to robbery. Supp.App.131. The prosecutor told the jury:

> [Mr. Lee] got a gift in that case from the prosecutors in Oklahoma. They gave him a plea bargain. And this allowed him to get off with just a robbery.

*Id.*; Dkt.1 at 49. As proof, the Government introduced a certified copy of Lee's

---

compelling showing of future dangerousness through its cross-examination of Dr. Cunningham and its "rebuttal" testimony of Dr. Ryan.

Supp.App.12. *See also* Supp.App.2-3, 5 (noting that "the Government's case-in-chief was brief," that the "Government's cross-examination of Dr. Cunningham was extensive" and that the Government "focused almost exclusively on future dangerousness in its cross-examination of Dr. Cunningham.").

Oklahoma state court conviction for robbery, Dkt.1 at 49, and presented at the Arkansas trial some of the evidence the state prosecutors had amassed in the Oklahoma case. Supp.App.130-31. This was a powerful message to give to jurors at the penalty phase: Danny Lee got away with one murder, don't let it happen again.

The capital jurors obliged. The proceedings in the Kehoe-Lee trial thus concluded with a perverse result: although the Government had proved during a months-long trial that Kehoe was the more culpable of the two men, both in the enterprise as a whole and in the capital offense, the jury spared his life, but sentenced Lee to die. Supp.App.116.

## Post-Trial and Appellate Proceedings

Trial counsel argued in a motion for new trial that the prosecution exceeded the scope of direct in their cross of Dr. Cunningham on the PCL-R. The district court agreed. Supp.App.1. Concluding that "the unfairness [was] patent" in the Government's introducing its psychopathy theory of future danger through the defense expert, the district court granted relief. Supp.App.11. It found the PCL-R testimony prejudicial, concluding that "it is very questionable whether the jury would have given Defendant Lee the death penalty" without it. Supp.App.12.

The Eighth Circuit reversed. Examining the issue solely as an evidentiary question, the court explained that the Federal Death Penalty Act (FDPA) permits the introduction of a range of evidence at a capital sentencing and, because the PCL-R was relevant to future dangerousness, its "probative value" outweighed unfair prejudice. Supp.App.28-29. At no point was the court asked to consider

6

whether the test was indeed reliable. It did not disturb the district court's finding that, absent the evidence, Lee would likely not have been sentenced to die.[4] Supp.App.12

### *The §2255 Case*

Although the challenge was available at the time of trial and was routinely raised by the defense bar, Lee's counsel failed to investigate or contest the use of the PCL-R against him. Dkt.1 at 14. In fact, when challenged in another case about the reliability of the PCL-R, government expert Thomas Ryan – the same psychologist whose findings were used at the Lee trial – withdrew his report and reliance on the test. *Id.* Dr. Ryan has disavowed all use of the PCL-R to prove future danger in a capital case. Supp.App.200.

New counsel in post-conviction recognized this omission and raised the issue of ineffective assistance of counsel (IAC) with regard to the PCL-R evidence. Supp.App.75-76. However, §2255 counsel bungled their litigation. Despite clear circuit rules establishing how §2255 pleadings should be filed, Lee's counsel failed to present the district court with evidence available to establish the Sixth Amendment claim. There was nothing strategic or intentional about their actions: they simply did not know or follow the applicable habeas requirements. *See* Supp.App.99-102; 204; 210. In denying the post-conviction motion, the district court

---

[4] The court there considered only the issues raised in the motion for new trial. Following that limited decision, Lee filed a general brief on direct appeal. The Eighth Circuit rejected his claims, Supp.App.32, and the Supreme Court denied certiorari. *Lee v. United States*, 545 U.S. 1141 (2005).

held that Lee had not demonstrated prejudice as to the PCL-R as required by *Strickland v. Washington* and its progeny. Supp.App.76. Section 2255 counsel belatedly realized their error and attached the necessary support for the claim in a Motion to Alter or Amend the Judgment Pursuant to Fed. R. Civ. P. 59(e). The Arkansas district court denied the motion, holding that collateral counsel had failed to comply with a settled Eighth Circuit procedural rule barring the use of Rule 59(e) motions "to introduce new evidence which could have been offered or raised prior to the entry of judgment." Supp.App.102. This procedural failure left the judge with no choice but to dismiss the claim. The Supreme Court denied certiorari following affirmance by the circuit. *Lee v. United States,* 137 S. Ct. 1577 (2017).

### Subsequent Post-conviction Proceedings

Although §2255 counsel mishandled the case in post-conviction and cost Lee his one opportunity to litigate trial counsel's poor performance on the PCL-R, there was little he could do about it: collateral counsel's errors, no matter how serious, have historically been left without remedy. However, shortly after Lee's §2255 proceedings were completed, the Supreme Court made a narrow but significant change in the law regarding post-conviction representation. In *Trevino v. Thaler*, 569 U.S. 413 (2013), and *Martinez v. Ryan*, 566 U.S. 1 (2012), the Court held that a petitioner must receive "a meaningful opportunity to present a claim of ineffective assistance of trial counsel" in an initial-review collateral proceeding. *Trevino*, 133 S. Ct. at 1921. If a procedural error by collateral counsel prevented merits review of a substantial claim, *Martinez* and *Trevino* would now open the door to review if

8

certain requirements were met.

Lee immediately sought to avail himself of this remedy. Because his §2255 lawyers botched the procedural requirements, the district court was foreclosed from full review of his ineffectiveness claim. Represented by new counsel,[5] Lee filed a Rule 60(b) motion citing the change in law and the centrality of the PCL-R "diagnosis" to his death sentence. Supp.App.111. Believing that the motion was not a "true" 60(b) within the meaning of *Gonzalez v. Crosby*, 545 U.S. 524 (2005), the district court deemed it successive and denied relief. *Id.* Finding the *Trevino* path to review available only to prisoners convicted in *state* courts, the Eighth Circuit affirmed. Supp.App.117. The rehearing petition brought a dissent from Judge Kelly who recognized that *Trevino* must have application to a federal prisoner in Lee's position:

> In this case, if one grants that Lee's §2255 counsel was ineffective in failing to attach the evidence in support of his ineffectiveness claim to his petition, Lee will have completed his journey through the court system without ever having had a chance to present a colorable ineffective assistance of trial counsel claim to a court with the aid of an effective lawyer—which seems to be exactly the problem that *Martinez* and *Trevino* sought to remedy.

Supp.App.121.

The Eighth Circuit interpreted §2255 to preclude the kind of review to which *Martinez* and *Trevino* had opened the door: substantial errors by counsel in an initial-review collateral proceeding. With the structure of the §2255 foreclosing

---

[5] Because their failures were now at issue, post-conviction counsel had to withdraw from the case.

9

review – a state litigant filing pursuant to §2254 could rely on Rule 60(b), but a similarly-situated federal prisoner filing under §2255 could not – Lee turned to the Savings Clause for review of his claim. The district court for the Southern District of Indiana, Hon. James Patrick Hanlon presiding, deemed his claim on all fours with the one filed in *Purkey v. United States* and denied review. App.6-7.

*The truth emerges about the alleged prior murder proceeding*

While Lee was challenging one of the two bases of his death sentence, facts were emerging to show the other was unfounded as well. Counsel discovered that the Government's penalty phase presentation about the Oklahoma murder was false. The state prosecutors did not offer the teenaged Lee a "gift" despite his being "legally" guilty of murder; instead, the presiding Oklahoma judge – who heard all the evidence the Arkansas prosecutors relied on and more – told them they needed to dismiss the murder case because they could not even establish probable cause. EDARK Dkt.1297; Supp.App.218. There had been no "gift" – there was instead an inflated charge that the prosecution could not prove.

Armed with this new evidence, Lee attempted use the §2255 process to establish violations of *Brady v. Maryland* and *Napue v. Illinois.* EDARK Dkt.1297. The district court for the Eastern District of Arkansas, Hon. J. Leon Holmes presiding, deemed the motion successive, but found that Lee had established a prejudicial violation of his rights:

> In light of the government's reliance on the Wavra murder during sentencing, it is reasonably likely that, if it had been disclosed at trial that the Oklahoma court found the evidence insufficient to establish that Lee was guilty of murder, the outcome at sentencing would have

been different.

Supp.App.137.

Again having found §2255 inadequate to protecting his rights, Lee raised the issue in his §2241 petition in the Southern District of Indiana. The district court there first agreed with Judge Holmes's finding, and granted a stay of Lee's then-pending execution on that basis.[6] App.31. The Government filed an emergency appeal of the stay order. A panel of this Court vacated the order, holding that the standards for granting a stay of execution had not been satisfied. App.42. The district court subsequently reversed itself and denied the §2241 petition in its entirety. App.3.

### Summary of the Argument

The district court erred in holding that the Savings Clause does not permit Lee to proceed under §2241.

*First*, the court erred in holding that Lee's argument was foreclosed by its previous *Purkey* decision. Lee is not contending that §2255 was inadequate because his postconviction counsel were ineffective. Nor is he asking this Court to permit him to raise a new claim under §2241. Here, the §2255 court had Lee's IAC claim before it but found it was foreclosed from considering it due to §2255 counsel's errors. When the subsequent *Trevino* decision created a remedy, courts nationwide reviewed these issues in §2254 and §2255 cases via Rule 60(b). In Lee's case,

---

[6] Lee had filed a motion to stay his execution but withdrew it when the district court for the District of Columbia granted a preliminary injunction on a challenge to the new execution protocol. Dkts.17, 22. Judge Hanlon granted the stay *sua sponte*.

however, the Eighth Circuit issued a universal edict that Rule 60(b)—part and parcel of §2255 proceedings—is not available to federal prisoners to remedy this issue. Under the unique circumstances of Lee's case, §2241 must be available to rectify this absence of a corrective process.

*Second*, the court erred by denying Lee's due process claims absent discovery despite finding that the claims, if true, would establish a right to relief and that further facts were needed to determine §2241 jurisdiction. The court erroneously denied Lee's claims, imputing an improper "due diligence" standard to the analysis of his misconduct allegations.

## Standard of Review

This Court reviews "the denial of [a] habeas petition *de novo*, and all of the district court's factual determinations for clear error." *Light v. Caraway*, 761 F.3d 809, 812 (7th Cir. 2014). Denial of the petitioner's request for discovery is reviewed for abuse of discretion. *Hubanks v. Frank*, 392 F.3d 926, 933 (7th Cir. 2004).

## Argument

I. **The district court erred when it found Lee's trial IAC claim could not be raised pursuant to §2241.**

The lower court's holding that §2241 provided no basis for Lee to litigate his trial IAC claim was grounded in a fundamental misconception. The district court made short shrift of Lee's allegations, stating that his claim is "essentially identical to a claim addressed [by the district court] in *Purkey*... Notably, both Lee and Purkey take the position that the *Martinez-Trevino* doctrine, as extended in *Ramirez [ ],* permits them to raise ineffective assistance claims in a §2241 petition."

12

App.6. This was never Lee's argument.

The petition below did not raise a trial IAC claim for the first time; nor did it ask the court to extend §2241 so he could bring new claims. Moreover, Lee (unlike Purkey) did not assert that the structural impediment of §2255 was his previous lawyers' ineffectiveness. The ineffectiveness of his §2255 lawyers was merely one of several circumstances that led the Eighth Circuit to interpret Rule 60(b) in a manner that created the inadequacy of §2255.

The impediment in Lee's case arose from a combination of factors. The §2255 court was fully aware of Lee's trial IAC claim and had the evidence supporting the claim before it. That court, however, was prevented from reviewing that evidence because of §2255 counsel's failure to timely present it, thus foreclosing merits review.

At that time, the Supreme Court had not yet decided *Martinez* and *Trevino*. Therefore, even though the reviewing court had the evidence before it and clearly recognized the problem caused by Lee's attorneys, it had no way to fix the problem.

*Trevino* changed this. Lee immediately tried to avail himself of its remedy through a Rule 60(b) motion, just like the movant in *Ramirez*. However, the Eighth Circuit, over dissent, refused to apply *Trevino* to his case and dismissed his attempts to reopen. Thus all avenues within §2255 were blocked from Lee, even while other similarly situated movants had access to a remedy.

The trial and §2255 judge understood that Lee's death sentence should not stand.  Recognizing that it was "not redressable under [the] existing legal

principles" constraining him, the judge was nevertheless convinced that this did not mean that Lee's sentence "constitutes a fair and rational result under the peculiar and special circumstances of this particular case." Supp.App.85. The facts and argument in *Purkey* do not resolve Lee's case and the district court's reliance on them to deny Lee's case was error. In this unique circumstance, the operation of the §2255 statute precluded a reasonable opportunity to obtain a reliable judicial determination of the trial Sixth Amendment right. This is why Lee should be permitted to proceed under §2241.

### A. Why §2255 was inadequate and ineffective in Lee's case.

Lee's trial counsel failed to raise an available challenge to the PCL-R that would have resulted in its never having been presented to the jury; his initial post-conviction attorneys compounded that error by not properly raising that failure in collateral proceedings; and access to a newly-announced available remedy for that Sixth Amendment violation was denied him under the interpretation given Rule 60(b). Thus, a substantial, likely dispositive constitutional violation has evaded federal court review through no fault of Lee's and §2241 proceedings remain the sole bulwark against an unconstitutional execution.

### 1. Lee's underlying trial IAC claim.

Lee's death sentence rests on a bogus "diagnosis" presented to the jury as scientific fact. The PCL-R, central to the Government's case for the "future dangerousness" aggravator and thus for death, should not have been in front of Lee's jury. The PCL-R was administered to Lee by the Government's psychologist

14

and expert witness, Dr. Thomas Ryan. His report found finding that based on Lee's score on the PCL-R, he could be labeled (in medical terms) a "psychopath" who would pose a future danger in prison. The Government informed the jury of Dr. Ryan's opinion through its cross-examination of defense expert, Dr. Mark Cunningham, effectively using him to advance its theory that Dr. Ryan's clinical diagnosis of Lee as a "psychopath" proved Lee was and would remain a violent and dangerous person if allowed to live.

This was not a brief or passing exploration. The jury was told that "psychopathy" is an accepted term in the field of forensic psychology, "psychopath" an acknowledged psychological label, and the PCL-R "the standard for the assessment of criminal psychopathy in North America." Dkt.1 at 7-8.

The prosecution, still through Dr. Cunningham, then informed the jury that individuals scoring high enough on the PCL-R to be designated as psychopaths were substantially more likely to commit future acts of violence than the general population – i.e., that the PCL-R was an accurate predictor of future dangerousness. Dkt.1 at 8. Perhaps most damning for a prisoner on trial for his life, they were told that those who score high enough on the PCL-R to be diagnosed as "[p]sychopaths do not appear amenable to treatment." Dkt.1 at 8.

Then the Government stuck the diagnosis to Lee. The prosecutor extensively cross-examined the expert about various alleged acts and incidents in Lee's life that purportedly corresponded to domains of the PCL-R, including impulsivity and acts of violence. Supp.App.6-8; Dkt.1 at 8. Ultimately, Dr. Cunningham was asked to

15

attest that Dr. Ryan had administered the PCL-R and determined that Lee was a psychopath based on the results. Dkt.1 at 9.

Having led the defense witness in detail through the mechanics of the psychopathy test, the credentials of the expert who gave it, and the poor prognosis for Lee, the prosecutor had little left to do on this when his own expert took the stand on rebuttal, though he was sure to have Dr. Ryan remind the jury at the end of his testimony that the PCL-R results were valid and accurate. Dkt.1 at 9.

### a. Trial counsel failed to meet the prevailing standard at the time for challenging the PCL-R.

Had trial counsel raised the challenges that were standard practice at the time of Lee's trial, his jury would have heard none of this improper and unreliable evidence. When properly challenged in another capital trial shortly thereafter, Dr. Ryan disavowed all use of the PCL-R to prove future danger in prison and retracted his reliance on it in capital cases. Unfortunately for Lee, his counsel unreasonably failed to investigate and then make the same challenge. *See Strickland v. Washington*, 466 U.S. 668 (1984) (ineffectiveness test comprised of two prongs, one establishing counsel's deficient performance and the other the prejudice caused by their acts or omissions); *Wiggins v. Smith*, 539 U.S. 510 (2003) (deficient sentencing performance due to unreasonable failures to investigate).

The lawyers were on notice that the Government might introduce psychopathy evidence in the case. They knew Dr. Ryan had administered the PCL-R to Lee. They were aware of his opinion that their client's score on that instrument indicated he would be violent in prison, a devastating conclusion for a capital

16

defendant. They shared those results and opinion with their own expert, Dr. Cunningham. But they did not investigate or prepare. They did not question the probity of the PCL-R or examine whether it could in fact reliably predict a defendant's future dangerousness in prison. This failure proved fatal to their client.[7]

Had they performed appropriately, trial counsel would have found a readily available challenge to prevent the jury from hearing anything about Dr. Ryan's PCL-R testing and diagnosis. Scientific studies, as early as 1997, found no scientifically valid relationship between psychopathy scores and violence in prison. Prominent experts condemned testimony pointing to such a correlation. As one leading expert on the PCL-R stated:

> [I]n 1999 a claim that a high PCL-R score indicated a high risk of future violence in federal prison was not only made in the absence of any empirical support, it actually contradicted the published, available scientific evidence on the subject at that time. Under these circumstances, at the time of Lee's 1999 trial, an expert could not ethically and responsibly have asserted that a high PCL-R score was predictive of whether an inmate would be violent in a U.S. prison.

Supp.App.187 (Declaration of John F. Edens, Ph.D.) at ¶7.

As the then President of the American Psychological Association has put it:

> Dr. Ryan's reliance on the PCL-R to predict future dangerousness in prison was unsupported by empirical evidence, did not present an appropriate application of generally accepted ethical principles applicable to psychologists, and violated the generally accepted

---

[7] The only objection trial counsel raised to the psychopathy/future dangerousness testimony was an evidentiary one -- that the Government's elicitation of that testimony during cross-examination of Dr. Cunningham and Dr. Ryan's rebuttal testimony "exceeded the scope" of Dr. Cunningham's direct examination. Supp.App.3-13.

standards of forensic psychological practice.

Supp.App.192 (Declaration of Donald N. Bersoff Ph.D., J.D.) at ¶¶12-16.

Moreover, it was standard practice at the time by the defense bar to challenge the reliability of the PCL-R. *See e.g. United States v. Barnette*, 211 F.3d 803, 815 (4th Cir. 2000) (noting Barnette filed *in limine* challenge to reliability of PCL-R prior to his 1998 trial); *United States v. Bullock*, No. 3:98-cr-00150-JRS-1 (E.D. Va. Jan. 14, 1999), Dkt.190 (highlighting challenge to PCL-R based on its unreliability).

Yet Lee's counsel failed to do so. They did not examine the uses to which the test could validly be put or even research the relevant literature. They did not question whether there really was any "science" behind the prosecutor's claim that it proved Lee would be a danger if kept alive in prison. They therefore did not file a motion *in limine* on this basis. They did not object when the prosecution used its own defense expert witness to argue that the purported "psychopathy diagnosis" proved their client would be a future danger. They neglected to do any of this despite the power of the future danger aggravator in a capital case and of expert opinion in any case. Their sole objection to the questioning of Dr. Cunningham about the PCL-R was on the ground that the Government's cross exceeded the scope of the direct.[8] This was deficient performance pursuant to *Strickland*.

---

[8] When this same point was raised by the defense in a motion for new trial, the trial court agreed and vacated Lee's death sentence. The Eighth Circuit reversed that ruling, but, significant for this action, it did so on the explicit understanding that *the PCL-R was in fact probative of future danger. See United States v. Lee*, 274 F.3d 485, 495 (8th Cir. 2001) (stating any error in admitting the psychopathy

### b. Trial counsel's deficient performance was prejudicial.

This omission proved costly to Lee. Had defense counsel disputed the test's probity and reliability and raised the issue pretrial, the jury would never have heard the damning PCL-R evidence. It is clear that Dr. Ryan, in response, would have withdrawn his opinion on the matter entirely. This is not a matter of speculation; we know this based on Dr. Ryan's actions and testimony in two other federal capital proceedings from the same period: *United States v. Haynes*, No. 8:98-cr-00520-PJM-1 (D. Md.), and *United States v. Stitt,* No. 2:98-cr-00047-RAJ-RJK-1 (E.D. Va.).

In *Haynes,* in May 2000, Dr. Ryan was retained to testify about future dangerousness using the PCL-R and psychopathy scores just as in *Lee*. When defense counsel moved to exclude Dr. Ryan's testimony supported by expert declarations attesting his opinion was unreliable and unethical, Dr. Ryan voluntarily withdrew his expert report, and refused to testify regarding the PCL-R or psychopathy.

Thereafter, Dr. Ryan provided a sworn declaration in §2255 proceedings in *Stitt*, a case that had been tried in 1998, the year *before* Lee's trial. There too Dr. Ryan had administered the PCL-R and testified about the defendant's future

---

testimony did not result in "unfair prejudice" precisely because "Lee's potential psychopathy was probative of his future dangerousness."). Trial counsel's evidentiary objection accepted as accurate the predicate fact that a psychopathy score was probative of future dangerousness in prison, when, in fact, the *opposite* was true. Defense counsel's failure to investigate the instrument thus prejudiced their client on appeal as well.

dangerousness based on a psychopathy score. In his §2255 declaration, however, Dr.

Ryan repudiated his 1998 trial testimony and disavowed the notion that a capital

defendant's PCL-R score is predictive of his future dangerousness in prison.

Dr. Ryan was clear that the evidence which caused him to refuse to testify in

2000 was available as early as 1998 and that Stitt's trial counsel could have

confronted him with it at that time:

> Although the basis for a challenge to the use of the PCL-R existed at
> the time of the *Stitt* trial, no such challenge was brought by defense
> counsel. The challenge in *Haynes* rested on the fact that the existing
> scientific literature did not demonstrate a relationship between PCL-R
> scores and prison violence sufficient to conclude that a high scorer
> would likely be dangerous in prison. The *Haynes* motion was filed
> approximately 18 months after the trial in *Stitt.*

Supp.App.201 (Declaration of Thomas V. Ryan, Ph.D.) at ¶7.[9]

If such a challenge was feasible in 1998, it was in 1999 as well. Had Lee's

trial counsel investigated and made the same objection to the use of the PCL-R to

prove the future danger aggravator, Dr. Ryan would have come to the same

conclusion he did in *Haynes* and he would have withdrawn his report and

opinions.[10] As Dr. Ryan's findings provided the sole basis for the Government's

---

[9] S*ee also* Supp.App.201. at ¶8 ("It was not and still is not possible to conclude to a
reasonable degree of scientific certainty, based on studies that were published at
the time of the *Stitt* trial or on relevant research published since then, that a
correlation exists between high PCL-R scores and federal prison violence.").

[10] Dr. Ryan has further stated that having been alerted to the fact that his prior
conclusions lacked scientific basis, he no longer relies on the PCL-R to assess future
dangerousness in capital cases:

> Since withdrawing my report in the *Haynes* case, I have been retained
> by the government in several other federal death penalty cases, and

elicitation of the psychopathy evidence during Dr. Cunningham's cross-examination, withdrawal of his report and opinion, as in *Haynes*, would have resulted in a very different penalty phase for Lee – one without any evidence or argument that medical experts had determined he was a "psychopath" who would be an uncontrollable danger even if incarcerated for the rest of his life.

### c. But for trial counsel's deficient performance, there is a reasonable probability that the outcome of the sentencing proceeding would have been different.

The trial judge's conclusion that without the PCL-R Lee would not likely have been sentenced to death, Supp.App.12, is amply supported by the trial record. The prosecutor relied heavily on the PCL-R throughout the penalty phase. He told the jury in opening that his

> psychological profile [ ] in the end will convince you that as he sits here today and will be in the future, Lee is a dangerous man. *That, ladies and gentlemen, is a lot of what this trial will be about.*

Dkt.1 at 15 (emphasis added). Throughout trial, the Government asked the jurors to consider psychopathy in scientific, medical terms: "In the end, what the evidence that will be presented will establish is that *Lee is a psychopath. I don't mean that in a common term. I do mean that in the medical use.*" Supp.App.11 (emphasis added). The Government also explicitly argued that the PCL-R test established Lee's future

---

testified in those that went to trial. In no case have I relied on the PCL-R, because I no longer believe that the PCL-R is a reliable indicator of a defendant's future dangerousness in federal maximum-security prisons due to the lack of peer reviewed empirical studies.

Supp.App.201 at ¶10.

dangerousness: "We will prove in this case to you that Lee, *because of his psychological profile*, who he is and who he will be for years to come, is dangerous and will continue to be dangerous." *Id.* (emphasis added).[11]

Significantly, the prosecution urged the jury from the outset to filter all of the aggravating evidence it would hear through the "diagnosis" of psychopathy. It offered evidence of Lee's alleged prior bad acts as not merely of historical significance, but as proof that he was a psychopath and fit a consistent profile:

> The evidence that will be presented in this trial is going to help you understand that Lee, this man who sits right here in this courtroom, is a violent and dangerous man. He thrives on this stuff. *That is part of his profile*. Even if you sent him to prison for the rest of his life, he will be a threat for a long, long time.

Supp.App.11 (emphasis added). This point was hammered home in closing, as the jury was told to view all of Lee's purported "prior bad acts" as being symptomatic of, and consistent with, a diagnosis of psychopathy:

> Can't we all now, with the benefit of hindsight, look at this and see, my God, look at what the *diagnosis* was. … This man is at risk to re-offend violently.

Dkt.1 at 16 (emphasis added).

It is not difficult to see the effect this presentation would have had on a

---

[11] *See also* Dkt.1 at 15 n.16 ("[E]ven if jailed for the rest of his life, he still will be a danger to others, to fellow inmates, to prison guards. He continues to be dangerous."); *id.* ("Lee was then, as he is today, angry, suspicious, hostile, broody, a dangerous person."); *id.* ("And during this trial then we balance his life, those he has hurt or will hurt in the future[.]").

22

sentencing jury.[12] The substantial time the Government spent questioning that expert about the PCL-R underscores its essential role in its case for death.[13] The persuasive power of the test and the attendant psychological label have led courts in federal capital prosecutions to warn of its prejudicial effect. *See, e.g., Barnette*, 211 F.3d at 811, 825 (4th Cir. 2000) (expert PCL-R testimony "was as damning as it could be"); *Stitt v. United States,* 369 F. Supp. 2d 679, 699-700 (E.D. Va. 2005) (finding it "clear that the jury might have reached a different verdict" had Dr. Ryan's psychopathy been excluded); *United States v. Sampson*, 335 F. Supp. 2d 166, 220 & 222 n.27 (D. Mass. 2004) (prohibiting expert from using "psychopath" in federal capital case, noting prejudicial effect).

Contrasting Lee's penalty phase with that of his codefendant is also telling. Kehoe had a string of charged murders and attempted murders behind him, including those of confederates no longer trusted, and had previously burglarized the Muellers' home. Among the worst of his crimes was the attempted murder of two Ohio police officers during a routine traffic stop, where Kehoe shot thirty-three rounds at the officers, firing at them in their cars, and then during another shoot-

---

[12] Its prejudicial effect was not limited to the subject matter. The Supreme Court has repeatedly noted the heightened role experts play for jurors in assessing future danger. *See Buck v. Davis*, 580 U.S. ___, 137 S. Ct. 759 (2017). *See also id.* at 776 ("Here was hard statistical evidence -- from an expert -- to guide an otherwise speculative inquiry.") and *id.* at 777 (evidence can be particularly damaging to jury when given through the defense's own expert).

[13] Supp.App.2-3 (Government's case-in-chief "brief;" its examination of the defense expert, "extensive").

out on a subsequent chase.[14] Despite the litany of his prior violent acts,[15] including

against law enforcement, the jury did *not* find that he would be a future danger. A

key difference was that the Government never used expert testimony or a scientific

basis to claim that Kehoe was an unredeemable psychopath.

In the end, any question over whether the PCL-R evidence was central to the

Lee case may have been answered by the trial judge himself, who found it "very

questionable whether the jury would have given Defendant Lee the death penalty"

without it. Supp.App.12.[16] The same judge presided over both the Lee and Kehoe

joint guilt phase trial and their individual sentencing proceedings (as well as Lee's

post-conviction challenge) and was thus particularly well-suited to assess the

evidence across the board.

Given the focus of the prosecution; the influence of scientific, expert

testimony on jurors; the different sentences given the two co-defendants; the explicit

finding of the presiding judge; and the concurring views of other courts on the power

of this evidence, there can be little doubt that Lee was prejudiced by the use of the

PCL-R against him. But for the introduction of this evidence, "there is a reasonable

---

[14] *United States v. Kehoe,* 310 F.3d 579, 585 (8th Cir. 2002).

[15] The prosecution's evidence was also that Kehoe killed young Sarah Powell alone.

[16] In a post-trial order, the district court judge carefully analyzed the role of the PCL-R at Danny Lee's sentencing trial. His analysis, however, began from an assumption that the psychopathy evidence was *valid* since no evidence or argument to the contrary had been presented to him. The court could thus speak to its powerful effect, but not to the impropriety of its very use to begin with. This avoidable error followed the case into the Eighth Circuit. *See* Supp.App.29.

probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

### 2. Lee's court-appointed §2255 counsel's ineffectiveness denied him the opportunity to remedy the trial error.

In light of the above, Daniel Lee would have had a very strong trial IAC claim which should have been litigated in §2255. Unfortunately for Lee, his court-appointed §2255 counsel's representation on this key claim was also woefully deficient. It deprived him of his one and only[17] meaningful opportunity for redress of this Sixth Amendment violation.

### a. Post-conviction counsel bungled the litigation.

Habeas counsel's failure to comply with basic §2255 obligations cannot be disputed. Despite clear circuit rules establishing how §2255 pleadings should be filed, Lee's counsel failed to present evidence available to establish the IAC claim. This was not a strategic decision: they knew of available evidence, including sworn statements from Dr. Ryan proving the claim. Supp.App.204-216 (Declarations of Laurence Komp, Esq., and David A. Ruhnke, Esq.), at ¶¶10-11. They were aware of supporting expert opinions and of the *Haynes in limine* motion. *Id.* at ¶12. (The motion "provided detailed factual, scientific and legal analyses as to why the PCL-R could not reliably predict future dangerousness in prison." *Id.*). Yet they "pled none

---

[17] Where state petitioners have two opportunities to litigate post-conviction claims – first in state habeas, and then in federal court – §2255 litigants are provided only the single federal forum for collateral review.

of its detailed factual information in support of the claim." *Id.* at ¶15. They failed to reach out to experts to obtain information, affidavits, or testimony. *Id.* at ¶15.

This omission was not a reasoned decision but was based on a misunderstanding of the law. As both counsel later acknowledged:

> There was no strategic or tactical rationale for not asserting the readily available facts…nor was there a strategic or tactical rationale for not obtaining and appending supporting documentation to our Motion from any of the forensic psychologists who had demonstrated their willingness to challenge Dr. Ryan's particular use of the PCL-R, based on the fact that such use was scientifically unsupportable, and violated professional and ethical standards. *We thought that by pleading the issue we had met the requirements of §2255.*

*Id.* at ¶17 (emphasis added).

### b. §2255 counsel's errors led the court to make a procedural ruling foreclosing full merits review of the IAC claim.

After the §2255 motion was denied, post-conviction counsel attempted to present the supporting evidence for the Sixth Amendment claim by way of a reconsideration motion pursuant to Federal Rule of Civil Procedure 59(e). The district court made painfully clear, however, that it was foreclosed from considering Lee's claim at this point because of habeas counsel's failure to follow proper procedure. As the district court held, and the Court of Appeals subsequently agreed, in only belatedly presenting the evidence in a post-judgment motion, collateral counsel had failed to comply with a settled Eighth Circuit procedural rule barring the use of Rule 59(e) motions "to introduce new evidence which could have been offered or raised prior to the entry of judgment." *United States v. Lee*, 792 F.3d 1021, 1025 (8th Cir. 2015) (quoting *United States v. Metro. St. Louis Sewer Dist.*,

26

4404 F.3d 930, 934 (8th Cir. 2006)). This procedural failure left the judge with no choice but to dismiss the claim.

The district court's considerable frustration is apparent from its ruling. It admonished counsel repeatedly for "fail[ing] to adequately present facts sufficient to support [the] ineffective assistance of counsel claims," Supp.App.99, and for having "failed" in their "obligation" to demonstrate the need for a hearing. Supp.App.100-01. A good part of its opinion was spent cataloguing ways in which habeas counsel's representation on this issue was deficient:

- Counsel failed to "state the facts supporting each ground" as the law required. Supp.App.99.

- Counsel failed "to provide sufficient information…to permit the Court to evaluate both the performance and prejudice prongs of the…ineffective assistance standard." Supp.App.100.

- Counsel's "conclusory statement" that the Government's expert, subsequent to Lee's trial, had "stopped using the PCL-R to evaluate future dangerousness" was "not sufficient to place the Court on notice of the full argument" later urged in the 59(e) motion. Supp.App.101.

The court noted the many chances it had given counsel to establish the IAC claim. Supp.App.99 ("The Court was purposefully lenient in permitting the parties to expand the record as they wished before taking up the merits of [the] motion," even permitting habeas counsel to conduct "any and all" requested discovery); *id.* (counsel failed to act when the court gave them "one final opportunity" to submit

27

"additional legal authority" or "argument in support of the grounds for relief" then pending); Supp.App.100 (habeas counsel were "on notice of the law and pleading requirements for §2255 motions"); *id.* ("Finally, before ruling, the Court provided Petitioner with yet another opportunity to submit anything he wished in support of his Petition."); Supp.App.101 (counsel "offers no explanation" as to why the documentation was not submitted until the Rule 59 (e) motion). Rarely has a court commented so directly on the failures of collateral counsel.

But all the district court could do at the Rule 59 stage was castigate counsel and enter final judgment denying relief. The court's hands were tied even though the claim, properly pled, may well have required further factual development:

> Petitioner offers no explanation for why such affidavits or other supporting information were not provided to the Court before it ruled on his original motion for §2255 relief. Had they been, the Court might have determined that an evidentiary hearing was required. *However, the Court is foreclosed by existing legal principles from considering the information now*, absent permission and direction from the Eighth Circuit to do so.

Supp.App.101.

### 3. The Supreme Court crafted a remedy for prisoners whose post-conviction counsel bungled a substantial ineffectiveness claim.

Shortly after Lee's §2255 proceedings were completed, the Supreme Court made a narrow but significant change in the law regarding the failures of post-conviction counsel. In *Trevino v. Thaler*, 569 U.S. 413 (2013), and *Martinez v. Ryan*, 566 U.S. 1 (2012), the Court held that a habeas petitioner must receive "a meaningful opportunity to present a claim of ineffective assistance of trial counsel" in an initial-review collateral proceeding. *Trevino*, 569 U.S. at 428. Driving these

28

holdings was a fundamental concern with a defendant's Sixth Amendment right to the effective assistance of counsel at trial. *Martinez*, 566 U.S. at 12 (right to effective counsel "bedrock principle," "foundation" of adversary system). When that right has been denied, the forum in which a defendant may seek relief is an "initial-review collateral proceeding," as it "provide[s] the first occasion to raise a claim of ineffective assistance [of trial counsel]." *Id.* at 8.

The *Martinez* Court ruled that if that "initial review" proceeding is itself "undertaken with ineffective counsel," the right to effective trial counsel will not be vindicated. *Martinez*, 566 U.S. at 14. Absent an equitable remedy to excuse the most serious errors of habeas counsel, "a lawyer's failure to raise an ineffective-assistance-of-trial-counsel claim during initial-review collateral proceedings could . . . deprive a defendant of any review of that claim at all." *Trevino*, 569 U.S. at 423.

Federal prisoners may face the same potential harm *Martinez* and *Trevino* identified: that post-conviction counsel's errors at an initial-review collateral proceeding might forfeit proper consideration of a substantial IAC claim. *See Ramirez v. United States,* 799 F.3d 845, 853 (7th Cir. 2015) ("the situation of a federal petitioner is the same as the one the Court described in *Trevino*: as a practical matter, the first opportunity to present a claim of ineffective assistance of trial or direct appellate counsel is almost always on collateral review, in a motion under section 2255"); *id.* at 854 ("We see no reason to distinguish between actions at the state level that result in procedural default and the consequent loss of a chance for federal review, and actions at the federal level that similarly lead to a

29

procedural default that forfeits appellate review.");[18] *United States v. Sheppard*, 742 Fed. Appx. 599 (3rd Cir. 2018) (discussing *Martinez* issues occurring in §2255 proceedings).

What mechanism is available for giving federal prisoners effect to that remedy presents a more challenging question. *See Purkey v. United States*, No. 19-3318, 2020 WL 3603779 at *10-11 (7th Cir. July 2, 2020) ("But the problem is that the availability of further relief for someone in Purkey's position is not a simple matter of common law."). In Lee's case, however, this should have been no issue; Rule 60(b) can provide a remedy where, as here, a procedural defect foreclosed review of the Sixth Amendment claim. *See Purkey,* 2020 WL 3603779 at *7 (noting that *Ramirez* held "a federal prisoner could seek to reopen an action under section 2255 using…60(b) on reasoning that is analogous to *Martinez* and *Trevino*."); *Sheppard*, 742 Fed. Appx. at 602 (*Martinez* claim arising after federal prisoner's original §2255 proceedings have concluded may be pursued through Rule 60(b) motion to reopen judgment).

---

[18] Any distinction about who is entitled to the remedy should in fact favor federal prisoners because application of the remedy in §2255 proceedings requires no federal intrusion into state court judgments. *See Ramirez*, 799 F.3d at 854 ("[I]f review were to be more restricted on either the state or federal side, federalism concerns suggest that it would be the state side."). *See also* Supp.App.123 (Kelly, J., dissenting from denial of rehearing) ("It may even be less problematic to excuse procedural defaults in federal post-conviction proceedings, since doing so does not implicate concerns about thwarting the states' interests in the finality of their judicial processes."); *see also id.* (noting that the procedural rule at issue in Lee's §2255 proceeding was "a judicially-created federal one. If we were to excuse it, the only framework of procedural rules we would impinge on is our own, not another sovereign's.").

Indeed, during the recent *Purkey* argument the Government conceded that if §2255 counsel's performance "created a procedural bar to hearing the [IAC] claim, then I think 60(b) is the avenue [for an equitable remedy]." Oral Arg. Available at http://media.ca7.uscourts.gov/sound/external/mn.19-3318.19-3318_06_16_2020.mp3 (last visited July 6, 2020). This is just what occurred in Lee's case.

### 4. Lee, unlike Movants in other circuits, was denied access to Rule 60(b) as a *Trevino* remedy.

Despite meeting the *Trevino* requirements, Lee's IAC claim was nevertheless foreclosed from §2255 review by the Eighth Circuit's interpretation of the law. Satisfying the jurisdictional requirements of *Gonzalez v. Crosby*, 545 U.S. 524 (2005) should have been straightforward -- numerous circuit courts, including the Eighth Circuit Court of Appeals, had already found Rule 60(b) to be an appropriate vehicle for remedying the defect in the collateral proceeding that *Martinez* and *Trevino* had identified. *See Williams v. Delo*, No. 13-2058 (8th Cir. Sept. 23, 2013) (reversing district court's denial of a Rule 60(b) motion) (Supp.App.223); *Cox v. Horn*, 757 F.3d 113, 115 (3d Cir. 2014) (remanding to district court for determination of 60(b) motion on the merits, implicitly finding jurisdiction to hear the motion); *Adams v. Thaler*, 679 F.3d 312, 319 (5th Cir. 2012); *McGuire v. Warden*, 738 F.3d 741 (6th Cir. 2013) (deciding 60(b) motion on the merits, implicitly finding jurisdiction to hear the motion); *Cook v. Ryan*, 688 F.3d 598, 608 (9th Cir. 2012).

The Eighth Circuit nevertheless rejected that rationale in Lee's case for the sole reason that he is a *federal,* not a state, prisoner.

In refusing to hear his claim, the Eighth Circuit concluded that although collateral counsel's omission in litigating a Sixth Amendment claim in *state* post-conviction can constitute a defect in the integrity of that proceeding under *Gonzalez*, the identical omission by §2255 counsel cannot. *See United States v. Lee*, 792 F.3d 1021, 1024 (8th Cir. 2015) (*Martinez* and *Trevino* do not "[extend] to federal review of claims not adequately raised *in an initial §2255 proceeding*") (emphasis added). The Eighth Circuit therefore deemed Lee's Rule 60(b) motion successive and affirmed the district court's ruling that it lacked jurisdiction.

Shortly after the Eighth Circuit released its opinion, this Court issued its decision in *Ramirez.* Despite the strikingly similar fact patterns in *Ramirez* and *Lee* –each case involved the same type of §2255 counsel error (failure to present records in support of an IAC claim), the same type of harmful result (a procedural barrier that foreclosed full merits review of the claim) and the same type of vehicle used to remedy that harm (a Rule 60(b) motion) – Ramirez was allowed to utilize the *Trevino* remedy to obtain meaningful §2255 review, but Lee was not.

Pointing to the circuit split, Lee sought rehearing in his case. His petition was denied, but now over a strong dissent on the question of whether federal prisoners should have recourse to *Martinez* and *Trevino*. Pointing to this Court's analysis, dissenting Judge Kelly noted that if §2255 counsel was ineffective "Lee will have completed his journey through the court system without ever having had a chance to present a colorable ineffective assistance of trial counsel claim to a court with the aid of an effective lawyer ·· which seems to be exactly the problem that

32

*Martinez* and *Trevino* sought to remedy." Supp.App.121.[19]

Although the divergent outcomes in *Ramirez* and *Lee* turn on differing circuit interpretations of how Rule 60(b) motions function in applying *Trevino* to §2255 cases (c*ompare Lee*, 792 F.3d at 1022-25, *with Ramirez*, 799 F.3d at 850), Lee is not asking this Court to overrule or even question its sister circuit. Just as this Court accepted the Fifth Circuit's interpretation of successor standards even while disagreeing, *Webster v. Daniels,* 784 F.3d 1123, 1134 n.4 & n.5 (7th Cir. 2015), this Court is bound by the Eighth Circuit's interpretation that §2255 is unavailable to Lee. The disparate treatment of similarly situated cases, however, is clear proof of the inadequacy and ineffectiveness of Lee's §2255 proceedings.

### B. Because §2255 is an inadequate and ineffective remedy under the circumstances of his case, Lee is entitled to turn to §2241.

---

[19] Judge Kelly also addressed this Court's treatment of the *Lee* decision in its *Ramirez* opinion where it charged him with a failure to seek authorization for successive litigation and faulting his counsel for lacking diligence. *Ramirez*, 799 F.3d at 854. In her opinion, Judge Kelly explained why this interpretation of *Lee* was inaccurate.

First, as Judge Kelly noted, Lee, like Ramirez, was not required to seek authorization. She appropriately saw the question as whether a Rule 60(b), post-*Martinez* and *Trevino*, would properly be attacking "a defect in the federal habeas proceedings' integrity and therefore constitute a 'true' Rule 60(b) motion." Supp.App.122. If a Rule 60(b) motion "based in part on post-conviction counsel's failure to attach documents necessary to support his ineffectiveness of trial counsel claims" is a "valid" use of Rule 60(b), then precertification by the court of appeals under section 2244(b) (3) is not required; as in *Ramirez*, the district court would have jurisdiction to hear the Rule 60(b) motion in the first instance. *Id.*

Second, although *Ramirez* characterizes the failure to present supporting evidence in support of the IAC claim as a matter of *Lee's* lack of diligence, the issue actually was the same as in *Ramirez*: whether *"§2255 counsel was ineffective* in failing to attach the evidence in support of his ineffectiveness claim to his petition." Supp.App.121 (emphasis added). There is no material distinction between *Ramirez* and *Lee* in this respect.

Lee plainly has a strong claim for relief on ineffectiveness grounds: had trial counsel performed competently, challenging the Government's reliance on false evidence to establish its key aggravating factor, it is at least reasonably likely that he (like his co-defendant) would not have been sentenced to death. Had §2255 counsel litigated the issue properly, it is just as likely that the post-conviction court would have provided relief. When the Supreme Court announced a narrow remedy for just this kind of failure by post-conviction counsel, Lee diligently sought to avail himself of it, just as state prisoners successfully had done. But, although his case meets the requirements necessary to invoke the *Martinez* remedy, he was told that recourse to *Martinez* was categorically unavailable for those in §2255.  The remedy afforded him by §2255 has thus proved inadequate to "test the legality" of his sentence of death. 28 U.S.C. §2255(e). Under these circumstances, Lee may turn to §2241 for redress.

> 1. **This Court has found §2241 jurisdiction in a range of circumstances where 28 U.S.C. §2255 has proved ineffective to vindicate the denial of a constitutional right.**

Section 2255(e) sets out what is known as the "savings clause." On the rare occasions when the ordinary operation of the §2255 statute is neither adequate nor effective to test the legality of a conviction or sentence, the savings clause allows the federal prisoner to do so through a motion filed pursuant to 28 U.S.C. §2241. A §2241 motion functions neither as substitute for §2255 litigation nor an end-run around the successor bars of §2255(h). Section 2255(e) instead provides a "safety valve," a way for a federal prisoner to pursue a viable claim that §2255 is not

equipped to resolve.

This Court has described §2255(e) inadequacy variously as a "glitch" in the remedy, *Unthank v. Jett*, 549 F.3d 534, 536 (7th Cir. 2008), a "lacuna" in its functioning, *Webster v. Daniels*, 784 F.3d 1123, 1138 (7th Cir. 2015), or a "structural problem" in §2255 that forecloses "even one round of effective collateral review" of the claim. *Taylor v. Gilkey,* 314 F.3d 832, 835 (7th Cir. 2002). To invoke jurisdiction under §2241, Lee must show that §2255 has proved inadequate or ineffective to "test the legality" of his sentence of death. 28 U.S.C. §2255(e). *Garza v. Lappin*, 253 F.3d 918, 921 (7th Cir. 2001) (something more than an inability to satisfy §2255(h) is necessary to invoke the savings clause; prisoner must show that the §2255 remedy has proved inadequate or ineffective).

To determine whether §2255 has proved inadequate or ineffective, this Court does not employ a single, overarching test. *Purkey*, 2020 WL 3603779 at *8 (noting Court's §2241 caselaw does not "create rigid categories delineating when the safety valve is available…"). Inadequacy is demonstrated when §2255 is "so configured as to deny a convicted defendant any opportunity for judicial rectification" of a fundamental defect in his conviction or sentence; when the "essential function" served by habeas corpus is impaired "by the limitations on the use of the remedy provided in section 2255." *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998). The need for §2241 review arises from the particular way in which §2255 has proved inadequate under the unique circumstances a case. Close scrutiny of the case law finding §2241 jurisdiction reveals one common theme: Where courts are confronted

35

with a claim of fundamental injustice unreviewable under §2255, they have adopted a flexible approach to §2241 review. *See Beason v. Marske,* 926 F.3d 932, 935 (7th Cir. 2019) (citing *Webster* and noting "differing emphases in our caselaw interpreting *Davenport* and concluding that '[a]ll of these decisions hold, nevertheless, that there must some kind of structural problem with section 2255 before 2241 becomes available.'")

This Court has demonstrated, in cases like *Garza, Brown* and *Webster,* that there is no one legal test to determine if §2241 review should be available. Rather, these cases show that a court must carefully review the specific facts and allegations before it and, where the petitioner has been diligent but a "lacuna" or "glitch" in the law prevents review, craft a remedy narrowly tailored to address the specific harm alleged. These cases further indicate that when it appears that rectifying fundamental constitutional error has been precluded by operation of the §2255 statute, a flexible approach is warranted. This analysis is consistent with that of other federal circuits. *See e.g., Poindexter v. Nash*, 333 F.3d 372, 378 (2nd Cir. 2003); *In re Smith*, 285 F.3d 6, 8 (D.C. Cir. 2002); *In re Jones*, 226 F.3d 328, 333–34 (4th Cir. 2000); *In re Dorsainvil*, 119 F.3d 245, 251–52 (3d Cir. 1997).

    **2. Because it has, under these circumstances, denied Lee his "one meaningful opportunity" to litigate his substantial claim of trial counsel's ineffectiveness, the §2255 remedy has proved inadequate in this case.**

There is plainly a "glitch" in the operation of the §2255 statute related to Lee's ineffectiveness claim. The Supreme Court has ruled that a prisoner may now excuse an omission on a substantial Sixth Amendment issue in post-conviction

36

litigation if initial collateral counsel provided ineffective representation on that issue. *See Martinez, supra; Trevino, supra.* As the federal §2255 statute is also an "initial collateral review proceeding," Lee should have been able to avail himself of those decisions. *See Massaro*, 538 U.S. at 504-507. Indeed, if he had been convicted of the same federal crimes in a different circuit, he would have been able to do so in a §2255 through a 60(b) motion.

But the structure of the federal collateral statute, as interpreted by the Eighth Circuit, is precluding him from doing so. Because a judgment had already issued in his case when *Trevino* was decided, Lee had to rely on a Rule 60(b) motion to avail himself of the remedy. Yet the Eighth Circuit, interpreting *Martinez* and *Trevino* as applying only to state prisoners with state-imposed procedural obstacles, treated his Rule 60(b) motion as a successive petition that could not meet the requirements of §2255(h). Nor is there any other mechanism within §2255 that provides a path for adjudication of Lee's Sixth Amendment claim. His Rule 60(b) motion was rejected, and he cannot seek relief under the successor provisions of §2255: his Sixth Amendment claim neither establishes his innocence of the offense (§2255(h)(1)), nor rests on a new rule of constitutional law (§2255(h)(2)).

Lee has a substantial Sixth Amendment claim that his trial counsel gravely failed him in not properly challenging the false PCL-R "future danger" evidence. Had this challenge been made, his jury would never have heard this evidence. And as the presiding judge contemporaneously noted, absent its introduction, it was "very questionable whether the jury would have [imposed] the death penalty."

37

Supp.App.12. The plain failures of his post-conviction counsel, catalogued by the presiding judge and precluding him from considering the Sixth Amendment claim, then deprived Lee of the one chance at relief for this error that collateral review is designed to provide.

Lee was therefore denied a reasonable opportunity to obtain a reliable judicial determination of his Sixth Amendment claim during his §2255 proceeding. This is one of those "rare circumstances in which the operation of the successive petition rules absolutely prevent[s]"[20] Lee from accessing an available remedy and establishing a right to relief. As in *Davenport, Garza* and *Webster*, Lee appears to have a right without a remedy. *See* Supp.App.121 (Kelly, J, dissenting from denial of rehearing). Absent resort to the savings clause, Lee may be executed without having had his substantial Sixth Amendment claim adjudicated by any court. In fact, if his claim is construed to be beyond the scope of the savings clause, it will produce an untenable result: similarly situated *state* prisoners will have a remedy to redress a *federal* constitutional violation despite habeas counsel's ineffectiveness, while *federal* prisoners will not.

## C. Resort to the savings clause in Lee's case would maintain the limited nature of the remedy.

Unlike the cases of state prisoners, who may rely on *Martinez* to raise entirely new Sixth Amendment claims in §2254 that were defaulted for not being raised in the initial state habeas, Lee's case implicates a much narrower class of

---

[20] *Garza*, 253 F.3d at 922.

Sixth Amendment claims.[21] The unfair and irrational result of his §2255 proceeding was created, as Judge Eisele acknowledged, by the "peculiar and special circumstances of this particular case." Supp.App.85.

Lee is not arguing that §2241 is available because his §2255 counsel were ineffective. He is entitled to proceed under §2241 because the corrective process of Rule 60(b) in his case was wholly absent. Lee's petition concerns a Sixth Amendment claim that was, in fact, raised in the §2255 proceeding in district court, but foreclosed from review due to habeas counsel's deficient representation. Critically, this procedural ruling occurred *prior* to the Supreme Court's decisions in *Martinez* and *Trevino*, thus leaving the judge no recourse at the time beyond castigating post-conviction counsel for their incompetent performance. After *Trevino* was decided, Lee diligently sought to rely on it but the Eighth Circuit refused to allow him to utilize Rule 60(b), the only legal avenue left him in §2255 at that point.

This set of circumstances is not likely to recur. The remedy Lee seeks here would not extend to a §2241 petition seeking to raise an entirely new Sixth Amendment claim that had not previously been raised at the time of the §2255 proceeding. Cf. *Purkey, supra.* He seeks redress for the unique unfairness in his case: where habeas counsel committed an error that precluded proper consideration of a pleaded substantial IAC claim and *Trevino* was decided *after* the district court no longer had jurisdiction. Under these circumstances, §2255 has proved an

---

[21] As noted elsewhere in this brief, it is also a far narrower and different kind of claim from that raised and rejected in the recent *Purkey* case.

inadequate and ineffective remedy to redress the Sixth Amendment violation and resort to the savings clause is appropriate.[22]

Moreover, a litigant's ability to invoke §2241 in this manner is of course also constrained by the demanding requirements of *Martinez* itself.[23] Lee is able to satisfy these requirements: his habeas counsel unreasonably failed to present evidence in support of a substantial Sixth Amendment claim at his initial-review collateral proceeding; this failure was neither strategic nor tactical; their errors led to the imposition of a procedural ruling precluding full merits review of a pivotal Sixth Amendment claim. Habeas counsel's ineffectiveness was also prejudicial: but for counsel's error, the district court would not have been foreclosed from considering the evidence that irrefutably supported the Sixth Amendment claim. Indeed, at least one reviewing judge has determined that Lee has met all the requirements of *Martinez,* including that his claim was "potentially meritorious" and deserving of further consideration. Supp.App.122 (Kelly, J, dissenting from denial of rehearing). There is a reasonable probability that the outcome of the §2255 proceeding would have been different had it not been undertaken with ineffective

---

[22] A number of §2241 decisions involve cases where an applicable and pivotal Supreme Court case was released after the prisoner's §2255 proceeding had concluded. *See, e.g., Beason v. Marske*, 926 F. 3d 932 (7th Cir. 2019); *In re Davenport*, 147 F.3d 605 (7th Cir. 1998).

[23] See *Martinez,* 566 U.S. at 14-16 (setting out limited nature of remedy and citing its five prerequisites). Additionally, meeting the *Martinez* requirements still "does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Id.* at 17.

counsel.

Rarely will a court be faced with this set of circumstances. Here, the jury heard prejudicial false evidence establishing future dangerousness because of trial counsel's failures. Ill-prepared §2255 counsel then badly mishandled the claim preventing the judge from reviewing the full claim. After completion of the §2255 proceeding the Supreme Court released a pivotal decision providing habeas petitioners with a remedy for this kind of narrow error. A subsequent circuit court interpretation of the §2255 statute precluded reconsideration. Under these circumstances, §2255 has proved ineffective and inadequate to address a significant, remediable constitutional error: that trial counsel failed to challenge dangerous junk science at their client's capital sentencing. The lower court erred when it found no jurisdiction pursuant to the savings clause to review the merits of the claim.

## II. The district court erred in denying Lee's Due Process claims for lack of jurisdiction.

The Government violated Lee's due process rights when it suppressed exculpatory evidence and misled the jury regarding the nature of a prior conviction used as aggravating evidence at his capital trial. Although the court initially found it reasonably probable Lee would not have been sentenced to death but for these constitutional violations, and that his claims, as pled, deserved further factual development, it denied the §2241 petition without additional process, relying on this Court's order vacating the stay of execution. App.42. The district court's order misapplied the governing standards and should be reversed.

### A. The Due Process violations.

Shortly after appointment, Lee's counsel filed several motions requesting that the Government disclose any favorable material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. EDARK Dkts.28, 31, 33, 35. It renewed that request later in the trial proceedings as well. EDARK Dkts.258, 259, 260. The Government responded that it recognized its obligations as continuing," EDARK Dkt.55 at 2, and later that the "bulk" of the *Brady* material had been disclosed. Dkt.1 at 42. Based on those assurances, the court entered an order dismissing Lee's *Brady* request as moot. EDARK Dkt.145 at 1, 3. The Government produced no additional *Brady* material in the case. EDARK Dkt.327 at 1; EDARK Dkt.288 at 2.

### 1. The trial evidence

As discussed above, "future dangerousness" was a key part of the Government's case for death. To bolster this aggravating factor before the jury, the prosecution relied heavily on one prior bad act: Lee's purported responsibility for the 1990 murder of Joseph Wavra in Oklahoma. The Government claimed Lee was legally culpable for his murder which was committed by his cousin David Patton at a house party when Lee was 17. It then told the jury that Lee had been allowed to plead to the lesser crime of robbery due to the largesse of the Oklahoma prosecutors. Supp.App.131.

To prove its first point, the prosecution presented selective witnesses and evidence from the Oklahoma proceedings, including the transcript of the teenaged Lee's testimony at Patton's preliminary hearing on the murder charge. Initially only

42

Patton, whom Lee idolized, was arrested and charged with Wavra's murder. Lee subsequently gave two statements to local law enforcement denying any involvement in the actual murder. At Patton's preliminary hearing on September 28, 1990, seventeen-year-old, lawyerless Lee was called by the prosecution as a state's witness. Rather than providing testimony consistent with his previous two statements, Lee altered his account, shifting responsibility away from his cousin and asserting that he was much more involved in the events leading to Wavra's death. Although he had taken the stand to testify as a state's witness, the judge ordered the sheriff to take young Lee into custody pending murder charges. The teenager told Patton, "I love you," before he was escorted to lock-up. Dkt.1 at 45-46.

But Lee was never convicted of murder. Instead, he pleaded guilty to the lesser offense of robbery. The Government told the jury that the only reason for this was because the Oklahoma prosecutors chose to offer Lee the "gift" of a second chance:

> [Lee] got a gift in that case from the prosecutors in Oklahoma. They gave him a plea bargain. And this allowed him to get off with just a robbery.

Dkt.1 at 44. The prosecution used that fact to argue that Lee had escaped justice for the Wavra murder and that jurors should draw a straight line that ran from that crime to the Mueller murders:

> Now, few of us in life get an opportunity for a second chance. But Mr. Lee did. And he *got a gift in that case from the prosecutors* in Oklahoma. They gave him a plea bargain. And this allowed him to *get off with just a robbery*. He got minimal jail time. And he was given that opportunity to walk out that door with a second chance. Unfortunately, that doorway led him eventually to Tilly, Arkansas.

43

Dkt.1 at 52 (emphasis added).

The Government emphasized in closing that there was no question that Danny Lee had committed the Wavra murder. Dkt.1 at 44 ("legally and morally the blood of Joey Wavra's hands is on Daniel Lee"); *id.* ("[Daniel Lee] has an earlier murder under his belt . . . has a prior victim's blood on his hands"); *id.* ("Usually you commit a murder, and you get sent away for a very long time. … Daniel Lee got a do over."). And it urged the jury to distinguish Lee from codefendant Kehoe – the lead actor in the Mueller case whom the jury had just sentenced to life – on this basis. *Id.* at 53 ("drastic distinction" between Lee and Kehoe was Wavra murder); *id.* at 52 (unlike Kehoe, Lee was a "psychopath" who "even if jailed for the rest of his life, he still will be a danger to others, to fellow inmates, to prison guards. He continues to be dangerous."); *id.* at 55 ("[t]here's no prior Joey Wavra as to Chevie. There is as to Lee.").

That Lee "got away" with the Wavra murder through the largesse of the local prosecutors was a key prosecution theme in closing. Dkt.1 at 53 ("How about that DA in Oklahoma who let him get off with a robbery?"). The pointed implication was that Lee had unfortunately been allowed to get away with murder by the local Oklahoma prosecutors, but that the Federal Government would not make the same mistake here, and neither should the jurors.

The jury was persuaded: all twelve jurors found that the "future dangerousness" aggravator had been proven in Lee's case, and they sentenced Lee to death. Supp.App.151-52; 164; 176.

44

### 2. The truth

On December 13, 1990, just a few short months after Patton's preliminary hearing, Lee had his own preliminary hearing on the murder charge he was facing following his testimony for his cousin. The full facts concerning that hearing and the later resolution of Lee's case on a lesser charge are not evident in the Oklahoma court records. The public record contains no hearing transcript, nor any pleadings or orders that explain the reasons and circumstances that resulted in the plea. However, a fee application submitted to the Oklahoma state court by Lee's court-appointed counsel and more recently discovered indicates the date the preliminary hearing took place, and contains notes that the presiding judge ruled that the State's evidence for the crime of "Murder I" was "not established by the evidence," and that the state should "consider refiling on the charge of Robbery I." Supp.App.218. Rather than grace or "largesse," the Oklahoma prosecutors appear to have been following the mandate of a judge who found they did not have the evidence.

This fee application is not *Brady* material that proves Lee's misconduct claims. Rather, it corroborates his allegation that such *Brady* materials exists—that is, that the Government has, and continues to, suppress information about the true reason that the murder charge was resolved with a robbery plea. The notes on the fee application suggest that the Oklahoma judge, who took into account all the evidence that the Arkansas prosecutors presented at the capital trial and more,

concluded it was insufficient even to establish probable cause. That is when the State apparently resolved this case with a plea to robbery -- that Lee took Wavra's keys without his consent.

This is a far cry from the Government's presentation that Lee was "legally and morally" guilty of Wavra's murder and essentially got to walk away from it due to prosecutorial charity. And the Government's insistence at the penalty phase that Lee had "gotten away" with one murder and should not be given such a "gift" again was, as the Government knew or should have known, a perversion of the truth. But, thus far, Lee has been stymied from developing and proving his Due Process claims due to the Government's continued suppression of information about the true story behind the plea deal.

## B. Section 2255 was inadequate and ineffective to remedy these violations.

Counsel for Lee renewed a *Brady* request in §2255 and received no further evidence. In fact, the Government doubled-down on its trial presentation. In response to the separate §2255 claim that trial counsel were ineffective for failing to challenge the evidence concerning the Wavra murder, the Government stated it was "at a loss to understand that which Lee now argues his trial counsel should have done," and that it was "difficult to imagine" anything that "would have placed the true nature of Mr. Lee's role in that offense … in an entirely different light." EDARK Dkt.1126-1 at 75-6. The district court relied on these representations in denying that claim. Supp.App.74.

After the fee application came to light, Lee filed a second-in-time §2255

46

motion claiming that the Government violated his due process rights when it suppressed material evidence and misled the jury regarding the nature of a prior conviction. EDARK Dkt.1297. He alleged both *Brady* and *Napue* violations. *See Socha v. Richardson*, 874 F.3d 983, 987 (7th Cir. 2017) (*Brady* elements include that evidence was favorable, suppressed and material); *United States v. Cardena*, 842 F.3d 959, 976-77 (7th Cir. 2016) (*Napue* requires showing that prosecution presented testimony that it knew or should have known was false and that affected judgment of jury).

The Arkansas district court found that the allegations were made in good faith based on the "cursory statement" noted on the fee application, and that if, in fact, the allegations were true, then the claims would be "material":

> In light of the government's reliance on the Wavra murder during sentencing, it is reasonably likely that, if it had been disclosed at trial that the Oklahoma court found the evidence insufficient to establish that Lee was guilty of murder, the outcome at sentencing would have been different.

Supp.App.137.

Although the district court agreed that these due process violations could establish the Lee's death sentence was unconstitutional, it held that it was without jurisdiction to hear them. Under Eighth Circuit law, material *Brady* claims cannot be brought in a second-in-time §2255 motion; they must instead be raised in a successive motion, which requires pre-authorization by the Circuit under §2255(h). Supp.App.137-140. Lee's application for a Certificate of Appealability on the successor issue was denied, over the dissent of Judge Jane Kelly. *See* Supp.App.144.

47

This interpretation of the §2255 statute precluded Lee from gaining review of meritorious *Brady/Napue* violations that unquestionably affected his sentence. This construction of §2255(h) conflicts with that of other circuits. *See e.g. Babbit v. Woodford,* 177 F.3d 744 (9th Cir. 1999) (allowing authorization of newly discovered evidence which speaks directly to the basis of a death sentence). That interpretation also effectively allows the prosecution to suppress exculpatory evidence until it is too late for the post-conviction review process to have any effect on the case.

## C.  The district court erred in ruling that the Due Process violations are not redressable under the Savings Clause.

The Government's suppression of *Brady* material denied Lee a "'reasonable opportunity . . . to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence,'" *Chazen*, 938 F.3d at 856 (quoting *Davenport*, 147 F.3d at 609), or "an unobstructed procedural shot at getting his sentence vacated," *Davenport*, 147 F.3d at 609, during his initial §2255 proceeding. When, as here, the Government is able to conceal evidence relating to punishment issues until a §2255 motion is denied, movants in circuits like the Eighth have no remedy in the §2255 statute.

But it should matter that a federal judge already determined it reasonably likely that, absent Government misconduct, Lee would not have been sentenced to die. The savings clause must be operative in a case where §2255(h) has foreclosed a prisoner's ability to prevent his unconstitutional execution simply because the evidence relates to punishment and not guilt. *See Webster*, 784 F.3d at 1139 ("a core purpose of habeas corpus is to prevent a custodian from inflicting an

48

unconstitutional sentence").

The district court was in the process of resolving these issues when it *sua sponte* stayed Lee's December 9, 2019 execution. Agreeing with the Eastern District of Arkansas that the claims were meritorious, it concluded that further fact development would be necessary given the absence of information about what information was available in Oklahoma when, and in order to resolve the claims on a full record. App.27-35.

A panel of this Court granted the Government's emergency motion to vacate the stay the very next day. But because the Government was enjoined by a different court from carrying out any executions, the stay litigation became moot. The district court now had the time it needed to oversee additional fact development and consider the §2241 petition more fully.

But it did not.

Instead, the district court denied the §2241 petition roughly three and a half months later, without affording Lee any additional process. Even while noting that "the Seventh Circuit's order in *Lee* did not hold that Mr. Lee's due process claims do not meet the Savings Clause," it nevertheless read "the Seventh Circuit's decision in *Lee* as having considered and rejected the several reasons cited by this Court *for granting the stay*" as a rejection of Lee's §2241 claims themselves. App.9 (emphasis added). The district also concluded that the circuit opinion must have rejected Lee's discovery requests, as well as any other support for Lee's arguments. *Id.* This was error.

49

### 1.  The district court improperly concluded that the vacatur of the stay foreclosed review of the claims on the merits.

It is black-letter law that resolution of a preliminary injunction is not a consideration of the underlying claims and is not a substitute for a full and final determination of the claims presented, even though one of the factors for a stay of execution is the "likelihood of success on the merits." *See University of Texas v. Camenisch*, 451 U.S. 390, 394 (1981) (noting difference between "likelihood of success" and "success"). "The propriety of preliminary relief and resolution of the merits are of course significantly different issues." *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 782 (7th Cir. 2011) (quoting *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 721 n.10 (2007)). The two processes must also not be confused because "[g]iven the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete…" *Caminisch*, 451 U.S. at 395. *See also id.* (findings of fact and legal conclusions from preliminary-injunction stage not binding at trial on merits)

The district court here did precisely what *Camenisch* forbids: it construed this Court's stay analysis as binding on the merits. In fact, it did this even though it explicitly noted that, on its face, the vacatur did *not* foreclose further review of the claims on the merits. *See* App.9 (recognizing that the "Seventh Circuit's order in *Lee* did not hold that Mr. Lee's due process claims do not meet the Savings Clause…"). This was erroneous.

### a. The stay litigation in this Court was hastily conducted in a matter of hours on an incomplete record.

As reflected on the docket, the Government filed an emergency motion to vacate the stay at 9:34 AM (central time) on December 6, 2019. *Lee v. Watson et al.*, No. 19-3399, Dkt. 3. The Seventh Circuit allowed Lee's counsel, who were engaged in other litigation simultaneously, only five and a half hours to respond. The order vacating the stay was issued approximately two hours later, with the entire appeal lasting about eight hours.

Not only was it conducted in "haste" and under "less formal" procedures, but the issues before the Court were also resolved upon "evidence that [was] less complete[.]" *Camenisch*, 451 U.S. at 395. Indeed, the Court explicitly noted that its ruling was based solely on the limited record that had been developed up to that point. App.43 That ruling did not foreclose further fact development and merits review, and the district court's refusal to do so upon remand—after already finding such additional process was warranted—was error. *See infra* at II.C.2.

### b. The district court erroneously adopted the order vacating the stay, which was based on a non-applicable standard, as a substitute for full merits review.

The law is clear that the issues to be resolved in stay litigation are not the same as those necessary to resolve the underlying lawsuit. *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 782 (7th Cir. 2011). The stay litigation queried whether Lee was entitled to an order maintaining the status quo so he could develop the facts necessary to prove his claims in the district court. The circuit

51

panel believed he was not. But that decision, balancing the interests of the parties, did not obviate the district court's obligation—time permitting—to resume the ordinary process of resolving the merits of the claims on an appropriately developed record. *See e.g. West Virginia Ass'n of Community Health Centers, Inc. v. Heckler,* 734 F.2d 1570, 1578-79 (D.C. Cir. 1984) (stay litigation is an "inappropriate setting" to reach merits). Because the issues involved in the stay became moot when Lee's execution date expired, the district court was required to review his §2241 petition as it would any other and decide the claims under the appropriate governing rules and standards.

Specifically, the district court was required to consider the allegations in petition in the light most favorable to Lee, determine whether discovery was appropriate, allow expansion of the record, and determine whether to hold a hearing. Indeed, the court had already found that further factual development was necessary to determine whether Lee was entitled to habeas relief and whether he could meet §2241. *See* App.17, 33, 35. Nothing in the panel's opinion contradicted these findings. Instead, the district court treated the vacatur as "law of the case" that precluded any further consideration of the petition. This was error. "While it is true that some of the Court of Appeals' language suggests a conclusion that [respondent] would win on the merits, the court certainly did not hold that the standards for summary judgment had been met." *Caminisch*, 451 U.S. at 398. The district court's order improperly short-circuited consideration of the issues.

Adopting the panel's reasoning about a preliminary injunction and treating it

as law of the case not only contravened clear Supreme Court precedent but was also

unfair to Lee. This is particularly true where, as here, the ruling that set the stay

litigation in motion and led to the panel decision was issued *sua sponte* by this

Court and, due to the Government's expedited appeal, resulted in a truncated

review process. Cursory review of his case cannot substitute for the actual

proceedings on the merits to which Lee was entitled. *See Proimos v. Fair

Automotive Repair, Inc.,* 808 F.2d 1273, 1277 (7th Cir. 1987) (vacating denial of

relief where district court treated denial of preliminary injunction as a

determination of the merits without, among other things, factual development).

### 2. The district court improperly denied fact development about whether there was "newly discovered evidence" and misconstrued the factual basis for the claim.

Before its stay was vacated, the district court made detailed findings

regarding the need for further fact development—none of which were disturbed.

App.33-35. Of particular importance was whether the Government possessed

exculpatory information that could prove Lee's theory about the circumstances

surrounding the plea deal. The district court noted that the Government did not

dispute that Lee's theory— that the Oklahoma judge found there was no probable

cause to charge Lee with murder—was plausible. App.34.

Regarding the issue of suppression, the court highlighted contemporaneous

FBI memoranda, obtained by Lee pursuant to FOIA requests, that documented the

Government's pre-trial investigation into the Wavra matter. App.34. These records

demonstrate the extent to which the Government's investigators and the Oklahoma

53

case agents worked together in preparation for Lee's penalty phase, and disclosed much greater contact between federal and local authorities than the Government had acknowledged. Dkt.18 at 9-10; Supp.App.219-22. In fact, FBI agents had traveled to Oklahoma City to "review and obtain all records relative to the 1990 murder in order to determine Lee's level of participation," and specifically reviewed the files of the local prosecutors, which included contemporaneous hand-written notes explaining the circumstances surrounding Patton's plea. *Id.* These FOIA records suggest the Government does, in fact, possess information that could corroborate allegations that it knew or should have known that the robbery plea was the result of a judicial determination that there was insufficient evidence to establish probable cause that Lee was guilty of murder, and not the local prosecutor's generosity as the jury was repeatedly informed.

The district court spotlighted another area requiring further fact development: whether the fee application was "newly discovered." App.27-28. Although the Government contended it would have been discoverable through due diligence by Lee's counsel, the district court determined that "more information was needed" to resolve whether the fee application was publicly available "at the time" of trial:

> All the United States has offered is that the fee application "is listed on the public docket sheet from the Oklahoma case and contained within the publicly-available court file." Dkt. 14 at 69. Whether or not this alone establishes that the fee application was publicly available at the time of Mr. Lee's trial, it says nothing about whether the other alleged *Brady* material was publicly available.

App.35. The district court emphasized that the determination as to whether the

54

evidence was "newly discovered," and whether more evidence remained in the possession of the authorities, required factfinding:

> At this stage, Mr. Lee has shown there is a significant possibility that there is newly discovered evidence to support his claims and that there may be additional discoverable evidence to support them. Whether Mr. Lee can ultimately prevail by demonstrating that the evidence exists and is newly discovered is a question for another day. But that determination, particularly in a death penalty case, should be made on a fully developed record.

App.28.

But following the vacatur of the stay, the district court concluded that the since the Circuit found that the fee application was not concealed, it must also have rejected "the premise" of Lee's discovery requests. App.9. This was error.

First, whether the fee application was publicly available "at the time" is just as unresolved now as it was last December. Whether an online entry was available in some form to counsel in 1999 (when the case was tried), or even in 2006 (when the §2255 motion was filed) is not known. The order vacating the stay did not resolve this issue.

> The principal "newly discovered" evidence on which Lee relies is *a statement made on the record by a judge* decades ago and *available from that state court*. Indeed, *the statement was made in Lee's presence*, and although he may not have understood its potential significance that is some distance from the information being concealed or unavailable.

App.43 (emphasis added) (citations omitted).

The record does not support this supposition. As the district court was aware, there is no transcript of Lee's preliminary hearing, so it is unknown whether the

Oklahoma judge made any such statement "on the record."[24] Nor does the fee

application purport to be such a statement. There are *no* state court records that

explain what actually transpired at the hearing, much less establish that the judge

made a statement "in Lee's presence." Those facts are yet to be determined.

As the district court previously recognized, the actual *Brady* material is not

the fee application—it's the information that explains why the State resolved Lee's

murder charge with a plea to the lesser offense of robbery. This information is not,

and has not ever been, "publicly available." Yet in its order denying the §2241

petition, the district court erroneously conflated the fee application with the *Brady*

material, thus misconstruing the factual basis for the claim in the process.[25]

Given that Lee's due process claims otherwise met the relevant pleading

requirements, it was error to deny him the opportunity to utilize the available

means of discovery and fact development in order to obtain information in the

Government's possession to prove his claims. *See Bracy v. Gramley*, 520 U.S. 899,

905-909 (1997); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (a district court acts

---

[24] As *Camenisch* warned, this is why resolution of stay factors made in haste, on an incomplete record, cannot substitute for proper fact development and merits determinations.

[25] In its order denying Lee's Rule 59(e) motion, the district court stated that "[w]ith due diligence, Lee's counsel could have accessed the fee application and used it in Lee's original § 2255 motion to bring *Brady* and *Napue* claims and to seek the discovery that he now seeks in this §2241 action." App.13. Not only does this presume facts that the court previously acknowledged were not established by the record—whether the fee voucher was accessible in 2006—it mistakenly presumes, contrary to Supreme Court precedent, that simply because Lee's current counsel obtained the document, that automatically establishes that prior § 2255 counsel were not diligent. *See infra* at II.C.3.b.

"prematurely" and "erroneously" when it dismisses a well-pleaded complaint, thereby "preclud[ing] any opportunity for the plaintiffs" to establish their case "by subsequent proof"); *Am. Nurses' Ass'n v. State of Illinois*, 783 F.2d 716, 723 (7th Cir.1986) (requiring plaintiff to plead unknown details before discovery would improperly deny plaintiff the opportunity to prove claim).

### 3. The district court's application of a "diligence" requirement was erroneous.

The district court erred by applying a "diligence" requirement to deny Lee's §2241 petition pointing to this Court's mention of *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015), and *United States v. Shields*, 789 F.3d 733 (7th Cir. 2015) in its order vacating the previous stay.

#### a.  *Webster* and *Shields* do not foreclose the *Brady* claims.

The panel opinion implied that Lee's claim must fail because it assumed Lee was present during the Oklahoma proceedings and that "although [Lee] may not have understood its potential significance that is some distance from the information being concealed or unavailable." App.43. This is, however, exactly the argument *Webster* rejected.

The *en banc* court in *Webster* found the evidence unavailable even though Webster clearly was present for his psychological testing and evaluations because there was no evidence that he "was capable of appreciating its significance." *See Webster*, 784 at 1140.  The mere fact that Lee was present at his preliminary hearing likewise cannot defeat his claim. The panel in fact explicitly held that the teenaged Lee, like Webster, "may not have understood its potential significance."

57

App.43.

*Shields* is also inapposite. Unlike Lee, Shields obtained the relevant documents before trial ended. 789 F.3d at 747. Moreover, the court found his broader *Brady* claim to be "nothing but speculation" and faulted counsel for failing to request *in camera* review of the documents. *Id.* at 747-48. The Government has never disclosed the relevant evidence to Lee; the document he discovered that alerted him to the *Brady* claim was found happenstance only after his §2255 proceedings were complete. And as the district court has specifically found, "more information is needed to determine whether the alleged *Brady* information was publicly available at the time." App.35.

Furthermore, Lee has been asking for any *Brady* evidence repeatedly since before trial and has always been assured by the Government that all such evidence has been disclosed. At no point did the Government reveal any of the facts at issue here that turn its main penalty phase contention on its head.

### b. The district court improperly ignored controlling Supreme Court precedent rejecting a "diligence" requirement.

The district court's denial held that Lee's *Brady* claim could not be considered under *Webster* because it is not "concealed or unavailable" "if the defense could have accessed it with due diligence." App.9. It repeated this holding in rejecting Lee's Rule 59(e). App.13 ("With due diligence, counsel could have accessed the fee application…"). Despite Lee's argument that the application of a "diligence" standard contravened Supreme Court precedent, it felt "bound by the Seventh Circuit with respect to this legal question." App.13. This was error.

58

It is axiomatic that courts in this circuit must follow the Supreme Court "if there [is] a conflict between this circuit's precedent and Supreme Court precedent." *Robb v. Norfolk & Western Ry. Co.*, 122 F.3d 354, 361 n. 5 (7th Cir.1997). *See also Lee v. United States*, 570 F.Supp.2d 142, 149–50 (D.D.C. 2008) ("when holdings of the Supreme Court and the D.C. Circuit are irreconcilable, the Supreme Court's decision will trump every time"). Indeed, it is proper for a district court to disregard Circuit precedent if there is contrary Supreme Court case law. *Cameo Convalescent Ctr., Inc. v. Percy*, 800 F.2d 108, 110 (7th Cir. 1986).

Contrary to the lower court's ruling, the Supreme Court has explicitly rejected the notion that defense counsel's lack of diligence in discovering exculpatory information relieves the prosecution of its constitutional duty of disclosure. *See Banks v. Dretke*, 540 U.S. 668, 695-96 (2004) ("A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process."; rejecting notion that "defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed."). Indeed, a number of circuits have recognized that *Banks* is controlling law on this matter. *See, e.g., United States v. Tavera*, 719 F.3d 705, 711 (6th Cir. 2013) (noting *Banks* repudiated "due diligence" which "places the burden of discovering exculpatory information on the defendant and releases the prosecutor from the duty of disclosure."); *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 291 (3d Cir. 2016) ("[T]he concept of 'due diligence' plays no role in the *Brady* analysis."); *Amado v.*

59

*Gonzalez*, 758 F.3d 1119, 1136-37 (9th Cir. 2014) (due diligence rule "is contrary to federal law as clearly established by the Supreme Court ... and unsound public policy."). The district court's application of a "diligence" requirement was thus clear error.

The Supreme Court's analysis of "due diligence" in other habeas contexts confirms the district court's error. In *Williams v. Taylor*, 529 U.S. 420 (2000), the Supreme Court examined 28 U.S.C. §2254(e)(2) to determine what constituted "due diligence" of habeas counsel. The lower court held state habeas counsel did not exercise due diligence because he failed to discover court records §2254 counsel later uncovered proving a previous marriage between a juror and a sheriff deputy. 529 U.S. at 442. It reasoned that since federal habeas counsel was able to uncover the relationship in a public record in a county courthouse, then state habeas counsel could have discovered the same facts with due diligence. *Id.* at 443.

The Supreme Court explicitly rejected this reasoning. First, the "underdevelopment of these matters" was attributable to the prosecutor and juror. *Id.* Because of their "silence," counsel had "no reason" to suspect that they had not properly disclosed their relationships and "no basis" to investigate further. *Id.* at 442-43. Second, the Court rejected the notion that federal habeas counsel's discovery of the publicly available record proved that state habeas counsel lacked diligence. *Id.* at 443 ("We should be surprised, to say the least, if a district court familiar with the standards of trial practice were to hold that in all cases diligent counsel must check public records containing personal information pertaining to

60

each and every juror.").

The district court here committed the same error—that since Lee's current counsel discovered the now publicly available fee application, previous §2255 counsel could have, too, with "due diligence." App.13. Indeed, this not only contravened *Williams*, but also Circuit law holding that such reasoning is incorrect.[26] *See Boyko v. Parke,* 259 F.3d 781, 791-92 (7th Cir. 2001) (§2254 counsel's ability to obtain transcript did not establish lack of diligence by prior counsel; remanding for further factual development); *Richardson v. Briley*, 401 F.3d 794, 800 (7th Cir. 2006) (where state counsel reasonably relied on "the veracity of the prosecutor's misrepresentations at trial," no lack of diligence for failing to uncover available information about prosecutorial misconduct discovered by §2254 counsel). And, as in *Williams*, the nature of the record at issue here is also relevant to the analysis: a fee application is not the type of document one would reasonably consider to be part of the "record" of the criminal proceedings and final judgment in a case. It is an extra-record document submitted for an administrative purpose, to ensure payment for services rendered by court-appointed counsel. The district court's application of "due diligence" to these facts was erroneous.

---

[26] In *Montenegro v. United States*, 248 F.3d 585, 592 (7th Cir. 2001), this Court observed that for purposes of analyzing "due diligence" in the § 2255 context, "the analogy to § 2254 is probably appropriate, even though the relevant § 2254 provision applies to a determination whether an applicant is excused from a failure to develop the factual basis for the claim in state court proceedings."

## Conclusion

The district court erred in finding §2241 jurisdiction unavailable to Daniel Lee. His death sentence rests on two false claims, both of which have been found prejudicial by federal courts. Section 2255, as interpreted, has proved inadequate to address either. For the foregoing reasons, the Court should vacate the judgment of the district court and remand for further proceedings on the merits of Lee's petition.

Respectfully submitted,

/s/ Morris H. Moon
Morris H. Moon
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

/s/ George G. Kouros
George G. Kouros
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

July 6, 2020

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 16, 831 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office Professional Plus 2016 in 12-point Century font. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ George G. Kouros
GEORGE G. KOUROS

July 7, 2020

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the

Court for the Seventh Circuit using the CM/ECF system on July 7, 2020. I certify

that all participants in the case are registered CM/ECF users and that service will

be accomplished by the CM/ECF system.

<u>/s/ George G. Kouros</u>
GEORGE G. KOUROS
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

## CIRCUIT RULE 30(d) CERTIFICATION

In accordance with Circuit Rule 30(d), the undersigned hereby certifies that all materials required by Circuit Rules 30(a) and (b) are included in the attached Petitioner-Appellant's Appendix.

/s/ George G. Kouros
GEORGE G. KOUROS

July 7, 2020

No. 20-2128

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

DANIEL LEWIS LEE,

*Petitioner-Appellant*,

*v.*

T.J. WATSON, WARDEN USP TERRE HAUTE, et al.,

*Respondents-Appellees*.

On Appeal from the United States District Court
for the Southern District of Indiana, No. 2:19-cv-00468-JPH-DLP
Before the Honorable Judge James P. Hanlon

## PETITIONER-APPELLANT'S
## APPENDIX

MORRIS H. MOON
ASSISTANT FEDERAL PUBLIC DEFENDER
FEDERAL CAPITAL HABEAS PROJECT
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556

GEORGE G. KOUROS
ASSISTANT FEDERAL PUBLIC DEFENDER
FEDERAL CAPITAL HABEAS PROJECT
6411 Ivy Lance, Suite 710
Greenbelt, MD 2070
(301) 821-0855

July 7, 2020

## Appendix Index

Judgment (S.D. Ind. Mar. 20, 2020)……………………………………………………APP.1

Order Denying § 2241 Petition (S.D. Ind. Mar. 20, 2020)…………………………..APP.3

Order Denying Motion to Alter or Amend (S.D. Ind. June 26, 2020)…………...APP.11

Opinion and Order Staying Execution of Daniel Lewis Lee
    (S.D. Ind. Dec. 5, 2019)……………………………………………………………..APP.16

Order Vacating Stay of Execution (7th Cir. Dec. 6, 2019)…………………………...APP.42

28 U.S.C. § 2241……………………………………………………………………………APP.45

28 U.S.C. § 2255……………………………………………………………………………APP.47

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| DANIEL LEWIS LEE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 2:19-cv-00468-JPH-DLP |
| | ) | |
| WARDEN USP TERRE HAUTE, et al. | ) | |
| | ) | |
| Respondents. | ) | |

**FINAL JUDGMENT**

The Court now enters final judgment.  Petitioner's petition for writ of

habeas corpus is denied and the action is dismissed with prejudice.

Date: 3/20/2020

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Laura Briggs, Clerk of Court

By: _Pam Pope_
Deputy Clerk

Distribution:

Michael Scott Gordon
US Attorney's Office - Eastern District of Arkansas
michael.gordon@usdoj.gov

George Gust Kouros
FEDERAL CAPITAL HABEAS PROJECT
george_kouros@fd.org

APP.1

APP.2

Morris H. Moon
FEDERAL CAPITAL HABEAS PROJECT
Morris_Moon@fd.org

John M. Pellettieri
U.S. DEPARTMENT OF JUSTICE
john.pellettieri@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

DANIEL LEWIS LEE,                        )
                                         )
            Petitioner,                  )
                                         )
      v.                                 )      No. 2:19-cv-00468-JPH-DLP
                                         )
WARDEN USP TERRE HAUTE, et al.           )
                                         )
            Respondents.                 )

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

Daniel Lewis Lee is a federal prisoner on death row at the United States Penitentiary in Terre Haute, Indiana. He was sentenced to death 20 years ago in the United States District Court for the Eastern District of Arkansas after a jury found him guilty of murdering a gun dealer and the gun dealer's family to steal money and guns. The conviction and sentence were affirmed on direct appeal and multiple requests for post-conviction relief were denied by the United States Court of Appeals for the Eighth Circuit.

Mr. Lee seeks relief from this Court by way of a 28 U.S.C. § 2241 petition. Mr. Lee first argues that his counsel was ineffective during the penalty phase of his trial in violation of his Sixth Amendment rights. Mr. Lee next argues that newly discovered evidence shows that the United States violated his due process rights when it suppressed material evidence and misled the jury regarding the nature of a prior conviction in Oklahoma. This Court stayed Mr. Lee's execution pending resolution of this action, but the Seventh Circuit granted the United States' motion to vacate the stay.

APP.3

Based on that decision, Mr. Lee's claims cannot proceed in this § 2241 action. The Court thus **denies** the petition for a writ of habeas corpus without reaching the merits of the claims presented.

## I.

In its Order staying Mr. Lee's execution, the Court set forth the procedural background of Mr. Lee's conviction and challenges thereto. *See* Dkt. 27 at 2-5. The Court incorporates by reference that background here, including that Mr. Lee previously attempted to raise his current claims in his court of conviction and in the Eighth Circuit.

First, Mr. Lee raised his ineffective assistance claim via a Rule 60(b) motion in his 28 U.S.C. § 2255 proceeding. The District Court denied the motion, and the Eighth Circuit affirmed. *See United States v. Lee*, 2014 WL 1093197 (E.D. Ark. Mar. 18, 2014); *United States v. Lee*, 792 F.3d 1021 (8th Cir. 2015).

Second, Mr. Lee raised his due process claims in another 28 U.S.C. § 2255 proceeding. The District Court denied the motion as an unauthorized second or successive § 2255 motion, and the Eighth Circuit denied a certificate of appealability. *See United States v. Lee*, No. 4:97-cr-00243-KGB, Dkt. 1313 (E.D. Ark.); *Lee v. United States*, No. 19-2432 (8th Cir. Nov. 4, 2019).

## II.

Mr. Lee's § 2241 petition raises two claims. First, he argues that trial counsel provided ineffective assistance by failing to use available evidence to challenge the results of the Hare Psychopathy Checklist-Revised ("PCL-R") that was offered by the United States in support of an aggravating factor during the

APP.4

penalty phase.  Dkt. 1 at 11-46.  The United States relied upon the PCL-R to demonstrate, among other things, that Mr. Lee presents a risk of future dangerousness.  Dkt. 1 at 11-46.

Second, Mr. Lee advances two related due process claims under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959).[1] The due process claims focus on the degree of Mr. Lee's involvement in the murder of Joseph Wavra in Oklahoma when Mr. Lee was seventeen years old.  In support of its position that Mr. Lee presented a risk of future dangerousness and deserved the death penalty, the United States argued that Mr. Lee was responsible for Mr. Wavra's murder.  Mr. Lee maintains that the United States violated *Brady* and *Napue* when it suppressed exculpatory evidence regarding Mr. Wavra's murder and presented evidence that created a false impression for why Mr. Lee was not prosecuted for Mr. Wavra's murder.  Dkt. 1 at 46-68.

The United States argues that the Court cannot reach the merits of these claims because Mr. Lee cannot raise them in a § 2241 petition.  Dkt. 14.  Mr. Lee disagrees.  In the end, the Court concludes that Mr. Lee's claims cannot proceed in this § 2241 action and thus denies the petition without reaching the merits of the claims presented.

---

[1] In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  "*Napue* [*v. Illinois*, 360 U.S. 264 (1959)] and *Giglio* hold that a prosecutor may not offer testimony that the prosecutor knows to be false."  *Bland v. Hardy*, 672 F.3d 445, 447 (7th Cir. 2012).

Whether Mr. Lee can bring his claims via § 2241 depends on whether he meets the requirements of 28 U.S.C. § 2255(e)—commonly referred to as the Savings Clause.  *See Webster v. Daniels*, 784 F.3d 1123, 1135 (7th Cir. 2015) (en banc).  The Savings Clause permits claims to proceed in a § 2241 petition if a petitioner can show that "the remedy by [§ 2255] motion is inadequate or ineffective to test the legality of his detention."  28 U.S.C. § 2255(e).  The legal standards governing the Savings Clause determination are set forth in the Court's Order staying Mr. Lee's execution and its recent decision in *Purkey v. United States*, No. 2:19-cv-00414-JPH-DLP (S.D. Ind. Nov. 20, 2019), Dkt. 76 at 8-15.  Those legal standards are incorporated here by reference.  *See* Dkt. 27 at 9-11; *Purkey*, No. 2:19-cv-00414-JPH-DLP, Dkt. 76 at 8-15.

Here, neither of Mr. Lee's claims meet the Savings Clause.  Mr. Lee's ineffective assistance claim is—for purposes of the Savings Clause analysis— essentially identical to a claim addressed in *Purkey*.  Like Mr. Lee, Mr. Purkey sought to bring ineffective assistance of trial counsel claims in his § 2241.  Mr. Purkey relied on similar legal arguments for why his ineffective assistance claims meet the Savings Clause.  Notably, both Mr. Lee and Mr. Purkey take the position that the *Martinez-Trevino* doctrine, as extended in *Ramirez v. United States*, 799 F.3d 845 (7th Cir. 2015),[2] permits them to raise ineffective assistance claims in a § 2241 petition.

[2] *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), establish an opportunity for 28 U.S.C. § 2254 petitioners challenging state court judgments from some states to argue ineffective assistance of post-conviction counsel as cause to excuse procedural default of their ineffective assistance of trial counsel claims.  *Ramirez* extended *Martinez* and *Trevino* to

The Court rejected this and other of Mr. Purkey's arguments, concluding that his ineffective assistance claim did not meet the Savings Clause.  The Court explained that neither the *Martinez-Trevino* doctrine nor *Ramirez* involve the Savings Clause question, and that *Ramirez* has subsequently been narrowly construed by the Seventh Circuit.  *See Purkey*, No. 2:19-cv-00414-JPH-DLP, Dkt. 76 at 21-23.  These factors led the Court to conclude that the Seventh Circuit would likely not expand *Ramirez,* thus requiring the Court to decline to do so.

The Court further reasoned that permitting ineffective assistance claims to proceed in § 2241 actions would run counter to both Seventh Circuit precedent and the statutory framework established in § 2255, which sought to steer almost all post-conviction proceedings away from § 2241.  *Id.* at 23-27; *see id.* at 27 ("[U]nlike the relatively narrow categories of claims [the Seventh Circuit has] allowed to proceed [in § 2241 petitions], ineffective assistance of trial claims are ubiquitous.").  The Seventh Circuit set forth similar reasoning in reversing this Court's Order staying Mr. Lee's execution.  *See Lee v. Watson*, 2019 WL 6718924, *1 (7th Cir. Dec. 6, 2019) (stating that Mr. Lee's likelihood of success is "slim" because ineffective assistance claims "are regularly . . . resolved under § 2255").  For this reason and those set forth in *Purkey,* the Court concludes that Mr. Lee's ineffective assistance claim does not meet the Savings Clause and thus cannot proceed in this § 2241 action.

28 U.S.C. § 2255 proceedings, allowing a petitioner to challenge § 2255 counsel's effectiveness in a Rule 60(b) motion. 790 F.3d at 854.

APP.7

Mr. Lee's due process claims similarly do not meet the Savings Clause. The Court previously concluded that Mr. Lee's due process claims likely meet the Savings Clause. Dkt. 27 at 11-13. Among other things, the Court reasoned that "if Mr. Lee is correct that his [due process] claims rest on newly discovered evidence, he meets the core of the Savings Clause test as described by the Seventh Circuit," as he did not have this evidence during his § 2255 proceedings and thus did not have "'an unobstructed procedural shot at getting his sentence vacated.'" *Id.* at 12 (quoting *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998)). The Court concluded that Mr. Lee had made a sufficient showing "that there is newly discovered evidence to support his [due process] claims and that there may be additional discoverable evidence to support them."[3]  *Id.* at 13.

The Seventh Circuit disagreed, concluding that Mr. Lee's likelihood of meeting the Savings Clause is "slim." *Lee*, 2019 WL 6718924, at *1. The Seventh Circuit reasoned that claims like Mr. Lee's "are regularly made and resolved under § 2255," thus it is unlikely that § 2255 is inadequate or ineffective. *Id.* The Seventh Circuit further noted that *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (en banc), held that "§ 2255 may be deemed inadequate or ineffective if the provision for successive collateral attacks in § 2255(h) does not permit a prisoner to present factual developments that could not have been litigated earlier." *Lee*, 2019 WL 6718924, at *1. The Seventh Circuit concluded that the evidence Mr. Lee designates as "newly discovered" is not so within the meaning

---

[3] The Court emphasized that while it was unclear whether Mr. Lee could ultimately demonstrate that the evidence was "newly discovered", that determination "should be made on a fully developed record." Dkt. 27 at 13.

of *Webster.*   Because Mr. Lee was aware of it, the court reasoned, the evidence was not "concealed or unavailable."   *Id.*; *see id.* (noting that evidence is not newly discovered under *Webster* "if the defense could have accessed it with due diligence.").

Although the Seventh Circuit's order in *Lee* did not hold that Mr. Lee's due process claims do not meet the Savings Clause, it provided specific reasons why those claims were not likely to succeed.   *Id.*   This Court therefore reads the Seventh Circuit's decision in *Lee* as having considered and rejected the several reasons cited by this Court for granting the stay.[4]   Those reasons—now foreclosed—are the only reasons that could support a conclusion that the Savings Clause is met.   Thus, based on the Seventh Circuit's order in *Lee*, the Court concludes that Mr. Lee's due process claims do not meet the Savings Clause and thus cannot proceed in this § 2241 action.

### III.

The claims Mr. Lee presents in his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 are barred by the Savings Clause, 28 U.S.C. § 2255(e).   His petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 is **denied**, and this action is dismissed with prejudice.

Because the Court has concluded that Mr. Lee's claims are barred by the Savings Clause, his pending motions for oral argument, dkt. [16], to stay this

---

[4] For example, in its order granting a stay, this Court reasoned that Mr. Lee had shown that discovery might uncover additional evidence to support his position that his due process claims meet the Savings Clause and have merit.   *See* Dkt. 27 at 12-13.   The Seventh Circuit's decision rejected this premise.

APP.9

action, dkt. [17], and for discovery, dkt. [18], are **denied**.   Final Judgment

consistent with this Order shall issue.

**SO ORDERED.**

Date: 3/20/2020

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Michael Scott Gordon
US Attorney's Office - Eastern District of Arkansas
michael.gordon@usdoj.gov

George Gust Kouros
FEDERAL CAPITAL HABEAS PROJECT
george_kouros@fd.org

Morris H. Moon
FEDERAL CAPITAL HABEAS PROJECT
Morris_Moon@fd.org

John M. Pellettieri
U.S. DEPARTMENT OF JUSTICE
john.pellettieri@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| DANIEL LEWIS LEE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 2:19-cv-00468-JPH-DLP |
| | ) | |
| WARDEN USP TERRE HAUTE, et al. | ) | |
| | ) | |
| Respondents. | ) | |

## ORDER DENYING MOTION TO ALTER OR AMEND JUDGMENT

Daniel Lewis Lee filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 challenging his death sentence. This Court entered an order staying Mr. Lee's execution. The Seventh Circuit vacated that order and on remand, this Court denied Mr. Lee's § 2241 petition, holding that his claims are barred by 28 U.S.C. § 2255(e). Mr. Lee filed a Rule 59(e) motion to alter or amend judgment, and the motion is fully briefed. For the reasons that follow, Mr. Lee's motion is denied.[1]

To obtain relief under Rule 59(e), a movant must show "(1) that the court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded entry of judgment." *Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012). Mr. Lee argues that the Court committed manifest errors of law and fact by (1) concluding that his claim for relief was foreclosed by the Seventh Circuit's order vacating the stay; (2) conflating the legal standard for evaluating a motion for a stay of execution with the legal standard for evaluating

---

[1] The government has reset Mr. Lee's execution date for July 13, 2020. Dkt. 43.

the merits of his petition; (3) denying him the ability to conduct discovery; (4) finding that his ineffective assistance of counsel claim could not proceed under Section 2241; and (5) failing to consider all of his arguments and claims.

Mr. Lee first argues that the Court erred in denying his § 2241 petition without authorizing discovery on the question of whether his *Napue* and *Brady* claims satisfy the § 2255(e) exception outlined in *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (en banc). Dkt. 37 at 2–10. He contends that the Court applied the wrong legal standard and misunderstood the Seventh Circuit's order vacating the stay.

To satisfy the § 2255(e) savings clause using the path outlined in *Webster*, a petitioner must proffer newly discovered evidence. 784 F.3d at 1140. Mr. Lee sought to discover allegedly suppressed evidence that would allow him to satisfy § 2255(e), which in turn would enable the Court to consider the merits of his § 2241 petition. Dkt. 37 at 11 ("Mr. Lee has asserted that the Government suppressed—*and continues to suppress*—evidence in its possession showing that it knew the details of the actual resolution of the Oklahoma case and that the details of that resolution contain exculpatory information."). Mr. Lee argues that this Court and the Seventh Circuit missed the point and mistakenly believed his argument to be that the fee petition was the only newly discovered evidence.

But the Court understood Mr. Lee's position. *See* dkt. 27 at 18 (opinion and order staying execution) ("Mr. Lee responds that the information surrounding Mr. Lee's guilty plea to the robbery charge, rather than the fee application, is the *Brady* material. In other words, Mr. Lee says the fee

APP.12

application is only *evidence of* a *Brady* violation."). The Seventh Circuit similarly considered and rejected Mr. Lee's argument. There is no indication that the panel did not understand or ignored this argument. The Seventh Circuit found that the fee application cannot be considered "newly discovered" evidence under *Webster*. *Lee v. Watson*, 2019 WL 6718924, at *1 (7th Cir. Dec. 6, 2019). *Id.* With due diligence, counsel could have accessed the fee application and used it in Mr. Lee's original § 2255 motion to bring *Brady* and *Napue* claims and to seek the discovery that he now seeks in this § 2241 action. Because the fee application was not concealed or unavailable, Mr. Lee cannot rely on it to satisfy § 2255(e)'s savings clause and litigate a § 2241 action to pursue other evidence that he believes the government to possess, dkt. 37 at 11.

Mr. Lee also takes issue with the Seventh Circuit's application of the due diligence standard, dkt. 37 at 13–15, but this Court is bound by the Seventh Circuit with respect to this legal question. And Mr. Lee has not shown that this Court committed a manifest error in applying the due diligence standard articulated by the Seventh Circuit in assessing whether his evidence was "newly discovered" under *Webster. See* dkt. 35 at 7 ("[E]vidence is not newly discovered under *Webster* 'if the defense could have accessed it with due diligence.'" (quoting *Lee*, 2019 WL 6718924, at *1)).

Unlike *Webster*, where new counsel uncovered and identified previously unavailable evidence in the form of records, 784 F.3d at 1132, Mr. Lee argues that there *may* exist some type of previously undisclosed evidence. Because § 2255 gave Mr. Lee a viable route to discovery of the evidence sought by his

petition, he cannot show that § 2255 was "inadequate or ineffective" or that the Court committed manifest error by denying his *Brady* and *Napue* claims on § 2255(e) grounds.

Mr. Lee further argues that the Court committed manifest error when it denied his ineffective assistance of counsel claim. The Seventh Circuit has extended *Martinez v. Ryan*, 566 U.S. 1 (2012), to allow a federal prisoner to argue in a Rule 60(b) motion that § 2255 counsel's ineffectiveness prevented the prisoner from properly litigating trial counsel's effectiveness. *Ramirez v. United States*, 799 F.3d 845, 854 (7th Cir. 2015). But neither the Seventh Circuit nor the Supreme Court has held that a federal prisoner may rely on § 2255 counsel's ineffectiveness to satisfy § 2255(e)'s savings clause. While the Seventh Circuit is now considering that question, *see* dkt. 44-1 (transcripts of oral argument in *Purkey v. United States*, No. 19-3318 (7th Cir.)), under existing law Mr. Lee cannot show manifest error in the Court's holding that § 2255(e) bars his ineffective assistance claim. *Purkey v. United States*, No. 2:19-cv-00414, dkt. 76 (Nov. 20, 2019) (collecting cases where courts considered and rejected the argument that ineffective assistance of trial counsel claims relying on *Martinez-Trevino* meet the Savings Clause).

Mr. Lee's last argument is that the Court erred in not addressing his claim that applying § 2255(e) to bar his § 2241 petition would result in an unconstitutional suspension of the writ of habeas corpus. Dkt. 37 at 18–19. The Seventh Circuit has defined the scope of § 2255(e)'s savings clause to avoid violation of the Constitution's Suspension Clause. *See Worman v. Entzel*, 953

APP.14

F.3d 1004, 1008 (7th Cir. 2020); *cf. Webster*, 784 F.3d at 1152 (Easterbrook, J., dissenting) (citing *United States v. Hayman*, 342 U.S. 205 (1952)) (noting that "if some application of § 2255 would conflict with the Suspension Clause, a district court could [use § 2255(e)] to proceed under § 2241 without any need to hold § 2255 unconstitutional"). The Court now makes explicit what was implicit in its order denying relief: application of § 2255(e) to bar Mr. Lee's petition does not violate the Suspension Clause.

Because Mr. Lee has failed to show that the Court's order denying relief rests on a manifest error of law or fact, his motion to alter or amend judgment, dkt. [37], is **DENIED**.

**SO ORDERED.**

Date: 6/26/2020

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Michael Scott Gordon
US Attorney's Office - Eastern District of Arkansas
michael.gordon@usdoj.gov

George Gust Kouros
FEDERAL CAPITAL HABEAS PROJECT
george_kouros@fd.org

Morris H. Moon
FEDERAL CAPITAL HABEAS PROJECT
Morris_Moon@fd.org

John M. Pellettieri
U.S. DEPARTMENT OF JUSTICE
john.pellettieri@usdoj.gov

APP.15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

DANIEL LEWIS LEE,                          )
                                           )
                    Petitioner,            )
                                           )
           v.                              )      No. 2:19-cv-00468-JPH-DLP
                                           )
WARDEN  USP TERRE HAUTE, et al.            )
                                           )
                    Respondents.           )

**OPINION AND ORDER STAYING EXECUTION OF DANIEL LEWIS LEE**

Daniel Lewis Lee is a federal prisoner on death row at the United States Penitentiary in Terre Haute, Indiana.  He was sentenced to death 20 years ago in the United States District Court for the Eastern District of Arkansas after a jury found him guilty of murdering a gun dealer and the gun dealer's family to steal money and guns.  The conviction and sentence were affirmed on direct appeal.  Mr. Lee sought postconviction relief under 28 U.S.C. § 2255 in the district court where he was convicted and sentenced.  That request was denied by the district court and the court of appeals affirmed.  Mr. Lee filed further § 2255 motions challenging his death sentence in the district court of conviction, but those challenges were denied on procedural grounds.

Mr. Lee now seeks relief from this Court by way of a 28 U.S.C. § 2241 petition alleging ineffective assistance of counsel and newly discovered evidence as the basis for the relief sought.  Mr. Lee first argues that his trial counsel was ineffective during the penalty phase of his trial in violation of his Sixth Amendment rights.  Mr. Lee next argues that newly discovered evidence shows

APP.16

that the United States violated his due process rights when it suppressed material evidence and misled the jury regarding the nature of a prior conviction. Mr. Lee seeks a stay of his execution and asks the Court to authorize him to conduct discovery.

Mr. Lee is entitled to a stay of his execution based on his due process claims.[1] While further factual development is needed for the Court to be able to resolve the claims presented in Mr. Lee's petition, he has shown there is a significant possibility that he can bring these claims in a § 2241 action and substantial grounds for the claims. The other factors necessary to obtain a stay also weigh in Mr. Lee's favor. Accordingly, Mr. Lee's execution is stayed until further order of this Court.

## I.

The following procedural background focuses on the facts relevant to Mr. Lee's due process claims.[2]

### A.  The Indictment and Trial

Mr. Lee and his co-defendant Chevie Kehoe were indicted in the United States District Court for the Eastern District of Arkansas. *See United States v. Lee*, No. 4:97-cr-00243-KGB-2 (E.D. Ark. Dec. 12, 1997), Dkt. 1. They were tried

---

[1] The Court does not address or need to reach whether Mr. Lee's ineffective assistance claim warrants a stay.

[2] A complete recitation of the facts and procedural background can be found in the opinions issued by the United States Court of Appeals for the Eighth Circuit following Mr. Lee's appeals. *See United States v. Lee*, 274 F.3d 485 (8th Cir. 2001) ("*Lee I*"); *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004) ("*Lee II*"); *United States v. Lee*, 715 F.3d 215 (8th Cir. 2013) ("*Lee III*"); *United States v. Lee*, 792 F.3d 1021 (8th Cir. 2015) ("*Lee IV*").

together and, following a two-month trial, the jury found both guilty of capital murder and racketeering. *Lee II*, 374 F.3d at 643. Mr. Lee and Mr. Kehoe each had a separate trial at the penalty phase.

Mr. Kehoe's penalty phase trial was first, and the jury returned a verdict of life in prison without the possibility of release. *Lee I*, 274 F.3d at 488. The United States informed the District Court that, given this decision, it did not intend to continue pursuing the death penalty for Mr. Lee. *Id.* As later explained by the District Judge, "[t]here was no question that Kehoe was the more culpable of the two with regard to the criminal acts charged in the indictment and proved at trial." Dkt. 1-2 at 3. But the Attorney General denied the United States Attorney's request to withdraw the death penalty with respect to Mr. Lee, *Lee I*, 274 F.3d at 488, so Mr. Lee's penalty phase proceeded. The jury found that the United States established four of the five aggravating factors it presented, Dkt. 1-10 at 5-8, and one or more jurors found that Mr. Lee established five of the fourteen mitigating factors he presented, *id.* at 9-10. The jury returned a verdict of death on May 14, 1999. *Lee I*, 274 F.3d at 488.

**B. Mr. Lee's Appeals and Collateral Attacks on His Conviction and Sentence**

Mr. Lee's conviction and sentence were affirmed on direct appeal. *Lee II*, 374 F.3d at 643. He then filed a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 in the United States District Court for the Eastern District of Arkansas. That motion was denied, and the Eighth Circuit affirmed. *See Lee III*, 715 F.3d at 217; *United States v. Lee*, 2008 WL 4079315 (E.D. Ark.

Aug. 28, 2008).  Mr. Lee's Rule 60(b) motion was also denied, and the Eighth Circuit affirmed that decision as well.  *Lee IV*, 792 F.3d at 1022; *United States v. Lee*, 2014 WL 1093197, *5-6 (E.D. Ark. Mar. 18, 2014).

On September 10, 2018, Mr. Lee filed another § 2255 motion in the District Court.  *United States v. Lee*, No. 4:97-cr-00243-KGB, Dkt. 1297 (E.D. Ark. Sept. 10, 2018).  He argued that newly discovered evidence revealed that his due process rights as set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959) (the "*Brady* and *Napue* claims") were violated during the penalty phase of his trial.  These are the claims that Mr. Lee now raises in his § 2241 petition before this Court.  Neither claim was raised at the sentencing phase of his trial or in his first § 2255 petition.

On February 26, 2019, the District Court denied the September 2018 § 2255 motion as an unauthorized successive § 2255 motion and denied Mr. Lee a certificate of appealability.  *Lee,* No. 4:97-cr-00243-KGB, Dkt. 1313.  The District Court held that another § 2255 motion raising material *Brady* claims constitutes a "second or successive" § 2255 motion, and thus Mr. Lee could not proceed without authorization from the Eighth Circuit.  *Id.* at 14-17.  The parties agree that § 2255(h) does not allow Mr. Lee to obtain this authorization.  While Mr. Lee's § 2255 motion was not allowed to proceed, the District Court found that the newly discovered evidence was material, specifically stating that had the evidence been disclosed at trial "it is reasonably likely that . . . the outcome at sentencing would have been different."  *Id.* at 14.

On July 25, 2019—while Mr. Lee's request for a certificate of appealability was pending before the Eighth Circuit—the Department of Justice set Mr. Lee's execution date for December 9, 2019.  On November 4, 2019, the Eighth Circuit denied Mr. Lee's request for a certificate of appealability.  *Lee v. United States*, No. 19-2432 (8th Cir. Nov. 4, 2019).  Judge Kelly dissented, arguing that reasonable jurists could disagree regarding whether a material *Brady* claim in a second § 2255 motion qualifies as an impermissible second or successive § 2255 motion.  *Id.* at 1-2.

### C.  Mr. Lee's Petition in this Case

Mr. Lee filed the habeas petition in this case under 28 U.S.C. § 2241 on September 26, 2019.  Mr. Lee moved to stay his execution on November 8, 2019, the same day his habeas petition was fully briefed.  Mr. Lee's discovery motion— seeking to conduct additional discovery to support both of his claims—remains pending.

### II.

This case's procedural posture is unique because Mr. Lee is a plaintiff in a case pending in the United States District Court for the District of Columbia (the "Execution Protocol Litigation").  On November 20, 2019, while the stay request was pending in this case, the United States District Court for the District of Columbia stayed Mr. Lee's execution.  *See In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145-TSC (D.D.C. Nov. 20,

2019), Dkt. 50, Dkt. 51.[3]   Mr. Lee then moved to withdraw his motion to stay his execution in this Court.  Dkt. 22.

The United States has appealed the stay entered in the Execution Protocol Litigation.  *Id.*, Dkt. 52.  The appeal is pending before the United States Court of Appeals for the District of Columbia Circuit.  *See In re FBOP Execution Protocol Cases*, No. 19-5322 (D.C. Cir. Nov. 22, 2019).  The United States' request to vacate the stay issued in the Execution Protocol Litigation is pending before the United States Supreme Court.  *See Barr, et al. v. Roane, et al.*, No. 19A615 (Dec. 2, 2019).

It is not known at this time whether the stay issued by the District Court in the District of Columbia will stand or be vacated.  But Mr. Lee's motion for a stay in this case is fully briefed, and considerations of the orderly administration of justice make it appropriate for the Court to rule at this time on Mr. Lee's motion for a stay.

**III.**

The standards governing preliminary injunctions apply to motions to stay executions in habeas proceedings.  *See Williams v. Chrans*, 50 F.3d 1358, 1360 (7th Cir. 1995) ("The law governing stays of death sentences is, in general, the same as that employed in other situations.").  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

---

[3] The Execution Protocol Litigation is a civil rights action involving Mr. Lee's and several other federal death row inmates' challenges to the federal execution protocol.  It has been ongoing since 2005.

balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Hill v. McDonough*, 547 U.S. 573, 584 (2006).  Additionally, the Court must consider "the extent to which the inmate has delayed unnecessarily in bringing the claim." *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004); *see Lambert v. Buss*, 498 F.3d 446, 451 (7th Cir. 2007).

In the death penalty context, a stay is warranted only upon "a showing of a significant possibility of success on the merits." *Hill*, 547 U.S. at 584.  When, as here, a habeas petition is not a prisoner's first, a stay of execution "should be granted only when there are 'substantial grounds upon which relief might be granted.'"  *Garza v. Lappin*, 253 F.3d 918, 920-21 (7th Cir. 2001) (applying this standard to a § 2241 petition).

### A.   Mr. Lee has Shown a Significant Possibility of Success on the Merits of his *Brady* and *Napue* Claims

The Court begins with the factual background necessary to understand Mr. Lee's *Brady* and *Napue* claims.  The District Court of conviction summarized the background of Mr. Lee's *Brady* and *Napue* claims before ruling that it could not reach the merits:

> To justify a death sentence for Lee when Kehoe had been sentenced to life imprisonment, the Government's penalty-phase case emphasized the future-dangerousness aggravator. The Government argued that Lee's past conduct showed that he was violent and volatile, and that he would present a danger in prison. Focusing on the Wavra murder, the Government introduced evidence showing Lee's role in that crime. Brian Compton, who was at the party when Wavra was killed by John David Patton, testified about Lee's involvement; the transcript of Lee's testimony at John David Patton's Oklahoma preliminary hearing was read aloud; and the responding

APP.22

Oklahoma detective and the forensic pathologist described Wavra's wounds and cause of death. The jury heard that, at a social gathering in 1990, Lee, then age seventeen, and his cousin, John David Patton, beat Wavra and forced him down a manhole into a storm sewer; that Patton went down into the manhole with Wavra, while Lee retrieved a plastic bag, rope, and knife that he handed down to Patton; that Patton handed Wavra's clothes up to Lee, who put them in the plastic bag; and that Patton then used the knife to repeatedly stab Wavra and slit his throat. Patton was convicted of first-degree murder in an Oklahoma state court, while Lee pled to deferred adjudication on a robbery charge. Other future-dangerousness evidence included (1) Lee's threatening behavior toward a sheriff's deputy, while he was in jail awaiting trial, and (2) a 1995 Florida conviction for carrying a concealed weapon.

In both opening and closing argument, the Government told the jury that Lee "has an earlier murder under his belt." It argued that, even though Patton "wielded that knife," Lee helped him by giving him the knife and rope. The Government argued Lee knew what he was doing when he gave the knife to Patton, and that he both "legally and morally" had "the blood of Joey Wavra" on his hands. The Government contended the robbery plea offer was a "gift" from the Oklahoma prosecutor and an "incredible deal" – and a missed opportunity for Lee to turn his life around. . . .

Both [the District Judge who presided over Mr. Lee's trial] and the Eighth Circuit recognized the Wavra evidence as an integral piece of the Government's penalty-phase case. In finding that Lee was not unfairly prejudiced by expert testimony and then reinstating the death penalty, the Eighth Circuit noted that, "none of the evidence elicited from Dr. Cunningham was likely to inflame the jury as much as testimony about Lee's involvement in the murder of Joey Wavra, which had been part of the government's case." *Lee*, 274 F.3d at 494. Similarly, in rejecting Lee's argument that his trial lawyers should have done more to investigate the Wavra murder, [the District Court] acknowledged evidence of Lee's participation in that crime was "powerful and likely contributed to or influenced the jury's ultimate decision" in favor of a death sentence. *Lee*, 2008 WL 4079315, at *45.

*Lee,* No. 4:97-cr-00243-KGB, Dkt. 1313 at 7-9 (citations omitted).

For his *Brady* claim, Mr. Lee contends that the United States suppressed

exculpatory evidence regarding the legal proceedings associated with Mr.

Wavra's murder.  For his *Napue* claim, he contends that in the penalty phase of his trial the United States created a false impression to the jury regarding his conviction associated with Mr. Wavra's murder.  In support of these claims, Mr. Lee presents as evidence, among other things, a fee application from the defense attorney who represented Mr. Lee during the Oklahoma state court proceedings, including the preliminary hearing on the murder charge.  The fee application states: "The matter came on for hearing before Judge Hall; District Attorney called witness; hearing held; Court finds crime of Murder I not established by evidence; Court recommends a Dismissal of Murder I charges and State consider refiling on charge of Robbery I."  Dkt. 1-13 at 3.  Mr. Lee contends the United States withheld evidence that the murder charge was dropped due to a lack of probable cause and falsely told the jury that Mr. Lee was "legally" responsible for Mr. Wavra's murder.

Because Mr. Lee brings his claims in a § 2241 petition, the Court must first determine whether his claims can pass through the Savings Clause and then evaluate whether he has a significant possibility of success on the merits of his *Brady* and *Napue* claims.  *Garza*, 253 F.3d at 920 (cautioning courts not to conflate the two questions).  Although these inquiries somewhat overlap in this case, they are distinct.  *Id.* at 923.  The Court addresses each question in turn.

1.      Availability of § 2241[4]

---

[4] The undersigned recently confronted similar issues in *Purkey v. United States*, No. 2:19-cv-00414-JPH-DLP (S.D. Ind. Nov. 20, 2019).  *Purkey* also involved a federal death row inmate with an upcoming execution date who sought to raise constitutional claims via § 2241.  Ultimately, the Court rejected Mr. Purkey's

"As a general rule, a federal prisoner wishing to collaterally attack his conviction or sentence must do so under § 2255." *Chazen v. Marske*, 938 F.3d 851, 856 (7th Cir. 2019).   But Congress created the Savings Clause within § 2255 as a narrow exception to the "general rule" that requires a federal prisoner to bring a collateral attack under § 2255. Determining whether the Savings Clause is met is a "very knotty procedural issue" of "staggering" complexity. *Chazen*, 938 F.3d at 855-56.   While it is "hard to identify exactly what [the Savings Clause] requires," *id.* at 863 (Barrett, J., concurring), several guiding principles have emerged from the Seventh Circuit.

Under the Savings Clause, a prisoner can seek a writ of habeas corpus through an action under § 2241 if the prisoner can show "that the remedy by [§ 2255] motion is inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e).   "Only in rare circumstances" is the Savings Clause met. *Light v. Caraway*, 761 F.3d 809, 812 (7th Cir. 2014) (citations and quotations omitted).   Section 2255 is inadequate or ineffective in a specific case only when there is "some kind of structural problem with section 2255." *Webster*, 784 F.3d at 1136.  A structural problem requires "something more than a lack of success with a section 2255 motion."  *Id.*  It must "foreclose[] even one round of effective collateral review, unrelated to the petitioner's own mistakes." *Poe v. LaRiva*, 834 F.3d 770, 773 (7th Cir. 2016) (citation and quotation omitted).   At bottom, the Savings Clause is met when a structural problem with § 2255 prevented a federal

arguments, concluding that none of his claims could be brought in a § 2241 petition, and denied his petition.  *See id.*, Dkt. 76.

prisoner from having "'a reasonable opportunity [in a prior § 2255 proceeding] to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence.'" *Chazen*, 938 F.3d at 856 (alteration in original) (quoting *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998)); *see Davenport*, 147 F.3d at 609 (suggesting that § 2255 is inadequate or ineffective if the prisoner did not have "an unobstructed procedural shot at getting his sentence vacated").

There is a significant possibility that Mr. Lee has met this standard. First, in all three circumstances where the Seventh Circuit has found the Savings Clause met—*Davenport*, *Garza*, and *Webster*—it recognized that § 2241 is available to challenge the "fundamental legality" of a sentence, not just a conviction. *See Webster*, 784 F.3d at 1136 (discussing this holding in *Davenport* and *Garza*). Mr. Lee seeks to challenge the fundamental legality of his death sentence.

Second, as in *Webster*, Mr. Lee purports to rely on newly discovered evidence to show that his death sentence is unconstitutional. *Webster* suggests that the structure of § 2255 generally, and the language of the Savings Clause in particular, encompasses such claims, especially since § 2255(h) does not authorize raising such a claim in a second or successive § 2255 motion. *See Webster*, 784 F.3d at 1138. If principles of statutory interpretation alone do not lead to this conclusion, *Webster* instructs that the "next step would be to take into account the fact that a core purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence," which is what Mr. Lee attempts to show here. *Id.* at 1139.

APP.26

Third, and most importantly, if Mr. Lee is correct that his *Brady* and *Napue* claims rest on newly discovered evidence, he meets the core of the Savings Clause test as described by the Seventh Circuit.  Mr. Lee could not have raised these claims until the evidence was discovered, which he says was not until after his initial § 2255 proceedings had concluded.  His initial § 2255 thus did not present him with a "'reasonable opportunity . . . to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence,'" *Chazen*, 938 F.3d at 856 (quoting *Davenport*, 147 F.3d at 609), or "an unobstructed procedural shot at getting his sentence vacated," *Davenport*, 147 F.3d at 609, based on these claims.  Moreover, an opportunity to pursue these claims is not available in the District Court of conviction.  His attempts to raise his *Brady* and *Napue* claims in that court were already denied on procedural grounds, and § 2255(h) forecloses any further attempts to pursue them there. *See Lee v. United States*, No. 19-2432 (8th Cir. Nov. 4, 2019); *Lee,* No. 4:97-cr-00243-KGB, Dkt. 1313.

Applied to the facts presented in this case, the structure of § 2255 prevents the District Court of conviction from hearing a claim based on newly discovered evidence that the United States suppressed evidence and misled the jury during Mr. Lee's penalty phase.  This could result in an unconstitutional death sentence.  These considerations constitute the "something more" necessary to meet the Savings Clause.  *Webster*, 784 F.3d at 1136.

While the parties vigorously dispute whether the evidence identified by Mr. Lee qualifies as "newly discovered", this only reinforces the need to stay Mr. Lee's

APP.27

execution and permit additional discovery.[5]  At this stage, Mr. Lee has shown there is a significant possibility that there is newly discovered evidence to support his claims and that there may be additional discoverable evidence to support them.  Whether Mr. Lee can ultimately prevail by demonstrating that the evidence exists and is newly discovered is a question for another day.  But that determination, particularly in a death penalty case, should be made on a fully developed record.  *See* Dkt. 14 at 72 (the United States agreeing that "the fee application does not exclude the possibility that the hearing took place as Lee imagines"); *id.* at 77 (the United States acknowledging that "it is not clear whether the [Oklahoma] court made that recommendation [to drop the murder charge] at the request or with the acquiescence of the prosecutors as a part of a negotiated plea disposition").

Granting Mr. Lee limited relief, that is, a stay of execution without ruling on the merits of his petition, is essentially what happened in *Webster*.  The Seventh Circuit held that Mr. Webster's claims were not "barred as a matter of law" by the Savings Clause, but it remanded to the District Court for further factual development to determine whether the Savings Clause was met.  *Webster*, 784 F.3d at 1145-46 (ordering the District Court to hold a hearing to determine whether certain facts are true that bear on whether the Savings Clause is met).

2.      *Brady* and *Napue* Claims

---

[5] Mr. Lee's motion for discovery is presently pending before the Court.  The Court will address this motion by separate order.

The Court turns next to whether there is a significant possibility that Mr. Lee will be able to prevail with his *Brady* and *Napue* claims.  Although *Brady* and *Napue* claims are distinct, they are related and thus discussed together.  *See Long v. Pfister*, 874 F.3d 544, 549 (7th Cir. 2017) (en banc) ("The *Napue-Giglio* rule is a cousin to the *Brady* doctrine.")  The Court begins by setting forth the legal standards governing these claims before discussing whether Mr. Lee has shown a significant possibility that they are meritorious.

The Supreme Court in *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87; *see Snow v. Pfister*, 880 F.3d 857, 867 (7th Cir. 2018) ("The failure to disclose [exculpatory] evidence is a violation of the accused's due process rights.").  To establish a *Brady* violation, a petitioner must show three things: "first, that the evidence at issue was favorable; second, that the evidence was suppressed; and third, that it was material to his defense."  *Socha v. Richardson*, 874 F.3d 983, 987 (7th Cir. 2017).

In *Giglio*, the Supreme Court "made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice."  405 U.S. at 153.  Relatedly, "*Napue* stands for the proposition that prosecutors may not suborn perjury, and holds that a defendant's due-process rights are violated when the government obtains a conviction through the knowing use of false testimony."  *United States v.*

*Hilliard*, 851 F.3d 768, 782 (7th Cir. 2017); *see Bland v. Hardy*, 672 F.3d 445, 447 (7th Cir. 2012) ("*Napue* and *Giglio* hold that a prosecutor may not offer testimony that the prosecutor knows to be false."). To establish a due-process violation under *Napue*, Mr. Lee must show "'(1) that there was false testimony; (2) that the government knew or should have known it was false; and (3) that there is a likelihood that the false testimony affected the judgment of the jury.'" *United States v. Cardena*, 842 F.3d 959, 976-77 (7th Cir. 2016) (quoting *United States v. Freeman*, 650 F.3d 673, 678 (7th Cir. 2011)). Together, the *Brady* and *Napue* doctrines are "two manifestations of the principle that prosecutors must expose material weaknesses in their positions." *Long*, 874 F.3d at 549.

Mr. Lee asserts that he made two separate *Brady* requests—one shortly after trial counsel was appointed and another after the United States moved to amend its notice of intent to seek a death sentence. The United States does not dispute this and responds that it complied with its obligations under *Brady*.

Mr. Lee argues that the United States violated *Brady* by not disclosing that the Oklahoma judge in the Wavra case found probable cause did not exist to support a murder charge against Mr. Lee. He argues that the United States then violated *Napue* by falsely stating to the jury that Mr. Lee was legally responsible for Mr. Wavra's murder and that his robbery plea was a gift from the Oklahoma prosecutor. Dkt. 1 at 46-64.

Some elements of Mr. Lee's *Brady* and *Napue* claims are readily met while others are not as clear. But at this juncture, Mr. Lee's obligation is not to

conclusively prove-up those claims. It is to show a significant possibility that he can do so.

    i.  Materiality and Favorability Elements

The District Court of conviction previously found that the *Brady* evidence was material (and thus favorable). *Lee,* No. 4:97-cr-00243-KGB, Dkt. 1313 at 14 ("[A]ssuming that the Oklahoma state court held at a preliminary hearing that the evidence was insufficient to establish probable cause that Lee was guilty of murdering Joey Wavra, that evidence is material. In light of the government's reliance on the Wavra murder during sentencing, it is reasonably likely that, if it had been discovered at trial that the Oklahoma court found the evidence insufficient to establish that Lee was guilty of murder, the outcome at sentencing would have been different."). The Court sees no basis to disagree with that finding at this stage of the proceedings.

As noted above, the Wavra murder was central to the United States' penalty-phase case. And it was at least part of the United States' argument for why Mr. Lee should be sentenced to death even after the jury had sentenced his more culpable co-defendant, Mr. Kehoe, to life. *See, e.g.,* Dkt. 14-6 at 9 (the United States arguing during closing that Mr. Lee's involvement in "the Joey Wavra murder . . . alone illustrates this drastic distinction on several levels between Danny Lee and Chevie Kehoe"); *id.* at 11 (the United States arguing during closing that Mr. Lee "has an earlier murder under his belt," which the jury "should consider in distinguishing Lee from Kehoe because Lee has been

here before").   There is thus a significant possibility Mr. Lee can establish the materiality and favorability elements of his *Brady* claim.

ii.  False Evidence that Affected the Judgment of Jury

Mr. Lee has also established a significant possibility that two of the *Napue* elements are met.   First, there is a significant possibility that Mr. Lee may be able to show that the United States misled the jury when it stated during the penalty phase that Mr. Lee was "legally" responsible for Mr. Wavra's murder and that his robbery plea was a "gift" from the Oklahoma prosecutor.   Dkt. 14-6 at 10 ("I would suggest to you both legally and morally the blood of Joey Wavra's hands is on Danny Lee."); Dkt. 14-2 at 45 ("[Mr. Lee] got a gift in [the Wavra] case from the prosecutors in Oklahoma.   They gave him a plea bargain.   And this allowed him to get off with just a robbery.").   The fee application alone—which suggests that an Oklahoma judge determined that probable cause did not exist to charge Mr. Lee with murder—casts significant doubt on whether these statements were true.   Second, for the same reasons the *Brady* materiality element is met, there is a significant possibility that Mr. Lee may be able to show that this narrative affected the judgment of the jury.

iii.  Was the Information Suppressed and Did the United States Knowingly Make False Statements

This leaves two intensely disputed issues: whether the United States suppressed information regarding the plea agreement (for the *Brady* claim) and whether the United States knew or should have known that the statements at issue were false (for the *Napue* claim).   Beginning with the former, the United

APP.32

States argues that this element cannot be met because publicly available information is not considered suppressed for purposes of a *Brady* claim, and the fee application was a "publicly-available document [that] was readily available to Lee." Dkt. 14 at 69; *id.* ("Lee's lawyers were well aware that the government intended to introduce evidence about the Wavra murder at Lee's sentencing hearing and easily could have obtained a copy of the fee application.").

Mr. Lee responds that the information surrounding Mr. Lee's guilty plea to the robbery charge, rather than the fee application, is the *Brady* material. In other words, Mr. Lee says the fee application is only *evidence of* a *Brady* violation. *See* Dkt. 15 at 21 ("The Government consulted with detective from the Oklahoma City Police Department who were involved with the [Wavra] case, who interrogated the juvenile Danny Lee, and who testified at the preliminary hearing of . . . David Patton [Mr. Lee's cousin who was convicted of murdering Mr. Wavra]. Mr. Lee alleges that the Government, as part of these or other discussions, must have learned of facts exculpatory to Mr. Lee and failed to disclose them. [Mr. Lee's] claim is that *this* information—*i.e.*, the facts surrounding that plea—constitutes *Brady* material.").

While further factual development is necessary to resolve these issues, Mr. Lee has presented substantial grounds for his claim that the United States suppressed exculpatory information relating to Mr. Lee's robbery plea. The evidence presented thus far demonstrates a significant possibility that Mr. Lee may be able to show that the United States knew that the robbery plea was

offered to Mr. Lee after an Oklahoma judge determined that probable cause to charge Mr. Lee with murder did not exist.

In addition to the fee application from the Oklahoma case file there is evidence that Federal Bureau of Investigation ("FBI") Agents traveled to Oklahoma "to review and obtain all records" regarding Mr. Wavra's murder, and that they reviewed the local prosecutor's file on the Wavra case.[6]  *See* Dkt. 18-1; Dkt. 18-2.  The United States does not dispute Mr. Lee's contention that none of the information or records gained from this investigation was disclosed to Mr. Lee.  Moreover, the United States acknowledges it does not know much about the circumstances surrounding Mr. Lee's plea agreement in the Wavra case.  The United States agrees that "the fee application does not exclude the possibility that the hearing took place as Lee imagines"—that is, that the Oklahoma judge found there was no probable cause to charge Mr. Lee with murder.  Dkt. 14 at 72.  The United States further acknowledges that "it is not clear whether the [Oklahoma] court made that recommendation at the request or with the acquiescence of the prosecutors as a part of a negotiated plea disposition."  *Id.* at 77.

The evidence presented by Mr. Lee, particularly when viewed in the context of what the United States admittedly does not know, is sufficient to demonstrate a significant possibility that Mr. Lee may be able to show that the United States

---

[6] Mr. Lee also points out that one of the Oklahoma detectives who investigated Mr. Wavra's murder testified for the United States during its case-in-chief, Dkt. 14-2 at 51-52, and the United States also consulted with the Oklahoma detective who interrogated Mr. Lee regarding the murder, *id.* at 11-12.

had exculpatory information regarding Mr. Lee's robbery plea, and that it knew or should have known the arguments and statements made at the penalty phase regarding the circumstances surrounding Mr. Lee's plea in the Wavra case were misleading.[7]

While further factual development is necessary for the Court to be able to determine whether Mr. Lee is entitled to habeas relief, he has established substantial grounds for his *Brady* and *Napue* claims.  This is sufficient for the immediate remedy he seeks, a stay of execution.

### B.  Irreparable Harm

The irreparable harm to Mr. Lee is clear: absent a stay, he could be executed on December 9, 2019, before he can fully litigate his *Brady* and *Napue* claims.  *See Williams v. Chrans*, 50 F.3d 1358, 1360 (7th Cir. 1995) (holding that "irreparable harm is taken as established in a capital case" because "[t]here can be no doubt that a defendant facing the death penalty at the hands of the state faces irreparable injury").  The United States rightfully concedes that Mr. Lee faces irreparable harm.  Dkt. 20 at 3.

### C.  Balance of Harms

---

[7] As to the United States' argument that publicly available evidence cannot be suppressed under *Brady*, at best, more information is needed to determine whether the alleged *Brady* information was publicly available at the time.  All the United States has offered is that the fee application "is listed on the public docket sheet from the Oklahoma case and contained within the publicly-available court file." Dkt. 14 at 69.  Whether or not this alone establishes that the fee application was publicly available at the time of Mr. Lee's trial, it says nothing about whether the other alleged *Brady* material was publicly available.

The Court must next balance the harms to the parties. Again, absent a stay, Mr. Lee could be executed even though there is a significant chance his death sentence was obtained in violation of his constitutional rights. The harm to the United States stems from its "strong interest" in "proceeding with its judgment." *Lambert*, 498 F.3d at 452. A stay will delay this outcome.

When considered in the full context of Mr. Lee's challenges to the constitutionality of his death sentence, the harm to Mr. Lee far outweighs the harm to the United States. Much of the twenty-year delay in proceeding with the judgment is attributable to the United States, which demonstrates that it lacked urgency about proceeding with its judgment against Mr. Lee until very recently.

Since he was sentenced to death in 1999, Mr. Lee has been consistently challenging the constitutionality of his death sentence. During that litigation, both Mr. Lee and the United States requested and received several unopposed extensions of time. Significant delays in resolving this litigation, however, fall solely upon the United States. For example, Mr. Lee petitioned the United States Supreme Court for a writ of certiorari on April 13, 2016, and the United States did not file its response until nearly a year later, having obtained nine extensions of time. *See Lee v. United States*, No. 15-8942. This undermines its position that any additional delay will cause significant harm to its interests.

Similarly, the United States waited eight years—from 2011 to 2019—to adopt a new execution protocol. *See In re the Federal Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145-TSC, Dkt. 50 at 14. Only after it

announced the new execution protocol and scheduled Mr. Lee's execution has the United States exhibited its current level of urgency to enforce its criminal judgments. This too undermines the notion that additional delay will cause significant harm.

Finally, the United States has not acted with the necessary urgency even in this litigation. Mr. Lee filed this action on September 26, 2019, when his execution date was two-and-a-half months away. Given this, the Court gave each party two weeks to file their respective briefs and warned both parties that the Court did not "anticipate extending these deadlines absent extraordinary circumstances." Dkt. 6 at 1. Nevertheless, the United States requested (over Mr. Lee's objection) a twenty-eight-day extension of time because the attorneys assigned to the matter "had previously-existing responsibilities that prevented them from turning their full attention immediately to this case." Dkt. 10 at 3. Failing to adequately staff this case with counsel that could devote their full attention to it such that Court-ordered deadlines must be extended further undermines the notion that the harm to the United States of additional delay would be significant.

Given that the United States has significantly contributed to delays in scheduling Mr. Lee's execution and resolving Mr. Lee's legal challenges, the Court concludes that the additional delay caused by a stay in Mr. Lee's execution will only minimally harm the United States. Such minimal harm is substantially outweighed by the harm to Mr. Lee should a stay not issue. Accordingly, the balance of harms strongly favors staying Mr. Lee's execution.

APP.37

### D. Public Interest

While the public has an interest in the enforcement of Mr. Lee's criminal judgment, that interest is significantly diminished in this case. Mr. Lee has presented substantial grounds for claims that his death sentence is unconstitutional. The public interest is not served by permitting the execution of Mr. Lee when such potentially meritorious claims have not been evaluated by any court. Furthermore, while not dispositive to the public interest prong of the preliminary injunction test, several family members of the victims, the lead prosecutor, and the District Judge who presided over the trial all oppose Mr. Lee being executed. *See* Dkt. 1-2; Dkt. 17-1; Dkt. 17-2; Dkt. 17-3.

### E. Unnecessary Delay

Before staying an execution, the Court must consider "the extent to which the inmate has delayed unnecessarily in bringing the claim." *Nelson*, 541 U.S. at 649-50; *see Lambert*, 498 F.3d at 451. "[T]here is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Nelson*, 541 U.S. at 650.

The United States contends that Mr. Lee could have brought his *Brady* and *Napue* claims in 2014 when he was aware of the fee application forming the basis of those claims. Dkt. 20 at 7. Mr. Lee maintains he has been diligently and constantly litigating his claims in the Eighth Circuit, and he has been specifically litigating his *Brady* and *Napue* claims long before he had an execution date. Dkt. 21 at 1-2.

APP.38

While it is certainly feasible that Mr. Lee could have raised his *Brady* and *Napue* claims earlier than he did in the Eighth Circuit, when considered in the context of the lengthy procedural history of this case, Mr. Lee has been diligently pursing his claims. Mr. Lee's direct appeal concluded in June 2005. *See Lee v. United States*, 545 U.S. 1141 (2005). His § 2255 proceedings concluded over nine years later, in October 2014. *See Lee v. United States*, 135 S. Ct. 72 (2014). Before the § 2255 proceeding concluded, Mr. Lee had already begun litigating the ineffective assistance claims he raises here by way of a post-judgment motion in his original § 2255 proceeding. That litigation concluded in December 2015. *See United States v. Lee*, 811 F.3d 272 (8th Cir. 2015).

Perhaps most importantly, Mr. Lee raised his *Brady* and *Napue* claims in the District Court of conviction in September 2018, long before July 2019, when his execution date was set. Moreover, he raised them in this § 2241 action before he knew with certainty that he did not have an avenue to raise them via § 2255. His application for a certificate of appealability was pending before the Eighth Circuit when his execution date was announced, and it remained pending when he filed this action.

The foregoing is important context for considering whether Mr. Lee has unnecessarily delayed pursuing his claims. Given that (1) the United States has not executed any federal death row prisoner for 16 years; (2) it did not adopt an execution protocol under which it could execute Mr. Lee for 8 years; (3) during the 20 years since Mr. Lee was sentenced to death he has been almost constantly engaged in litigation regarding the constitutionality of his death sentence; (4) Mr.

APP.39

Lee began litigating his *Brady* and *Napue* claims in his court of conviction well before his execution date was set; and (5) that litigation remained pending when Mr. Lee's execute date was set and when Mr. Lee brought the instant § 2241 petition in this Court, the Court concludes that Mr. Lee has not unnecessarily delayed in bringing his *Brady* and *Napue* claims such that a stay is unwarranted. This is not a case where an inmate waited until an execution date was set or until the eve of his execution to bring claims that could have been brought much earlier. *Cf. Dunn v. Price*, 139 S. Ct. 1312, 1312 (2019); *Price v. Dunn*, 139 S. Ct. 1533, 1535-40 (2019) (Thomas, J., dissenting); *Gomez v. United States Dist. Court for Northern Dist. of Cal.*, 503 U.S. 653, 654 (1992) (per curiam).

## IV.

For the reasons explained above, Daniel Lewis Lee's execution scheduled for December 9, 2019, is **STAYED**. Mr. Lee has demonstrated substantial grounds upon which to challenge the legality of his execution. Specifically, the structure of § 2255 prevents the District Court of conviction from hearing his claims that are based on newly discovered evidence. Mr. Lee has also demonstrated a significant possibility that he may be able to prevail on those claims by showing that the United States suppressed evidence and misled the jury during his penalty phase. In the end, Mr. Lee may not be able to make this showing. For now, he must have a reasonable opportunity to obtain a reliable judicial determination of these challenges to the fundamental legality of his sentence.

Mr. Lee has also established that the other factors the Court must consider before issuing a stay weigh in his favor. This includes the Court's conclusion that Mr. Lee has not unnecessarily delayed pursuing his claims. He was pursuing these claims well before his execution date was set. There is no concern that Mr. Lee waited to raise his claims on the eve of his execution simply as a delay tactic.

A separate order staying Mr. Lee's execution shall issue. Counsel for the United States are responsible for ensuring that the Warden of the United States Penitentiary in Terre Haute, Indiana, the United States Marshal for this District, and all other officials who would have any involvement in Mr. Lee's execution are notified of this stay and comply with its requirements.

**SO ORDERED.**

Date: 12/5/2019

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Michael Scott Gordon
US Attorney's Office - Eastern District of Arkansas
michael.gordon@usdoj.gov

George Gust Kouros
FEDERAL CAPITAL HABEAS PROJECT
george_kouros@fd.org

Morris H. Moon
FEDERAL CAPITAL HABEAS PROJECT
Morris_Moon@fd.org

John M. Pellettieri
U.S. DEPARTMENT OF JUSTICE
john.pellettieri@usdoj.gov

APP.41

# United States Court of Appeals

For the Seventh Circuit

Chicago, Illinois 60604

Submitted December 6, 2019

Decided December 6, 2019

Before

FRANK H. EASTERBROOK, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

| | |
|---|---|
| No. 19-3399<br><br>DANIEL LEWIS LEE,<br>　　*Petitioner-Appellant*,<br><br>　　　*v.*<br><br>T. J. WATSON, Warden, *et al.*,<br>　　*Respondents-Appellants*. | Appeal from the United States District Court for the Southern District of Indiana, Terre Haute Division.<br><br>No. 2:19-cv-00468-JPH-DLP<br>James Patrick Hanlon, *Judge*. |

**Order**

Daniel Lewis Lee has been convicted of three murders and sentenced to death. His convictions and sentences have been affirmed by the Eighth Circuit, and multiple requests for collateral relief under 28 U.S.C. §2255 have failed on the merits or for lack of the authorization required by 28 U.S.C. §2244(b)(3) and §2255(h). See 274 F.3d 485 (8th Cir. 2001); 374 F.3d 637 (8th Cir. 2004); 715 F.3d 215 (8th Cir. 2013); 792 F.3d 1021 (8th Cir. 2015); No. 19-2432 (8th Cir. Nov. 4, 2019).

Case: 20-2289     Document: 67          Filed: 07/08/2020     Pages: 134
Case: 19-3399   Document: 67       Filed: 12/06/2019   Pages: 3

In July 2019 the United States scheduled Lee's execution for December 9, 2019. Two months later he filed a petition for a writ of habeas corpus under 28 U.S.C. §2241 in the Southern District of Indiana, where he is confined. He requested a stay of execution but later withdrew that request. Yesterday, notwithstanding the request's withdrawal, a district judge stayed Lee's execution. The judge recognized that §2255(e) forecloses resort to §2241 unless a motion under §2255 is inadequate or ineffective to test the validity of the conviction and sentence. The district judge was not prepared to say that §2255 *is* ineffective to test the validity of Lee's death sentence; instead he wrote that there is a "significant possibility" (slip op. 11) that Lee may be able to meet the standard of §2255(e), that evaluating Lee's arguments will take more time, and that his execution therefore should be deferred.

This decision does not conclude that Lee has satisfied the standards for stays prescribed in *Nken v. Holder*, 556 U.S. 418 (2009). Before receiving a stay, an applicant must make a "strong showing" of probable success on the merits. *Id*. at 434. The prospect of irreparable injury is not itself enough. The district judge did not conclude that Lee is likely to succeed on the merits or that he has a "strong" prospect of doing so. As far as we can see, the likelihood of success is slim. Lee makes two substantive arguments—that he received ineffective assistance of counsel at sentencing and that the prosecutor concealed or suppressed exculpatory or impeaching evidence. Arguments of those kinds are regularly made and resolved under §2255.

*Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (en banc), holds that §2255 may be deemed inadequate or ineffective if the provision for successive collateral attacks in §2255(h) does not permit a prisoner to present factual developments that could not have been litigated earlier. The district court stated that there is a "significant possibility" that Lee "may" be able to satisfy the standard of *Webster*, but the court did not conclude that there is a "strong showing" either that *Webster*'s standard has been met or that Lee would be entitled to relief on the merits if the issues he raises were relitigated. Indeed, the judge did not explain why there is even a "significant possibility" that the supposedly newly discovered evidence is in fact newly discovered, as *Webster* uses that phrase. The principal "newly discovered" evidence on which Lee relies is a statement made on the record by a judge decades ago and available from that state court. Indeed, the statement was made in Lee's presence, and although he may not have understood its potential significance that is some distance from the information being concealed or unavailable. See *Webster*, 784 F.3d at 1140

Case: 20-2128 Document: 67 Filed: 07/08/2020 Pages: 124
Case: 19-3399 Document: 7 Filed: 12/06/2019 Pages: 3

(explaining that evidence is not "newly discovered" if the defense could have accessed it with due diligence); see also *United States v. Shields*, 789 F.3d 733, 746–47 (7th Cir. 2015) (publicly available court records accessible with due diligence are not *Brady* material).

One further observation. The grant of a stay entails equitable as well as legal considerations. Lee did not attempt to use §2241 for more than four years after the Eighth Circuit rejected the last of his contentions, and more than four years after, by his own account, he obtained the evidence that he characterizes as newly discovered. Even after an execution date was set, he waited a further two months to seek a writ of habeas corpus. It is understandable that a district judge, entertaining a request for relief from capital punishment, would want to take a hard look at the matter, a look that may take more time than the impending execution date permits. But someone who waits years before seeking a writ of habeas corpus cannot, by the very act of delay, justify postponement of the execution. See *Nelson v. Campbell*, 541 U.S. 637, 649–50 (2004).

The motion to vacate the stay of execution is granted.

**28 U.S.C. § 2241**

## § 2241.  Power to grant writ

**(a)** Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions. The order of a circuit judge shall be entered in the records of the district court of the district wherein the restraint complained of is had.

**(b)** The Supreme Court, any justice thereof, and any circuit judge may decline to entertain an application for a writ of habeas corpus and may transfer the application for hearing and determination to the district court having jurisdiction to entertain it.

**(c)** The writ of habeas corpus shall not extend to a prisoner unless—

**(1)** He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or

**(2)** He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or

**(3)** He is in custody in violation of the Constitution or laws or treaties of the United States; or

**(4)** He, being a citizen of a foreign state and domiciled therein is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof, the validity and effect of which depend upon the law of nations; or

**(5)** It is necessary to bring him into court to testify or for trial.

**(d)** Where an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him and each of such district courts shall have concurrent jurisdiction to entertain the application. The district court for the district wherein such an application is filed in the exercise of its discretion and in furtherance of justice may transfer the application to the other district court for hearing and determination.

**(e)(1)** No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by

the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

**(2)** Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

**28 U.S.C. § 2255**

**§ 2255.  Federal custody; remedies on motion attacking sentence**

**(a)** A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

**(b)** Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.  If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

**(c)** A court may entertain and determine such motion without requiring the production of the prisoner at the hearing.

**(d)** An appeal may be taken to the court of appeals from the order entered on the motion as from a final judgment on application for a writ of habeas corpus.

**(e)** An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

**(f)** A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—

>   **(1)** the date on which the judgment of conviction becomes final;

>   **(2)** the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United

APP.47

States is removed, if the movant was prevented from making a motion by such governmental action;

**(3)** the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

**(4)** the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

**(g)** Except as provided in section 408 of the Controlled Substances Act, in all proceedings brought under this section, and any subsequent proceedings on review, the court may appoint counsel, except as provided by a rule promulgated by the Supreme Court pursuant to statutory authority.  Appointment of counsel under this section shall be governed by section 3006A of title 18.

**(h)** A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain—

**(1)** newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or

**(2)** a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.