No. 20-2128

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

DANIEL LEWIS LEE,

*Petitioner-Appellant*,

*v.*

T.J. WATSON, WARDEN USP TERRE HAUTE, et al.,

*Respondents-Appellees*.

On Appeal from the United States District Court
for the Southern District of Indiana, No. 2:19-cv-00468-JPH-DLP
Before the Honorable Judge James P. Hanlon

## PETITIONER-APPELLANT'S
## SUPPLEMENTAL APPENDIX

MORRIS H. MOON
ASSISTANT FEDERAL PUBLIC DEFENDER
FEDERAL CAPITAL HABEAS PROJECT
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556

GEORGE G. KOUROS
ASSISTANT FEDERAL PUBLIC DEFENDER
FEDERAL CAPITAL HABEAS PROJECT
6411 Ivy Lance, Suite 710
Greenbelt, MD 2070
(301) 821-0855

July 7, 2020

## Supplemental Appendix Index

*United States v. Daniel Lee*, 89 F.Supp.2d 1017 (E.D. Ark. Mar. 21, 2000)
(Order granting motion for new trial)……………......…………….......……SUPP.APP.1

*United States v. Daniel Lewis Lee,* 274 F.3d 485 (8th Cir. 2001)
(Reversing order granting motion for new trial)……...……………….…...SUPP.APP.24

*United States v. Daniel Lee*, 374 F.3d 637 (8th Cir. 2004)
(Direct appeal opinion)……………….…………………………………....SUPP.APP.32

*United States v. Daniel Lee*, No. 4:97-cr-243 (E.D. Ark. Aug. 28, 2008), Dkt. 1163
(Order denying § 2255 motion)……………….…………………………..SUPP.APP.43

*United States v. Daniel Lee*, No. 4:97-cr-243 (E.D. Ark. Dec. 22, 2010), Dkt. 1180
(Order denying Rule 59(e) motion)……………….………………......……….SUPP.APP.98

*United States v. Daniel Lee*, No. 715 F.3d 215 (8th Cir. 2013)
(Order affirming denial of § 2255 motion)………...…………………….SUPP.APP.104

*United States v. Daniel Lee*, No. 4:97-cr-243 (E.D. Ark. Mar. 18, 2014), Dkt. 1249
(Order denying Rule 60(b) motion)……………….…………………….…SUPP.APP.111

*United States v. Daniel Lee*, 792 F.3d 1021 (8th Cir. 2015)
(Order affirming denial of Rule 60(b) motion)…………………….…..SUPP.APP.117

*United States v. Daniel Lee,* 811 F.3d 272 (8th Cir. 2015)
(Kelly, J., dissent from denial of rehearing)……………………….…….SUPP.APP.121

*United States v. Daniel Lee*, No. 4:97-cr-243 (E.D. Ark. Feb. 26, 2019), Dkt. 1313
(Order denying second-in-time § 2255 motion)………………....………..SUPP.APP.124

*United States v. Daniel Lee*, No. 19-2432 (8th Cir. Nov. 4, 2019)
(Order denying COA; Kelly, J., dissenting)…………....……………….SUPP.APP.144

*United States v. Daniel Lewis Lee*, Penalty Phase Verdict Form….….SUPP.APP.146

Letter of District Court Judge G. Thomas Eisele………………..…….SUPP.APP.184

Declaration of John F. Edens, Ph.D……………………...………….....SUPP.APP.187

Declaration of Donald N. Bersoff Ph.D., J.D………………….……….SUPP.APP.192

Declaration of Thomas V. Ryan, Ph.D…………………...…….………SUPP.APP.200

Declaration of Laurence Komp, Esq……………………….……………SUPP.APP.204

Declaration of David A. Ruhnke, Esq………………………………...……SUPP.APP.210

Fee Application, Oklahoma County District Court No. CF-90-5292…...SUPP.APP.217

FBI Memorandum, Sep. 14, 1998………………………………….……..SUPP.APP.219

FBI Memorandum, Oct. 19, 1998………………………………….……..SUPP.APP.221

Oklahoma Prosecutor Handwritten Notes, Mar. 7, 1991………….…….SUPP.APP.222

*Williams v. Delo*, No. 13-2058 (8th Cir. Sept. 23, 2013)…………………SUPP.APP.223

89 F.Supp.2d 1017
United States District Court,
E.D. Arkansas,
Western Division.

UNITED STATES of America
v.
Daniel Lewis LEE, a/k/a Daniel Lewis
Graham, D.L. Graham, and Danny Lee.

No. LR–CR–97–243(2).
|
March 21, 2000.

**Synopsis**

Defendant filed motion for a new sentencing phase trial, and to require the Attorney General to follow the Death Penalty Protocol found in the United States Attorney's Manual before exercising her prosecutorial discretion in deciding whether to withdraw or decertify the death penalty notice in this case. The District Court, Eisele, J., held that: (1) Government exceeded the permissible scope of cross-examination in its questioning of defendant's mental health expert and in its examination of its rebuttal witness, and, as a result, irreversibly compromised defendant's rights; (2) defendant had right to enforce compliance with self-imposed and internal procedures found in the Death Penalty Protocol; and (3) Deputy Attorney General did not have the authority under Death Penalty Protocol to make the final decision on the U.S. Attorney's request to decertify the death penalty notice for defendant.

Order in accordance with opinion.

**Attorneys and Law Firms**

**\*1018** Dan Stripling, Robert A. De La Cruz, U.S. Atty.'s Office, E.D. Ark., Little Rock, AR, for U.S.

John T. Lassiter, Hatfield & Lassiter, Little Rock, AR, Cathleen V. Compton, Little Rock, AR, for Defendants.

*MEMORANDUM OPINION AND ORDER REGARDING FUTURE DANGEROUSNESS AND THE DEATH PENALTY PROTOCOL*

EISELE, District Judge.

There are two matters that are currently pending in Defendant Danny Lee's case. First, Defendant Lee has filed a Motion for a New Sentencing Phase Trial due to the improper introduction of evidence regarding his alleged propensity for future dangerousness. Second, this Court must resolve the issue of whether Defendant Lee has the right to require the Attorney General to follow the Death Penalty Protocol found in the United States Attorney's Manual before exercising her prosecutorial discretion in deciding whether to withdraw or decertify the death penalty notice in this case. Each issue will be considered separately.

## *FUTURE DANGEROUSNESS*

### I. Background

Defendant Lee and his co-defendant, Chevie Kehoe, were convicted by a jury of participating in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), conspiring to violate the racketeering statute in violation of 18 U.S.C. § 1962(d), and committing three violent acts in aid of racketeering, namely three murders under Arkansas law, in violation of 18 U.S.C. § 1959(a)(1). In separate sentencing hearings, the same jury "recommended" that Defendant Kehoe be sentenced to life without possibility of release for each of the murders and that Defendant Lee be sentenced to death for each of the three murders.

In its notice of intent to seek the death penalty against Defendant Lee, the Government, as required by statute, identified several aggravating factors that it anticipated using at sentencing. For each of the murders, the Government offered the following statutory aggravating factors: 1) that Defendant Lee murdered each victim in expectation of the receipt of anything of pecuniary value; 2) that Defendant Lee murdered each victim after substantial planning and premeditation; and 3) that Defendant Lee intentionally killed or attempted to kill more than one person during a single criminal episode. For the Sarah Powell murder, the Government offered the additional statutory aggravating factor that the victim was particularly vulnerable due to her youth, that being eight years of age. For each of the murders, the Government offered the non-statutory aggravating factor of future dangerousness. It is the last of said factors, future dangerousness, that is the subject of Defendant Lee's motion.

During the pre-trial stages of the case, Defendant Lee retained a mental health expert to assist in his defense in the event a sentencing hearing was necessary. The Government, in turn, requested discovery from the Defendant as to his mental health **\*1019** evidence so that it would be able, if necessary, to rebut Defendant Lee's evidence. The Government emphasized in its request:

> The United States will *not* introduce mental health evidence during its case-in-chief in the penalty phase. Instead, the United States would only use this evidence to rebut any mental health evidence introduced by the defendant in his case-in-chief. If the defendant does not introduce the evidence, the United States will not introduce mental health evidence.

Gov't Mot. for Disc. of Mental Health Evid. Re: Def. Lee, Doc. No. 627, at 2 (emphasis in original). At that time, the Government anticipated that Defendant Lee would use his mental health expert to present mitigation evidence as well as to rebut the Government's non-statutory aggravating factor of future dangerousness. The Defendant objected to the requested disclosure.

The Court, following the case of *United States v. Beckford,* 962 F.Supp. 748 (E.D.Va.1997), informed the parties that it was inclined to grant the Government's request. Consequently, the parties submitted to the Court a proposed order, which the Court signed, setting forth a mental health evidence disclosure process much like the procedure followed in *Beckford. See* Order Re: Mental Health Issues–Defendant Lee, Doc. No. 665, dated Mar. 31, 1999. Pursuant to the Order, Defendant Lee was required to submit to an examination by the Government's mental health expert.

As trial preparations continued, Defendant Lee and his mental health expert, Dr. Mark Cunningham, a forensic psychologist, ultimately decided not to attempt to rebut the Government's evidence of future dangerousness. This decision was based at least in part on the fact that pre-trial rulings by United States Magistrate John F. Forster, Jr., prevented Dr. Cunningham from obtaining all the information he felt necessary to complete a proper risk assessment. As

a result of said decision, Dr. Cunningham did not perform a risk assessment for future dangerousness of Defendant Lee. However, the Government's expert, Dr. Thomas Ryan, as part of his examination of Defendant Lee, did perform a risk assessment analysis.

During its case-in-chief at Defendant Lee's penalty phase trial, the Government offered four factual instances in support of its claim of future dangerousness. First, by way of the testimony of Randall Yarbrough, Chai Choi, Brian Compton, and Rochelle Ezzi, and the former testimony of the Defendant, the Government presented evidence of Defendant Lee's involvement in the murder of Joseph John Wavra in Oklahoma when the Defendant was age seventeen. Second, through the testimony of Nancy Cummings, the Government presented evidence that Defendant Lee verbally assaulted and threatened a Pulaski County Sheriff's Deputy while incarcerated during the trial of this case. Third, the Government offered into evidence a 1995 Florida conviction record for Defendant Lee for the crime of carrying a concealed weapon. Fourth, the Government presented evidence of Defendant Lee's lack of remorse as evidenced by his statements made to Gloria Kehoe. In sum, the Government's case-in-chief was brief, covering only approximately eighty-two pages of transcript.

The Defendant offered the following mitigating factors in his defense: 1) Defendant Lee's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge; 2) Defendant Lee was under duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge; 3) Defendant Lee does not have a significant prior criminal record other than his juvenile record; 4) Defendant Lee committed the killing or killings under mental or emotional disturbance; 5) another person equally culpable in the crimes will not be punished by **\*1020** death; 6) Defendant Lee was subjected to emotional and physical abuse, abandonment and neglect as a child and was deprived of the parental guidance and protection which he needed; 7) Defendant Lee suffered from neurological impairments that were identified and which could have been treated when he was a child and adolescent; 8) Defendant Lee suffers from brain dysfunction, which has gravely impaired his ability to function in the absence of strong support and guidance; 9) Defendant Lee was introduced to drugs and alcohol while still a child; 10) Defendant Lee needs a structured environment and would likely benefit from the

structure of a prison; 11) Defendant Lee was only 22 years old when the murders were committed; 12) Defendant Lee is a follower and was under the influence of Chevie Kehoe and possibly others at the time of the offense; 13) other persons were involved in this racketeering enterprise and conspiracy who will under the law receive no sentence or substantially less punishment or were not prosecuted; and 14) Mr. Kirby Kehoe was involved in the planning of the 1996 burglary of the Muellers.

Defendant Lee presented exclusively mitigation evidence in his defense; he did not attempt to rebut any of the Government's evidence in support of aggravation. During his defense, Defendant Lee presented the testimony of Dr. Cunningham. Dr. Cunningham offered testimony concerning Defendant Lee's life, concluding with his opinion of the formative factors in Defendant Lee's life. Dr. Cunningham did not offer risk assessment or future dangerousness testimony. He limited his testimony to explaining Defendant Lee's mitigators to the jury.

The Government's cross-examination of Dr. Cunningham was extensive and the subject of much controversy. Finally, the Government offered the testimony of Dr. Ryan in its rebuttal case. Dr. Ryan's testimony is also the subject of dispute.

In his current Motion, Defendant Lee contends that he was deprived of his right to a fair sentencing proceeding in two respects. First, Defendant Lee contends that this Court erred in permitting the Government to go as far as it did during its cross-examination of Dr. Cunningham. In particular, the Defendant asserts that the Government used its cross-examination of Dr. Cunningham to improperly develop *new evidence of risk assessment and future dangerousness* that was neither permitted by the Court's instructions, mentioned in the Government's case-in-chief, nor, reasonably analyzed, covered in the Defendant's direct examination of Dr. Cunningham. Second, Defendant Lee claims that the Court erred in permitting the Government to go beyond the scope of permissible rebuttal by questioning Dr. Ryan about risk assessment and future dangerousness when such matters were not raised by Defendant Lee in his defense, and further, that such evidence of future dangerousness went beyond the limits specifically set forth in the Court's instructions.

## II. Discussion

### A. Authority to Consider Motion

Before delving into the merits of these two arguments, the Court must first decide if it has the authority to do so upon Defendant Lee's post-conviction motion. Rule 33 of the Federal Rules of Criminal Procedure provides, in relevant part, that "the court may grant a new trial to th[e] defendant if the interests of justice so require." Furthermore, it is clear that "[d]istrict courts have broad discretion in passing upon motions for new trial and such rulings are subject to reversal only for a clear abuse of discretion." *United States v. Saborit,* 967 F.Supp. 1136, 1144 (N.D.Iowa 1997) (citing Eighth Circuit cases).

Likewise, Fed.R.Cr.P. 35(c) provides, in relevant part, that "[t]he court, acting within 7 days after the imposition of sentence, may correct a sentence that was imposed as a result of arithmetical, technical, or other clear error." Again, such a ruling is left to the sound discretion of the **\*1021** trial court. *See United States v. Gruenberg,* 53 F.3d 214, 215 (8th Cir.1995) (considering Rule 35(a) motion); *United States v. Jenkins,* 105 F.3d 411, 411 (8th Cir.1997) (considering Rule 35(b) motion); *see also United States v. Durham,* 178 F.3d 796, 799 (6th Cir.1999) (considering Rule 35(c) motion).

The Government argues that the cited rules of criminal procedure do not apply to a case under the Federal Death Penalty Act of 1994 ("FDPA"). It contends that the trial court has no post-sentencing authority other than to sentence the Defendant as recommended by the jury and that the Defendant's only method to obtain relief is on appeal as provided in section 3595 of the FDPA. Clearly, the Federal Rules of Criminal Procedure do not contemplate a case such as Defendant Lee's because they were drafted long before the FDPA came into existence. That is not to say, however, that Congress, in drafting the FDPA, did not intend for the rules of criminal procedure to apply. As the Fifth Circuit has aptly stated:

> The Federal Rules of Criminal Procedure apply to sentencing hearings; Fed.R.Crim.P. 1 provides, "These rules govern the procedure in all criminal proceedings in the courts of the United States...." Rule 54, Fed.R.Crim.P., excludes certain proceedings, but not sentencing hearings. Section 3593(c) waives rule 32(c)'s presentence report

requirement, which suggests the negative implication that the Rules of Criminal Procedure usually do apply to sentencing hearings under the FDPA.

*United States v. Webster,* 162 F.3d 308, 346 (5th Cir.1998), *cert. denied,* 528 U.S. 829, 120 S.Ct. 83, 145 L.Ed.2d 70 (1999). Therefore, this Court has the authority it would have in any other case to grant the Defendant post-sentencing or post-conviction relief.

As a forethought, the Court acknowledges that Defendant Lee's arguments are worthy of extremely careful scrutiny because this is a death penalty case and, as such, Defendant Lee's life is at stake. The court in *United States v. Pena–Gonzalez,* 62 F.Supp.2d 358, 360 (D.P.R.1999), appropriately described decisions in death penalty cases as follows:

> [This decision] entails the unique gravity appropriate for capital cases. Capital punishment is qualitatively different from any other form of criminal penalty we may impose. *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). With it, we deny the convict any possibility of rehabilitation and order instead his execution, the most irrevocable of sanctions. *Gregg v. Georgia,* 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Its severity demands a heightened need for reliability in the determination that death is the appropriate punishment in a specific case. *Caldwell v. Mississippi,* 472 U.S. 320, 323, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (citing *Woodson,* 428 U.S. at 305, 96 S.Ct. 2978). We must be, therefore, particularly sensitive to insure that unique safeguards are in place that comport with the constitutional requirements of the Due Process Clause of the Fourteenth Amendment

and the Eighth Amendment. *Gregg,* 428 U.S. at 187, 96 S.Ct. 2909.

Furthermore, it has been said that, "[i]n capital proceedings generally, th [e] [Supreme] Court has demanded that factfinding procedures aspire to a heightened standard of reliability. This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different." *Ford v. Wainwright,* 477 U.S. 399, 411, 106 S.Ct. 2595, 91 L.Ed.2d 335 (Marshall, J., plurality opinion) (citing *Spaziano v. Florida,* 468 U.S. 447, 456, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)).

**B. Examination of Dr. Cunningham**

Turning to the merits, Defendant Lee first argues that the Government exceeded the permissible scope of cross-examination **\*1022** in its questioning of Dr. Cunningham. Section 3593 of the FDPA sets forth the procedure for a death penalty sentencing hearing under the act:

> At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592.... The defendant may present any information relevant to a mitigating factor. The government may present any information relevant to an aggravating factor for which notice has been provided .... Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury....

The government and the defendant shall be permitted to rebut any information received at the hearing, and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor, and as to the appropriateness in the case of imposing a sentence of death. The government shall open the argument. The defendant shall be permitted to reply. The government shall then be permitted to reply in rebuttal. The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt. The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless the existence of such a factor is established by a preponderance of the information.

18 U.S.C. § 3593(c) (Supp.1999).

Rule 611(b) of the Federal Rules of Evidence provides that "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." Generally, the scope of cross-examination is limited to matters testified to on direct plus matters bearing upon the credibility of the witness. *United States v. Thomas,* 58 F.3d 1318, 1322 (8th Cir.1995); Fed.R.Evid. 611 advisory committee's note. Furthermore, restriction of the scope of cross-examination is a matter committed to the sound discretion of the trial court. *United States v. Lee,* 743 F.2d 1240, 1249 (8th Cir.1984).

The Court has reviewed Dr. Cunningham's direct testimony in painstaking detail. Dr. Cunningham, in large part, served as a narrator for the events in Defendant Lee's troubled life until he reached the age of seventeen or eighteen. [1] He told the jury about the individuals involved in Defendant Lee's life, how they treated him, what problems they themselves had, and how their actions affected Defendant Lee. Dr. Cunningham also testified about problems Defendant Lee experienced growing up, such as medical problems, problems in school, and substance abuse problems. In sum, Dr. Cunningham's testimony amounts to an attempt to explain to the jury how Defendant Lee's involvement in the crimes for which he was convicted was affected by external factors beyond the Defendant's control. Ultimately, Dr. Cunningham declared that "My opinion is that Danny Lee experienced many traumatic and adverse life experiences that fundamentally shaped him. It shaped him neurologically, psychologically, socially, emotionally and ethically, and that I think contributed to his involvement in this offense." Tr. at 7742.

Admittedly, Dr. Cunningham mentioned that Defendant Lee exhibits anger, acting out, a lack of trust, and rebellious behavior. **\*1023** He even stated that persons with histories similar to that of Defendant Lee would be at risk for violence in adulthood. However, Dr. Cunningham was very careful not to offer any opinion on Defendant Lee's future dangerousness. Indeed, as Dr. Cunningham himself stated, "the focus of my evaluation ... was on formative factors that brought [the defendant] to this place and was not specifically oriented toward what is his diagnosis at this time." Tr. at 7744. The Government itself acknowledges that "Dr. Cunningham did not make any diagnosis. Rather, he identified features of Lee's life that made him at risk for a variety of psychological conditions." Gov't Briefre: Alleged Punishment Phase Error Supplemental, Doc. No. 939, at 2 (emphasis omitted).

The Government, on the other hand, focused almost exclusively on future dangerousness in its cross-examination of Dr. Cunningham. The first substantive question posed by the Government to Dr. Cunningham was "Do you have an opinion whether or not Mr. Lee is a dangerous person, a violent person, as he sits here today?" Tr. at 7745. The next substantive question was "During [my] opening statement I said to the jury that Mr. Lee is a violent man. Is that true?" Tr. at 7745. At that point, counsel for Defendant Lee asked to approach and made a motion in limine to exclude any questioning as to risk assessment or future dangerousness: [2]

MS. COMPTON: Actually I meant to make a motion in limine at the end of my direct examination of Dr. Cunningham. This becomes very important. Dr. Cunningham did not perform a risk assessment on Danny

Lee. He did not come here and testify as to his future dangerousness or lack thereof. Now, admittedly, in the affidavit that he gave to the Court, he said that he might go there. However, we did not do that. And I don't think that Dr. Cunningham is going to be prepared to talk about risk assessment and future dangerousness given the fact that he and I decided not to go into that after [the Magistrate Judge] overruled us on some of the issues that we had asked about and additional tours of the Bureau of Prisons, additional information that Dr. Cunningham was going to need if we were going to do risk assessment and future dangerousness. We are not.

Dr. Cunningham is doing strictly mitigation. I would move in limine to keep the government from going into an area which has not been brought out in direct and which isn't going to be. His assessment is strictly as to mitigation and not as to risk assessment of future dangerousness. We are not prepared to go there.

THE COURT: I gather the report, which I have not seen, does go beyond what you used on direct?

MS. COMPTON: No, sir.

THE COURT: It does not?

MS. COMPTON: We don't do any risk assessment or future dangerousness. It is strictly within mitigation and psychological factors as has been testified to on direct.

THE COURT: Well, he has identified himself as a clinical and forensic psychologist with a Ph.D. degree. He has had an intimate investigation of the Defendant, so I think Mr. Liroff should be able to ask him in his opinion if he is dangerous. Now, he can handle himself. If it's in the area of his expertise and considering what has been revealed about his intimate knowledge of the man, he can inquire. I think the expert is fully capable of explaining why he can't answer certain of these questions.

 **\*1024**  MS. COMPTON: All right.

THE COURT: He is in effect making him his own witness, is he not, when he goes out of the realm of what you've questioned him about. He runs somewhat of a risk. But as far as just saying, no, you can't do that, I don't think I'm in a position to do that. It's up to the witness to say I'm not prepared to handle that, or I don't have enough information to do it, or I need more studies or whatever. So I'm going to let him inquire. The witness

—at some point I may feel that it's diminishing returns here.

Tr. at 7746–48. [3]

When the Government resumed questioning, it again focused on violence. The following is a complete list of the questions posed by the Government to Dr. Cunningham from the time of the aforementioned bench conference to the Court's recess for the day on Wednesday, May 12, 1999:

BY MR. LIROFF:

Q. Is this man, your client, Mr. Lee, is he a dangerous man? (Tr. at 7748).

Q. Is there a feature of his personality that he is a person who likes violence? (Tr. at 7749).

Q. This is, this offense is isolated in terms of the violence that was displayed? Is that your answer? (Tr. at 7749).

Q. His record is replete with evidence of violence. (Tr. at 7750).

 **\*1025**  Q. In terms of the contextual situation, it is across the board. He has committed violence in institutions? (Tr. at 7750).

Q. He has committed violence in institutions against peers? (Tr. at 7750).

Q. I should say that in a more straightforward language. While incarcerated, while in custody, he had assaulted other patients or inmates? (Tr. at 7750).

Q. Are you aware that while incarcerated in this case pending trial he assaulted other inmates? (Tr. at 7750–51).

Q. Doctor, I will get back to that. You answered that you don't recall. He has no understanding or appreciation of the enormity of this situation, does he? (Tr. at 7751).

Q. Did you hear the comment he made a moment ago? (Tr. at 7751, referring to the defendant's having stated "Bullshit" in response to one of Mr. Liroff's questions).

Q. Do you know that's not the first time? (Tr. at 7751).

Q. Do you know that he regularly states pejorative obscene insults to the lawyers in this case? (Tr. at 7751).

Q. Is that a sign of paranoia? (Tr. at 7751).

Q. Let's talk about his violence. He has been violent in institutions against staff? (Tr. at 7752).

Q. And recently there was an attempt or at least an expression of threat of violence against staff? (Tr. at 7752).

Q. This is the type of thing, one aspect, that suggests if incarcerated he will continue to be a threat, present a threat of violence? Yes? (Tr. at 7752).

Q. So what you are saying is we have to see if he actually hurts somebody first to see if he will hurt somebody? (Tr. at 7753).

Q. You've testified, I believe today, that he exercises poor judgment? (Tr. at 7753).

Q. Do you know of a study, scientific study, that says those features go away when you enter a prison? (Tr. at 7753).

Q. Yesterday I used a term "psychopath." The question is, is that a psychological term? (Tr. at 7754).

Q. Do you recognize it? (Tr. at 7754).

Q. And does it come from a test, a psychological instrument prepared by a Dr. Hare? (Tr. at 7754).

In this seven-page section alone, the Government used a form of the word "violence" nine times and was able to elicit from Dr. Cunningham in his responses fifteen mentions of some form of the word "violence." The next morning, the Government continued to elicit testimony from Dr. Cunningham relating to Defendant Lee's violent tendencies:

BY MR. LIROFF:

Q. In the investigation in this case did you learn that during the course of that relationship that Mr. Lee partook of domestic violence as against Jennifer?

A. Yes, I did.

Q. And you learned that Mr. Lee in fact abused her physically when she was pregnant with his child.

A. I heard testimony to that effect, that's correct.

Q. And in fact that there was a point when—have you seen a police report relating to an incident of domestic violence between Jennifer and Mr. Lee?

* * * * * *

Q. Were you aware of an incident where she tore up his photograph of Adolph Hitler and he attacked her and the police had to be called?

A. I heard that described. Yes, I did.

Q. In your review of the records there is [sic] other instances of violence, behavior, violent behavior by Mr. Lee?

A. Yes, there is.

Q. Was there substantial discussion, excuse me, discussion of the fact that Mr. Lee assaulted his sister, his younger sister Carrie?

A. There was a reference to that as well, on a single occasion as I recall.

 *1026  Q. Was there, and I'm not sure how accurate it is, I don't know if you were able to ascertain anything about it, but there was also a reference of Mr. Lee assaulting his mother?

* * * * * *

Q. And there was also discussion in the record relating to burglary offenses?

A. That's correct.

Q. That Mr. Lee broke into homes and took things?

A. There was a burglary II charge as I recall.

Q. Several?

A. There's at least a single one and I think there's more than one. I can look at my—

Q. That's fine. Will you agree there's more than one?

A. I believe that's the case.

Q. An arson offense?

A. That's correct.

Q. Threatening a state witness?

A. That's correct.

* * * * * *

Case: 20-2128     Document: 7     Filed: 07/08/2020     Pages: 227

Q. And while Mr. Lee is at these facilities he's assaulting other patients or inmates?

A. I don't know if the word assault is usually the case. They talk about discharging him because of violence, they talk about him being aggressive with staff and other patients and making threats or being intimidating. There is not—I'm hesitant to—"assault" has a connotation of a more serious kind of attack or injury. I don't recall a description from the records of an attack that was noted in the detail where they said he did this, he really hurt somebody.

Q. Is it true that in the records they refer to a facility known as D.H.S. and indicate that no, excuse me, that he was placed at Wesleyan, W–E–S–L–E–Y–A–N and while there he instigated an assault involving a staff member?

A. It does indicate that he was—that's correct he was admitted there on February 22, 1989, dismissed on March 10th as being unacceptable to their program because of aggressiveness.

Q. And for example, while he was at St. Anthony's Hospital he couldn't be kept there because they didn't feel that they could treat him because of his aggressive behavior?

A. That's correct.

Q. He's described otherwise as intimidating and harassing other patients?

A. That's correct.

Q. Physically abusive to patients?

A. Again, that's my general recollection. I don't have that particular part of the chart in front of me.

Q. There's a reference that he was picked up on a string of armed robberies?

Tr. at 7777–82.

From there, the Government's questioning of Dr. Cunningham turned to the subject of psychopathy. Through the cross-examination of Dr. Cunningham, the Government was able to define psychopathy and describe the characteristics of a psychopath for the jury. Among the characteristics described were lack of remorse (Tr. at 7805), impulsivity (Tr. at 7805), poor behavioral control (Tr. at 7805), increased incidence of predatory violence (Tr. at 7807), increased risk of violent recidivism (Tr. at 7809), and not being amenable to treatment

(Tr. at 7819). Ultimately, the Government, through Dr. Cunningham, advised the jury that Dr. *Ryan* had diagnosed Defendant Lee as a psychopath. Tr. at 7826.

### C. Examination of Dr. Ryan

Defendant Lee also raises the issue of whether Dr. Ryan's testimony was proper rebuttal. Prior to Dr. Ryan's testifying, the Court limited the scope of said testimony as follows:

> THE COURT: ... I'm going to grant the Defendant Lee's motion in limine with respect to the issue of psychopathy, the Hare psychopathy test, and any reference to the defendant being a, quote, **\*1027** psychopath, unquote, on the basis that such would not be proper rebuttal.

Tr. at 7836. Despite said ruling, the Court is troubled by several aspects of Dr. Ryan's direct testimony because of their focus on Defendant Lee's alleged violent nature.

Q. Did your examination suggest that Mr. Lee was a person who was suspicious?

A. Yes.

Q. Distrustful?

A. Yes.

Q. Angry?

A. Yes.

Q. There was a suggestion by Dr. Cunningham of a particular test you performed called an MMPI and that he talked about an elevated something, and he used the word "paranoia."

A. Yes.

Q. Could you explain what your tests showed in that area?

A. That test is a personality test. In fact, it's the most widely used personality test in the world, and it looks at a variety of personality features. It looks at anxiety, depression,

psychopathic deviancy. It looks at heightened levels of energy, what we call mania. It also looks at someone's level of suspiciousness, and that is called paranoia scale. And he was slightly elevated on the paranoia scale ....

Tr. at 7917–18.

Q. You told us you talked to Mr. Lee about his life. For example, did you ask him how he became involved in the skinhead movement?

A. Yes, I did.

Q. What did he say?

A. He told me that he got involved because he could have sex with a lot of women, drink a lot of beer, and get in a lot of fights.

Q. Did you talk to Mr. Lee about fights?

A. Yes.

Q. It's not so much how much, but did he talk to you about why he fought?

A. Well, he told me that he drank a lot and would get himself in trouble, but that he enjoyed the fighting.

Q. He enjoyed it?

A. Yes. He liked the stimulation.

Q. Did he seem impulsive to you? Mr. Lee.

A. Yes, he did.

Q. Tell me what your thoughts were on that.

A. All right. There was an incident when some lunch trays were coming through, and the guard wouldn't let him have the lunch right away, and he immediately just jumped out of his chair and became extremely angry at the guard, arguing and using profanity as to why he couldn't get his lunch right then and there, and I thought that was a great example of impulsivity.

Tr. at 7919–20.

Q. Did he react to various people that would walk by?

A. Yes. It was striking the way that he reacted differently. For example, I noticed that when black guards and black inmates went by, he had a lot of negative things to say and

used a lot of profanity, talking about things that they were doing in jail and that sort of thing that offended him.

On the other hand, when white guards were there, he was friendly as could be. He was waving, smiling. Same thing with other inmates when they were walking by. I thought that was rather striking. It was such a dichotomy.

Tr. at 7925.

### D. Impropriety of the Examinations

Upon reflection, the Court sees numerous problems in the Government's cross-examination of Dr. Cunningham and in Dr. Ryan's "rebuttal" testimony. First, with respect to Dr. Cunningham, the Court erred in ever assuming that the Government could properly make Dr. Cunningham its own witness on the subject of Defendant Lee's mental health. *See* Tr. at 7748. The Government had affirmatively **\*1028** stated to Defendant Lee and the Court that it would not introduce mental health evidence in its case-in-chief. Thus, the Government was wrong to allow the Court to proceed on the mistaken assumption that, despite such representation, Dr. Cunningham could testify on the Government's behalf "as its witness." Equally, the Court was at fault for not noting that this would violate the representation made by the Government and in not acting promptly to nip the improper tactic in the bud. More important is the fact that Defendant Lee was entitled to notice of the aggravating evidence to be introduced against him so that he could prepare for his mitigation defense. The introduction of such aggravating evidence against Defendant Lee through his own mental health expert during his "defense" was fundamentally unfair in that Defendant Lee had no opportunity to respond thereto.

Second, the Government several times elicited testimony from Dr. Cunningham and Dr. Ryan regarding past bad acts of the Defendant that were not brought out in the Government's case-in-chief or in the direct examination of Dr. Cunningham. Examples include physical abuse of a girlfriend (Tr. at 7777), assault of his sister (Tr. at 7779–80), burglary and arson offenses (Tr. at 7780–81), assaulting inmates and patients at various facilities (Tr. at 7781), becoming violent in the lunch line (Tr. at 7920), and treating blacks differently than whites (Tr. at 7925). The Government even emphasized some of these factual instances to the jury in its closing argument. *See* Tr. at 7960, 7968. These factual instances were, pure and simple, aggravating evidence in support of future dangerousness and should have come in, if at all, in the

Government's case-in-chief. Defendant Lee was entitled to notice that these factual instances would be offered against him as well as an opportunity to defend against them before the jury. [4] However, because the Government introduced them through the "back door," Defendant Lee had no notice or meaningful opportunity to defend.

Third, and perhaps most importantly, the Government's cross-examination of Dr. Cunningham and its presentation of Dr. Ryan as a rebuttal witness focused far too much on Defendant Lee's tendency for violence and his purported diagnosis as a "psychopath." Dr. Cunningham's direct testimony focused exclusively on mitigation evidence. Dr. Cunningham put it best:

> What I was trying to measure is what formative factors shaped him. I wasn't attempting to label just exactly what are we going to call him at this point, a dysthymic disorder, explosive disorder, antisocial personality disorder, is he borderline? I wasn't trying to label him with the conclusion. I was attempting to evaluate what factors were formative in nature, and so I structured my evaluation accordingly. I didn't do a lot of things that I would have done if I was trying to label him out here. I was attempting to look at how do we get here, what happened that brought us to this point.

Tr. at 7829. [5] The Government's questioning of Dr. Cunningham went well beyond the mitigation evidence raised by Dr. Cunningham on direct and ultimately became an expanded encore presentation of the Government's case for future dangerousness. Dr. Ryan's testimony also improperly focused on Defendant Lee's violent character traits. The Court erred in failing to restrain the Government in these respects despite Defendant Lee's insistence that the questioning was improper. [6] **\*1029** As a result, Defendant Lee's rights were irreversibly compromised.

The Government argues that, because the defense explored Defendant Lee's violence on direct-examination, it opened the door to additional discussion of the nature of that violence. By analogy, the Government asserts that, if a doctor testifies that a patient is at risk for cancer, cross-examination should be permitted to determine whether the patient has cancer, and if so, how severe it is. If Defendant Lee's violence is the cancer in the Government's analogy, then the cross-examination at issue was clearly improper. Essentially, the Government in its case-in-chief offered evidence that Defendant Lee has cancer, and it offered factual instances to support that allegation, such as a biopsy that revealed cancerous tissue. In putting on Dr. Cunningham as a mitigation witness, Defendant Lee for all intents and purposes admitted the cancer, but attempted to explain the cancer's presence by showing that it was a result of external factors. It does not follow that, on cross-examination, the Government could inquire into the nature or severity of the cancer. Defendant Lee had admitted to the cancer's presence, and Dr. Cunningham did not go into the nature or severity thereof. Rather, proper cross-examination should have been limited to the methods and techniques used by the doctor in arriving at his conclusions. Admittedly, this did not leave the Government with much room on cross-examination, but the Court must conclude that this was a product of a careful strategy on Defendant Lee's part in choosing to limit Dr. Cunningham's testimony as he did.

The Government's analogy also fails with respect to Dr. Ryan's rebuttal testimony. Dr. Ryan did not look at the same factors in Defendant Lee's life as Dr. Cunningham did. To the contrary, Dr. Ryan's evaluation of Defendant Lee focused almost entirely on risk assessment evidence. Thus, many of the opinions Dr. Ryan had to offer on Defendant Lee were improper rebuttal. As the Court said during the sentencing hearing:

> THE COURT: If they are both looking at the same thing and come up with a different diagnosis, I think you are right, but if one of them is looking at one thing and one of them is looking at something else and says these factors indicate cancer and the other one says these factors indicate pneumonia then the trains miss.

Tr. at 46 (May 13, 1999, Volume 46, under seal). [7]

The Government incorrectly relies on portions of Dr. Cunningham's direct testimony as justification for its cross-examination. It cites the following passage from the doctor's direct testimony as evidence that Dr. Cunningham addressed the issue of remorse, thus opening the door for exploration of that issue on cross-examination:

> Here they are diagnosing him with an intermittent explosive disorder. That means that the person goes along and then has an outburst of anger and rage that's much out of proportion to the stimulus, to the situation that should be causing, then often afterwards feels kind of embarrassed or ashamed or regretful about what happened there.

Tr. at 7730. When placed in context, it is clear that Dr. Cunningham was not referring to his *own* opinion or diagnosis of Defendant Lee but, rather, he was reciting the diagnosis and opinion of some other doctor or expert who had seen the Defendant during his teenage years. The Government did not choose to bring such other experts to testify in its own case, and those experts therefore were not subject to cross-examination. The unfairness is patent.

Turning to the issue of the Government's cross-examination on the subject of psychopathy, it is clear that this evidence was improper. While the psychopath evidence may, to a certain extent, have been **\*1030** proper cross-examination as it was an alternate explanation for the Defendant's alleged violence, the presentation of the psychopath evidence turned into future dangerousness and risk assessment evidence, thus going beyond the scope of proper cross-examination.

The Government contends that it was Dr. Cunningham who first raised the issue of psychopathy on direct:

> DR. CUNNINGHAM: For example, if somebody is a *psychopath,* that's down at one end of the continuum. At the other end of the continuum is a borderline personality disorder. Both of them have attachment problems. This guy doesn't attach at all. This one attaches, but in an unstable

and tense way. So they are both attachment disorders, different ends of the continuum.

Tr. at 7729 (emphasis added). Here, Dr. Cunningham was reviewing for the jury the Defendant's psychiatric records from the Oneida Baptist Institute when the Defendant was fifteen years old. The records indicated a "rule out of borderline personality disorder." Tr. at 7728. Dr. Cunningham was, in the quoted passage where he mentions a "psychopath," trying to explain a borderline personality disorder to the jury. The doctor did not offer any opinion or diagnosis of Defendant Lee on the subject of borderline personality disorder or psychopathy. It can hardly be said that the doctor's mere mention of the word "psychopath" opened the issue for intense cross-examination by the Government.

Although it did not register to the Court at the time, it now appears that from the outset, the Government intended to use Defendant Lee's mental health evidence as part of its own case for future dangerousness. In opening statements, the Government stated:

> MR. LIROFF: ... The evidence that will be presented in this trial is going to help you understand that Mr. Lee, this man who sits right here in this courtroom, is a violent and dangerous man. He thrives on this stuff. *That is part of his profile.* Even if you sent him to prison for the rest of his life, he will be a threat for a long, long time.
>
> In the end, what the evidence that will be presented will establish is that *Mr. Lee is a psychopath.* I don't mean that in a common term. I do mean that in the medical use.

\* \* \* \* \* \*

> We will prove in this case to you that Mr. Lee, *because of his psychological profile,* who he is and who he will be for years to come, is dangerous and will continue to be dangerous.

Tr. at 7381, 7383 (emphasis added). In questioning Dr. Cunningham, the Government highlighted to the jury that psychopathy is a clear indication of future dangerousness:

> Q. And do you agree with their statement that the Hare psychopathy check list is the single most promising recent development in risk assessment of correctional and

forensic populations, has been the psychopathy check list revised. Do you agree with that?

* * * * * *

Q. Is it fair to say that the psychopathy check list serves a purpose other than violence assessment, violence risk assessment?

Tr. at 7812.

Introduction of the psychopathy evidence was error because it improperly emphasized Defendant Lee's future dangerousness. Defendant Lee chose neither to perform a risk assessment analysis nor to present rebuttal evidence on the future dangerousness aggravating factor. He was therefore ill-equipped to handle the Government's discussion of psychopathy.[8]  **\*1031**  In failing to restrict the Government's statements and inquires regarding psychopathy more than it did, the Court erred, and, as a result, Defendant Lee did not receive a fair sentencing hearing.

In sum, it is now apparent from the Government's opening statement and the brevity of its own direct case on the issue of future dangerousness that the Government intended from the beginning to make its most compelling showing of future dangerousness through its cross-examination of Dr. Cunningham and its "rebuttal" testimony of Dr. Ryan. Hence, the Court must ask: Would this jury have given Defendant Kehoe life without parole and Defendant Lee the death penalty if: 1) the Government had not used Dr. Cunningham at all, or, 2) if the Government had not been permitted to open up an area on cross-examination that Dr. Cunningham had not addressed during direct-examination? The Court concludes that it is very questionable whether the jury would have given Defendant Lee the death penalty based upon the Government's direct case, a properly confined cross-examination of Dr. Cunningham, and a properly limited rebuttal by the Government.

The Government also clearly exceeded the proper scope of evidence permitted by the Court's instruction on the non-statutory aggravating factor of "future dangerousness." That instruction states:

The non-statutory aggravating factor alleged by the Government is that Daniel Lewis Lee would be a danger in the future to the lives and safety of other persons, as evidenced by:

(a) his involvement in the murder of Joseph John Wavra on or about July 24, 1990, in Oklahoma City, Oklahoma;

(b) misdemeanor conviction of carrying a concealed in [sic] weapon in Martin County, Florida, on May 3, 1995; and

(c) lack of remorse, as evidenced by his statements made to Gloria Kehoe.

You are not being asked, nor are you permitted, to impose any form of punishment for the activities described above. You are only asked to consider whether the activities described above prove beyond a reasonable doubt that Daniel Lewis Lee would be a danger in the future to the lives and safety of other persons.

Docket No. 815. This instruction specifically limited the evidence the Government was permitted to introduce in support of this aggravating factor.

In its June 22, 1999 brief captioned "Government's Brief Regarding Alleged Punishment Phase Error, Supplemental," the Government notes that the above instruction, as given to the jury in Defendant Lee's penalty phase trial, did not list the threat allegedly made by Defendant Lee against the Pulaski County Deputy Sheriff as an evidentiary basis for supporting the non-statutory aggravator for future dangerousness although the Court had specifically granted the Government's earlier motion to include that threat. The Government is correct in that assertion.

The instructions utilized by the Court were submitted before or during the guilt phase of the trial and were agreed to by the parties. The actual punishment phase instructions were submitted to both the Government and the Defendant immediately before the penalty phase argument, and neither party noted this omission. The Government was permitted to put on evidence of the threat during the penalty phase of the trial. The Government concludes its argument on this point as follows:

> If the jurors had been correctly instructed, they would have been permitted to consider the threat Lee made against the deputy sheriff. Because the instructions prevented the jury from effectively considering the

threat, the only party disadvantaged by this error, was the Government.

Docket No. 939 at pgs. 4–5. Because the Court permitted evidence of the threat to the deputy sheriff to be introduced and argued, it is likely that the jury took that evidence into consideration in spite of the omission in the instructions. Nevertheless, **\*1032** upon retrial, this mistake can be corrected. The main point here, however, is that the accuracy and specificity with which the permitted evidence supporting non-statutory aggravating factors are set forth in the instructions will not prevent unfairness if the Court's evidentiary rulings let in proof that goes beyond the evidence specified.

Accordingly, the Court concludes that it was error to allow the introduction of the aforementioned evidence regarding future dangerousness during the penalty phase of Defendant Lee's trial. The implications of this ruling and its possible interaction with the Court's ruling on the Protocol issue will be discussed at the conclusion of this Order.

### *DEATH PENALTY PROTOCOL*

### I. Background

On May 4, 1999, a jury convicted Defendants Chevie Kehoe and Danny Lee of several RICO offenses involving *inter alia* the robbery and murder of the Mueller family in Tilley, Arkansas. [9] Shortly thereafter, separate penalty phase trials were scheduled for the two Defendants. Defendant Kehoe's penalty trial occurred first. On May 10, 1999, immediately before the penalty verdict was returned in Defendant Kehoe's case, the Government announced *in camera* that if the jury sentenced Defendant Kehoe to life imprisonment, it would not pursue the death penalty for Defendant Lee. May 10, 1999 Transcript (under seal) at 3–6,(Docket No. 824). The Government then explained that it would have to contact the Department of Justice ("DOJ") to obtain permission to withdraw or decertify the death penalty notice. *Id.*

Around 10:45 a.m., the jury sentenced Defendant Kehoe to life imprisonment without the possibility of parole. Accordingly, the Government again indicated during a second *in camera* conference that it would contact the DOJ and request permission to decertify or withdraw the death penalty

notice for Defendant Lee. May 10, 1999 Transcript (under seal) at 2–7, (Docket No. 825). The Court then asked the Government if it would be able to do so by noon, but the Government requested more time. *Id.* It was then decided that the Court would meet with counsel at 3:00 that afternoon. *Id.*

The parties reconvened in chambers at 3:00 p.m. *Id.* at 7. When the Court asked the United States Attorney, Ms. Paula Casey, whether the Government intended to seek the death penalty for Defendant Lee, she responded, "I've not spoken with the Attorney General, but with the Deputy Attorney General. The Department is not decertifying the death request." *Id.* at 8. The parties then announced that they were ready to proceed with the penalty phase of the trial the following morning. *Id.* Importantly, at no time did the Government ask for additional time to deal with the requested decertification of the death penalty for Defendant Lee. If such request had been made, this Court would naturally have granted it. The penalty phase of Defendant Lee's trial commenced the next **\*1033** morning, at the conclusion of which, the jury returned with a verdict of death.

Defendant Lee subsequently asked that the verdict be set aside because the Attorney General failed to follow the Death Penalty Protocol ("Protocol"), which is set forth in § 9–10.000 et seq. of the United States Attorney's Manual ("Manual"). That Protocol requires the Attorney General to make the final decision whether to decertify or withdraw a death penalty notice. [10] The relevant provision of the Protocol provides that:

> Once the Attorney General has authorized the United States Attorney to seek the death penalty, a notice of intention to seek the death penalty filed with the court shall not be withdrawn *unless authorized by the Attorney General* or approved by the United States Attorney as a condition of a plea agreement. If the United States Attorney wishes to withdraw the notice and proceed to trial, the United States Attorney shall Advise the Assistant Attorney General for the Criminal Division of the reason for that request, including the changes in facts or circumstances.
>
> > Any request to withdraw a notice shall be reviewed by the Committee [known as the Review Committee on Capital Cases] appointed by the Attorney General, which will make a recommendation to the Attorney General. *The Attorney General shall make the final decision.*

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

United States Attorney's Manual § 9–10.090 (emphasis added).

In response to Defendant Lee's allegations, Mr. Robert A. De La Cruz, an attorney for the Department of Justice, sent the Court a letter explaining that:

> The United States Attorney was required to seek *the Attorney General's authorization* to withdraw the notice of intent to seek a death penalty. The United States Attorney attempted to do that, after consultation with members of this trial team. The Attorney General was unavailable during the time allotted to the government by the Court, and *Deputy Attorney General Eric Holder decided* not to withdraw the Attorney General's previously-given authority to seek the death penalty. The Attorney General did not authorize the United States Attorney to withdraw the notice of intent to seek the death penalty. Accordingly, the United States was compelled to proceed with the sentencing phase of defendant Lee's trial, and the trial attorneys were under a continuing obligation to represent the interests of the United States, without regard to personal views.

Docket No. 840 at 9–10 (emphasis added). [11] The Government also submitted the affidavit of Mr. Kevin V. DiGregory, who was the member of the Attorney General's Review Committee on Capital Cases that received U.S. Attorney Casey's May 10, 1999, telephone call requesting permission to withdraw the death penalty notice for Defendant Lee. In his affidavit, Mr. DiGregory averred that:

> 4. At the time of Ms. Casey's telephone call to me, Attorney General Janet Reno was attending a meeting at the White House in Washington, D.C. Until such time as Attorney General Reno returned to her office at the Department, she was unavailable to decide the issue posed by United States Attorney **\*1034** Casey. Since the Attorney General

was not available, *we sought out Deputy Attorney General Eric H. Holder, Jr., as the decision-maker* because I was concerned about affording the decision-maker sufficient time to meet with the Committee, confer with the United States Attorney Casey, and make a decision prior to the 3:00 p.m. CDT deadline.

> 5. At approximately 2:30 p.m. EDT [12], the Committee met with Deputy Attorney General Holder and, via telephone, with the United States Attorney Casey. In the course of that meeting, *Deputy Attorney General Holder decided* that the notice of intention to seek the death penalty should not be withdrawn, and that decision was communicated to United States Attorney Casey.

Docket No. 887 (emphasis added). [13]

Defendant Lee then subpoenaed Attorney General Reno and Deputy Attorney General Holder in an effort to further determine what transpired on May 10, 1999, and the Government filed a Motion to Quash those subpoenas. This Court denied the Government's Motion on July 22, 1999. Docket No. 885. In that Order, this Court ruled that the subpoenas were necessary to determine: 1) Attorney General Reno's whereabouts on May 10, 1999; 2) the extent of her knowledge of, or participation in, the Protocol; 3) whether Defendant Lee had an adequate opportunity to be heard; 4) whether a recommendation was in fact made by the Committee; 5) whether the recommendation was conveyed to the individual vested with "final" authority; 6) whether Attorney General Reno was "legally absent" on that date; 7) whether Attorney General Reno specifically authorized Deputy Attorney General Holder to act in her stead in this case; and 8) whether, after the fact, Attorney General Reno reviewed the procedures and the decision of Deputy Attorney General Holder and approved or disapproved of the procedures used and with his ultimate decision to seek the death penalty. *Id.*

After the Order was entered, the Government filed a Petition for a Writ of Mandamus asking the Eighth Circuit to prevent the issuance of the subpoenas. The Eighth Circuit granted the petition because of its decision that Defendant Lee failed to establish "exceptional circumstances" justifying the issuance of subpoenas to high government officials, such as the Attorney General and her Deputy. *See In re United States of America,* 197 F.3d 310 (8th Cir.1999). [14] During oral arguments before the Eighth Circuit, Defendant Lee conceded that in order to prevail on his motion to set aside

the death verdict, he need only establish that: "Reno did not participate in or approve the decision not to withdraw the death notice in this case, that Reno did not know of Casey's request to withdraw the notice, and that *the death penalty protocol was not followed.*" *Id.* at 314 (emphasis added). So, in addition to a lack of exceptional circumstances, the Eighth Circuit reasoned that the Reno and Holder subpoenas were unnecessary because "[t]he record as developed at the June 29 hearing and in the DiGregory affidavit contains sufficient evidence *to establish each of these facts,* none of which appears to be disputed by the government." *Id.* (emphasis added).

Accordingly, this Court will now presume that the Protocol, as stated in United States Attorney's Manual § 9–10.090, was in fact violated because Attorney General Reno did not participate in, or approve of, **\*1035** Deputy Attorney General Holder's decision not to withdraw the death penalty notice, and further, she did not even know of the U.S. Attorney's request to withdraw the notice at anytime before that decision was made and conveyed to this Court. Furthermore, although Defendant Lee has not been permitted to establish this as a fact (because of the decision by the Eighth Circuit), this Court will assume that the Attorney General could easily have been contacted [15] about this serious issue before 3:00 p.m. on May 10, 1999, and that, in any event, time was not a factor because the parties could have requested and received additional time to accommodate the convenience of Attorney General Reno. Hence, this Court must now resolve the issues of: 1) whether Defendant Lee has a right to enforce compliance with the procedures found in the Protocol before the Attorney General makes the final decision on the U.S. Attorney's request to decertify the death penalty notice in this case; and 2) whether, under the circumstances stated, Deputy Attorney General Holder had authority to act in Attorney General Reno's stead. [16]

## II. Discussion

### A. Right to Enforce the Protocol

The first issue this Court must resolve is whether Defendant Lee has a right to enforce compliance with the procedures found in Attorney General Reno's Death Penalty Protocol. When considering the Government's petition for mandamus, the Eighth Circuit seemed to surmise, in dicta, that perhaps Defendant Lee had no such right. *See In re United States of America,* 197 F.3d at 315–16. Upon careful consideration, this Court respectfully disagrees. **\*1036** The basic premise from which the Eighth Circuit rightfully began its analysis is the *Accardi* doctrine, which, in sum, provides that an administrative agency must follow its own procedural rules if those rules will affect an individual's rights. *See Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). Because the *Accardi* doctrine cases are particularly applicable to the facts at hand, they warrant considerable discussion.

In *Accardi,* section 19(c) of the Immigration Act of 1917 gave the Attorney General discretion to suspend the deportation of an illegal alien if certain criteria were established. *Id.* at 262–633, 74 S.Ct. 499. The Attorney General, however, passed regulations that delegated this discretionary decision to the Board of Immigration Appeals. [17] *Id.* at 266, 74 S.Ct. 499. The respondent, Mr. Accardi, argued that the decision to deport him was invalid because the Board and the Attorney General failed to follow the procedures mandated by those regulations. *Id.* at 266–67, 74 S.Ct. 499. The Supreme Court held that although Mr. Accardi did not have the right to interfere with the Board's or the Attorney General's discretion by questioning their *ultimate and substantive* decision to deport him, he did have a right to require them to follow their self-imposed procedures when making that determination. *Id.* In this respect, the Court explained:

> It is important to emphasize that we are not here reviewing and reversing the manner in which discretion was exercised. If such were the case we would be discussing the evidence in the record supporting or undermining the alien's claim to discretionary relief. Rather, we object to the Board's alleged failure to exercise its own discretion, contrary to valid regulations.

*Id.* at 268, 74 S.Ct. 499. Hence, the Court ruled that if Mr. Accardi could establish that the procedures were in fact violated, he would be entitled to a new deportation hearing. *Id.*

The *Accardi* doctrine was further expanded during the McCarthy era when actions were taken against individuals for their alleged association with the Communist party. For example, in *Service v. Dulles,* 354 U.S. 363, 370, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957), a statute commonly referred to as the "McCarran Rider" gave the Secretary of State "absolute

discretion" to terminate any employee of the Department of State or of the Foreign Service "whenever he shall deem such termination necessary or advisable in the interests of the United States" (quoting Pub.L. No. 82–188, § 103, 65 Stat. 581). The Secretary of State, however, enacted self-imposed regulations that established an elaborate procedure to be followed when deciding whether to terminate an employee for disloyalty. *Id.* at 383–87, 77 S.Ct. 1152. The petitioner, Mr. Service, argued that pursuant to *Accardi,* the Secretary's decision to terminate him was invalid because the Secretary did not follow the procedures mandated by those regulations. *Id.* at 372, 77 S.Ct. 1152. The Supreme Court agreed and gave the following explanation:

> While it is of course true that under the McCarran Rider the Secretary was not obligated to impose upon himself these more rigorous substantive and procedural standards, neither was he prohibited from doing so, as we have already held, and having done so he could not, so long as the Regulations remained unchanged, proceed without regard to them.

*Id.* at 388, 77 S.Ct. 1152. Accordingly, the Court invalidated the Secretary's decision to terminate Mr. Service and remanded the case for further consideration. *Id.* at 388–89, 77 S.Ct. 1152.

Over the next six years, the Supreme Court held in other McCarthy era cases that an individual had the right to force an agency to comply with its self-imposed procedural rules or regulations when making **\*1037** a substantive and discretionary decision. *See Yellin v. United States,* 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963)(holding that an individual had the right to force the House Committee on Un–American Activities to abide by its own procedural rules during an investigatory hearing); *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959)(holding that, although Congress gave the Secretary of Interior absolute discretion to terminate an employee in the name of national security, the Secretary was nevertheless required to follow its own procedural rules when making such a determination).

Finally, and most relevant here, is the case of *Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), where the Supreme Court held that the *Accardi* doctrine also applied to procedural rules found in an agency's *internal manual.* In *Morton,* the Bureau of Indian Affairs ("BIA") denied the respondents' request for general assistance benefits because the respondents failed to satisfy a geographic limitation promulgated by the Bureau. *Id.* at 205, 94 S.Ct. 1055. On appeal, the respondents claimed that the geographic regulation was invalid because it was not published in the Federal Register or Code of Federal Regulations as required by the Bureau's "internal-operations brochure." *Id.* at 235–36, 94 S.Ct. 1055. The Supreme Court held that the geographic limitation was invalid, not because of the substance of that regulation, but because the BIA failed to publish it in compliance with their self-imposed rule requiring them to do so. *Id.* In reaching this conclusion, the Court said:

> Where the rights of individuals are affected, *it is incumbent* upon agencies to follow their own procedures. This is so even where the *internal procedures* are possibly *more rigorous* than otherwise would be required.... Before the BIA may extinguish the entitlement of these otherwise eligible beneficiaries, it must comply, at a minimum, with its own *internal procedures.*

*Id.* at 235, 94 S.Ct. 1055 (internal citations omitted) (emphasis added).

Likewise, the Eighth Circuit has held on numerous occasions that pursuant to the *Accardi* doctrine an agency must follow its self-imposed procedural rules when making discretionary decisions that affect an individual's rights. *See, e.g., Munnelly v. United States Postal Serv.,* 805 F.2d 295, 302 (8th Cir.1986) (acknowledging that the Postal Service had to abide by its self-imposed procedural rules, which were printed in an internal postal manual, when deciding whether to terminate an employee); *Oglala Sioux Tribe v. Andrus,* 603 F.2d 707, 721 (8th Cir.1979) (recognizing that an Indian

tribe must follow its own procedural rules before transferring a superintendent).

From these cases, it is abundantly clear that an individual has the right to force an administrative agency [18] to follow its own procedural rules, even when those rules are contained in an internal manual and are more stringent than the broad authority given to that agency, if the decision made under those rules will affect the individual's rights. In the aforementioned cases, the courts applied this doctrine when the individual rights affected were citizenship, employment, and eligibility for general assistance benefits. In the present case, the right affected is the most fundamental right— the right to life. Hence, this Court concludes that because Defendant Lee's right to life will be affected [19] by the Attorney General's decision **\*1038** whether to withdraw or decertify the death penalty notice, he has a right to require the Attorney General to follow her self-imposed procedures found in the Protocol before she makes that substantive decision. This Court wishes to emphasize, as the Supreme Court did in *Accardi,* that this ruling in no way impinges upon the Attorney General's broad discretion to make this *substantive* decision yea or ney, as she alone decides in this case. Although this Court does not have the authority to review, or look behind, the Attorney General's ultimate decision, the aforementioned cases clearly establish that this Court can require her to follow her *procedural* Protocol before making that decision.

In reaching this conclusion, the Court is not unmindful of the Government's assertion that the Attorney General and her U.S. Attorneys are somehow exempt from the *Accardi* doctrine because it is impermissible for a court to impinge upon their broad prosecutorial discretion. As illustrative of this point, the Government points to several Eighth Circuit cases holding that the accused has no right to enforce the Petite Policy, [20] which, similar to the Death Penalty Protocol, is an internal policy found in the U.S. Attorney's Manual. *See, e.g.,* *United States v. Basile,* 109 F.3d 1304, 1308 (8th Cir.1997), *cert. denied,* 522 U.S. 873, 118 S.Ct. 189, 139 L.Ed.2d 128 (1997); *United States v. Lester,* 992 F.2d 174, 176 (8th Cir.1993); *United States v. Moore,* 822 F.2d 35, 38 (8th Cir.1987). However, the Government's argument is flawed because in each of those cases the accused tried to challenge the Government's *ultimate and substantive* decision whether to pursue a successive prosecution instead of the procedures the DOJ followed when making those decisions.

In fact, unlike the Death Penalty Protocol, the Petite Policy contains no procedural components.

The Government, however, is correct that other jurisdictions have held that defendants do not have a protected interest in the Death Penalty Protocol. *See* *United States v. Feliciano,* 998 F.Supp. 166 (D.Conn.1998); *United States v. McVeigh,* 944 F.Supp. 1478 (D.Colo.1996); *Nichols v. Reno,* 931 F.Supp. 748 (D.Colo.1996), *aff'd,* 124 F.3d 1376 (1997); *United States v. Boyd,* 931 F.Supp. 968 (D.R.I.1996), *cert. denied,* 528 U.S. 1098, 120 S.Ct. 842, 145 L.Ed.2d 708 (2000); *United States v. Roman,* 931 F.Supp. 960 (D.R.I.1996), *cert. denied,* 528 U.S. 1127, 120 S.Ct. 960, 145 L.Ed.2d 833 (2000); *Walker v. Reno,* 925 F.Supp. 124 (N.D.N.Y.1995). Again, these cases are factually distinguishable from the case at hand.

For instance, in the cases arising out of the bombing of the Oklahoma City federal building, the courts rejected Defendant Nichols' and McVeigh's substantive challenges **\*1039** to Attorney General Reno's ultimate decision to seek the death penalty. *McVeigh,* 944 F.Supp. 1478; *Nichols,* 931 F.Supp. 748. Importantly, in those cases the DOJ *had in fact followed the procedures mandated by the Protocol,* and hence such procedural compliance was not an issue. *See* *McVeigh,* 944 F.Supp. at 1483. [21] Likewise in *Feliciano, Boyd,* and *Roman,* the defendants asked the courts to force the Government to disclose the mitigating and aggravating factors provided to the Attorney General's Capital Case Review Committee even though no such procedural rights were found in or mandated by the Protocol. *Feliciano,* 998 F.Supp. 166; *Boyd,* 931 F.Supp. 968; *Roman,* 931 F.Supp. 960. Hence, this Court concludes that these cases have no bearing on its conclusion that Defendant Lee has a right to require the DOJ and the Attorney General to follow their procedural Protocol when making the substantive decision whether or not to seek the death penalty in his case.

Finally, and most persuasive, is the case of *Walker v. Reno,* 925 F.Supp. 124 (N.D.N.Y.1995). In that case, the court concluded, as does this Court, that a defendant does not have a right to challenge the Attorney General's *ultimate and substantive decision* to seek the death penalty. However, the *Walker* court declared, albeit in dicta, that pursuant to

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

the *Accardi* doctrine, a defendant would have a right to force the DOJ and the Attorney General to follow the *procedural Protocol* found in the DOJ Manual. On this matter, the Court explained:

> In this case, plaintiffs' Complaint contains no allegation that defendant Reno ignored the procedures contained in her Protocol. Indeed, from all appearances defendant Reno scrupulously followed her self-prescribed Protocol procedures. Plaintiff has not alleged, for instance, that the U.S. Attorney sought the death penalty without the prior written authorization of the Attorney General, Protocol at § 9–10.000(A), or failed to submit a prosecution memorandum to the Attorney General, *Id.* at § 9–10.000(A); or that plaintiff's counsel were denied a reasonable opportunity to present matters in opposition to capital punishment to the U.S. Attorney and DOJ, *Id.* § 9–10.000(B), (D); or that the Attorney General failed to appoint a special committee to review all submissions, *Id.* § 9–10.000(D), or failed to receive a recommendation from that committee. *Id. Under the foregoing cases, such allegations might well provide a basis for this Court to set aside defendant Reno's determination and remand the matter to the Attorney General for reconsideration pursuant to the procedures she has prescribed for herself in the Protocol.*

*Walker,* 925 F.Supp. at 132–33 (emphasis added)(footnotes omitted).

Based on the foregoing analysis, this Court concludes that pursuant to the *Accardi* doctrine, Defendant Lee has a right to require the DOJ and the Attorney General to comply with its self-imposed and internal procedures found in the Death Penalty Protocol before the Attorney General makes the final substantive decision whether to decertify the death penalty notice in his case.

## B. Deputy Attorney General Holder's Authority to Act

Hence, this Court must now decide whether the Protocol was in fact violated on May 10, 1999, when the U.S. Attorney submitted her decertification request to the Attorney General's Office. In light of the Eighth Circuit's holding, as explained above, this Court must assume that the Protocol was in fact violated because Attorney General Reno did not participate in, or approve of, Deputy Attorney General Holder's decision not to withdraw the **\*1040** death penalty notice, and further, she did not even know of the U.S. Attorney's request to withdraw the notice at anytime before that decision was made and conveyed to this Court. In response to these assumptions, the Government argues that the Protocol was not violated because, under the circumstances of this case, Deputy Attorney General Holder had the authority to act in Attorney General's stead and make the ultimate decision to not withdraw the death penalty notice as to Defendant Lee. This Court disagrees for two reasons.

First, this Court concludes that Deputy Attorney General Holder did not have the authority to make the final decision on the U.S. Attorney's request to decertify the death penalty notice for Defendant Lee because Attorney General Reno was not legally absent. Congress anticipated that there might be some instances where the Deputy Attorney General might need to act on behalf of the Attorney General. Accordingly, Congress passed an act that provides, in relevant part, that: "In case of a vacancy in the office of Attorney General, or of his *absence* or disability, the Deputy Attorney General may exercise all the duties of that office, and for the purpose of section 3345 of title 5 the Deputy Attorney General is the first assistant to the Attorney General." 28 U.S.C. § 508(a) (emphasis added). Likewise, the relevant regulation declares that: "In case of vacancy in the office of the Attorney General, or of his *absence* or disability, the Deputy Attorney General shall, pursuant to 28 U.S.C. § 508(a) perform the functions and duties of and act as the Attorney General." 28 C.F.R. § 0.132(a) (emphasis added). Unfortunately, neither the Act nor the Regulation define the word "absence."

The Government argues that on May 10, 1999, Attorney General Reno was legally absent, as contemplated by the Act and Regulation, because she was a few blocks away attending a conference at the White House. The Court finds this

argument unconvincing because, if accepted, the implication would be that the Deputy Attorney General could act in the Attorney General's stead whenever she was *temporarily away from the office,* such as if she had gone to lunch or left for the evening. Surely such a result would be preposterous, especially, where as here the most fundamental right—the right to life—is at issue and contact with the Attorney General could have been easily established. [22] Furthermore, neither the parties nor this Court could find any cases where the word "absence" has been given such a broad construction. In fact, the only cases applying 28 U.S.C. § 508(a) have involved the Deputy Attorney General's or the Solicitor General's authority to act when the Attorney General *had resigned,* and was not merely temporarily out-of-pocket, as in this case. *See* United States v. Pellicci, 504 F.2d 1106 (1st Cir.1974), *cert. denied,* 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975); *United States v. Halmo,* 386 F.Supp. 593 (E.D.Wis.1974); United States v. Curreri, 363 F.Supp. 430 (D.Md.1973). Accordingly, the Court concludes that Deputy Attorney General Holder did not have the authority to act in Attorney General Reno's stead on the theory that she was legally absent as contemplated by either 28 U.S.C. § 508(a) or 28 C.F.R. § 0.132.

Second, the Court concludes that Deputy Attorney General Holder did not have authority to act in Attorney General Reno's stead because the specific language of the Protocol provides that the final decision to decertify a death penalty notice must be made by the Attorney General personally. In support of this conclusion, **\*1041** the Court turns to 28 C.F.R. § 0.15(a), which provides that: "The Deputy Attorney General is authorized to exercise all the power and authority of the Attorney General, *unless any such power or authority is required by law to be exercised by the Attorney General personally.*" (Emphasis added.) This same language can also be found in Section 1–2.102 of the U.S. Attorney's Manual. As previously mentioned, the Death Penalty Protocol unequivocally declares that "the *Attorney General* shall make the final decision" whether to decertify a death penalty notice. U.S. Attorney's Manual § 9–10.090 (emphasis added). The Government argues that Section 9–10.090 does not have the force of law as required by 28 C.F.R. § 0.15 and Section 1–2.102. This Court, however, has already held that pursuant to the *Accardi* doctrine, procedural statements found in the U.S. Attorney's Manual have the force of law if they affect an individual's rights. Here, it is clear that the Attorney General mandated by her own Protocol that she alone would make a final determination whether to withdraw a death

penalty notice. Hence, Deputy Attorney General Holder had no right to usurp Attorney General Reno's clear reservation of exclusive authority merely because she was temporarily away from her office. Furthermore, it is clear that the Attorney General can revoke any general grant of authority to the Deputy Attorney General, and it appears that Attorney General Reno did exactly that when she promulgated Section 9–10.090, which unequivocally declares that she, personally, will make the final decision on a request to decertify a death penalty notice. So, assuming that before the promulgation of the Protocol the Deputy Attorney General had such general authority, it is clear that the Attorney General removed that general authority when she place the Protocol in effect.

For these reasons, this Court rules that Deputy Attorney General Holder did not have the authority, under the facts of this case, to make the final and substantive decision to deny the U.S. Attorney's request to decertify or withdraw the death penalty notice in Defendant Lee's case. Accordingly, the Court concludes that the Death Penalty Protocol was in fact violated in this case, and that Defendant Lee has a right to require the Attorney General and the DOJ to properly comply with the procedures established in the Protocol before the Attorney General makes the "final decision" to withdraw or not withdraw the death penalty notice. Therefore, the Court sets aside as a nullity Deputy Attorney General Holder's decision and remands the matter to Attorney General Reno for consideration pursuant to the procedures she has prescribed for herself in the Protocol. *See* Walker, 925 F.Supp. at 133.

### CONSEQUENCES OF COURT'S RULING

The Court must now determine the disposition of this case in light of the rulings entered herein on the future dangerousness and Protocol issues. The Court interprets its ruling on the Protocol issue as requiring the Government to "turn-the-clock-back" to that moment immediately after the Government announced its intention to seek the decertification of the death penalty notice. The Department of Justice and the Attorney General must then fully and properly comply with the procedural terms of the Death Penalty Protocol, to-wit: 1) the request to withdraw the death penalty notice will be reviewed by the Review Committee on Capital Cases; 2) the Committee will make its recommendation to Attorney General Reno; and 3) Attorney General Reno, *herself,* will then make the final decision whether to decertify or withdraw the death penalty notice as to Defendant Lee.

If the Attorney General decides to grant the U.S. Attorney's request to decertify the death penalty notice, this Court will impose the sentence of life without the possibility of release. [23] In contrast, if the **\*1042** Attorney General decides not to decertify the death penalty notice, then both of the Court's rulings, i.e., its ruling on the Protocol issue and its ruling that it was error to introduce certain evidence of future dangerousness, will require that Defendant Lee be given a new penalty phase trial. A new jury will have to be selected for this purpose. Furthermore, a new penalty phase trial might require the presentation of most of the evidence introduced during the guilt phase of the trial because Defendant Lee contends that the jury should be made aware of Defendant Kehoe's greater and more culpable role in the RICO crimes which nevertheless resulted in Defendant Kehoe receiving a sentence of life imprisonment without the possibility of release. Of course, elaborate stipulations might shorten the trial to some degree. The Court will determine the specific procedures for conducting a new penalty phase trial if and when the occasion arises.

**CONCLUSION**

IT IS THEREFORE ORDERED THAT the Department of Justice and the Attorney General be, and they are hereby, ordered to properly review and act upon the U.S. Attorney's request to decertify or withdraw the death penalty notice in Defendant Lee's case in accordance with the procedures mandated by the Death Penalty Protocol before the Attorney General, herself, makes the final decision whether to grant or deny that request.

IT IS THEREFORE FURTHER ORDERED THAT Defendant Lee's Motion for a New Penalty Phase Trial be, and it is, hereby GRANTED. Accordingly, if the Attorney General denies the request to decertify or withdraw the death penalty notice, then the Court will hold a new penalty phase trial for Defendant Lee. If the Attorney General grants the request to decertify or withdraw the death penalty notice, then the Order for a new penalty phase trial will be moot, and the Court will sentence Defendant Lee to life imprisonment without the possibility of release.

**All Citations**

89 F.Supp.2d 1017

**Footnotes**

[1]    Dr. Cunningham was able to testify for others in his narrator role because of section 3593(c)'s relaxed evidentiary standard. *See* *United States v. Jones,* 132 F.3d 232, 241 (5th Cir.1998), *aff'd,* 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (stating that sentencing hearing is not governed by traditional evidentiary restraints).

[2]    The Court believes this motion to be a proper objection by Defendant Lee to improper cross-examination by the Government, contrary to the Government's argument that Defendant Lee did not timely object and therefore had waived any claim of error. In addition, counsel for Defendant Lee later stated, "I was assuming that I had an ongoing objection because of my motion so I didn't stand up and object every time." Tr. at 7832. The Court responded, "That's true, I understood that. In fact, we talked about that before the evening recess." Tr. at 7832.

[3]    This colloquy makes clear the Court's assumptions and reasoning which led it into error. The Court had in mind a common situation with respect to such expert psychological or psychiatric testimony, i.e., where the expert covers, say, two completely separate relevant areas thoroughly in his or her pre-trial examination and analysis of a defendant but, then, because the result of the expert's examination into one of those areas is not favorable to the defendant, the expert attempts to limit his or her testimony solely to the other area which, assumedly, *is* favorable to the defendant. If the expert witness acknowledges on cross-examination that he is thoroughly prepared on both areas, then it has been this Court's practice to permit the Government to develop such information and opinions on cross-examination.

Here, since the Court did not understand clearly just what areas into which Dr. Cunningham had gone in his pretrial studies of Defendant Lee, it opted to let the Government tentatively explore the situation. Therefore, at the very least, the Court should have cut off the examination as soon as it became apparent that the Government was going into areas into which Dr. Cunningham had not qualified himself to render any opinion—the area of future dangerousness.

On February 18, 2000, Defendant Lee submitted (attached to Brief) the affidavit of Dr. Cunningham. It clearly shows the experience and expertise Dr. Cunningham has in the area of "future dangerousness." However, because of the circumstances, it was decided not to examine Defendant Lee and make the other studies necessary in attempt to refute the Government's aggravating factor of future dangerousness. In this connection, the Court's notes paragraph 9 (page 7) of the affidavit, to wit:

> In preparation to individualize the violence risk assessment to Mr. Lee, I requested specific statistical data and procedures, including the rate of assaults among white supremacists in BOP. Mr. Lane Liroff did not provide this and other important data. I additionally requested that I be allowed a tour of several U.S. Penitentiaries and a more detailed tour of ADX Florence, such as had been provided to Dr. Thomas Ryan, the Government's expert in *U.S. v. Danny Lee.* These tours would have allowed me additional specific perspectives regarding confinement, rehabilitation, and treatment programs for Mr. Lee. Mr. Liroff strongly protested these tours in appearing before Judge Forster, asserting that such tours were against BOP policy and would seriously compromise the security of the U.S. Penitentiaries. However, I subsequently discovered correspondence in my files that would seem to dispute Mr. Liroff's representations. This correspondence was from a prior federal capital case (*U.S. v. LaFawn Bobbitt* ) where prison tours had been ordered, but could not be accomplished before trial. In this correspondence (attached), Mr. Rick Schott (Attorney, U.S. Department of Justice, Federal Bureau of Prisons, U.S. Penitentiary) detailed that my proposed tour of U.S. Terre Haute would be the same as that afforded the *general public.* In the absence of the requested data, I could not sufficiently and reliably individualize my risk assessment of Mr. Lee.

4    The agreed instructions, indeed, set forth the evidence upon which the Government would rely to establish that "Daniel Lewis Lee would be a danger in the future to the lives and safety of other persons...." *See* pg. 1031, *infra.*

5    *See also* note 3, *supra.*

6    At the conclusion of Dr. Cunningham's testimony, the Court knew it had a made a mistake: "THE COURT: ... First, I am convinced that I probably permitted the Government to go much farther on cross-examination than is proper." Tr. at 7836.

7    *See* note 3, *supra.*

8    As Defendant Lee states in his reply brief, "Had Dr. Cunningham and the defense made the decision to address future dangerousness and risk assessment, Dr. Cunningham would have explained to the jury how the BOP handles violence and violent offenders within its system." Reply Brief, Doc. No. 856, at 3.

9    The Government has maintained throughout the pre-trial, trial and post-trial periods that Chevie Kehoe was the leader of the RICO enterprise and that Danny Lee and others were his subordinates. The proof at trial was consistent with those contentions. In fact, Defendant Lee was implicated in only a few of the numerous RICO acts alleged in the Indictment, and he was acquitted of at least two of the acts in which he was implicated. To be sure, he was found guilty of the RICO acts relating to the robbery and murders of the Mueller family, but even with respect to those crimes, the testimony was that Defendant Lee played a lesser role in their planning and commission. With respect to the murder of Sarah Powell, the principal testimony offered to establish the details of the crime was that of Chevie Kehoe's mother, Gloria Kehoe. Ms. Kehoe testified that she was told by Chevie Kehoe that Danny Lee could not participate in that murder and that he (Chevie Kehoe) had to carry it out alone. Moreover, the proof as a whole left the definite impression that Defendant Kehoe was the orchestrator of the entire RICO operation, and that Defendant Lee served as his subordinate for only a brief portion of the lengthy multi-state conspiracy.

Defendant Lee does not contend that the Government failed to follow the Protocol when it initially obtained the Attorney General's permission for seek the death penalty for Defendant Lee.

The Court takes strong exception to Mr. De La Cruz's suggestion that it is responsible for the U.S. Attorney's inability to obtain a decision on this most serious issue. At the time, the Court was unaware of the Protocol, and the procedures contained therein for obtaining permission to withdraw a death penalty notice. If the Court had been so advised and a request for an extension of time had been made, this Court would have certainly granted the parties' request in order to permit the Attorney General to personally attend to this most serious matter as provided in that Protocol. Indeed, continuing the penalty phase for a day or two, if necessary, would not have created more than a minor inconvenience.

Which would be 1:30 CDT.

The Protocol requires that the request to withdraw the death penalty notice "shall be reviewed by" the Review Committee on Capital Cases, and that the Committee "will make a recommendation to the Attorney General." U.S. Attorney's Manual § 9–10.090. Mr. DiGregory's affidavit does not state whether the Committee reviewed the request, or if the Committee made any recommendation thereon to the Attorney General.

Defendant Lee has filed a petition for a writ of certiorari asking the United States Supreme Court to review that decision. The Court has decided, with the parties' permission, to go forward with this matter without waiting for the Supreme Court's decision.

This Court's conclusion that Attorney General Reno could have been easily contacted is bolstered by a former Committee member's statement that, "[t]he Review Committee operates informally, with no set schedule and with *virtually immediate access to the Attorney General when necessary.*" Rory K. Little, The *Federal Death Penalty: History and Some Thoughts About the Department of Justice,* 26 FORDHAM URB. L.J. 347, 421 (1999) (emphasis added).

Defendant Lee argues that Congress gave the United States Attorney, and not the Attorney General, the authority to decide whether to seek the death penalty in a particular case. The relevant provision of the Federal Death Penalty Act provides that:

> If, in a case involving an offense described in section 3591, *the attorney for the government* believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice [to seek the death penalty] ....

18 U.S.C. § 3593(a)(emphasis added). The Act does not define the phrase "attorney for the government," but the Court agrees with the court in Nichols v. Reno, 124 F.3d 1376 (10th Cir.1997), as will be explained herein, that the quoted language refers to United States Attorneys.

Generally, the duty to "prosecute for all offenses against the United States" is allocated to the United States Attorneys. 28 U.S.C. § 547(a). However, the same title specifically gives the Attorney General the authority to "*supervise all litigation* to which the United States, an agency, or officer thereof is a party, and *shall direct all United States attorneys,* assistant United States attorneys, and special attorneys appointed under section 543 of this title *in the discharge of their respective duties.*" 28 U.S.C. § 519. The Tenth Circuit has interpreted these three statutory provisions as giving the Attorney General the authority to enact the Protocol which, in turn, gives her, and not the United States Attorneys, the final decision whether to seek the death penalty in a particular case. *See* Nichols, 124 F.3d at 1377 (10th Cir.1997) (affirming the same conclusion reached by the District Court of Colorado in Nichols v. Reno, 931 F.Supp. 748, 750 (D.Col.1996)).

The Court agrees with this reasoning, and therefore, rules that Attorney General Reno, and not United States Attorney Casey, has the authority to make the final decision whether to seek the death penalty in Defendant Lee's case. Nevertheless, this is a serious issue since, absent the adoption of the Protocol or some other directive or intervention by the Attorney General, exercise of this responsibility would be vested in the U.S. Attorneys involved and the decision of United States Attorney Casey here would have resulted in the withdrawal of the death penalty notice in Defendant Lee's case.

The Board's decision was reviewable by the Attorney General only in certain circumstances listed in 8 C.F.R § 90.12 (1949) and 8 C.F.R. § 6.1(h)(1) (Rev.1952). *Id.* at 266.

It is undisputed that the Department of Justice is an executive agency. *See also* *Walker v. Reno, 925 F.Supp. 124, 126 (N.D.N.Y.1995)* (holding that the DOJ is an executive agency).

In a law review article written by a former member of the Attorney General's Capital Case Review Committee, the author explains that:

> The U.S. Attorney's recommendation carries great, although not dispositive, weight with the Committee. This is particularly so when the recommendation is *against seeking death* in death-eligible case. Such "no death" recommendations are *almost always accepted,* not just because of the traditional autonomy of the U.S. Attorneys, but also because the U.S. Attorneys generally exercise great care in submitting their recommendations and are presumed to know their local communities, jury pools, judges, and the overall strengths and weakness of their particular case far better than Main Justice personnel.... On the other hand, a recommendation from a U.S. Attorney in favor of seeking the death penalty receives somewhat less deference at Main Justice. Here is where the goal of national uniformity in administering the federal death penalty often outweighs the localized perspective of field offices.

> Rory K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role,* 26 FORDHAM URB. L.J. 347, 422–23 (1999) (emphasis added). In light of this proclamation, it is readily apparent that Defendant Lee's right to life was adversely affected by the DOJ's failure to follow its procedural Protocol when considering the U.S. Attorney's recommendation to decertify the death penalty notice in this case.

The Petite Policy provides that U.S. Attorneys shall not prosecute any person for allegedly criminal behavior that was an ingredient of a previous state prosecution, unless the subsequent federal prosecution is specifically authorized in advance by the "appropriate Assistant Attorney General." *See* U.S. Attorney's Manual § 9–2.031. The Petite Policy also establishes three substantive criteria the Assistant Attorney General must consider when making that determination. *Id.*

Instead, Defendants McVeigh and Nichols claimed that the Attorney General's ultimate and substantive decision to seek the death penalty was invalid because she publicly announced her decision to do so before a suspect was even identified, and that her decision was improperly influenced by President Clinton's public pledge that the death penalty would be sought. *McVeigh,* 944 F.Supp. at 1483; *Nichols,* 931 F.Supp. at 750.

Defendant Lee offered to establish this theory through the testimony of Attorney General Reno and Deputy Attorney General Holder. However, because these subpoenas were quashed, no record could be made on the ease with which the Attorney General may have been contacted with regard to such a serious matter. Assuming this is not a matter of judicial notice, the Court must nevertheless assume that the Attorney General could have been easily contacted.

The Court heard, reviewed, and otherwise experienced all of the evidence in the guilt phase of the trial. Assuming that it has, under the law, the discretion under such circumstances to impose some other penalty than life without the possibility of release (such as life), the Court would nevertheless impose on Defendant Lee the sentence of life without the possibility of release.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

274 F.3d 485
United States Court of Appeals,
Eighth Circuit.

UNITED STATES of America, Plaintiff–Appellant,
v.
Daniel Lewis LEE, also known as Daniel Lewis
Graham, also known as D.L. Graham, also
known as Danny Lee, Defendant–Appellee.

No. 00–1975.
|
Submitted: Oct. 17, 2001.
|
Filed: Dec. 14, 2001.
|
Rehearing and Rehearing En
Banc Denied: Feb. 5, 2002.

**Synopsis**

Defendant who had been convicted of murder, and sentenced to death, filed motion for a new sentencing phase trial, and to require the Attorney General to follow the death penalty protocol found in the United States Attorney's Manual. The United States District Court for the Eastern District of Arkansas, Garnett T. Eisele, J., ordered that a new penalty phase hearing be held, 89 F.Supp.2d 1017. Government appealed. The Court of Appeals, Murphy, Circuit Judge, held that: (1) federal death penalty protocol does not create substantive or procedural rights enforceable by individuals, and (2) district court abused its discretion by ordering a new penalty phase hearing based on claimed evidentiary errors at trial.

Reversed, and sentence of death reinstated.

**Attorneys and Law Firms**

**\*488** Gwynn X. Kinsey, Jr., argued, Washington, DC (Paul J. Casey, Daniel Stripling, Margaret P. Griffey, on the brief), for appellant.

Cathleen V. Compton, argued, Little Rock, AR (Jack T. Lssiter, on the brief), for appellee.

Before McMILLIAN, RICHARD S. ARNOLD, and MURPHY, Circuit Judges.

**Opinion**

MURPHY, Circuit Judge.

Daniel Lewis Lee was convicted of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1). The jury returned a verdict of death after the penalty phase, and a sentence of death was imposed under 18 U.S.C. § 3594. Later the district court granted Lee's motion for a new penalty phase hearing. The government appeals, and we reverse.

I.

The indictment charged Danny Lee and Chevie Kehoe with a number of offenses including murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1). The defendants were accused of robbing and killing a gun dealer, his wife, and their eight-year old daughter in the course of seeking funds to support the Aryan Peoples Republic. The U.S. Attorney for the Eastern District of Arkansas filed notices of intention to seek the death penalty against both defendants under 18 U.S.C. § 3593(a).

Lee and Kehoe were convicted by a jury of the three capital counts on May 4, 1999, and the district court set a separate penalty phase hearing for each defendant under 18 U.S.C. § 3593(b). The case against Kehoe went first, and the jury returned a verdict of life without release. U.S. Attorney Paula Casey informed the court on May 10 that she would like to withdraw the death notice in Lee's case but that she was uncertain whether she needed approval from the Department of Justice (DOJ) under its death penalty protocol.[1] The **\*489** district court recessed the proceedings until 3 p.m. so that Casey could contact DOJ.

Under the death penalty protocol, the Attorney General is the ultimate decisionmaker on the question of whether the government will seek the death penalty or withdraw a previously filed death notice. *See* United States Attorneys' Manual § 9–10.020, 9–10.090 (1999). When Casey called DOJ, Deputy Attorney General Eric Holder took the call and informed her that Attorney General Janet Reno was unavailable because she was at a meeting in the White House. Holder convened the other members of the DOJ review committee to participate in a telephone conference, and at its conclusion he told Casey that the death notice would not be

withdrawn. Casey relayed the information to the court, and Lee's penalty phase hearing began the following morning.

Prior to the penalty phase, the government had served notice under 18 U.S.C. § 3593(a) that it would attempt to prove the nonstatutory aggravating factor of future dangerousness at Lee's hearing. The government had also disclosed that it would introduce evidence of four subjects to prove future dangerousness: Lee's involvement in the murder of Joseph John Wavra in Oklahoma when he was seventeen, Lee's threatening behavior toward a deputy sheriff during his incarceration for the guilt phase trial in this case, Lee's 1995 Florida conviction for carrying a concealed weapon, and Lee's lack of remorse. The parties had also approved instructions that would direct the jury to determine whether Lee's involvement in the Wavra murder, Lee's 1995 conviction, and Lee's lack of remorse made him a future threat to society. [2]

The government had also stated in a discovery motion before the penalty phase that it would "*not* introduce mental health evidence during its case-in-chief in the penalty phase... [but] would only use this evidence to rebut any mental health evidence introduced by the defendant in his case-in-chief." *United States v. Lee,* 89 F.Supp.2d 1017, 1019 (E.D.Ark.2000) (emphasis in original). Lee's counsel initially intended to rebut the government's case for future dangerousness by introducing a risk assessment of his future dangerousness performed by Lee's mental health expert, Dr. Mark Cunningham. After Dr. Cunningham was denied access to prison information he deemed critical, defense counsel decided as a matter of strategy that Dr. Cunningham would focus "strictly" on mitigation evidence concerning Lee's upbringing and environment. The government was unaware of this change in strategy and obtained permission for its own mental health expert, Dr. Thomas Ryan, to conduct a risk assessment of Lee in order to rebut the expected testimony of Dr. Cunningham.

During the voir dire of Dr. Cunningham at the penalty hearing, the government asked him about scientific techniques for conducting a risk assessment for future dangerousness. Lee objected on the basis **\*490** that Dr. Cunningham was not going to present a violence risk assessment. The government responded that Dr. Cunningham's scientific views were relevant to his qualifications, and the district court overruled the objection.

Dr. Cunningham testified during his direct examination before the jury about a number of mitigating factors from Lee's upbringing that might have predisposed him toward criminal behavior: 1) Lee was a follower and under the influence of Chevie Kehoe and others at the time of the instant offenses, 2) Lee had been abandoned by his biological father, abused by his stepfather, and neglected by his mother, 3) Lee had suffered from childhood seizures, attention deficit hyperactivity disorder, and learning disabilities, 4) Lee began abusing alcohol and drugs at an early age, and 5) Lee had been diagnosed with a potential borderline personality disorder and other psychological dysfunctions.

The government began its cross examination by questioning Dr. Cunningham about his psychological diagnosis of Lee and Lee's capacity for violence. Lee's counsel moved in limine to prevent the government from examining Dr. Cunningham about risk assessment and future dangerousness, arguing that he had not raised these subjects on his direct examination. The district court acknowledged Lee's concerns but denied the motion, stating:

> Well, [Dr. Cunningham] has identified himself as a clinical and forensic psychologist with a Ph.D. degree. He has had an intimate investigation of the defendant, so I think [the prosecutor] should be able to ask him in his opinion if he is dangerous. Now, he can handle himself. If it's in the area of his expertise and considering what has been revealed about his intimate knowledge of the man, he can inquire. I think the expert is fully capable of explaining why he can't answer certain of these questions.

The government then continued to examine Dr. Cunningham concerning Lee's violence, and Lee's counsel did not register any further objections.

Lee's counsel moved at the end of the trial day to limit the scope of the testimony to be given by the government's rebuttal expert, Dr. Ryan, seeking to exclude the topics of risk assessment, future dangerousness, and psychopathy. The district court deferred a ruling on this second motion in limine, but told counsel:

> We will leave it to the defendant to object as to his [i.e. Dr. Ryan's] testimony when it gets to the point you say, stop, it's not rebuttal. And I'll have to make a judgment as to whether it is or not. I'm not going to let the government put on its case on rebuttal that it should have put on in direct. If it's strictly rebuttal, there will be no problem.

Dr. Cunningham completed his cross examination on the following day when he testified about past acts by Lee, including episodes in which he had physically abused a girlfriend, assaulted his sister, committed burglary and arson, assaulted inmates and patients at various facilities, and treated blacks more poorly than whites. The government also asked him about psychopathy and whether Lee could be diagnosed a psychopath. The cross examination concluded without further objection by Lee's counsel.

Before Dr. Ryan took the stand, Lee's counsel requested a ruling on her motion to limit his testimony. The government argued that effective rebuttal required that it be permitted to ask about Lee's violence and potential psychopathy. During the discussion with the court, Lee's counsel said: "By the way, I was assuming that I had an ongoing objection because of **\*491** my motion so I didn't stand up and object every time." The district court indicated that it understood that, and after a recess it partially granted Lee's second motion in limine. The court barred Dr. Ryan from testifying "with respect to the issue of psychopathy, the Hare psychopathy test, and any reference to the defendant being a, quote, psychopath, unquote, on the basis that such would not be proper rebuttal." The court also indicated that it regarded the motion in limine to be "moot with respect to risk assessment analysis performed by Dr. Ryan because the government has indicated that it will not offer such testimony." The court declined to rule out other topics, such as matters raised in the government's case in chief for future dangerousness: "I will deal with the other issues with respect to whether future testimony is appropriately considered to be rebuttal on a question and answer basis if objections are raised."

Dr. Ryan took the stand, and the government questioned him about Lee's medical and psychological diagnoses. When the government asked whether Lee showed any remorse for his actions, his counsel objected. The district court overruled the objection: "It's borderline, but I'm going to let you go that far." The government's examination of Dr. Ryan concluded without further objection.

The jury returned a verdict of death on May 14, 1999. On the next business day, the district court wrote to counsel raising the question whether Deputy Attorney General Holder had had authority to deny the withdrawal of Lee's death notice and requested briefing on the issue. The court stated that "no one believed that it would be appropriate to seek the death penalty for Lee if the death penalty had not been imposed upon Mr. Kehoe." Lee then moved under Fed.R.Crim.P. 33 and 35 to set aside the death verdict and for a new penalty hearing. He claimed that the government had repeatedly violated the court's order limiting testimony concerning future dangerousness, had violated a plea agreement whereby Lee would plead to life without release if the government did not pursue the death penalty,[3] and had breached its death penalty protocol when the Deputy Attorney General acted in the Attorney General's absence. Lee also moved to compel testimony from Attorney General Reno and Deputy Attorney General Holder about why the Attorney General had been gone and how the protocol was administered in her absence. The district court granted the subpoenas, and Reno and Holder petitioned for a writ of mandamus. This court granted the writ, quashed the subpoenas, and remanded for further proceedings. *In re United States,* 197 F.3d 310, 316 (8th Cir.1999).

On remand there was additional briefing before the court issued its order for a new penalty hearing. In the order, the district court said it would set aside "as a nullity" Deputy Attorney General Holder's decision not to withdraw the death notice and ruled that Lee had a right to force DOJ to comply with the death penalty protocol. *Lee,* 89 F.Supp.2d at 1041. The court ordered that DOJ "fully and properly comply" with the protocol in reconsidering the U.S. Attorney's request to withdraw Lee's death notice. *Id.* If the Attorney General were to agree to withdraw Lee's death notice, the court would sentence Lee to life without release. *Id.* If the Attorney General did not withdraw Lee's death notice, the court would grant Lee a new penalty phase trial. *Id.* at 1042 (regardless of **\*492** whether or not there had been full compliance with the protocol). The conditional new trial order was based on the court's conclusions that Lee had enforceable rights in the protocol, that they had been violated, and that the court had

Case: 20-2128   Document: 7   Filed: 07/08/2020   Pages: 227

erred in permitting the government to introduce aggravating evidence of Lee's past bad acts and potential psychopathy on cross examination and rebuttal, thus depriving Lee of advance notice of the evidence to be used against him at sentencing and in contravention of the government's prehearing statement and approval of jury instructions. The government then filed this appeal.

## II.

The United States argues on appeal that the district court abused its discretion in ordering a new penalty trial because (1) individuals have no enforceable rights in the DOJ death penalty protocol, (2) the district court did not commit error, much less plain error, in admitting testimony concerning Lee's past bad acts and potential psychopathy on cross examination and rebuttal, (3) the district court should not have applied Federal Rule of Evidence 611(b) in its post hearing analysis of the evidence at Lee's capital sentencing hearing, (4) Lee had no right to advance notice of the evidence the government would introduce at the penalty phase, and (5) the government's evidence was not limited by its prehearing statement or acceptance of jury instructions. Lee responds that the district court did not abuse its discretion because its order was based on proper grounds, although Lee's counsel conceded at oral argument that the remedy for violation of the death penalty protocol would be resubmission of the withdrawal request to the Attorney General, not a new penalty trial.

## A.

The district court's order for a new penalty trial was conditioned on whether or not DOJ would withdraw Lee's death notice. The predicate for this order was the court's conclusion that the government had breached the protocol when Deputy Attorney General Holder acted in the Attorney General's absence and made the decision not to withdraw Lee's death notice and that Lee had a right to enforce compliance with the protocol under the *Accardi* doctrine. *See United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954).

 When this case was last before us, we recognized that the *Accardi* doctrine bars administrative agencies from taking action "inconsistent with their internal regulations when it would affect individual rights," but we noted that "[n]o case has ever held that the *Accardi* doctrine applies to the internal regulations of the DOJ." *In re United States,* 197 F.3d 310, 315 (8th Cir.1999). *See also United States v. Williams,* 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992); *United States v. Myers,* 123 F.3d 350 (6th Cir.1997); *United States v. Gillespie,* 974 F.2d 796 (7th Cir.1992); *United States v. Pacheco–Ortiz,* 889 F.2d 301 (1st Cir.1989). Courts have agreed that individuals have no enforceable rights under another internal DOJ policy known as the *Petite* policy, which restricts federal prosecution of individuals already prosecuted under state law for the same act or acts. *See Delay v. United States,* 602 F.2d 173, 178 (8th Cir.1979); *United States v. Hayes,* 589 F.2d 811, 818 (5th Cir.1979); *United States v. Thompson,* 579 F.2d 1184, 1189 (10th Cir.1978); *United States v. Hutul,* 416 F.2d 607, 626 (7th Cir.1969). Prosecutorial discretion has been treated differently than other types of agency discretion, *see* **\*493** *United States v. Armstrong,* 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), and the special nature of prosecution is the reason that the *Accardi* doctrine has not been applied to criminal law enforcement policies and procedures. *Compare United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979) (not applicable to evidence obtained in violation of internal IRS regulations governing electronic surveillance), *with Yellin v. United States,* 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963) (applicable to procedures governing investigation by congressional committee).

The DOJ Manual, which contains the death penalty protocol, expressly states that it does not create substantive or procedural rights enforceable by others and that it does not limit DOJ's lawful "prerogatives":

> The Manual provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations hereby placed on otherwise

Case: 20-2128     Document: 7          Filed: 07/08/2020     Pages: 227

lawful litigative prerogatives of the Department of Justice.

United States Attorneys' Manual at § 1–1.100. Federal courts have held this disclaimer to be effective. *See* *Nichols v. Reno,* 124 F.3d 1376 (10th Cir.1997); *United States v. Busher,* 817 F.2d 1409, 1411–12 (9th Cir.1987). *Cf.* *United States v. Craveiro,* 907 F.2d 260, 264 (1st Cir.1990) (DOJ Handbook on the Comprehensive Crime Control Act of 1984 does "not confer substantive rights on any party"). The disclaimer also puts criminal suspects and defendants on notice that they lack enforceable rights in DOJ policies and procedures.

We agree with those courts which have concluded that the death penalty protocol is unenforceable by individuals. *See* *Nichols v. Reno,* 124 F.3d 1376 (10th Cir.1997), *aff'g* 931 F.Supp. 748 (D.Colo.1996); *Walker v. Reno,* 925 F.Supp. 124, 134–35 (N.D.N.Y.1995). Since the death penalty protocol does not create individual rights that Lee can enforce, any violation of it was not a basis on which the district court could issue its conditional order for a new penalty hearing.

B.

The order for a new penalty hearing was also based on the district court's previous evidentiary rulings. The standard of review for a new trial order is abuse of discretion. *United States v. McBride,* 862 F.2d 1316, 1319 (8th Cir.1988). The government argues that the district court abused its discretion in ordering a new trial on these grounds since its original rulings at Lee's penalty hearing were not erroneous and certainly not plain error. The plain error standard is used to decide whether to grant a new trial if a defendant has failed to preserve an alleged error at the sentencing phase. *Id.* at 1319. *See also* Fed.R.Crim.P. 52(b) (court may take judicial notice of plain errors "not brought to the attention of the court"). Generally a party must object to evidence at the time it is introduced in order to preserve an alleged error. *McBride,* 862 F.2d at 1319. A motion in limine is not a substitute for an objection and does not alone preserve error for review. *United States v. Roenigk,* 810 F.2d 809, 815 (8th Cir.1987). If alleged errors have been adequately preserved, a new trial may be granted "if the interests of justice so require." Fed.R.Crim.P. 33.

In this case the trial court was satisfied that Lee sufficiently preserved his evidentiary objections. The court agreed that Lee had raised a continuing objection in respect to Dr. Cunningham's cross examination, the government did not **\*494** contest that ruling at the time, and we see no abuse of discretion here. Lee's motion to limit the scope of Dr. Ryan's rebuttal testimony was granted in part by the district court, and Lee objected during Dr. Ryan's testimony when the government asked whether Lee had ever shown remorse for things he had done in his life. We conclude, therefore, that the standard for granting a new penalty hearing was whether the interests of justice required it.

The Federal Death Penalty Act (FDPA) erects very low barriers to the admission of evidence at capital sentencing hearings. Since the need to regulate the scope of testimony is less at the penalty phase than at the guilt phase of trial, parties may present evidence "as to any matter relevant to the sentence." 18 U.S.C. § 3593(c). *See also* *Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949) (A judge or jury at a capital sentencing hearing should "not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial."); *Gregg v. Georgia,* 428 U.S. 153, 203–04, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (In a capital sentencing hearing, "it [is] desirable for the jury to have as much information before it as possible when it makes the sentencing decision.").

The Federal Rules of Evidence do not control the admission of evidence in capital penalty hearings. 18 U.S.C. § 3593(c). The district court may exclude evidence only "if its probative value is outweighed by the danger of creating *unfair* prejudice, confusing the issues, or misleading the jury." *Id.* (emphasis added). Although determining whether there is a threat of unfair prejudice is a fact specific inquiry, *see, e.g.,* *United States v. McVeigh,* 153 F.3d 1166 (10th Cir.1998), the admission of evidence of unadjudicated prior offenses at a capital sentencing hearing is constitutionally permissible and not inherently prejudicial. *See* *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); *United States v. Hall,* 152 F.3d 381, 404 (5th Cir.1998); *Eaton v.*

*Angelone,* 139 F.3d 990, 998 (4th Cir.1998); *Hatch v. State of Oklahoma,* 58 F.3d 1447, 1465 (10th Cir.1995).

The court permitted the government to elicit a number of unadjudicated past bad acts by Lee, including instances in which Lee physically abused a girlfriend, assaulted his sister, committed burglary and arson offenses, assaulted inmates and patients at various facilities, and treated blacks more poorly than whites. These acts were probative of Lee's future dangerousness, but they were also relevant to the credibility of Dr. Cunningham. Dr. Cunningham's mitigation testimony selectively presented facts about Lee's past and his upbringing to cast him in a sympathetic light. The government's cross examination permissibly tested whether Dr. Cunningham's presentation produced a distorted account.

Any threat of unfair prejudice did not outweigh the probative value of testimony about Lee's past bad acts. The acts were not substantially different in kind or degree than those brought out by the government during its case in chief. Indeed, none of the evidence elicited from Dr. Cunningham was likely to inflame the jury as much as testimony about Lee's involvement in the murder of Joey Wavra, which had been part of the government's case. Lee also benefitted from a limiting instruction which told the jury it could consider only future dangerousness evidence which had been brought out in the government's case in chief. Finally, the record indicates that the jury would have been justified in recommending a death sentence regardless of the unadjudicated offenses elicited from **\*495** Dr. Cunningham. We conclude that the district court did not err by admitting testimony on cross examination concerning Lee's past bad acts.

The government's cross examination of Dr. Cunningham also elicited testimony on the issue of psychopathy. Lee's potential psychopathy was probative of his future dangerousness, a subject of the government's case in chief but not of Dr. Cunningham's direct testimony. Even if the government's examination of Dr. Cunningham about psychopathy exceeded the scope of his direct, we fail to find a threat of unfair prejudice. By introducing a mental health expert in defense, Lee opened the door to testimony concerning psychological diagnosis. Moreover, the FDPA provides for a broad scope of evidence at the penalty phase in a capital case. The district court did not commit error in admitting testimony concerning psychopathy on cross examination. Since the court's evidentiary rulings in respect to Dr. Cunningham's testimony were not erroneous, a new trial was not required in the interests of justice.

Dr. Ryan's testimony comprises fifty pages in the record, and the government elicited only one statement from him about lack of remorse when he answered that Lee did not display "a lot of guilty feelings or remorseful feelings" about his actions. The government's brief examination of Dr. Ryan concerning Lee's lack of remorse exceeded the scope of Dr. Cunningham's direct testimony, but Dr. Ryan's statement fell within the wide boundaries set for the admission of evidence at capital sentencing hearings and we cannot conclude that this single comment unfairly prejudiced Lee. Since Lee was not unfairly prejudiced by the evidence, the interests of justice did not require a new trial.

The government argues that the district court relied on Rule 611(b) of the Federal Rules of Evidence to conclude that Dr. Cunningham's cross examination had exceeded the scope of direct even though these rules do not apply to capital sentencing hearings. Although the district court quoted extensively from § 3593(c) of the FDPA, including the language limiting the applicability of the Federal Rules of Evidence, it concluded that the scope of cross examination had impermissibly exceeded direct testimony, *Lee,* 89 F.Supp.2d at 1027–28, 1031, and cited Rule 611(b), *id.* at 1022. In contrast, the court did not appear to apply the § 3593 balancing test between probative value and unfair prejudice. Evidentiary issues in a capital sentencing hearing are controlled by the FDPA rather than the normal evidentiary rules, and the § 3593 test should have been the focus instead of Rule 611(b).

The district court also concluded that its allowance of aggravating evidence from Lee's own mental health expert was unfair to Lee because he had no advance notice of the evidence and no opportunity to respond. *Id.* at 1028. The FDPA requires the government to serve a defendant notice "setting forth the aggravating factor or factors that the government... proposes to prove as justifying a sentence of death." 18 U.S.C. § 3593(a). Although Lee had a right to advance notice of the aggravating factors the government sought to prove at sentencing, Lee had no right to advance notice of the specific evidence the government would use to prove those factors.[4] *See Gray v. Netherland,* 518 U.S. 152, 167–68, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996); *United States v.* **\*496** *Battle,* 173 F.3d 1343, 1347

(11th Cir.1999). Lee would have been unfairly prejudiced if the government had lied about the evidence it planned to introduce, *see* *id.* at 165, 116 S.Ct. 2074, but the record contains no evidence that the government intentionally misled Lee. The FDPA also requires that "the defendant...be permitted to rebut any information received at the hearing and...be given fair opportunity to present argument as to the adequacy of the information." 18 U.S.C. § 3593(c). Lee was not denied an opportunity to respond to the government's aggravating evidence, however. Lee had his turn to offer evidence, and he could have moved for a continuance if he felt it necessary, *see* *Gray,* 518 U.S. at 169, 116 S.Ct. 2074, or he could have sought surrebuttal, *see* *United States v. Barnette,* 211 F.3d 803, 821–22 (4th Cir.2000) (denial of surrebuttal after introduction of new evidence is reversible error). The record does not show unfair prejudice.

The government also challenges the district court's conclusion that its evidentiary rulings had been unfair to Lee because it had permitted evidence which had diverged from the government's prehearing statement that it did not intend to introduce mental health evidence unless Lee offered it first and from the government's approval of instructions which limited jury examination of future dangerousness to its case in chief. It does not appear that the court erred or was prejudicially unfair to Lee in either respect. The government did not introduce mental health evidence during its case in chief. Only after Dr. Cunningham had testified on direct did it attempt to cross examine him on subjects touching on Lee's mental health. Dr. Cunningham is a mental health expert, and his testimony about Lee's upbringing and environment was relevant to Lee's mental health and propensity toward criminal behavior. Lee's argument that Dr. Cunningham's direct testimony was not mental health evidence because it did not encompass risk assessment or psychological diagnosis is overly restrictive. Finally, neither the district court nor Lee have cited any authority for the proposition that jury instructions approved before trial set the limits of cross examination and rebuttal testimony without consideration of

how evidence was later developed at trial. Lee was not entitled to a new penalty trial on these grounds.

The record shows that the experienced district judge handled the evidentiary issues at the penalty hearing conscientiously and expertly. The district court did not err in permitting the government's cross examination of Dr. Cunningham, and Dr. Ryan's single statement on rebuttal about Lee's lack of remorse did not present a threat of unfair prejudice. After examining all of the points on which the district court relied in finding error in its admission of certain evidence at Lee's penalty hearing, we conclude that it was an abuse of discretion to order a new hearing based on these grounds.

### III.

In sum, we conclude that Lee has no enforceable rights under the death penalty protocol and that any violation of it would not entitle him to a new penalty trial. After studying the record, we conclude that Lee is not entitled to a new penalty trial on the evidentiary issues relied on by the district court in its new penalty hearing order because (1) admission of evidence that exceeded the scope of Dr. Cunningham's direct testimony was not error, (2) Dr. Ryan's statement on rebuttal that Lee lacked remorse did not raise a threat of unfair prejudice, (3) Rule 611(b) did not control the admission of evidence at Lee's capital sentencing hearing, (4) Lee had no **\*497** right to advance notice of the evidence the government would introduce at the penalty phase, and (5) the evidence introduced by the government at the penalty phase was not prohibited by its prehearing statement or preapproved jury instructions. It was therefore an abuse of discretion to order a new trial on the grounds stated.

Accordingly, the order of the district court for a new penalty hearing is reversed, and the sentence of death is reinstated.

**All Citations**

274 F.3d 485, 190 A.L.R. Fed. 657

### Footnotes

1    The death penalty protocol, now found in § 9–10.000 et seq. of the United States Attorneys' Manual, was promulgated by DOJ shortly after passage of the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591(a) et

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

seq. Under the protocol, a prosecutor who wishes to charge a capital count in a federal indictment must send to the DOJ Criminal Division a completed death penalty evaluation form describing the facts and evidence underlying the indictment, the theory of liability, the federal interest in the case, and any other information relevant to the charging decision. United States Attorneys' Manual § 9–10.040 (1999). The evaluation form is reviewed by the Attorney General's Review Committee on Capital Cases, whose members are appointed by the Attorney General. *Id.* at § 9–10.050. The review committee makes a recommendation to the Attorney General, who then decides whether the government will seek the death penalty. *Id.* The same procedure is used when a prosecutor wishes to withdraw a previously filed death notice. *Id.* at § 9–10.090.

2      Although the instructions did not reference Lee's threatening behavior toward the deputy sheriff, the district court allowed the government to introduce evidence about it at the penalty hearing.

3      In a ruling on June 30, 1999, the district court rejected Lee's claim that there had been a plea agreement.

4      It should also be noted that the jury instructions approved by Lee before the penalty phase provided advance notice of the evidence which the government later introduced during its case in chief.

---

**End of Document**     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works.     SUPP.APP.31  8

374 F.3d 637
United States Court of Appeals,
Eighth Circuit.

UNITED STATES of America, Plaintiff–Appellee,

v.

Daniel Lewis LEE, also known as Daniel Lewis
Graham, also known as D L Graham, also
known as Danny Lee, Defendant–Appellant.

No. 02–2389.
|
Submitted: April 15, 2004.
|
Filed: July 8, 2004.
|
Rehearing and Rehearing En
Banc Denied Sept. 21, 2004.

**Synopsis**

**Background:** Following reversal of order granting a new sentencing phase of capital trial, 274 F.3d 485, defendant, who was convicted in the United States District Court for the Eastern District of Arkansas, G. Thomas Eisele, J., of conspiring to violate and violating the Racketeer Influenced and Corrupt Organizations (RICO) statute, and of three murders in aid of racketeering, appealed his convictions, and death sentence.

**Holdings:** The Court of Appeals, Murphy, Circuit Judge, held that:

nontestifying codefendant's statements to his brother about codefendant's involvement in certain murders were not testimonial in nature for confrontation clause purposes, but rather were admissible against defendant because they were coconspirator statements made in furtherance of criminal activity;

any error in the admission against defendant of nontestifying codefendant's statement's to his mother about codefendant's involvement in certain murders was harmless since those statements merely corroborated the large amount of evidence presented against defendant at trial;

court did not abuse its discretion in refusing to give defendant's proposed jury instruction for accomplice testimony;

court did not abuse its discretion by denying defendant's motion to sever his trial from codefendant's;

Federal Death Penalty Act (FDPA) was constitutional; and

defendant's ineffective assistance claims were premature.

Affirmed in part and dismissed in part.

**Attorneys and Law Firms**

**\*641** Counsel who presented argument on behalf of the appellant was Cheryl A. Pilate, of Kansas City, Missouri. Kent E. Gipson of Kansas City, Missouri, also represented Daniel L. Lee.

Counsel who presented argument on behalf of the appellee was Clarence D. Stripling, AUSA, of Little Rock, Arkansas.

Before MORRIS SHEPPARD ARNOLD, MAGILL, and MURPHY, Circuit Judges.

**Opinion**

MURPHY, Circuit Judge.

A jury convicted Daniel Lewis Lee of conspiring to violate and violating the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. §§ 1962(c) and (d), and of three murders in aid of racketeering in violation of 18 U.S.C. § 1959. The jury also returned a verdict of death and a death sentence was imposed. Lee moved successfully for a new sentencing phase of the trial; the government appealed and we reversed.[1] Now before the court is Lee's direct appeal of his conviction and sentence. We affirm the judgment of the district court.[2]

I.

The evidence presented at trial showed that Lee, Chevie Kehoe (Kehoe), his father Kirby Kehoe, his brother Cheyne Kehoe (Cheyne), and Faron Lovelace participated in a variety

of criminal activities to promote and fund a white supremacist organization known as the Aryan Peoples' Republic or the Aryan Peoples' Resistence (APR). Kehoe formed the APR to establish an independent nation of white members of the Christian Identity faith in the Pacific Northwest. He patterned it after an antigovernment, white supremacist organization called the Order.

Lee met Kehoe in 1995, and Kehoe recruited him into the APR. In January 1996, Lee and Kehoe left the state of Washington and traveled to Arkansas where they dressed in police raid clothing and went to the home of William Mueller, a gun dealer near Tilley who owned a large collection of weapons and ammunition. Kehoe and his father had robbed Mueller in February 1995, and Kehoe planned to find valuable property at his house. The Muellers were not at home when Lee and Kehoe arrived so they waited. When the Muellers returned, Lee and Kehoe overpowered and incapacitated **\*642** Mueller and his wife. Then they questioned Nancy Mueller's eight year old daughter, Sarah Powell, about where they could find cash, guns, and munitions. After finding $50,000 in cash, guns, and ammunition, they shot the three victims with a stun gun, placed plastic bags over their heads, and sealed the bags with duct tape. They took the victims in Kehoe's vehicle to the Illinois bayou; there they taped rocks onto them and threw them into the bayou. The bodies were discovered in Lake Darnelle near Russellville, Arkansas in late June 1996.

Kehoe and Lee returned to Spokane with the stolen property around January 14, 1996. Kehoe traveled to several states to sell the Mueller property at gun shows, and he and Lee were apprehended by law enforcement in 1997 after some of Mueller's guns had been traced to Kehoe.

Lee, Kehoe, and several others were indicted on December 12, 1997. On January 5, 1998, Lee appeared in court for arraignment and was ordered detained until trial. A superceding indictment was filed, charging Lee with racketeering in violation of 18 U.S.C. § 1962(c), conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d), murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1), conspiracy to commit robbery in violation of 18 U.S.C. § 1951(a), and use of a firearm in violation of 18 U.S.C. § 922. The indictment alleged that the APR was a RICO enterprise designed to start a revolution in the United States in order to create a new nation and that

members of the APR, including Lee, established and financed the APR through robbery, kidnapping, murder, and dealing in stolen property. Prior to trial the conspiracy to commit robbery and firearm charges were dismissed.

The government filed notices of intent to seek the death penalty against both Lee and Kehoe under 18 U.S.C. § 3593(a). The amended death penalty notice for Lee identified several aggravating factors that the government intended to prove in support of death sentences for each of the three murder counts he faced. These aggravating factors included: expectation of receiving something of pecuniary value, 18 U.S.C. § 3592(c)(8); substantial planning and premeditation to cause the death of the victim, *id.* § 3592(c)(9); intentional killing of more than one person in a single criminal episode, *id.* § 3592(c)(16); and risk of future dangerousness. The government also listed the additional aggravating factor of a vulnerable victim in Sarah Powell's murder. *Id.* § 3592(c)(11).

Lee and the government filed several pretrial motions. After a hearing in November 1998, the district court granted a motion under Fed.R.Crim.P. 16(d) to restrict Lee's personal access to discovery materials in the interest of protecting witnesses. In February 1999, the district court granted the government's request to delay the mandatory disclosure of witness names under 18 U.S.C. § 3432. The district court also denied several motions by Lee and Kehoe. Prior to trial all the defendants other than Lee and Kehoe pled guilty. Lee and Kehoe were jointly tried.

At trial, the government presented numerous witnesses and circumstantial physical evidence to prove Lee's participation in the murders of the Mueller family. Kehoe's mother, Gloria, testified that Lee had confessed the murders to her. The district court also admitted statements made by Kehoe to his mother, in which he confessed the Mueller murders and other criminal activities in great detail. Gloria testified that Kehoe told her Lee had participated in the murder of the adults, but would have no part in the killing of Sarah Powell so Kehoe had done it alone. The district court also admitted hearsay statements **\*643** made by Kehoe to his brother, Cheyne, confessing the three murders. The government called a number of other witnesses. They included Sean Haines, a man Lee had attempted to recruit into the APR, James and Dalvine Wanker, both of whom knew Lee when he lived in Washington, and David Lynch, who helped Lee recruit other

people into the APR. Haines testified that Lee was involved in Kehoe's white supremacist movement and that he had tried to recruit him into the APR several times. The Wankers corroborated Gloria Kehoe's testimony by recounting that Lee had told them about a trip down south in which some people had messed with him and he had done something violent to take care of them. They also testified that Lee had made statements to them about his white supremacist beliefs. Lynch stated that he had helped Lee recruit Jon Cox into the APR and that Lee had told him about taking part in militia type activities.

The circumstantial evidence adduced at trial included physical evidence connecting Kehoe's vehicle to the crime scene, evidence that Lee and Kehoe were in Arkansas at the time of the murders, evidence connecting Lee and Kehoe to police raid clothing worn at the time of the murders, their possession of Mueller property immediately after the murders, Lee's fingerprint found on Mueller belongings stored with APR property, and hair similar to Lee's found on a raid cap which Kehoe told Cheyne was used during the Mueller murders.

Following a two month trial, on May 4, 1999 a jury convicted Lee and Kehoe of the capital murder counts, racketeering, and conspiracy to commit racketeering. The defendants were sentenced after separate penalty phases before the same jury. Kehoe's penalty phase proceeded first, and he was sentenced to life without release. After Kehoe's sentencing, the U.S. Attorney tried to withdraw the death notice in Lee's case, but the Department of Justice denied her request. *United States v. Lee,* 274 F.3d 485, 488–89 (8th Cir.2001). Prior to Lee's penalty phase, the parties agreed on instructions permitting the jury to consider Lee's past criminal history and behavior. The jury returned a death verdict against Lee on May 14, 1999. A few days later on May 19, Lee moved for correction of the sentence and a new sentencing phase of the trial. The district court granted the motion, and the government appealed. We reversed and reinstated the death sentence. *Id.* at 497. Now before the court is Lee's direct appeal from the judgment of conviction and sentence.

## II.

On his direct appeal Lee raises a number of issues. He argues that his Sixth Amendment rights to confrontation and effective assistance of counsel were violated. Other issues

include limitations put on his discovery rights, the sufficiency of the evidence and the indictment, the denial of his severance motion, certain jury instructions, and the constitutionality of the Federal Death Penalty Act.

### A.

Lee argues that his Sixth Amendment confrontation rights were violated by the admission of hearsay statements made by nontestifying codefendant Kehoe to Gloria and Cheyne Kehoe. Lee contends that the statements are testimonial and therefore inadmissible under the confrontation clause. *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (Mar. 8, 2004). We review denials of confrontation clause objections de novo, *United States v. Beal,* 279 F.3d 567, 570 (8th Cir.2002). If any evidence was admitted in violation of Lee's confrontation **\*644** rights, we consider whether the error was harmless beyond a reasonable doubt. *Lilly v. Virginia,* 527 U.S. 116, 140, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999).

The confrontation clause of the Sixth Amendment gives an accused the fundamental right to confront the witnesses against him. *Crawford,* 541 U.S. at ——, 124 S.Ct. at 1359. The central function of this right is to protect individuals from the use of ex parte statements as evidence against them in a criminal trial. *Id.* at 1363. The confrontation clause bars the admission of testimonial statements made by witnesses outside of court, unless the witnesses are unavailable and the defendant had a previous opportunity to cross examine them. *Id.* at 1369. While the Supreme Court has not attempted to give a complete listing of what may be included within the category of testimonial statements, in *Crawford* it specified that plea allocutions, grand jury testimony, prior trial testimony, preliminary hearing testimony, and police interrogations are testimonial statements. *Id.* at 1374. In contrast to these examples, casual statements to an acquaintance are not testimonial. *Id.* at 1364. Nor are statements to a coconspirator or business records testimonial. *Id.* at 1367; *United States v. Reyes,* 362 F.3d 536, 541 (8th Cir.2004).

Lee argues that the statements made to Cheyne Kehoe are testimonial because they were detailed, confessional, and made after the events to a cooperating individual. He contends that these statements are not admissible as statements made to

a coconspirator because Cheyne did not join the conspiracy and the statements were not made in furtherance of it. *See* Fed.R.Evid. 801(d)(2)(E).

A statement is not hearsay and is admissible as a statement made to a coconspirator if it advances the objectives of the conspiracy and does not merely inform the listener of the declarant's activities. *United States v. Snider,* 720 F.2d 985, 992 (8th Cir.1983). Coconspirator statements made outside the scope of the conspiracy may be admissible, *id.,* and statements made to recruit new members are in furtherance of the conspiracy. *United States v. Ortiz–Martinez,* 1 F.3d 662, 674 (8th Cir.1993).

Lee asserts that the statements to Cheyne were not coconspirator statements because Kehoe made them only to inform his brother about his activities. He cites *Snider* in support, a case in which hearsay statements did not come within the coconspirator category because they had been made to the testifying witness to impress her and she was not involved in the marijuana enterprise. 720 F.2d at 992. Here, Kehoe made the statements to Cheyne while they were traveling around the country together, selling guns and ammunition stolen from the Muellers at the time of their murders. Kehoe confessed the murders to Cheyne in great detail, admitted that he had killed Sarah Powell on his own, and showed Cheyne the police raid gear he and Lee had used in gaining access to the Mueller house. Kehoe shared this information with Cheyne to explain why he needed to dispose of the arms quickly, to enlist Cheyne's assistance in selling them, and to recruit Cheyne into the APR. After hearing this information, Cheyne continued to participate willingly in the sale of the stolen property. We conclude that Kehoe's comments to Cheyne about the Mueller murders were not testimonial in nature. They are admissible because they were coconspirator statements made in furtherance of criminal activity, namely the selling of stolen property. *See Crawford,* 541 U.S. at ——, 124 S.Ct. at 1367; *Reyes,* 362 F.3d at 541.

Lee argues that Kehoe's statements to Gloria are testimonial because **\*645** they were confessional, detailed, and made to an individual who allegedly later became an agent of the government. Kehoe's statements to Gloria do not fall into any of the categories of testimonial statements identified in *Crawford,* 541 U.S. at ——, 124 S.Ct. at 1374. The circumstances surrounding them do not raise the same confrontation concerns as the introduction of witness statements previously made in court proceedings or during police interrogations. Kehoe's statements to his mother do not implicate the core concerns of the confrontation clause. He confessed to his mother after she asked him about Mueller property she saw in his possession while visiting him. This took place over a year before Gloria had any contact with law enforcement agents. Kehoe's statements were more like casual remarks to an acquaintance than formal testimonial statements made to law enforcement. *See id.* at 1364 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."); *see also* 18 U.S.C. § 1001(a)(2) (prohibiting the making of false statements to federal officers). Kehoe's statements to Gloria during her visit were not testimonial and are not barred under *Crawford.*

Lee contends that nontestimonial hearsay statements are only admissible after *Crawford* if they fall within one of the firmly rooted hearsay exceptions to the confrontation clause and that Kehoe's statements to Gloria do not fall within any of these exceptions. He argues that the indicia of reliability test under *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), is no longer part of confrontation clause analysis. The government counters that nontestimonial hearsay statements are admissible if they fall within one of the hearsay exceptions in the Federal Rules of Evidence or have sufficient indicia of reliability. It also maintains that substantial additional evidence was adduced at trial, making harmless any error in the admission of Kehoe's statements to Gloria.

After reviewing the record, we conclude that any error in the admission of Kehoe's statements to Gloria was harmless beyond a reasonable doubt. There was sufficient evidence at trial to support Lee's conviction, even without Gloria's testimony about what Kehoe had told her. The evidence admitted at trial included Lee's confession to Gloria that he was involved in the Mueller murders; he does not challenge the admission of this testimony on appeal because it was properly admitted as an admission by a party opponent. *See* Fed.R.Evid. 801(d)(2)(A). The government also produced several other witnesses (including the Wankers, Cheyne, Haines, and Lynch) who testified to Lee's involvement in either the Mueller murders or the APR organization. Considerable circumstantial evidence of Lee's participation in the Mueller murders was introduced, including Lee's fingerprints found on Mueller property, hair similar to Lee's

in a raid cap used during the murders, and Lee's possession of Mueller property immediately after the murders. Kehoe's statements to Gloria merely corroborated the large amount of evidence presented against Lee at trial. Any error in the admission of these statements was harmless beyond a reasonable doubt.

### B.

Lee argues that the district court abused its discretion by failing to give an accomplice instruction requiring the jury to consider whether the testimony of Gloria and Cheyne Kehoe was sufficiently corroborated. He maintains that failure to give the accomplice instruction violated his confrontation rights and that the testimony **\*646** of the Kehoes was uncorroborated. He asserts that corroboration was required under Arkansas substantive law, and that it was for the jury in its deliberations to determine the sufficiency of the prosecution's evidence. The denial of a request for a jury instruction is reviewed for abuse of discretion, *United States v. Gary,* 341 F.3d 829, 834 (8th Cir.2003), and reversal is only appropriate if the error affected the defendant's substantial rights. *United States v. Wright,* 246 F.3d 1123, 1128 (8th Cir.2001).

Special instructions for accomplice testimony are only required "where the witness's testimony concerning the defendant's participation in the offense is uncorroborated." *United States v. Schoenfeld,* 867 F.2d 1059, 1061 (8th Cir.1989). In cases where there is corroborating evidence, further instruction to the jury to treat accomplice testimony with caution is not needed. *United States v. Kehoe,* 310 F.3d 579, 593 (8th Cir.2002). Here, evidence at trial corroborated the testimony of Gloria and Cheyne. While Lee argues that less evidence was introduced against him than against Kehoe, witness testimony and other circumstantial evidence was introduced to corroborate the testimony of the Kehoes and to establish that the murders actually took place and that he participated in them. *United States v. Opdahl,* 610 F.2d 490, 492–93 (8th Cir.1979). Because the testimony was corroborated, the district court did not abuse its discretion in refusing to give Lee's proposed jury instruction.

### C.

Lee argues that the district court abused its discretion by denying his motion to sever his trial from Kehoe's. He contends that he was prejudiced by the joint trial because the district court admitted hearsay statements that were not independently admissible against him and there were spillover effects from evidence which implicated Kehoe but not him. The denial of a motion to sever is reviewed for abuse of discretion and will only be reversed if definite prejudice is shown. *United States v. Delpit,* 94 F.3d 1134, 1143 (8th Cir.1996).

Joint trials of defendants indicted together are generally conducted because they promote efficiency and the interests of justice, *Zafiro v. United States,* 506 U.S. 534, 538, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), but Rule 14 permits severance if "it appears that a defendant or the government is prejudiced by the joinder." Fed.R.Crim.P. 14. Severance is appropriate "only if there is a serious risk that joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933. It is not an abuse of discretion to deny a severance motion when not every joined defendant has participated in every offense charged, *Delpit,* 94 F.3d at 1143–44, when evidence which is admissible only against some defendants may be damaging to others, *id.,* or when there is varying strength in the evidence against each defendant. *United States v. Dierling,* 131 F.3d 722, 734 (8th Cir.1997).

Lee contends that his case falls within two categories identified in *Zafiro* as potentially problematic. One is where evidence is admitted that the jury can only consider against one defendant, and the other is where the defendants have markedly different degrees of culpability. *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933. *Zafiro* only noted that these are situations where the risk of prejudice is high, however, and the Court did not indicate that such cases automatically require severance. *Id.* **\*647** Moreover, the Court pointed out that these problems may be remedied by less drastic measures than severance. *Id.*

Lee argues that evidence was admitted at trial which was not independently admissible against him because the hearsay statements offered by Gloria and Cheyne Kehoe violated his confrontation clause rights. As we have already discussed, any error in the admission of these statements was harmless so this argument cannot prevail. Lee also maintains that it was

improper not to sever the trial because there were prejudicial spillover effects, citing *United States v. Baker,* 98 F.3d 330, 335 (8th Cir.1996). In contrast to Lee's case, the defendant alleging prejudice in *Baker* had not been charged with conspiracy. Here, Lee cannot show similar prejudice because he was charged with participating in the same conspiracy as Kehoe, and the fact that he was not charged with all the same predicate acts does not require severance. *See Dierling,* 131 F.3d at 734. The district court did not abuse its discretion in denying Lee's severance motion because the hearsay evidence was independently admitted against him and there were no prejudicial spillover effects from the evidence.

### D.

Lee argues that the evidence presented at trial was insufficient to prove that he was involved either in the charged criminal enterprise or in the conspiracy. He contends that the government did not prove that he intentionally joined the conspiracy or that the Mueller murders were motivated by white supremacist beliefs. We review de novo the sufficiency of the evidence to support a jury verdict. *United States v. Campa–Fabela,* 210 F.3d 837, 839 (8th Cir.2000). The facts are reviewed in the light most favorable to the verdict, all reasonable inferences are accepted, *id.,* and reversal is only appropriate if no reasonable jury could have found the defendant guilty. *United States v. Stroh,* 176 F.3d 439, 440 (8th Cir.1999).

To establish a conspiracy, the government must prove: (1) that there was a conspiracy; (2) that the defendants knew of the conspiracy; and (3) that the defendants intentionally joined the conspiracy. *United States v. Espino,* 317 F.3d 788, 792 (8th Cir.2003). Direct or circumstantial evidence may be used to prove the conspiracy's existence. *Id.* Lee argues that there was no evidence that he joined the conspiracy, but this argument is not supported by the record. Several witnesses testified to the fact that Kehoe led a white supremacist organization and intended to build an Aryan nation in Idaho. Haines identified Lee as a member of this organization and testified that Lee tried to recruit him into it. Further, Lynch stated that he helped Lee recruit Cox into the APR and talked with Lee about his militia type activities. This testimony alone is sufficient to show that there was a conspiracy, that Lee knew about it, and that Lee chose to join it.

Three elements must be proven to show that a RICO enterprise existed: (1) a common purpose that animates the individuals associated with it; (2) an ongoing organization with members who function as a continuing unit; and (3) an ascertainable structure distinct from the conduct of a pattern of racketeering. *United States v. Kragness,* 830 F.2d 842, 855 (8th Cir.1987). Lee argues that the government did not prove that he was part of the RICO enterprise charged in the indictment because there was no evidence that he shared the common purpose of a white supremacy movement until he was jailed in 1998 after the Mueller killings. The testimony of the Wankers indicated, however, that Lee had white supremacist **\*648** beliefs prior to his pretrial detention, and Haines' testimony demonstrated that Lee belonged to Kehoe's white supremacist movement and engaged in activities to further it.

There was sufficient evidence for a reasonable jury to find that both a conspiracy and a RICO enterprise existed and that Lee intentionally joined and participated in each.

### E.

Lee argues that the Federal Death Penalty Act, 18 U.S.C. § 3593 (FDPA), is unconstitutional because it allows for evidence inadmissible during the criminal trial to be admitted during the penalty phase unless its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. We rejected this argument earlier in this case, *see Lee,* 274 F.3d at 494–95, but Lee urges that the issue be revisited in light of *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Lee also argues that the FDPA is unconstitutional under *Ring* because it creates a new common law criminal offense. The government responds that Lee's evidentiary issue is barred under the law of the case doctrine and that the plain error rule applies to both issues since Lee did not preserve them in the district court. We review challenges to a criminal statute's constitutionality de novo. *United States v. Koons,* 300 F.3d 985, 990 (8th Cir.2002).

Lee asserts that the FDPA's relaxed admission standard during the penalty phase allows for introduction of less reliable evidence in violation of his due process and confrontation rights, relying on a post *Ring* decision, *United States v. Fell,* 217 F.Supp.2d 469 (D.Vt.2002),

since reversed on appeal. *See* *United States v. Fell, 360 F.3d 135, 143–46 (2d Cir.2004)*. We agree with the Second Circuit that the FDPA standard does not impair the reliability of the evidence admissible during the penalty phase. *Id.* at 145–46. Rather, the admission of more rather than less evidence during the penalty phase increases reliability by providing full and complete information about the defendant and allowing for an individualized inquiry into the appropriate sentence for the offense. *Id.* at 143. We agree that the FDPA standard provides a level of protection that ensures that defendants receive a fundamentally fair trial and that it is not unconstitutional.[3] *Id.* at 145.

Lee also asserts that the FDPA is unconstitutional after *Ring* because the Court exceeded its constitutional powers in that case by in effect creating a new common law criminal offense with elements never considered or enacted into law by Congress. The statute involved in *Ring* required aggravating factors for the death penalty to be imposed, and the Supreme Court considered them to be functional equivalents of the elements of an offense. *Ring, 536 U.S. at 609, 122 S.Ct. 2428.* Aggravating factors must therefore be found beyond a reasonable doubt before the death penalty may be imposed. *Id.* Lee argues that by holding statutory aggravating factors to be the functional equivalents of elements of the offense, the Supreme Court added elements to the offense, thus creating a new common law crime. He contends that since the FDPA **\*649** also requires proof of aggravating factors it must be interpreted after *Ring* to create new common law offenses. We reject Lee's argument because in *Ring* the Court did not add elements to the statutory offense. Rather it acknowledged that for a maximum penalty to be imposed, the legislature had required findings of aggravating factors in addition to findings on the elements of the offense. *Id.*

## F.

Lee argues that the district court erred because it recognized a potential juror's bias in favor of the death penalty, but it failed to strike that juror and prejudiced Lee by forcing him to use a preemptory strike to eliminate the juror. We review district court voir dire decisions for abuse of discretion. *United States v. Nelson, 347 F.3d 701, 706 (8th Cir.2003).* It is well settled that a defendant is not deprived of any rights if a district court fails to remove a juror for cause, the defendant elects to cure the alleged error by exercising a preemptory challenge, and

the defendant is then convicted by an unbiased jury. *United States v. Martinez–Salazar, 528 U.S. 304, 307, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000)*; *Nelson, 347 F.3d at 710;* *United States v. Paul, 217 F.3d 989, 1004 (8th Cir.2000).* Because Lee cured any error, he cannot prevail on this claim.

## G.

Lee raises several issues on appeal that were not preserved at trial, and we review each of these issues for plain error. Fed.R.Crim.P. 52(b). Under plain error review, there must be an error that is plain which affects substantial rights. *United States v. Cotton, 535 U.S. 625, 631, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002).* Reversal is only appropriate if the error affects the outcome of the case. *Id.* at 632, 122 S.Ct. 1781. We address each issue in turn.

## 1.

Lee argues that his confrontation rights were violated when the district court allowed his counsel to stipulate to the receipt of evidence at his penalty phase which the jury had already heard and seen during Kehoe's penalty phase.[4] He contends that he retains confrontation rights during the penalty phase, *see* *Ring, 536 U.S. at 584, 122 S.Ct. 2428,* and that personal confrontation rights cannot be waived by counsel. Lee concedes that the standard of review is plain error since he raised no objection at trial. He asserts nevertheless that the stipulation infringed on his personal confrontation rights so he need not show prejudice. The government does not contest that Lee has confrontation rights during the penalty phase, but argues that he has not shown plain error and points out that the same jury had already been exposed to all of this evidence.

A waiver of constitutional rights is effective if it is clear and intentional. *Brookhart v. Janis, 384 U.S. 1, 4, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966).* A defendant may waive his confrontation rights by pleading guilty, *Boykin v. Alabama, 395 U.S. 238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969),* by stipulating to the admission of evidence, *United States v.* **\*650** *Carlson, 547 F.2d 1346, 1357–58 (8th Cir.1976),* by voluntary absence at trial, *Taylor v. United States, 414 U.S. 17, 18–19, 94 S.Ct. 194, 38*

L.Ed.2d 174 (1973), and by his own misconduct or disruptive actions, *Illinois v. Allen,* 397 U.S. 337, 342–43, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). Counsel may waive an accused's constitutional rights for tactical reasons when the circumstances are not exceptional. *Loggins v. Frey,* 786 F.2d 364, 368 (8th Cir.1986). Circumstances are exceptional when a defendant has not personally waived nor acquiesced in an attempted waiver by counsel. *Id.*

Lee argues that under *Clemmons v. Delo,* 124 F.3d 944, 956 (8th Cir.1997), his counsel could not waive his confrontation rights by stipulating to the evidence presented at Kehoe's penalty phase. He says confrontation rights are personal, fundamental, and cannot be waived by counsel. In *Clemmons,* the court held that the defendant's confrontation rights were violated by his lawyer's consent to the admission of an accuser's deposition because the defendant had been unaware of the taking of the deposition, did not know that the evidence would be admitted until trial, and never consented to its admission. *Id.* at 952, 955–56. This case differs from *Clemmons,* however, for Lee knew about the stipulation before his penalty phase started and had the opportunity to object to his counsel's waiver of his confrontation rights before the court.

This case is more like *Loggins v. Frey,* 786 F.2d at 368, where we recognized a valid waiver of a defendant's confrontation rights. In *Loggins,* we held that the defense counsel's stipulation at trial to the admission of the victim's hearsay testimony did not violate the defendant's confrontation rights because he had acquiesced in the stipulation and had personally waived his confrontation rights by not objecting at trial. *Id.* The defendant there was aware of the testimony and had an opportunity to object to its admission, just as here. Lee was aware of the stipulation prior to the penalty phase and waived his confrontation rights when he did not object to the stipulation in court. Because Lee waived his confrontation rights, he cannot succeed on this claim.

2.

Lee argues that the district court erred in failing to dismiss the indictment against him because it did not allege every element of a capital offense by including the aggravating factors necessary to impose a death sentence. He contends

that the indictment did not include the mens rea or statutory aggravating factors required. *See* 18 U.S.C. §§ 3591(a)(2), 3592(c). The government maintains that the indictment charged Lee with three murders in aid of racketeering and that these murders were committed "with the purpose of causing the death of" the victims. It also asserts that the indictment included two statutory aggravating factors: murder in expectation of the receipt of something of pecuniary gain and intentional killing of more than one person in a single criminal episode. 18 U.S.C. §§ 3592(c)(8), (16). Lee admits that he first raised this issue on appeal and concedes that the plain error standard applies.

The Fifth and Sixth Amendments require that "any fact (other than a prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones v. United States,* 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). If the constitutional sufficiency of the indictment is first raised on appeal, then plain error applies. *Cotton,* 535 U.S. at 631, 122 S.Ct. 1781.

**\*651** Lee relies on a recently vacated decision of our court, *United States v. Allen,* 357 F.3d 745, 747 (8th Cir.2004), *reh'g en banc granted* May 11, 2004, for the proposition that an indictment violates the Fifth Amendment if it does not allege all the facts necessary for imposition of the punishment, including in a capital case at least one statutory aggravating factor under § 3592(c). In *Allen,* the defendant preserved this issue for appeal by raising the unconstitutionality of the indictment both before trial and again at trial, so the harmless error standard applied. *Id.* Here, because Lee first raised the issue on appeal a different standard applies and it includes "a separate fairness-integrity inquiry." *Id.* at 753 n. 6; *Cotton,* 535 U.S. at 631, 122 S.Ct. 1781. Lee must show that the indictment was defective and that it seriously affected the fairness and integrity of the judicial proceedings. *Cotton,* 535 U.S. at 631, 122 S.Ct. 1781; *Allen,* 357 F.3d at 753 n. 6.

Even if the indictment was defective, Lee cannot show plain error because it did not seriously affect the fairness and integrity of the judicial proceedings. *Cotton,* 535 U.S. at 633, 122 S.Ct. 1781. The proceedings were not tainted because Lee received an amended death penalty notice on

October 16, 1998. This case thus does not raise any of the notice problems generally associated with a defective indictment. Furthermore, the petit jury's findings confirmed the soundness of the judicial proceedings and rendered harmless any conceivable error in the charging decision. *Id.;*

*see also* United States v. Mechanik, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). The petit jury in Lee's case found that the government had proved the statutory aggravating factors of murder for pecuniary gain and intentional killing of more than one person in a single criminal episode. The jury also found that the nonstatutory aggravating factor of future dangerousness had been proved. Based on these findings, the jury unanimously voted to sentence Lee to death, and this indicates that initiation of the death penalty prosecution was not unfounded. Lee has not shown plain error.

3.

Lee argues that the district court violated his due process rights and 18 U.S.C. § 3432 by holding a hearing without his counsel having received notice of it or being present and by ruling that the prosecution did not have to provide defense counsel the names of witnesses three days before trial. [5] The government maintains that the names of the witnesses did not have to be disclosed because disclosure would have greatly endangered their lives.

Section 3432 provides that a person charged with a capital offense "shall at least three entire days before commencement of trial be furnished with a copy of ... the witnesses to be produced on the trial for proving the indictment." 18 U.S.C. § 3432. The statute provides for an exception "if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person." *Id.* The disclosure of witnesses in a capital case is generally required under § 3432, and failure to provide a witness list is reversible error unless the exception applies. Hall v. United States, 410 F.2d 653, 660 (4th Cir.1969). A defendant **\*652** can waive his rights by failing to object to the list, Brown v. United States, 375 F.2d 310, 317 (D.C.Cir.1966), or by failing to object at the commencement of the testimony of an undisclosed witness. Hickory v. United States, 151 U.S. 303, 307–08, 14 S.Ct. 334, 38 L.Ed. 170 (1894). Lee did not object either to the list or to the testimony of any of the undisclosed witnesses when they were called at trial and thus waived his disclosure and due process rights. Lee did not preserve this

issue by objecting so the standard of review on his appeal is plain error. *See* Fed.R.Crim.P. 52(b).

Lee contends that he can show plain error because the disclosure of Dee and James Wanker as witnesses less than 48 hours before their appearance prevented adequate trial preparation by his counsel. As evidence of inadequate preparation, Lee points to the fact that his counsel did not impeach these witnesses even though their credibility could have been questioned because they had received relocation money from the government. The decision of Lee's counsel not to impeach these witnesses could well have been strategic, however, for there was reason not to bring up the Wankers' relocation. The government says that they were moved because of previous retaliation against witnesses by white supremacist groups. Even though it has not said that it facilitated the Wankers' relocation due to a fear of retaliation by Lee, his counsel may have wanted to keep any evidence of this type from the jury. Lee has not shown plain error.

4.

Lee argues that his discovery rights were violated when the district court improperly excused the government from complying with § 3432 by not requiring the government to disclose the names of witnesses before trial. He also asserts that his discovery rights were violated by the court's order prohibiting counsel from allowing him to view or retain discovery materials and from disclosing witness names to him. He contends that the order was an impermissible intrusion into the attorney client relationship and effectively denied him counsel. Lee's counsel was present at the hearing on the government's motion to restrict discovery but did not raise an objection, and we review this issue for plain error.

Under Fed.R.Crim.P. 16(d), a district court may for good cause limit a defendant's discovery based on an ex parte written statement. As a general rule counsel cannot be prevented from assisting the accused during a critical stage of the proceeding or be banned from all communications with the defendant for any period of time. *See* Geders v. United States, 425 U.S. 80, 91, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976). Here, the district court found good cause for limiting Lee's access to discovery materials based on the government's argument that Lee was a danger to potential witnesses. Its order was not a blanket proscription against Lee communicating with counsel, however. The order prevented Lee from accessing discovery documents and the names of

witnesses, but it permitted him to be informed about all other matters and to discuss them with counsel. It did not violate § 3432, which only requires disclosure of witness and juror names to the defense but not to the defendant personally. The district court's order limiting discovery was not plain error because it did not impermissibly limit Lee's communications with his attorneys.

5.

Lee argues that his death sentence was arbitrarily imposed in violation of 18 U.S.C. § 3595(c)(1), the Fifth Amendment, **\*653** and the Eighth Amendment because Kehoe, the more culpable defendant, did not receive the death penalty. The government counters that Kehoe was not the more culpable defendant, for Lee had several serious prior offenses and had demonstrated a violent, unrepentant nature by attacking one of his jailors. Appellate courts "shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." 18 U.S.C. § 3595(c)(1). This claim of Lee's is reviewed for plain error because it was not raised earlier, and § 3595(c) does not create an exception to plain error review. Jones, 527 U.S. at 388–89, 119 S.Ct. 2090.

Lee argues that § 3595(c)(1) was violated because he received a harsher punishment than Kehoe, who he claims is the more culpable defendant. He cites no case indicating that imposition of the death penalty on one defendant but not the other violates § 3595(c)(1). We decided in *Paul* that the death penalty was not arbitrarily imposed on a capital defendant despite the jury's refusal to consider the accomplice's sentence of life imprisonment as a mitigating factor. *Paul,* 217 F.3d at 999–1000. Nor does the FDPA require proportional review of sentences. *Allen,* 247 F.3d at 760. Lee has not provided support for his claim that the death penalty was arbitrarily imposed on him.

H.

Lee argues that his Sixth Amendment right to assistance of counsel was violated by his trial attorneys because lead defense attorney, Jack Lassiter, had a conflict of interest.

According to Lee, Lassiter was conflicted by his desire to help the career advancement of a member of the defense team, Karen Coleman, and he gave preference to her interests over those of Lee. Lassiter thus refrained from disclosing to him or co-counsel that Coleman was planning to join the U.S. Attorney's office, even though he knew of her pending move several weeks in advance. He allowed Coleman to continue to work on Lee's case and to appear at hearings as Lee's sole representative up until her departure from the firm, even though she had accepted employment with the U.S. Attorney and had received security clearance. Lee only inadvertently learned of Coleman's departure when she left Lassiter's firm three weeks before trial.

When Kehoe's counsel learned about Coleman's departure around the same time, he raised the matter before the district court out of concern for the appearance of impropriety. The district court held a hearing at which Lee contends Lassiter testified adversely to his interests by supporting Coleman's employment interest. Lee also argues that Lassiter failed to join Kehoe's motion to disqualify the U.S. Attorney's office because of his conflict. At the hearing Lassiter testified that clients had not been informed of Coleman's departure until after her background check had been completed and explained that he had "full confidence in her integrity." He also stated that Coleman continued to organize witness statement files to prepare for trial after she had formally accepted the job in the prosecutor's office but that he did not feel that he needed to tell her to stop. He admitted that he had not discussed the situation with Lee, explaining that he had not had the opportunity. Another member of the defense team, Cathleen Compton, testified that she had grave concerns about the situation and that her concerns were shared by Lee. Lee contends that Lassiter testified contrary to his best interests, that the district court should have held a colloquy with Lee about the conflict, and that his interests should have been protected by the appointment of **\*654** new counsel for the duration of the hearing.

Lee further asserts that his right to effective assistance of counsel was violated because his trial attorneys failed to make several pretrial objections, including objections to restrictions on his ability to review discovery materials and to oppose the government's motion to delay the disclosure of witness names under 18 U.S.C. § 3234. He claims that the failure of his counsel to object to these discovery restrictions impeded their ability to consult effectively with him and to prepare for trial. Lee points out that his trial counsel did not object at trial to the testimony of previously undisclosed witnesses

or attempt to impeach their testimony even though valid grounds for impeachment existed. Finally, Lee argues that his trial counsel waived his confrontation rights by stipulating to highly prejudicial evidence during the penalty phase without consulting him.

A defendant's claims of ineffective assistance of counsel are generally not cognizable on direct appeal. *United States v. Triplett,* 104 F.3d 1074, 1083 (8th Cir.1997). They may be heard only if a miscarriage of justice would otherwise result, *see United States v. Woods,* 270 F.3d 728, 730 (8th Cir.2001), or if the district court has developed a record on the issues. *See Triplett,* 104 F.3d at 1083. Here, Lee argues that his ineffective assistance claims should be reviewed upon direct appeal because all the relevant facts are available, but he does not dispute that the district court has not developed a record on the issues and he does not argue that a miscarriage of justice would result if the claims were not reviewed now. Lee's ineffective assistance claims are premature and should be raised collaterally through a § 2255 motion in district court.

## III.

In sum, we conclude that Lee's confrontation rights were not violated by the testimony of Gloria and Cheyne Kehoe or by the district court's jury instructions, that the district court did not abuse its discretion by denying Lee's motion to sever, and that there was sufficient evidence presented at trial to support his conviction. We conclude further that the district court did not err by allowing Lee's counsel to stipulate to evidence at his penalty phase, by not dismissing the indictment, by holding an ex parte hearing under § 3432, or by limiting Lee's access to discovery. We find that the death penalty was not arbitrarily imposed in this case and that the Federal Death Penalty Act is constitutional.

Accordingly, we affirm Lee's conviction and sentence but dismiss without prejudice his ineffective assistance claims as premature.

**All Citations**

374 F.3d 637

## Footnotes

1    *United States v. Lee,* 274 F.3d 485 (8th Cir.2001).
2    The Honorable Garnett Thomas Eisele, United States District Judge for the Eastern District of Arkansas.
3    Lee also has no entitlement to relitigate an issue previously decided in an earlier stage of this case unless he "introduces substantially different evidence, or the prior decision is clearly erroneous and works a manifest injustice." *United States v. Bartsh,* 69 F.3d 864, 866 (8th Cir.1995). Lee has presented no new evidence and has not shown that our earlier decision was erroneous.
4    The stipulated evidence included victim vulnerability testimony and crime scene evidence. Three witnesses testified as to victim vulnerability: a cousin of Sarah Powell; a friend, who identified some of Sarah's clothing; and a man who had met Sarah at several gun shows and described her as the ideal child. The crime scene evidence consisted of flex cuffs, duct tape, rocks removed from the Muellers' bodies, and graphic photographs of the bodies.
5    On February 19, 1999, the prosecution wrote a letter to the district court requesting that seven witness names not be disclosed to the defense because it would greatly endanger their lives. Three of these witnesses, David Lynch and James and Dee Wanker, later testified at trial about Lee's involvement in the murders and APR. The Wankers were disclosed as witnesses less than 48 hours before their appearance at trial.

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4079315
Only the Westlaw citation is currently available.
United States District Court,
E.D. Arkansas,
Western Division.

UNITED STATES of America
v.
Daniel Lewis LEE.

No. 4:97-CR-00243-(2) GTE.
|
Civil No. 4:06-CV-1608.
|
Aug. 28, 2008.

*MEMORANDUM OPINION*

G. THOMAS EISELE, District Judge.

***1** Before the Court is Petitioner Daniel Lewis Lee's Motion to Set Aside Judgment under 28 U.S.C. § 2255. [1] The United States opposes any post-conviction relief. [2] Additional relevant pleadings include: (1) Petitioner's Reply in Support of 2255 Motion; [3] (2) Petitioner's Appendix to Brief; [4] (3) Petitioner's Supplemental Submission (mtDNA results) in additional support of § 2255 Motion and Brief in Support; [5] (4) Government's Supplemental Memorandum Opposing § 2255 Motion and Supplement; [6] (5) Petitioner's Supplemental Reply Memorandum regarding the DNA Exclusion; [7] and (6) Petitioner's Notice of Filing of Transcript of Gloria Kehoe's 3/31/98 Statement; [8] (7) Government's Reply to Petitioner's Response to the Court's Order of May 15, 2008; [9] and (8) Petitioner's Second Supplemental Memorandum in Support of his 28 U.S.C. § 2255 Motion Pursuant to the Court's May 22, 2008 Order. [10]

The Court has considered carefully the above pleadings. Additionally, the Court has undertaken a review of the relevant portions of the voluminous record in this matter. Based upon its careful consideration of all issues presented, the Court concludes that Petitioner is entitled to no relief.

**I. BACKGROUND**

Simultaneously with the filing of this Memorandum Opinion, the Court is filing a separate Memorandum Opinion addressing the § 2255 motions filed by Petitioner Danny Lee's co-defendant Chevie Kehoe. Significant portions of the Memorandum Opinions are the same, as they address many similar or identical arguments for relief presented by both Petitioners. This Memorandum Opinion is significantly broader because it also addresses challenges to the sentencing phase presented by Petitioner Lee, which were not presented by Petitioner Kehoe. [11]

**A. Procedural History**

On July 7, 1998, Chevie Kehoe ("Kehoe"), [12] Daniel Lewis Lee ("Lee"), and Kirby Kehoe ("Kirby") [13] were charged in a seven-count Superseding Indictment. [14] Lee and Kehoe were both charged in all 7 counts. Count 1 charged all three defendants with racketeering in violation of 18 U.S.C. § 1962(d). Count 1 alleged ten racketeering acts, of which Lee was charged with 4, specifically, the Mueller family murders/ robbery and the Spokane City Hall bombing (racketeering acts 4, 5, 6, and 7 of Count 1). [15] Chevie Kehoe was charged in all ten racketeering acts. Count 2 charged all three Defendants with a racketeering conspiracy in violation of 18 U.S.C. § 1962(d). Counts 3, 4, and 5 of the Superseding Indictment charged Lee and Kehoe with murder in aid of racketeering in violation of 18 U.S.C. § 1959 alleging that they murdered William Mueller, Nancy Mueller, and Sarah Powell, Nancy Mueller's eight-year-old daughter. Count 6 charged all three Defendants with a robbery conspiracy in violation of 18 U.S.C. § 1951(a) for the second robbery of the Muellers. Count 7 charged Lee and Kehoe with the use of a firearm in the Mueller robbery and murders in violation of 18 U.S.C. § 924(c).

***2** Before trial, Kirby pled guilty to racketeering as charged in Count 1. Also before trial, the Government dismissed Counts 6 and 7. The Government pursued the death penalty against both Kehoe and Lee.

The trial began on March 1, 1999. A single jury was selected to hear both the guilt and, if necessary, the penalty phases for both Defendants. On May 4, 1999, the jury found Kehoe and Lee guilty of the five remaining counts in the Superseding Indictment. As to Count 1, Lee was found to have committed the three racketeering acts associated with the murder of the

Mueller family, but was found not to have committed the racketeering act related to the Spokane City Hall bombing. Also as to Count 1, Kehoe was found to have committed all of the alleged racketeering acts with the exception of those for the robbery in the first degree of Jill and Malcolm Friedman, money laundering, first degree murder of Jeremy Scott, and first degree arson related to the Spokane City Hall bombing.

Kehoe and Lee's sentencing phases were conducted separately, with Kehoe's sentence determined first. The jury sentenced Kehoe to life without possibility of release for each of the three murders. The same jury then sentenced Lee to death for each of the three Mueller murders. On May 13, 2002, this Court imposed a Judgment of Death for Lee on Counts 3, 4, and 5, and Life Imprisonment on Counts 1 and 2, to run concurrent.

Lee sought to set aside the death penalty and attempted to obtain by subpoena evidence from Attorney General Reno and Deputy Attorney General Holder. This Court denied the Government's motion to quash the two subpoenas, but was reversed by the Eighth Circuit Court of Appeals, which issued a writ of mandamus directing that the subpoenas be quashed. [16] This Court subsequently granted Lee's request for a new penalty phase trial based on its conclusion that the Government exceeded the permissible scope of cross-examination in questioning Lee's mental health expert, improperly elicited aggravating evidence from Lee's own rebuttal expert, and breached its own internal protocol for imposing the death penalty. [17] The Eighth Circuit Court of Appeals reversed and reinstated the death penalty. [18]

Both Lee and Kehoe appealed their convictions. The Eighth Circuit Court of Appeals affirmed Lee's conviction. [19] The Supreme Court denied Lee's certiorari petition on June 27, 2005. [20] Lee timely filed the present motion for relief under § 2255 on June 26, 2006.

### B. Facts Supporting Conviction

#### 1. The Enterprise-the Aryan Peoples' Republic
The Government alleged that Defendants formed an "enterprise" known as the Aryan People's Republic, the Aryan People's Resistance, or the Aryan People's Revolution ("APR"). More specifically, the Government alleged that Chevie Kehoe was the leader of the enterprise and that Danny Lee, Cheyne Kehoe, Kirby Kehoe, and Faron Loveless were principal assistants. Chevie Kehoe conceptualized the enterprise based in part on Robert Matthews's group, known as "The Order." [21] The group believed that whites were the chosen race, [22] that Jews were the devil's children and should die, [23] and that the Bible justified violence. [24] Kehoe was so concerned with racial purity that at one point he contemplated killing his own wife and children because of suspicions that his wife's blood was tainted with Indian blood and therefore impure. [25]

 **\*3** The purpose of the enterprise was to establish an Aryan Homeland for the benefit of the white man, free of "mongrel races," in the Northwest United States. [26] Kehoe envisioned that his group could assume control in the aftermath of chaos created by simultaneously killing large numbers of judges and law enforcement officials. [27] He hoped to raise enough money to buy a remote piece of property to set up a training camp and to attract more members. [28]

#### 2. 1995 Mueller Burglary (Racketeering Act 1) [29]
William Mueller, his wife Nancy, and eight year old Sarah lived in Tilley, Arkansas. William Mueller was a gun show enthusiast who had strong anti-government views. The Mueller family and the Kehoe family became acquainted through gun shows when the Kehoe family lived in Arkansas. [30] Gloria Kehoe developed a friendship with the Muellers. [31]

In February 1995, Kehoe stole a trailer near Harrison, Arkansas, and pulled it to the home of his parents near Kingston, Arkansas. [32] On February 12, 1995, Chevie and Kirby Kehoe went to the Mueller home while the Mueller family was attending a gun show. [33] They robbed the home and divided the stolen property. Chevie Kehoe took some of the stolen property to Washington state. Kirby later became angry at his son, believing that Chevie had shorted him his share of the proceeds from coins that Chevie sold in Washington state. [34]

#### 3. Friedman Kidnaping and Robbery (Racketeering Act 2) [35]
On June 12, 1995, Faron Lovelace kidnaped and robbed Malcolm and Jill Friedman at their home outside of Colville, Washington. [36] Chevie and Kirby Kehoe dropped Mr. Lovelace off near the Friedman's home before the robbery. [37]

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

After robbing them of approximately $15,620, two guns, and a bottle of tequila, Lovelace had the Friedmans drive him to Spokane, Washington, where he stole their car and left them at a restaurant.[38] Lovelace was then picked up by Kehoe and Cheyne, who drove him from Spokane to Idaho.[39] Kehoe knew the Friedmans from his youth, when he worked for them both in their grocery store and in their home.[40]

Lovelace gave $15,000 of the money stolen from the Friedmans to Kehoe, who kept $13,000 and allowed Lovelace to keep $2,000.[41] Kehoe later gave Kirby $4,000.[42] Between June 18 and July 11, 1995, Kehoe and his wife used some of the proceeds from the robbery to purchase five acres of land near Priest River, Idaho.[43]

### 4. The Mueller Family Murders (Racketeering Acts 4-6; Counts 3-5)

Sometime after Christmas in 1995 or early January of 1996, Kehoe and Lee[44] left Spokane, Washington. They told friends that they were going to Idaho to build a barn,[45] but instead traveled to Arizona where they met Kirby and Gloria Kehoe ("Gloria").[46] After a brief stay in Arizona, Kehoe and Lee left for Oklahoma. Kehoe told Gloria that he was taking Lee to see Lee's mother because Lee did not have transportation or money to make the trip.[47] Lee's mother lived in Yukon, Oklahoma (near Oklahoma City) and had undergone emergency gall bladder surgery.[48]

 **\*4**  On January 10, 1996, around 6:00 p.m., Kehoe and Lee left Lee's mother's house in Oklahoma. Lee's mother gave them as much as $40.00 before they left town because they were low on cash.[49] Kehoe and Lee were driving Kehoe's blue 1985 GMC diesel truck, which he had purchased from his parents.[50]

On or about January 11, 1996, Kehoe and Lee broke into the Tilley, Arkansas home of William Mueller, Nancy Mueller, and Sarah Powell.[51] Kehoe and Lee were dressed in raid gear that gave the impression that they were federal law enforcement officers. When the Muellers returned home, Kehoe and Lee emerged from hiding and pretended to be federal law enforcement officers. They had to physically subdue William Mueller who strongly resisted. They suffocated the Muellers by placing plastic bags over their heads and using duct tape to secure the plastic bags.[52]

The undisputed evidence was that Lee was unwilling to kill Sarah, the little girl, so Kehoe killed her.[53] After killing the Muellers, Kehoe and Lee transported their bodies to Pope County and threw the bodies, weighted down with rocks, into the Illinois Bayou.[54]

Kehoe and Lee took cash, coins, numerous firearms, firearm parts, gun display cases, and ammunition from the Mueller home. Kehoe estimated the value of the cash and gold taken to be $50,000. He estimated the value of the firearms and firearm parts to be to be $30,000. For his part in the crime, Lee received $3,000 or $4,000 and a pistol.[55]

Kehoe and Lee returned with the stolen property to the Shadows Motel in Spokane, Washington, a place where Kehoe stayed off and on. The evidence established that they were back in Spokane no later than January 14, 1996, at 5:59 p.m., when Lee called his mother.[56]

Kehoe explained the large quantity of guns, gun parts, and cash in his possession to Jeff Brown, manager of the Shadows Motel, by stating that the guns and gun parts were on consignment from a dealer.[57] Kehoe later provided a similar explanation to his brother, Cheyne.[58]

On February 4, 1996, Gloria arrived at the Shadows Motel from Arizona and saw a large quantity of merchandise in her son's room.[59] During a trip to the grocery store, Kehoe confessed to Gloria that he "put Bill and Nancy on a liquid diet."[60] He then proceeded to tell Gloria in detail how he and Lee murdered and robbed the Muellers.[61] Later, at the motel, Lee also confessed his involvement in the murders to Gloria.[62]

On February 13, 1996, a man named Travis Brake was arrested in Seattle, Washington, and the police confiscated a .45 caliber Colt pistol from him.[63] The pistol was later linked to a .45 caliber Colt box belonging to the Muellers.[64] Brake testified that he purchased the gun at a gun show from an older man, a young man, and a young boy.[65] This information led investigators to the gun show where Brake had purchased the gun and then to the Kehoes at the Shadows Motel. Records revealed that "K.M. Gumm" (Chevie Kehoe's wife)[66] rented tables at a gun show in Seattle over the weekend of February 11, 1996.[67]

**\*5** On June 28, 1996, the bodies of the Mueller family were discovered. A woman fishing near a bridge that crossed the Illinois Bayou snagged two tennis shoes tied together with "something that was flapping around extending from it." [68] This discovery prompted a dragging operation that led to the recovery of portions of the bodies of William Mueller, Nancy Mueller, and Sarah Powell. Plastic bags were duct taped around the heads of all three bodies. One body was recovered with a large rock duct taped to it. The condition of the bodies indicated that rocks had been similarly placed around the other two bodies, by folding their arms over the rocks and then using duct tape to secure the rock to the body. [69]

In late June or early July of 1996, Kehoe had his 1985 GMC diesel truck-the vehicle that he and Lee took to Arkansas when they murdered the Muellers-painted white. [70] He then traded the vehicle to his father. [71]

On December 10, 1996, Sean Haines, Lee's former roommate, was arrested in South Dakota with a Bushmaster rifle in his possession. [72] The rifle had been reported stolen and was registered to the Muellers. Sean Haines told police he acquired the rifle from Chevie Kehoe. [73] Haines called Lee and informed him police were questioning him about the rifle. [74] Lee told Kehoe about Haines's arrest. [75] On December 11, 1996, the day after Haines was arrested, Kehoe, his wife, and children left the R.V. park in Spokane, Washington, where their motor home had been parked. [76] Danny Lee left for Oklahoma. [77]

### 5. Ohio Shootings (Racketeering Act 9) [78]

After leaving Spokane, Kehoe, his wife Karena, and their three children arrived in Yaak, Montana, with their motor home and the blue Suburban. [79] Kirby and Gloria were already living there. Also living there were Cheyne, his wife Tanna, and their baby. Shortly thereafter, Kehoe's and Cheyne's families left in the motor home, pulling the blue Suburban behind them. They planned to travel to Arizona to look for construction work. [80] Before leaving, Cheyne accompanied his brother to a storage unit in Old Town, Montana, where Kehoe filled the Suburban with guns, ammunition, and miscellaneous gun parts. [81]

Kehoe and Cheyne attended gun shows in Phoenix and Tucson, Arizona. [82] While selecting a gun to sell at one of the shows, Kehoe remarked to Cheyne that he needed to get rid of a particular shotgun because it was "one of the Muellers' guns." [83]

The two families traveled from Arizona to Galveston, Texas. By then they had decided to go on the "gun show circuit," rather than find construction work. [84] While in Galveston, Kehoe told Cheyne that the guns, parts, and accessories in his possession had belonged to the Muellers. Kehoe then confessed to Cheyne that he and Lee had murdered the Muellers. Kehoe provided considerable detail about the manner in which the crime had been committed. [85] He also showed Cheyne the raid gear he and Lee had worn. [86]

**\*6** After leaving Galveston, the two families traveled through Alabama, Florida, North Carolina, and West Virginia, before heading back west. They arrived in Ohio on January 21, 1997. [87] While in Ohio, Kehoe arranged to meet Lee in Greensboro, Kentucky, but Lee failed to show. [88]

On February 15, 1997, Kehoe and Cheyne were on their way to the campground where they were staying when they were stopped by law enforcement officers in Wilmington, Ohio. The traffic stop escalated into a shoot-out. Cheyne exited the truck and exchanged gunfire with a Clinton County, Ohio deputy sheriff. Following the shooting, Cheyne fled on foot while Kehoe jumped into the blue Suburban and drove away. [89]

Shortly after the first shoot-out, a city police officer located the blue Suburban, with Kehoe inside, parked a short distance away. [90] As the officer exited his vehicle, Kehoe opened fire on the officer and another officer who had arrived at the scene. Kehoe fired approximately 33 rounds. [91] A civilian bystander was shot in the arm. [92] Kehoe escaped on foot.

A search of the Suburban revealed, among other things, federal officer raid jackets, FBI caps, bullet proof vests, guns, various gun parts, ammunition, holsters, handcuffs, and duct tape. [93] In one of the caps, a hair was found that was later determined to be microscopically similar to Lee's hair. [94]

Following the shoot-out, Kehoe and Cheyne eventually reunited with their families with the help of Kirby and

Gloria.[95] Kehoe and Cheyne decided to flee together. Kirby agreed to help them get a vehicle. Kirby sold the 1985 GMC truck, the paint on which had been changed from its original blue to white, back to Kehoe.[96] After registering the GMC truck in Idaho, Kehoe and Cheyne traveled with their families to Arizona and then to Utah, where they met a rancher named Rod Leavitt.[97] Kehoe and Cheyne agreed to take care of Leavitt's alfalfa ranch in Beryl Junction, Utah, so they moved there with their families.[98]

### 6. Cheyne Kehoe's Surrender

Chevie Kehoe was upset about losing so many firearms and accessories in the aftermath the Ohio shootout. While in Utah, Kehoe discussed with Cheyne the possibility of murdering Kirby and Gloria in order to acquire Kirby's weapons and ammunition. Kehoe also commented that he could then take his other brothers, raise them, and use them as recruits for the APR.[99]

Cheyne, having become fearful of his brother, decided that he was going to leave. In June 1997, Cheyne, his wife and child took Kehoe's GMC truck and left the Utah ranch. On June 16, 1997, after stopping to see his parents in Yaak, Cheyne turned himself in to local authorities in Colville, Washington.[100]

An FBI forensic chemist later determined that paint samples taken from the GMC truck were "consistent, very similar" to metallic blue paint chips found in duct tape removed from the bodies of the Mueller family.[101]

On June 17, 1997, Kehoe was arrested in Cedar City, Idaho.

### 7. Gloria Kehoe's Cooperation

**\*7** In early March 1998, Gloria contacted ATF agents in Spokane and began cooperating with the authorities. Gloria was concerned that her husband, Kirby, would kill her because "she knew too much."[102] Gloria provided information that prompted the authorities to search two rental storage units- one in Thompson Falls, Montana, and the other in Old Town, Idaho.

On March 6 and 7, 1998, an ATF agent searched a storage unit at Thompson Falls, reported by Gloria to have been rented by Kirby.[103] Inside the unit were large quantities of guns, hand grenades, grenade parts, a machine gun, assault weapons, and over 30,000 rounds of ammunition of various calibers including armor piercing ammunition. Also found were a Maddi AK-47 gun, which had been registered to Nancy Mueller[104] and some Black Hills ammunition, which was determined, by matching serial numbers, to previously have been sold to William Mueller.[105]

In April of 1998, the authorities searched a storage unit in Old Town, Idaho, reported by Gloria to have been rented by Chevie Kehoe.[106] Among the items found in the search were two display cases similar to those used by William Mueller. The cases had fibers in them similar to the carpet in the Mueller home.[107] One of the cases had a hair similar to William Mueller's in it.[108] Fingerprints were found on one of the display cases that were determined to have been left by Kehoe and Lee.[109] Other items seized included personal papers belonging to Kehoe and his wife, Karena, a Rubbermaid container filled with Mueller property, and white supremacist and survivalist literature.[110]

### C. Strength of the Evidence

The Court has outlined some of the evidence linking Kehoe and Lee to the Mueller murders in part to demonstrate the abundance of evidence supporting the guilt phase convictions. Those bare facts alone can not convey the demeanor of the witnesses who testified, the scope and detail of the Government's evidence, or the general overall tenor of the case against Kehoe and Lee. While the bulk of the evidence at trial related to Kehoe, the jury's conclusion that Lee was with Kehoe when the Muellers were murdered and that he participated in the murders was well-founded. As this brief recitation of the facts also demonstrates, there was no question about Kehoe and Lee's respective roles: Chevie Kehoe was the ringleader, and Danny Lee was the follower.

Much of Lee's argument relates to the sentencing phase and the inherent unfairness of Lee's death sentence as compared to Kehoe's life sentence. This Court's previous rulings sympathized with this view, but, in evaluating this argument on collateral review, the Court must follow the law as interpreted and applied by the Eighth Circuit Court of Appeals.

## II. DISCUSSION OF PRELIMINARY ISSUES

Petitioner Danny Lee asserts that he is entitled to post conviction relief and raises the following claims: (1) ineffective assistance of counsel during the guilt phase of

his trial, with various subparts; (2) ineffective assistance of counsel during the sentencing phase of his trial, with various subparts; (3) ineffective assistance of appellate counsel, with various subparts; (4) that the death penalty is unconstitutional because it is sought and imposed in an arbitrary and capricious manner; (5) that it was error to admit evidence of Lee's juvenile conviction related to the Wavra murder; (6) that counsel did not meet the statutory definition of "learned in the law applicable to capital cases"; and (7) there is newly discovered evidence bearing on Kirby's role in the offense.

**\*8** Before taking up the merits of Petitioner's claims, the Court will address the issue of the necessity of a hearing. In considering a petitioner's challenge to his federal custody under § 2255, the Court is required to grant a prompt hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." [111] The Government contends that Petitioner has failed to allege facts which justify a hearing. The Court agrees. The Court's determination is based upon a review of the complete record in this matter, including relevant portions of the voluminous trial transcript, and the absence of the necessary offers of proof supporting Petitioner's claims.

More particularly, Petitioner has failed to include supporting affidavits or other independent support for the testimony of certain persons whom he contends should have been called to testify. Likewise, he has failed to offer independent support for the contention that certain witnesses who were called should have been cross-examined differently. He asserts that the failure to call these persons as witnesses or to cross-examine certain witnesses differently constitutes ineffective assistance on the part of his counsel. The Court specifically concludes, under such circumstances, that it is not required to conduct a hearing to permit the "discovery" testimony of the numerous witnesses whom Petitioner contends should have been called to testify or who should have been cross-examined differently. [112] Even accepting Petitioner's description of how such witnesses might have testified, the Court still concludes that no hearing is required.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE GUILT PHASE

### A. Legal Standard
To establish an ineffective assistance claim Petitioner Lee has a heavy burden since courts "indulge a strong presumption that counsel's conduct falls within the wide

range of professionally reasonably assistance and sound trial strategy." [113] To prevail, Petitioner must not only establish that his attorneys' performance was constitutionally deficient, but he must also demonstrate that he was prejudiced as a result of that deficient performance. [114] Indeed, courts are not required to analyze the performance prong if they determine that a petitioner suffered no prejudice as a result of the allegedly deficient performance. [115] Furthermore, "reasonable trial strategy does not constitute ineffective assistance of counsel simply because it is not successful." [116] As pointed out in the leading case of *Strickland v. Washington,* [117] the distorting effects of hindsight must be avoided and courts "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." [118] In evaluating counsel's conduct "judicial scrutiny of counsel's performance must be highly deferential." [119]

Counsel's conduct is deficient if it falls "outside the wide range of professionally competent assistance." [120] Counsel's performance will be considered objectively unreasonable if "counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would use under like circumstances." [121] Absent the requisite showing, courts "will presume attorneys provide[d] effective assistance and will not second-guess strategic decisions or exploit the benefits of hindsight." [122]

**\*9** When considering the prejudice prong the Court must decide whether Petitioner has established "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." [123] The Supreme Court has cautioned that "to set aside a conviction or sentence solely because the outcome could have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." [124] Thus, Petitioner must show some effect of the challenged conduct on the reliability of the trial process. Otherwise, the Sixth Amendment guarantee is generally not implicated . [125] A petitioner's failure to show prejudice is dispositive. In other words, absent a showing of prejudice a court need not address the reasonableness of counsel's performance. [126]

With this standard in mind, the Court turns to Petitioner's contentions regarding how his counsel's performance fell

short of the minimal standard of representation guaranteed by the Sixth Amendment. The Court has considered and rejected each and every allegation of ineffective assistance of counsel timely asserted by Petitioner on the merits, whether or not such allegation is discussed in detail herein.

### B. Errors in Failing to Call Certain Witnesses

Petitioner argues that his counsel erred in failing to call certain witnesses to testify at trial and failing to locate and interview certain witnesses. "The decision not to call a witness is a virtually unchallengeable decision of trial strategy." [127] However, counsel's failure to interview a witness or to discover mitigating evidence "may be a basis for finding counsel ineffective within the meaning of the Sixth Amendment right to counsel." [128]

Even assuming that counsel's failure to discover mitigating evidence or to present an exculpatory witness was constitutionally deficient, a petitioner still must "make a substantial showing that, but for counsel's failure to interview [or to call] ... the witness[ ] in question, there is a reasonable probability that the result of his trial would have been different." [129] To satisfy the prejudice prong, it is not enough to speculate as to what the witness might have said, if interviewed or called to the stand. Rather, a petitioner must present independent evidence, by affidavit or otherwise, as to what the witness would have said if he or she had been interviewed or called to testify. [130] Absent any independent evidence, prejudice can not be found without speculating that the outcome of the trial might have been different. Such speculation is "simply inadequate to 'undermine confidence in the outcome.' " [131]

Petitioner has provided no affidavits from the myriad of witnesses whom he claims should have been interviewed or called to testify. Such omission is arguably fatal to any finding of prejudice. Moreover, even accepting as true Petitioner's description of the omitted testimony, the evidence in this case overwhelmingly supported the jury's finding of guilt, and the Court can not find that the outcome would have been different if such persons had testified as Petitioner speculates.

 **\*10**  With these principles in mind, the Court considers Petitioner's specific contentions.

### 1. Kirby Kehoe

Petitioner Lee argues that his counsel were ineffective for not calling Kirby as a witness. He argues that the examination of Kirby would have cast doubt on his Arizona alibi, the roles played by his sons (Chevie and Cheyne) in the murders, and his role in and knowledge of the insurance fraud perpetrated by the Muellers with regard to a faked burglary of their residence.

The Government contends that after defense counsel was advised that the Government did not intend to call Kirby, defense attorneys Mark Hampton (representing Kehoe) and Jack Lassiter (representing Lee) conducted an extensive interview of Kirby in the presence of Kirby's attorney. Both defense attorneys agreed that calling Kirby would be more detrimental than favorable to the defense. The Government has supported its response with an affidavit from Mr. Lassiter. In his affidavit, Mr. Lassiter attests that he and Mr. Hampton "were given adequate time to interview Kirby Kehoe," "questioned Mr. [Kirby] Kehoe extensively," and "determined that Mr. [Kirby] Kehoe's testimony would not be helpful to the defense case." [132]

Petitioner responds by stating that Kirby's testimony would have emphasized the Kehoe family's involvement and de-emphasized Lee's role or involvement in any matter regarding the Muellers. He also argues that Mr. Lassiter's affidavit omits important information, *i.e.,* when the interview occurred (when in the Government's case were defense counsel required to decide whether to call a witness out of order and what other trial responsibilities they had at that time); how much time was provided for the interview; and whether limitations were placed on the substance of the interview due to the presence of Kirby's attorney.

When trial counsel conducts an investigation and determines not to call a witness, trial counsel's conduct does not violate either the "performance" or "prejudice" prongs. [133] Petitioner attempts to distinguish *Griffen* by noting that in that case trial counsel provided sworn deposition testimony and the petitioner had received an evidentiary hearing. The Court is not persuaded by Petitioner's argument. Trial counsel in this case clearly conducted an investigation and determined not to call Kirby as a witness. The Court concludes that Petitioner's counsel's decision was a legitimate trial strategy. Additionally, Petitioner has failed to establish *Strickland* prejudice based on the claimed error.

### 2. George Eaton

Petitioner contends that his trial counsel were ineffective for failing to call George Eaton as a witness. Petitioner states that in an interview by the press subsequent to the discovery of the bodies of the Mueller family, Eaton informed reporters that William Mueller expressed fear for his life two months before he vanished and reported a connection between William Mueller and Andy Strassmeir (who was connected to Timothy McVeigh and the Christian Identity community near Muldrow, Oklahoma). The Government contends that, even if true, the allegations prove nothing. Petitioner replies that William Mueller's expressed fear of Michael Brescia, *see below,* and individuals in the Christian Identity movement provides circumstantial evidence of William Mueller's state of mind.

 **\*11**  Assuming Eaton would testify as alleged, this claim fails to establish either deficient performance or resulting prejudice.

### 3. Peter Langan and Michael Brescia

Petitioner contends that his counsel were ineffective for failing to locate and interview Peter Langan and Michael Brescia. Petitioner states that Langan and Brescia were members of the Aryan Republican Army ("ARA"), which committed a series of bank robberies throughout the midwest in the early to mid-1990s with the proceeds going to finance the aims of the ARA, including the overthrow of the government. He further states that Langan was prosecuted for his role in the bombings and is serving a life sentence in federal prison. Similarly, Brescia was prosecuted and convicted, and was serving a federal sentence throughout most of the period leading up to the trial in this case. Petitioner states that during an interview with Eugene Wirges, a witness for the defense, William Mueller expressed fear for his life from Strassmeir and Brescia. The Government contends that Lee does not explain how Langan or Brescia possessed any information relevant to any issue. Petitioner replies that William Mueller's expressed fear of Brescia and individuals in the Christian Identity movement provides circumstantial evidence of William Mueller's state of mind.

This claim fails both the "performance" and "prejudice" prongs for ineffective assistance of counsel.

### 4. David Hill

Petitioner contends that his trial counsel were ineffective for failing to investigate and call David Hill as a witness. Petitioner states that Hill could have testified that he saw

Paul Humphrey and another man throwing something off of a bridge at the Illinois Bayou at about 8:15 a.m. during the second week of January 1996. [134]

The Government states that Lee's trial counsel relied upon the reports of the investigator and co-counsel. In addition to the affidavit from Mr. Lassiter, the Government has submitted an affidavit from Mark Hampton, one of Kehoe's trial counsel. Mr. Hampton attests that he was aware of the potential testimony of Hill and visited Hill twice, but determined that his testimony would not be helpful to the defense. [135] Mr. Lassiter's affidavit states that trial counsel were aware of Hill's availability to testify, but determined, based upon Mr. Hampton's and Investigator Eubanks's interviews, that Hill was not a beneficial witness to the defense. [136] Once again, the Government cites *Griffin* [137] for the proposition that when trial counsel conducts an investigation and determines not to call a witness, such decision may not form the basis for a successful ineffective assistance claim.

Petitioner replies by stating that the Government cites no authority that his trial counsel can defer their tactical decisions to an attorney representing a co-defendant. [138] Petitioner further states that his counsel suggested throughout the trial, and argued to the jury, that Paul Humphrey was a substantial and alternative guilty party, and distinguishes *Grifen* by noting that there the petitioner had received an evidentiary hearing.

 **\*12**  The Court concludes that Petitioner's counsel's decision not to call Hill was a legitimate trial strategy and there is no indication that such testimony would have altered the outcome of the trial.

### 5. Glen Hinson

Petitioner argues that his trial counsel were ineffective for failing to call Glen Hinson as a witness. He states that Hinson would have presented evidence that after Paul Humphrey obtained the title to the Mueller vehicle, he was nervous and scared, and that Nancy Mueller had told Hinson that she was frightened of Humphrey. The Government contends that Lee fails to explain how this testimony could have benefitted him and, further, that Nancy Mueller's statement would not be admissible. The Government points out that Humphrey testified extensively on direct examination by the defense, and the jury had the opportunity to consider the weight to give his testimony. Petitioner responds by stating

that testimony regarding Humphrey's disposition would have further corroborated the defense effort to shift blame to Humphrey. Petitioner further states that testimony about Nancy Mueller's state of mind regarding Humphrey would be admissible pursuant to Fed.R.Evid. 803(3) and would further support the defense that Humphrey was involved in the Mueller killings.

This claim fails both the "performance" and "prejudice" prongs for ineffective assistance of counsel. The Court notes that Humphrey was called to testify at trial by Petitioner. Petitioner's trial counsel attempted, but failed, to establish a link between Humphrey and the death of the Muellers. Humphrey was questioned in detail about the circumstances under which he acquired the title to William Mueller's vehicle and the fact that he attempted to have the title transferred to himself.

### 6. Eldon King

Petitioner asserts that his counsel were ineffective for failing to call Eldon King as a witness because he would have testified that Humphrey began acting strangely after the Muellers disappeared. He asserts that this evidence corroborates the defense effort to shift blame to Humphrey. The Government contends that the evidence would have established that Humphrey began acting strangely long before the Muellers disappeared, and Lee fails to explain how this evidence could have benefitted him.

As noted above, Petitioner's trial counsel attempted, but failed, to establish a link between Humphrey and the death of the Muellers. This claim fails both the "performance" and "prejudice" prongs for ineffective assistance of counsel.

### 7. Maria Ahrens and Vernon Ahrens

Petitioner contends that his counsel were ineffective for failing to call Maria and Vernon Ahrens as witnesses. He states that Maria Ahrens would have testified that she had seen the Muellers at her husband Vernon's auto shop the Thursday after they were supposed to be missing. Such testimony would have been confirmed by Vernon Ahrens.

The Government submits the affidavit of Agent Glen Jordan, which states that according to the discovery material provided to defense counsel, the Ahrens were interviewed on three occasions. [139] Although Maria Ahrens was not interviewed, she was present at an early interview. Agent Jordan's affidavit makes it clear that after reviewing a calendar for January

1996, the Ahrens fixed the last day they saw the Muellers as either January 3rd or 4th, 1996.

**\*13** In his reply, Petitioner asserts that the facts in this case are analogous to those in *Lord v. Wood.* [140] In *Lord,* the Court held that "counsel's cursory investigation of the three possible alibi witnesses [who claimed to have seen the victim after petitioner was supposed to have killed her], and their subsequent failure to put them on the stand, constitute[d] deficient performance that was prejudicial to [the petitioner's] defense." [141] Petitioner contends that the Ahrens were disinterested witnesses who would have corroborated the other witnesses who reported seeing the Muellers after the date of their alleged disappearance, including Janis Rowlands, Lucy Carr, Sue Sullivan, Ron Greer, and Mary Reid.

However, *Lord* is distinguishable because in that case "the most important elements of the [witnesses's] statements remained consistent in each interview with police and defense investigators during the four-month period following [the victim's] disappearance and murder." [142] Also, in *Lord,* the court stated that the witnesses never expressed any significant doubt about the sighting, and "[t]o this day, none of the three has wavered from his belief that it was [the victim] whom they saw...." [143] Here, the Ahrens clearly retracted their statements that they had seen the Muellers after they were supposed to be missing. Petitioner's claim fails both the "performance" and "prejudice" prongs for ineffective assistance of counsel.

### 8. Pam Wrappe

Petitioner asserts that his counsel were ineffective for failing to call Pam Wrappe as a witness. He states that Wrappe, an additional Wal-mart employee, participated in discussions regarding the Muellers being in Wal-mart, and would have further corroborated the testimony of Susan Weaver and Betty Gray. Weaver and Gray both worked for Wal-Mart. Both were called in the defense case to offer testimony that they had seen William Mueller in Wal-Mart after the January 12th date so critical to the Government's timeline.

Betty Gray was the district manager for Wal-Mart's shoe and jewelry division during the time in question. She knew William Mueller as a customer and as a contractor who performed electrical work for the store. Gray testified that she had a conversation with William Mueller about some electrical work on a remodeling project in the store during January of 1996. During direct, Gray testified that she

originally told Investigator Tom Brown that this conversation occurred on January 17th or 18th, 1996, but on cross-examination she explained that at the time she spoke with Brown, she had not reviewed her records. [144] After reviewing her records, which pinpointed the week during which the remodeling project at Wal-Mart had been completed, Gray indicated that conversation with William Mueller must have taken place between January 6th and 12th, 1996. [145] Thus, Gray's testimony in fact supported the Government's timeline.

Susan Weaver worked in Wal-Mart's food department during the time in question. She testified that she sold William Mueller a very large quantity of water by the gallon. She could not pinpoint the exact date that this occurred, but believed it to be "within a two month period of time" that an article about the disappearance of the Muellers appeared in the local newspaper. [146] A receipt for a large water purchase on January 22, 1996, corroborated Weaver's testimony. [147]

 **\*14**  Petitioner argues that Wrappe's testimony became more important because of the vacillation of Weaver and Gray during cross-examination. Petitioner's counsel spent a considerable amount of trial time attempting to prove that the Muellers were alive after the January 12 date so critical to the Government's theory. None of the testimony established the fact conclusively, however, and there was also considerable evidence to suggest that the Muellers were not seen or heard from after January 12th. In order to return a guilty verdict, the jury had to reject Petitioner's theory that the Meullers were alive after January 12th. Petitioner has failed to specifically set forth the testimony Wrappe would have provided. The Court can not find that if Wrappe had presented her unspecified testimony to corroborate that of Weaver and Gray that the outcome would have been different. Nor can the Court conclude that Petitioner's counsel was ineffective for failing to offer Wrappe's testimony.

Petitioner's claim fails both the "performance" and "prejudice" prongs for ineffective assistance of counsel.

### 9. David and Denise Hollabaugh

Petitioner asserts that his counsel were ineffective for failing to call David and Denise Hollabaugh as witnesses. He asserts that Nancy Mueller was treated at the Hollabaughs' clinic for stomach problems in early January, and that the Hollabaughs would have testified that Nancy Mueller told them that her family was planning on leaving town.

The Government contends that the Muellers "left town" many weekends to attend gun shows. The Government further contends that even if Nancy Mueller's statement was construed to mean that her family was leaving town for an extended period, Lee fails to explain how the testimony would be helpful to his case.

Petitioner replies by stating that Nancy Mueller's statement corroborates the defense theory that the Muellers were in fear of individuals and intended to "get off the grid."

Once again, Petitioner fails to provide any evidence that the Hollabaughs would have testified as alleged. Even if there were evidence presented that the Muellers intended to "get off the grid," such evidence would fall far short of overcoming the overwhelming evidence of Petitioner's guilt. Petitioner's claim fails both the "performance" and "prejudice" prongs for ineffective assistance of counsel.

### 10. Earlene Branch

Petitioner contends that his counsel were ineffective for failing to call Earlene Branch, Nancy Mueller's mother, as a witness. He asserts that Branch would have testified that she saw Nancy Mueller a few times at Wal-mart in early January and described her as nervous, upset, and not very talkative. He also states that Branch could have testified that while at the home of Sylvia and David Mason in February 1996, she believed she heard William Mueller's distinctive cough.

The Government states that it sees no possible benefit that could have accrued to the defense by calling Branch to testify as to Nancy Mueller's demeanor during a casual meeting. Also, the Government states that it is not aware of any testimony regarding hearing William Mueller's "distinctive cough," but states that such testimony would be easily discredited.

 **\*15**  Petitioner rebuts that Nancy Mueller's demeanor demonstrates her fear and implicates Humphrey and/or others from Oklahoma as a known threat, as opposed to Lee. Petitioner also contends that Branch's testimony that she heard her son-in-law's cough three weeks after he was alleged to be dead would not be easily discredited.

The testimony, if given as alleged, is not sufficiently specific that it would have undercut the ample evidence of Petitioner's guilt. Petitioner does not assert that Branch had any knowledge or even suspicion of a known threat. The Court agrees that any testimony regarding a "distinctive cough"

would have been easily discredited. Petitioner's argument fails both the "performance" and "prejudice" prongs.

### 11. Faron Lovelace

Petitioner contends that his counsel were ineffective for failing to call Faron Lovelace as a witness. He states that Lovelace would have testified that he had never heard of the "Aryan People's Republic," "Aryan People's Resistance," "Aryan People's Revolution," or any organization with the initials "APR." Petitioner also states that Lovelace claimed at the time of trial to be in possession of additional exculpatory evidence.

In response, the Government submits the affidavit of Mr. Hampton, which states:

> Trial counsel had numerous interviews with Faron Lovelace. In those interviews Lovelace asserted that he could prove persons other than our client, Chevie Kehoe and co-defendant Danny Lee had committed the murders of the Mueller family. However, Mr. Lovelace refused to state what this testimony would be. Mr. Lovelace also advised Judge Eisele that he could identify the true murders. [sic] This resulted in an in camera meeting with Judge Eisele where trial counsel was advised of Mr. Lovelace's assertions. The decision was made not to call Mr. Lovelace as trial counsel had no knowledge regarding what Mr. Lovelace's ultimate testimony would be. It also was obvious that Mr. Lovelace was not mentally stable. Counsel felt that presenting Lovelace as a defense witness would possibly compromise the defenses being permitted. The matter was discussed with defendant Kehoe. [148]

In his affidavit, Mr. Lassiter states that although defense counsel considered calling Lovelace as a witness, he was too unstable and would not state what evidence he had. [149] The Government argues that while defense counsel

knew of the witness and considered calling him, they wisely decided against doing so due to Lovelace's mental instability.

Petitioner argues that the affidavits of defense counsel provide no insight as to whether they considered calling Lovelace on the limited issue of the existence of the APR.

Petitioner's counsel's decision not to call Lovelace was clearly a legitimate and prudent trial strategy. Additionally, Petitioner's argument fails because the limited testimony proposed, if given, would not have altered the result in this case.

### 15. Norda Lewis

**\*16** Petitioner asserts that his trial counsel were ineffective in failing to call Norda Lewis, Faron Lovelace's wife, as a witness. Petitioner asserts that Lewis would have testified that she had never heard of the "Aryan People's Republic," "Aryan People's Resistance," "Aryan People's Revolution," or any organization with the initials "APR." The Government states that it has no indication that Lewis would have testified as alleged, and given the fact that she was rarely near Kehoe, the testimony would have been useless.

Petitioner's counsel's decision not to call Lewis was clearly a legitimate trial strategy. Additionally, Petitioner's argument fails because the limited testimony proposed, if given, would not have altered the result in this case.

### 16. Angela Holderman

Petitioner asserts that his trial counsel were ineffective in failing to call Angela Holderman as a witness. He contends that Holderman would have testified that she called the Mueller residence at 8:00 a.m. on January 11, 1996, and a man identifying himself only as "Darryl" answered the phone. Petitioner asserts that this would establish that there was an unknown individual, and potentially others, in the Mueller household immediately before (according to the Government's theory) the Muellers were killed. Petitioner contends that an individual's presence at a home where the residents disappear and later turn up dead is relevant, particularly when the name provided a witness does not fit the Government's theory of the case.

The Government contends, and the Court agrees, that even if available, this evidence would not have changed the outcome of the trial.

### C. Inadequate Cross-Examination of Witnesses

Petitioner claims that his trial counsel were ineffective in their cross-examinations of several Government witnesses either because they failed to properly impeach the witness or they failed to elicit testimony favorable to Petitioner during cross-examination.

To succeed on this challenge, Petitioner must show his counsel's cross-examination of these key witnesses fell below professional standards of competence and that such deficient performance prejudiced his defense. [150] As the Eighth Circuit has noted:

> The cross-examination of a witness is a delicate task; what works for one lawyer may not be successful for another. Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel. We have recently observed that there are a few [sic], if any, cross-examinations that could not be improved upon. If that were the standard of constitutional effectiveness, few would be the counsel whose performance would past [sic] muster. [151]

With this deferential standard in mind, the Court considers Petitioner's claim that his counsel's cross-examinations of certain witnesses were constitutionally deficient.

### 1. Gloria Kehoe

Gloria Kehoe testified for several hours over the course of two days. [152] The Court has reviewed the entire transcript of Gloria's testimony, both on direct and cross. The Court concludes that counsel's cross-examination of Gloria was well within the scope of a constitutionally effective cross-examination.

**\*17** Petitioner first argues that his trial counsel were ineffective for not calling Gloria as a witness in the defense case because she would have been subject to examination regarding her complicity in a plan, hatched by Kirby, to have Chevie kill one of his younger brothers to punish him for abusing one of Chevie's children. Chevie Kehoe refused to kill his brother, but instead gave him a lashing. The Government contends that Petitioner fails to explain how testimony that

a co-defendant's father hatched a plan to have one of his sons kill another would have aided his defense. Petitioner responds by stating that this testimony would demonstrate Cheyne's and Gloria's willingness to sacrifice one of their own regardless of his guilt.

The Court addressed this issue in two bench conferences while Gloria was testifying in the Government's case-in-chief. [153] The parties disputed the relevance of this line of questioning. The first bench conference was conducted at the conclusion of Gloria's testimony on April 7, 1999. The second bench conference was conducted the next morning before Gloria resumed her testimony. After initially ruling that the evidence was not proper cross-examination because it did not impeach Gloria, the Court subsequently altered its ruling and permitted defense counsel to ask the following three questions of Gloria:

> (1) Did she ever hear Kirby order Chevie Kehoe to kill anyone?;
>
> (2) (Assuming he did), to your knowledge, did Chevie Kehoe kill that person?; and
>
> (3) Did she take any action to stop her husband? [154]

While the Court limited the testimony on cross-examination, it pointed out that the defense was free to revisit the issue during its case-in-chief.

Petitioner's counsel asked Gloria the above questions during cross-examination. She acknowledged that Kirby had ordered Chevie to kill someone, but that Chevie refused to do so. [155] Defense counsel did not, however, call Gloria Kehoe during their case-in-chief to attempt to elaborate on or to further explain this incident.

The defense elicited this evidence, to the extent that the Court permitted it, during cross-examination. The Court only can assume that the decision not to elaborate on the issue further during the defense case was a tactical one. To question this decision would second guess defense counsel's strategy, which the law does not permit. While Petitioner argues that such evidence reveals Cheyne's and Gloria's willingness to sacrifice one of their own regardless of his guilt, an equally compelling argument may be made to the contrary, as no party appears to argue that Chevie's younger brother was innocent of abusing one of Chevie's children. Thus, a jury hearing such evidence might well conclude that Gloria was most concerned

with having the guilty answer for their wrongful actions, thereby enhancing her credibility. There simply is no basis for concluding that defense counsel were ineffective for not presenting more of this evidence during the trial.

**\*18**  Second, Petitioner argues that his trial counsel were ineffective in failing to cross-examine Gloria on a statement she made about Kehoe and Lee remaining in Arkansas after the Muellers were murdered. Gloria allegedly told officers that Kehoe and Lee, "waited around a few days" after the Muellers were murdered. He asserts that such evidence would contradict the evidence that Lee and Kehoe were in Spokane, Washington no later than January 14th. Petitioner argues that Gloria's statement to law officers destroys the Government's time line, but that trial counsel failed to bring it out on cross-examination.

The Government initially contended that Gloria made no such statement. Rather, Lee and Kehoe told Gloria that after the Spokane City Hall bombing, they parked on a hill above City Hall, watched the explosion, and were then disappointed because the police did not respond immediately.

To determine what Gloria actually said, the Court ordered Kehoe and Lee to produce a transcript of the interview.[156] The transcript reads in pertinent part:

> AD:[157] Did he tell you how long they were in, uh, close to the MUELLERS house before they actually took 'em down? Were they there for a day or two? Did they scope things out?

> GK: No. No, from what I understood he said that uh, the job was done and they took 'em and then they rode around in the Wagoneer to, for the, to see what came in the paper. See if the MUELLERS would come up missing or ... In other words how the media would handle it.

> AD: They rode around in the Wagoneer?

> GK: That's why I'm, that's what I believing he said.

> AD: So they stayed in that area for a while?

> GK: I'm not sure if it was that area or the outside of that area. I can't be quoted on that.

> AD: Did he tell you where he and DANNY went right after they disposed of the bodies? Where did they go?

> GK: You know, I was in shock by then.

> AD: Mm mh (affirmative).

> GK: I'll be very honest with you. I believe they just headed straight back to Spokane. I just remember him saying that they hung around for a few days. That could have been at DANNY'S mother's house and then they came back to Spokane.[158]

The Government replies that Gloria was momentarily confused about the Spokane City Hall bombing and the Mueller murders, and that the follow-up questions establish that she was aware of this confusion. Additionally, she made it clear that she was unsure about Kehoe's remarks, and ultimately stated that she believed "they just headed straight back to Spokane." Thus, it appears to the Court that even if trial counsel had questioned Gloria about the statement, she would have been easily rehabilitated by the Government.

Finally, even if it could be said that counsel's cross-examination of Gloria was constitutionally deficient, Petitioner suffered no prejudice because it would not have altered the result. Defense counsel effectively used what they had to work with in an effort to create reasonable doubt. They were, of course, limited by the facts. Admittedly, Gloria was an important Government witness. She was a difficult witness to cross-examine because of the fact that she testified convincingly, consistently with her prior statements, and against her own son.

### 2. Kelly Kramer

**\*19**  Petitioner asserts that his trial counsel were ineffective for failing to adequately cross-examine Kelly Kramer, Kehoe's "second wife."[159] Petitioner asserts that his counsel should have elicited testimony from Kramer that Chevie never spoke of setting up anything like the "Aryan People's Republic," "Aryan People's Resistance," "Aryan People's Revolution," or any organization with the initials "APR."

The Government states there is no factual basis for concluding Kramer, if asked, would have so testified. The Court agrees. Additionally, if she had so testified, it would not have changed the outcome of the trial.

### 3. Jeff Brown

Petitioner asserts that his trial counsel were ineffective in failing to adequately cross-examine Jeff Brown. Petitioner

asserts that although called as a Government witness, if asked, Brown would have testified that he never heard of the "Aryan People's Republic," "Aryan People's Resistance," "Aryan People's Revolution," or any organization with the initials "APR." Petitioner also asserts that Brown would have testified that he believed Kehoe had arrived back at the Shadows Motel in Spokane late in the day on January 12, 1996, or shortly after midnight on January 13, 1996.

The Government states that it has no factual basis to support the contention that Brown would have testified as alleged with respect to either subject. As to Kehoe's arrival at the Shadows Motel, the Government submits the affidavit of Agent Jordan, which states that there is no "indication in any of the numerous interviews of Mr. Brown which indicate that he thought Chevie Kehoe was at the Shadows Motel on either January 12, or January 13, 1996." [160]

Petitioner states that Brown's potential testimony would corroborate the trial testimony of Vada Campbell that Lee was at the Shadows Motel on January 13th. [161] The Court notes that Vada Campbell testified that she saw Lee at Sean Haines' "apartment on Augusta" on January 13th around 8:00 p.m. [162] Also, Petitioner states that Agent Jordan's affidavit refers to Kehoe's presence only, not Lee's, and the Government does not indicate whether Brown was specifically asked about these two dates in his interviews. Finally, unless the witness interviews are all signed, Petitioner asserts that it is improper to rely upon them, especially absent some adversarial process.

The Court finds that Petitioner has failed to establish that Brown would have testified as Petitioner argues. Additionally, and alternatively, if he had so testified, it would not have changed the outcome of the trial.

### 4. Jack Price

Petitioner asserts that his counsel were ineffective in failing to adequately cross-examine Jack Price. He states that although called as a Government witness, defense counsel failed to elicit an accurate recounting of Price's criminal history, and the Government failed to correct Price's false testimony. Price testified that "all my offenses consisted of fraud, bad checks, and theft of property, sir." Petitioner asserts that this was not accurate because Price also had prior convictions for armed robbery and assault with a firearm.

**\*20** In response, the Government submits the affidavit of Agent Jordan, which states that although Price was once charged with armed robbery and assault with a firearm, the NCIC record does not indicate that he was convicted of either crime. [163] In reply, Petitioner argues that although Petitioner may have mistakenly referred to "convictions," Price's testimony was still inaccurate because he had other "offenses" of armed robbery and assault.

The record disproves Petitioner's allegation. Price testified "all my offenses consisted of fraud, bad checks, and theft of property, sir" in response to the question, "what types of offenses have you ... pled guilty through the years?" [164] Petitioner offers no evidence that Price was convicted of armed robbery and assault with a firearm.

### 5. The Wankers

Petitioner asserts that his trial counsel were ineffective for failing to cross-examine the Wankers about being compensated by the Government. Petitioner states that throughout trial, the defense asserted that the Government's important witnesses "had been bought and paid for," making their credibility suspect. Additionally, Petitioner argues that in their rebuttal summation, the Government emphasized to the jury that the Wankers had not received any compensation, when in fact they received an unknown amount of money so that they could move out of the area. Petitioner also argues that defense counsel did not cross-examine the Wankers about their interviews with the media, but should have done so.

In response, the Government submits the affidavit of Agent Jordan, which states that Lee made statements to the Wankers implicating himself in a murder "down south" with the bodies being disposed "in a swamp." [165] The Wankers were identified as potential witnesses in the Spokane media, and agents became concerned because the criminal organization responsible for the Mueller murders, the Spokane City Hall bombing, and the Collville, Washington kidnapings had many associates in Washington and Idaho. [166] Agent Jordan further states that the Wankers received four $50 subsistence payments, which the Government equates to "meal money," for four days during the time they moved from one location to another for security reasons. [167] Petitioner contends that there is no mention of the need for security or danger to the Wankers on the paperwork for the subsistence pay.

As for the Wankers' media interviews, the Government argues that examination by defense counsel would have only established and unnecessarily emphasized that the case was significant in Spokane and that the Wankers were legitimately concerned for their safety. Lee's defense would not have been helped, the Government contends, by pointing out that Lee and his associates are considered so dangerous that witnesses against them must hide for protection. The Government also notes that Lee's argument is irreconcilable with his argument that the Government improperly bolstered Cheyne Kehoe's testimony by telling the jury that he was threatened by an Aryan prison gang member while incarcerated. Petitioner replies by stating that the Government presented the Wankers as "disinterested witnesses," not informants at trial.

**\*21** On direct appeal, in considering whether the district court erred in ruling that the prosecution did not have to provide defense counsel the names of witnesses three days before trial, the Eighth Circuit stated:

> The decision of Lee's counsel not to impeach these witnesses could well have been strategic, however, for there was reason not to bring up the Wankers' relocation. The government says that they were moved because of previous retaliation against witnesses by white supremacist groups. Even though it has not said that it facilitated the Wankers' relocation due to a fear of retaliation by Lee, his counsel may have wanted to keep any evidence of this type from the jury. Lee has not shown plain error. [168]

The Court concludes that Petitioner's counsel's decision not to cross-examine the Wankers on the fact that they had received the small amount of "meal money" from the Government or on the issue of the Wankers' media interviews was a legitimate trial strategy. Further, even if such strategy was defective, Petitioner can not demonstrate any resulting prejudice.

### D. Error in Failing to Object to Government's Pre-trial Motion to Bar Lee's Access to Discovery

Petitioner argues that his trial counsel were ineffective for failing to object to the Government's motion, made prior to trial, to bar Lee's access to early disclosed *Jencks* material for the protection of witnesses. The Court granted the motion. While the issue was challenged on appeal, it was reviewed and rejected under a stringent plain-error standard. Had counsel preserved the issue for appeal, Petitioner contends, it would have been reviewed under a more relaxed appellate standard and his conviction would have been vacated. The Court disagrees.

Prior to trial, the Government learned that Lee had forwarded copies of *Jencks* material to others along with letters suggesting an intent to bring harm to potential witnesses against him. The Government moved to deny Lee direct access to the written materials. Initially, the Government filed the motion ex parte, but the Court did not rule on the motion without knowledge and input from Petitioner's counsel. The Court held an emergency telephone conference to address the serious safety concerns posed by Lee's alleged conduct. During the conference, Karen Coleman represented Lee. She did so only because both Mr. Lassiter and Cathy Compton, Lee's other attorney, were out of state at the time. Although Ms. Coleman agreed to the Government's proposal to remedy the situation, she did so only after discussing the issue with Mr. Lassiter, who agreed with the Government's proposed remedy. [169]

The Court rejects Petitioner's suggestion, raised for the first time in its reply brief, that Karen Coleman had a conflict of interest that precluded her from effectively representing Lee on this issue. First, Ms. Coleman was acting with the knowledge and at the direction of Mr. Lassiter. Second, the Court has considered and rejected Petitioner's additional argument that his entire defense was prejudiced by Ms. Coleman's involvement in the case. The Court's discussion and ruling on the conflict of interest issue may be found below in Section H.

**\*22** Significantly, Lee and his counsel have never disputed-either prior to trial or now-that Lee in fact used the *Jencks* materials he obtained from his counsel in the threatening manner alleged by the Government. Thus, it is unclear what grounds Petitioner's trial counsel could have asserted if they had objected. In the absence of something to contradict the strong showing made by the Government, this Court's ruling would have been the same. And, as the Government points out, had trial counsel objected, the Government simply would have stopped providing *Jencks* material so far in advance. The

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Court concludes that defense counsels' failure to object to the Government's motion to bar Lee's access to certain discovery materials was not constitutionally deficient.

Further, the Court rejects Petitioner's contention that the Eighth Circuit would have reversed his conviction on appeal under a less deferential standard of review. In considering this issue on appeal, the Eighth Circuit stated:

> Here, the district court found good cause for limiting Lee's access to discovery materials based on the government's argument that Lee was a danger to potential witnesses. Its order was not a blanket proscription against Lee communicating with counsel, however. The order prevented Lee from accessing discovery documents and the names of witnesses, but it permitted him to be informed about all other matters and to discuss them with counsel. It did not violate § 3432, which only requires disclosure of witnesses and juror names to the defense but not to the defendant personally. The district court's order limiting discovery was not plain error because is did not impermissibly limit Lee's communications with his attorneys. [170]

"The standard for prejudice under *Strickland* is virtually identical to the showing required to establish that a defendant's substantial rights were affected under plain error analysis." [171] The Court concludes that Petitioner has failed to demonstrate *Strickland* prejudice.

### E. Failure to Object to the Court's Order Regarding Witness Lists

Petitioner asserts that defense counsel were ineffective for failing to object to the Court's Order excusing the Government from disclosing the names of eight witnesses three days before the trial started, which is normally required by 18 U.S.C. § 3432. The Court did so after concluding that identifying these witnesses so far in advance was likely

to jeopardize the life or safety of such witnesses. In its ruling, this Court applied the statutory exception for pre-trial disclosure of witnesses. [172]

Petitioner presents neither argument nor evidence to rebut the Government's contention that Lee posed a danger to potential witnesses. The Court can only conclude that no such evidence exists. Had Petitioner's counsel objected at trial without any evidence or argument to counter that of the Government, the Court would have entered the same Order and followed the same procedure at trial for the identification of witnesses. Trial counsel's failure to object to this Court's rulings regarding the disclosure of prosecution witnesses was not constitutionally deficient.

**\*23** The Court also rejects Petitioner's contention that the Eighth Circuit would have reversed the conviction if it had applied an abuse of discretion or clearly erroneous standard of review rather than a plain error standard of review. [173] "The standard for prejudice under *Strickland* is virtually identical to the showing required to establish that a defendant's substantial rights were affected under plain error analysis." [174] Just as the Eighth Circuit rejected a similar argument on plain error, this Court rejects Petitioner's contention that he suffered *Strickland* prejudice in connection with this issue.

### F. Failure to Request and Conduct mtDNA Testing

Petitioner argues that despite the availability of Mitochondrial DNA ("mtDNA") analysis at the time of trial, his counsel did not seek authorization for the funding needed to conduct such analysis of the hair found in the FBI "raid cap" and linked to the Mueller murders, which was determined to be microscopically similar to Lee's hair. Petitioner argues that mtDNA testing could have provided an absolute, science-based exclusion of Lee as the source of the hair, which would have undercut a key aspect of the Government's proof. Therefore, Petitioner argues that his counsel were ineffective for failing to request and conduct the mtDNA testing.

The Government submits Agent Jordan's affidavit, which states that the Government considered DNA testing of the hair, but investigators were advised that DNA testing was not possible on that hair. [175] Petitioner replies by noting that there is nothing in the record that suggests Lee's trial counsel deferred their decision-making process to Agent Jordan.

After submission of the initial round of briefs, Petitioner obtained mtDNA testing of the hair found in the FBI

"raid cap." The Analytical Report concluded that "[t]he mitochondrial DNA sequence data from the hair from the Baseball Cap (item 2) *differs* from that of the hair from Danny [Lee] [176] at a number of base positions and is therefore *excluded* as originating from the same person or maternal lineage." [177]

Petitioner now argues that evidence excluding him as the source of the hair is significant and material, especially considering the Government's theory that the raid cap in which the hair was found was used in the fake FBI raid involving the Muellers and given the Government's consistent reference to "Danny Lee's hair" throughout the trial. During trial, Chantelle Bequette, a criminalist at the Arkansas State Crime Laboratory, testified that "[t]he hair from the FBI cap was microscopically similar to the known hair from Danny Lee." [178] She explained that "microscopically similar" "means that the range of characteristics that were observed in the known hair and questioned hair were similar." [179] During trial, Bequette clarified that "finding that [the hairs] are similar doesn't necessarily point to a positive identification." [180] Additionally, on cross-examination, counsel for Petitioner noted, and Bequette agreed, that "the hairs do not possess enough individual characteristics to be positively identified as having originated from a particular person." [181]

 **\*24** Petitioner argues that counsel for the Government overstated the significance of the hair in its closing argument with the following comments:

> Danny Lee's hair. Mr. Lassiter got up here and spent a lot of time talking about Danny Lee's hair in the raid cap. Remember when they found this stuff they had two sets of raid equipment? One of them has a cap and they found a hair similar to Danny Lee's hair in the raid cap. But remember Chantell [Bequette]'s testimony? The reason they have to say similar and can't do a match is there are a couple of probabilities. Number one, people like me with white hair, they don't have enough pigment and characteristics. They are hard to match. But when

> you get past those people, as you do with Danny Lee, there might be another one out there. Remember, if she took a hair from everybody off the jury and everybody in the courtroom if you eliminated the white-haired people she would be able to match up because we would have had controlled conditions. That was her testimony. But she recognizes that there might be out there somewhere another hair that could match. We recognize that, but here, I submit to you, the evidence establishes that that was Danny Lee's hair. Not just a hair tested itself but the other proof that is associated with it are associated with him. [182]

In response, the Government states that it made clear, through its arguments and Bequette's testimony, that the only proof it was presenting was that the hair was microscopically similar to that of Lee. Furthermore, the Government states that the affidavits of ATF agent Jordan and Bequette (now Taylor) show that investigators made inquiry to determine whether DNA testing of the hair could be conducted, but were advised that it was not possible. [183] Agents were advised that no nuclear DNA testing was available as the hair had no root. [184] As to mtDNA testing, agents were advised that two centimeters of hair was required for the test. [185] Additional affidavits, as well as a copy of the FBI protocol in place in 1998, confirm that in order to obtain testing of a single hair in 1998, protocol required a 2 centimeter section of hair. [186] The Analytical Report submitted by Lee, and available at the time of trial, shows that the hair was approximately 1.1 centimeters in length.

Petitioner stresses that it is undisputed that mtDNA analysis was available at the time of the trial, that it could have been done prior to trial, and that such testing would have excluded Lee as the source of the hair. As set forth the affidavits of Brian Wraxall and Meghan Clement, [187] it is not the case that mtDNA analysis was unavailable on samples less than 2 centimeters in length, but rather lab protocols only permitted testing on such samples if the lab received permission to consume the sample. Thus, Petitioner argues that the protocols in place did not reflect a limitation on

available technology, but rather, a safeguard to protect the sample from being exhausted.

 **\*25**  The Court accepts that in 1998, mtDNA testing of a single hair required a 2 centimeter section of hair, unless the submitting agency authorized consumption of the entire sample. It is unclear in this case whether the parties could have agreed to permit the testing under these circumstances. Whether or not Petitioner's counsel can be faulted for failing to obtain a mtDNA test of the 1.1 centimeter hair in question, the Court finds that Petitioner has failed to demonstrate prejudice. The evidence in this case overwhelmingly supported the jury's finding of guilt. The Court can not find that the outcome would have been different if Petitioner's counsel would have obtained mtDNA testing and disproved Petitioner as the source of the hair found in the raid cap. For this reason, the Court rejects this claim.

### G. Adoption of a Jury-selection Strategy that Emphasized Seating African-Americans

Petitioner argues that his trial counsel were ineffective in adopting a jury-selection strategy that emphasized seating as many African-American jurors as possible. He states that the offensive and abhorrent white-supremacist views held by both Kehoe and Lee, which were part of the trial evidence, were likely to be particularly offensive to non-white people since they were the targets of race-based hatred. Lee had visible Nazi-related tattoos on both sides of his neck, and photographs of tattoos not otherwise visible were presented to the jury through testimony and photograph exhibits. Petitioner contends that the strategy emphasizing the selection of African-American jurors was unreasonable and prejudicial since the final jury was made up of a majority of African-Americans. [188]

In response, the Government submits the affidavit of Mr. Hampton, which states:

> Selecting a jury with as many black jurors as possible was a strategic decision made by defense counsel. Jury consultant Bob Berry concurred in the strategy. Defense counsel felt this strategy was reasonable because (1) blacks are more likely than whites to discredit government testimony,

> (2) research indicates that blacks are generally less likely to give the death penalty, and (3) it was felt that blacks were less likely to give the death penalty than whites in this particular case. [189]

Mr. Hampton represented Kehoe, not Lee. Petitioner points out that the affidavit submitted by one of his lawyers, Mr. Lassiter, makes no mention of jury selection strategy and fails to indicate that Lee's counsel adopted the strategy used by Kehoe's counsel. It would have been professionally deficient to do so, Petitioner contends, given his racially insensitive and inflammatory tattoos which were visible to the jury daily. It is unclear on this record that Petitioner's counsel joined in this strategy, but it appears highly unlikely that counsel for Kehoe and Lee would not have consulted on jury selection strategies. In any event, it is unnecessary to resolve this issue.

Petitioner also asserts that the basis of such a strategic decision is inherently racial and assumes racial proclivities as to beliefs and tendencies, which in turn discriminates against whites. Petitioner further asserts that even if such stereotypes are correct, it is unreasonable to rely on them when representing an individual who demeans and discounts the race the attorneys seek to favorably exploit.

 **\*26**  It is interesting to note that had the Government recognized the apparent defense strategy to seat as many black jurors as possible, presumably by using peremptory challenges only as to white jurors, the defense jury selection strategy could have been challenged as unconstitutional. The Supreme Court has held that "the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges." [190] Race-based jury selection offends the constitutional rights of the *jurors* who are eliminated from jury service because of their race. [191] That Petitioner's counsel may have allowed race to influence the jury selection process does not offend *Petitioner's* constitutional rights.

To the extent that Lee's counsel approved the jury selection strategy, the Court can not say that defense counsel's jury selection strategy fell below an objective standard of reasonableness. In assessing counsel's performance, the Court must "presume attorneys provide effective assistance and

[can] not second-guess strategic decisions or exploit the benefits of hindsight." [192]  To the extent that Lee's counsel did not in fact participate in or authorize this strategy, a contention that seems highly unlikely, the Court finds that Petitioner has failed to demonstrate that he was prejudiced as a result of such strategy. The Court can not find that a jury with a different racial composition would have returned a different verdict.

### H. Conflict of Interest of Attorney Karen Coleman [193]

Petitioner raises an ineffective assistance claim in connection with Karen Coleman, an attorney who assisted Mr. Lassiter, one of Petitioner's appointed defense counsel. Prior to the trial of this case, Ms. Coleman accepted employment with the Department of Justice to become an Assistant United States Attorney in the same office responsible for the prosecution of this case.

On December 7, 1998, Petitioner and this Court both became aware for the first time that Ms. Coleman had been hired by the United States Attorney for the Eastern District of Arkansas and that she planned to assume her new duties in January of 1999. During the December 7th hearing, the Court permitted defense counsel to question Ms. Coleman, Paula Casey (then United States Attorney for the Eastern District of Arkansas), and Mr. Lassiter. [194]  On December 22, 1998, the Court conducted an evidentiary hearing to consider the issue further. [195]  The Court devoted considerable resources and time to satisfy itself that the circumstances surrounding Ms. Coleman's job change would not compromise Petitioner's defense. As the Court concluded at the end of the December 22nd hearing:

> There is some problem with the timeliness of the disclosure in this case, but this record is absolutely clear that Ms. Coleman has not disclosed any confidential information that she received during her employment in this case with Mr. Lassiter, nor has the United States Attorney requested any such information. Furthermore, I'm convinced that both of these attorneys will honor their obligations, their oaths as attorneys not to disclose anything during the course of this proceeding until it's over ultimately, appeals and everything else. I am assuming and accepting Ms. Casey's statements that she will build the Chinese Wall. She's gone a little farther than may be required, but I think it's important that she has stated that she is going to move, just physically, the operation of this particular case out of her office and that will make it easier to

> insulate the attorneys involved in the case-the government attorneys involved in the case-from Ms. Coleman. Ms. Coleman is on notice, of course, of the concern of the Court and that she should remain-not only not discuss it, she shouldn't even be near any of the attorneys involved for the government on this case from hence forward. I think that's her attitude and her understanding. So I see no actual prejudice of the defendant's case or their defenses. And if I did, I would feel entirely differently about it but I'm going to overrule the defendant's motions, the two that are making motions essentially to disqualify the United States Attorney's Office or to dismiss for improper prosecutorial abuse of discretion. [196]

**\*27**  Petitioner now brings a litany of ineffective assistance allegations arising out of Ms. Coleman's departure. He contends that his defense counsel, Mr. Lassiter, was ineffective and breached his duty of loyalty to Petitioner when he vouched for Ms. Coleman's integrity at the December 7th hearing and by failing to inform Petitioner of Ms. Coleman's change in employment sooner. Second, Petitioner asserts that his counsel were ineffective for failing to move to disqualify the United States Attorney's office based on Ms. Coleman's employment or to join Kehoe's motion so moving. Finally, Petitioner argues that a hearing is necessary to determine whether Ms. Coleman, purposely or not, disclosed privileged and confidential information and/or work-product to the prosecution team and whether the United States Attorney's office set up adequate procedures to guard against the deliberate or inadvertent disclosure of such information.

Petitioner states that he had significant contact with Ms. Coleman and continued to have contact with her after Ms. Coleman had accepted employment with his prosecutors. Petitioner complains that Jack Lassiter had known for some time that Ms. Coleman was seeking employment with the United States Attorney, but failed to so advise his co-counsel, Ms. Compton, or Petitioner. Additionally, Petitioner states that Ms. Coleman was permitted to continue working on his case, although it was revealed during the two hearings in December 1998 that she had been offered the position, had accepted it four or five weeks earlier, and was awaiting only a routine background check before commencing her employment there.

In his affidavit, [197]  Petitioner states that Ms. Coleman assisted Ms. Lassiter and Ms. Compton in investigating the facts of the case and preparing for trial, and that during much of the pretrial period, she was his primary contact with the defense team. Specifically, Ms. Coleman reviewed

hundreds of documents, interviewed defense witnesses, attended defense team meetings, met with Petitioner in person and on the telephone, and gathered facts relating to Petitioner's alibi defense. Petitioner states that he had many confidential and privileged conversations with Ms. Coleman, who assured him that she was committed to him and his case for the "long haul."

Petitioner states that he learned about Ms. Coleman's departure when he called Mr. Lassiter's office and asked to speak with her. Petitioner states he felt completely betrayed, especially because it appeared that Ms. Coleman was trying to find out if he had any connection to Tim McVeigh or the "midwest bank robbers," although it had nothing to do with his defense.

Following the December 7th hearing, Kehoe moved to disqualify the United States Attorney's Office for the Eastern District of Arkansas from further participation in the case. Petitioner did not join in he motion. The motion to disqualify was denied. Petitioner asserts that although it would have been advantageous to have replacement prosecutors who were not as knowledgeable about the case, Mr. Lassiter's testimony supported the integrity of Ms. Coleman in a manner adverse to that interest. Petitioner complains that Mr. Lassiter testified that he believed in Ms. Coleman's honesty and integrity and did not believe that she would disclose confidential information to the prosecution. Petitioner did not share Mr. Lassiter's confidence in Coleman due to conversations in which she "probed" him for information unrelated to his defense. Additionally, Petitioner states that Ms. Coleman and Paula Casey, the United States Attorney for the Eastern District of Arkansas, gave conflicting accounts of some of the circumstances surrounding Ms. Coleman's application and hiring. Despite the testimony about a "Chinese wall" being built in the prosecutor's office so that any information that Ms. Coleman obtained while she was Petitioner's attorney would not be shared with the prosecutors on the case, Petitioner states that it did not reassure him or restore confidence in his defense team.

**\*28** In his affidavit, Petitioner states that he felt "shocked and betrayed" and expresses concern about Ms. Coleman "intensively questioning" him on a regular basis. He states that his testimony that he had "full confidence" in Mr. Lassiter and in his desire to help him was "rehearsed with [his] lawyers ahead of time" and "simply wishful thinking" because he never fully trusted his attorneys again after that day.

The Government responds that no grounds existed to disqualify the United States Attorney's Office for the Eastern District of Arkansas and that the obvious remedy was to wall off Ms. Coleman from the attorneys trying the case, which was done. Additionally, even if the United States Attorney's Office for the Eastern District of Arkansas had been disqualified, it is likely that Robert De La Cruz, who had been assigned from Washington D.C. to assist in the prosecution, would have continued with additional trial counsel from the Department of Justice or another district. The Government points out that Mr. De La Cruz had been working on the case for a year and was intimately familiar with the details of the case. Furthermore, the Government contends that the evidence against Lee was so overwhelming that an entirely new prosecution team would have easily secured a conviction.

Finally, the Government states that Mr. Lassiter was called as a defense witness and testified under oath as to why he had not questioned United States Attorney Casey about the Chinese wall to prevent Ms. Coleman from providing information to the attorneys trying the case. Mr. Lassiter stated, "I've worked with [ ] Coleman three and a half years. I know her integrity." [198] The Government questions whether Mr. Lassiter was supposed to lie or avoid the question.

The Government has submitted an affidavit from Ms. Coleman, which states:

1. At no time since joining the United States Attorney's Office have I revealed any attorney-client privileged information or trial/case strategy learned during the course of my representation of Danny Lee.

2. Upon my arrival at the United States Attorney's Office on January 4, 1999, the Kehoe prosecution team was in the process of moving to offices in another building to prepare for a trial. Until such time as they left the office, I made it a point not to be in the general vicinity of the offices of those attorneys.

3. My main task during the defense of Danny Lee was to organize and catalog the evidence received from the prosecution.

4. While I did have numerous conversations with Danny Lee during the course of my representation of him, those conversations were to gather information for use to the defense and to relay the information to other members of the defense team. At no time have I divulged information

learned during those conversations to anyone other than attorneys representing Mr. Lee. [199]

In his reply, Petitioner asserts that Ms. Coleman's acceptance of employment prior to ending her representation of him constitutes active representation of conflicting interests. Petitioner also asserts that Ms. Coleman's inaction at the pretrial hearing limiting his access to discovery materials demonstrates that the conflict adversely affected her performance.

**\*29** While Petitioner's counsel did not join Kehoe's motion for disqualification, it attempted to use the conflict issue to Petitioner's advantage. On December 15, 1998, Petitioner's counsel filed a petition to remove death penalty as a potential punishment stating that "[o]bjection has been made in open court to what is, or what appears to be, an irremedial conflict of interest," and outlining the details of Ms. Coleman's move to the United States Attorney's Office. [200] Ultimately, the motion was denied. [201]

"The Sixth Amendment right to counsel has been interpreted to provide for representation that is 'free from conflicts of interest or divided loyalties.' "[202] "A defendant bears the burden of showing that the conflict 'adversely affected the lawyer's performance.' "[203] "He may prevail on an ineffective assistance claim resulting from either an actual or a potential conflict of interest." [204] "Short of demonstrating that his counsel 'actively represented conflicting interests,' a defendant has not met the constitutional threshold for a claim of ineffective assistance." [205] "If a defendant is unable to demonstrate an actual conflict of interest under *Cuyler,* he may alternatively establish that his attorney: (1) had a potential conflict of interest which (2) actually prejudiced the defense." [206] "[T]he mere possibility of conflict is insufficient to impugn a criminal conviction." [207] "In order to support the second prong of this test, the defendant must show that the errors committed by counsel were so serious that the defendant was deprived of a fair trial or a reliable result" and "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [208]

The Court recognizes that a potential conflict of interest existed. However, Petitioner's claim fails because he cannot demonstrate that the potential conflict of interest actually prejudiced the defense. As discussed above, Ms. Coleman's

failure to object to the Government's motion to bar Lee's access to discovery was not constitutionally deficient, and Petitioner failed to demonstrate prejudice due to said failure to object. [209] Furthermore, even assuming that an actual conflict existed, Petitioner has failed to demonstrate that the conflict adversely affected Ms. Coleman's performance.

The Court further finds that Mr. Lassiter's statements to the Court do not constitute ineffective assistance of counsel. Mr. Lassiter had an obligation to testify truthfully. Also, Petitioner's counsel's failure to move for the disqualification of the United States Attorney's office, or to join in Kehoe's disqualification motion, does not constitute ineffective assistance of counsel. As noted above, the motion was denied. Petitioner cannot demonstrate that if his counsel would have joined the motion, it would have been granted, or that the result of his trial would have been different.

**\*30** As to the evidentiary hearing issue, the Government states that a post-conviction petitioner is only entitled to an evidentiary hearing if the facts alleged, if true, would entitle him to relief. [210] Affidavits may be reviewed by the court to determine whether an evidentiary hearing is required. [211] The Government notes that Lee does not assert in his affidavit that Ms. Coleman shared any privileged information. Furthermore, as outlined in Ms. Coleman's affidavit, there could have been no inadvertent sharing of information. Because these facts are uncontested, the Government contends that no hearing is required. The Court agrees. In the absence of any new information to suggest that Ms. Coleman actually made any disclosure of privileged and confidential information and/or work-product to the prosecution team or to suggest that Petitioner's defense was adversely affected by the conflict, this claim may be disposed of without a hearing.

### I. Failure to Capitalize on Inconsistent Testimony Regarding Searches

Petitioner asserts that although he recalls conflicting testimony regarding the search of a storage unit located in Old Town, Idaho, his counsel advised him that no such evidence had been presented. Specifically, Petitioner states that he recalls testimony from a federal agent, and an accompanying video tape, that documented an initial search of the Old Town unit that disclosed no incriminating evidence and a second search, conducted a few days later, where significant incriminating evidence was uncovered. Petitioner contends that his trial counsel's failure to capitalize on such conflicting

evidence in summation constituted ineffective assistance of counsel.

The Government responds that it has reviewed the testimony regarding the search of the Old Town, Idaho storage unit, and is unable to locate any conflict. Petitioner responds by stating that the Government "does not contest the multiple searches at locations which yielded differing results," and that "[f]urther factual development needs to occur regarding these circumstances that can challenge the reliability of the evidence discovered." Petitioner has failed to specify the conflicting testimony. Bare allegations will not suffice. After careful review of the portions of the transcript cited by the Government regarding the Old Town, Idaho storage unit, the Court agrees that there is no conflicting testimony.

### J. Failure to Object to Improper Closing Argument

Petitioner argues that during closing argument of the guilt phase, the Government engaged in five acts of significant misconduct, which his trial counsel failed to object to and preserve. Petitioner contends that trial counsel's failure to object to each of these acts by the Government constitutes ineffective assistance of counsel.

### 1. Comments Regarding Death Threats

Petitioner contends that the Government argued that Cheyne Kehoe had faced death threats from an inmate who was associated with the Aryan Brotherhood or other Aryan-related prison gang. Petitioner asserts that such argument improperly bolstered Cheyne's testimony and placed in front of a jury a prejudicial incident (if it did in fact really occur) that was never connected to Petitioner.

**\*31** The Government responds that Kehoe's trial attorney broached the subject during trial by asking if Cheyne had ever been placed in an infirmary while incarcerated in Ohio, and Cheyne responded that he had been placed in protective custody. [212] Kehoe's attorney pursued the matter. [213] On redirect, the Government clarified that Cheyne was placed in the infirmary as a safety precaution, and that a prison guard told Cheyne that while he was in the infirmary, an Aryan inmate got into the infirmary and threatened him, at which point Cheyne was taken into federal custody. [214] During the Government's closing argument, the Government's attorney stated:

So, you have heard that we have put on-we have made deals with some of these people. We made a deal with Cheyne Kehoe. We moved him out of the state prison to a federal prison. What did you hear about that? That Cheyne Kehoe had been put in protective custody, and that even after being put in protective custody an Aryan inmate came in looking for him and there were death threats on Cheyne's life. Is that a fair deal? That's a question you can answer yourself. [215]

The Government asserts that, throughout the trial, defense counsel argued that the Government had made deals with all of its witnesses, including a deal to allow Cheyne to serve his Ohio penitentiary time in the federal penitentiary system. The Government contends that there was clearly evidence that removing Cheyne to the federal penitentiary was undertaken to protect him, not to give him a better place to serve his time. Petitioner rebuts by stating that Cheyne's report that a guard told him of an alleged threatened attack on him was not admissible evidence and should not have been argued as such to the jury.

The Court agrees that considering the defense efforts to suggest that the Government had made deals with all of its witnesses, the Government had a right to question Cheyne to clarify the reason for moving Cheyne to a federal penitentiary. Clearly, at the time of closing arguments, the incident in question was already known to the jury as a result of Cheyne's testimony. The Court finds that counsel's failure to object to the aforementioned comments was not deficient, and Petitioner cannot demonstrate prejudice.

### 2. Comments About Kirby Kehoe's Failure to Participate in Murders

Petitioner contends that the Government's argument that Petitioner's involvement in the plot to kill the Muellers was the cause of Kirby's decision not to participate is speculation premised only upon inadmissible hearsay from Gloria because Kirby did not testify.

The Government states that it had to prove that Petitioner had a position in the enterprise. The Government asserts that it was arguing that Kehoe was the leader of the enterprise, and as such, involved Petitioner, despite Kirby's objection. [216] Specifically, in closing arguments, the Government stated:

If you will recall the testimony, Chevie Kehoe brought Danny Lee down to Arizona with the plans to do the January, 1996 robbery and murder of the Muellers. And

because he brought Danny Lee with him, Kirby Kehoe didn't want to play. He didn't want to go. He didn't want to participate, and he stayed in Arizona.

**\*32** According to the Government, this argument was premised on testimony provided by Gloria. During cross-examination by counsel for Kehoe, Gloria testified that Kirby told her that he had planned a second burglary of the Muellers, but that he "didn't want to have anyone outside the family do it." [217] She also testified that Kehoe "jumped the gun," and that "Chevie wanted Kirby to go," but Kirby would not go "because of Danny Lee." [218] The Government states that the testimony was not offered to prove the truth of the matter asserted, *i.e.* that Kirby knew in advance of the Mueller hit, but rather to impeach Gloria for not taking any action to protect the Muellers, and thus was not hearsay. Further, the Government states that even if the testimony was hearsay, an exception to the hearsay rule applies as the statement was clearly against Kirby's interest.

Petitioner replies that the Government impermissibly manipulated the alleged impeachment evidence brought out by Kehoe's attorney into substantive evidence of an enterprise at closing regarding a non-testifying co-defendant that pled guilty to the enterprise, and his counsel should have objected.

The Government's argument that testimony was non-hearsay or satisfies an exception to the hearsay rule is unavailing. While at the time the testimony was given it may have been offered as impeachment evidence, rather than for the truth of the matter asserted, the Government's argument was that the testimony indicated that Kirby did not want to participate in the Mueller murders because of Lee's involvement. Furthermore, the "statement against interest" exception applies only when the declarant is unavailable as a witness. [219]

The Court notes that Petitioner does not argue that his counsel should have objected to the admission of the testimony of Gloria to which the Government referred in closing argument. Said testimony was presented to the jury during Gloria's cross-examination by Kehoe's counsel. The Court agrees that the Government's comments were improper, and Petitioner's counsel should have objected. Had Petitioner's counsel objected to the Government's statement, the Court would have instructed the jury that the testimony referenced could only be considered for impeachment purposes. However, the Court concludes that counsel's failure to object does not satisfy the prejudice prong of *Strickland* because even absent counsel's error, the result of the proceeding would have been the same.

### 3. Name-Calling

Petitioner argues that, in its closing argument, the Government engaged in improper and unprofessional name-calling that devalued Petitioner's status as a human being, by referring to Petitioner as Kehoe's "faithful dog."

The Government states that this argument colorfully shows Petitioner's position in the criminal enterprise. During closing arguments, the Government stated, "Chevie Kehoe is the leader of this enterprise. Danny Lee, Danny Lee is like the faithful dog." [220] The Government contends that referring to someone's similarity to a faithful dog, something that is revered in our society, is not name calling and does not lower one's status as a human being.

**\*33** In response, Petitioner asserts that the Government's comment violates the principles of *Darden v. Wainwright.* [221] However, there, the Supreme Court held that although the prosecutor's incorporation of the defense's use of the word "animal" in reference to the defendant was improper, the comments did not deprive the defendant of a fair trial. [222] Here, although the Government might have more appropriately analogized the relationship between Kehoe and Petitioner, the comparison of Petitioner to a faithful dog was not prejudicial and did not impact the reliability of the trial process.

### 4. Arguing Facts Not in Evidence

Petitioner asserts that the Government argued facts that were not in evidence, by stating that Petitioner had referred to Nancy Mueller as a "dumb bitch." In closing, immediately after explaining Petitioner's role as the "henchman," the Government stated:

> But that's not all Danny did. Danny told Gloria after the murders, Gloria Kehoe, "Bill was one tough son of a bitch," talking about that fight when Bill fought for his life. "Bill was one tough son of a bitch." But Nancy was a dumb bitch because she pulled that plastic bag over her own head. [223]

The Government states that Gloria Kehoe testified as follows:

> Q. What did Mr. Lee tell you about the murders?
>
> A. Just said Bill was one tough son of a bitch because he fought so hard and how dumb Nancy was because she

thought it was real and helped put the trash bag on her head because she thought it was real . [224]

The Government states that the attorney for the Government erred in his recollection of this testimony, by using the term "bitch," but that given the actual testimony, such recollection error is understandable. The Government asserts that the matter is trivial. Petitioner rebuts that it is not trivial to argue to a jury that a defendant referred to a murder victim as a "dumb bitch" when no such statement had been made and is "incendiary to the highest level." The Court agrees that the reference is not trivial, but concludes that it does not rise to the level of *Stickland* prejudice because the Court can not find that the jury's verdict would have been different without such reference.

### 5. Reference to Kirby Kehoe's Guilty Plea

Petitioner contends that the Government improperly referred to Kirby Kehoe's guilty plea as proof of the existence of the RICO enterprise. During closing arguments, the Government's attorney stated:

> Count 2 is a conspiracy to commit racketeering activity, if you will. We talked a little bit about that conspiracy being a criminal agreement. It's an agreement to participate in racketeering activity in that the defendants deliberately joined with knowledge of the criminal organization's purpose. Now, Chevie Kehoe didn't join this. He created it. Danny Lee joined it. Faron Lovelace was involved in this enterprise. Kirby Kehoe was involved in this enterprise. Kirby Kehoe is not present today, because you've already been informed that Kirby Kehoe pled guilty to Racketeering Act Count 1 for his role and his participation in this criminal organization. There are others who were named, Cheyne Kehoe. Cheyne Kehoe told you he was up there after the Friedman robbery, and he counted that money out that was stolen from the Friedmans. And later, when they got

> to Ohio, who is in that blue Chevrolet Suburban? Cheyne Kehoe, along with Chevie Kehoe. The defendants agreed that one of the members of this enterprise would commit at least two of the crimes that we call racketeering acts. [225]

**\*34** The Government asserts that it was not arguing that Kirby's guilty plea was proof of the existence of the RICO enterprise. Rather, it was making the point that several people joined the criminal organization that Kehoe created, and only mentioned Kirby's guilty plea in passing.

In response, Petitioner quotes *United States v. Baez*[226] as follows:

> A codefendant's guilty plea may not be used as substantive evidence of a defendant's guilt.... If the codefendant testifies, however, either the government or the defense may elicit evidence of a guilty plea for the jury to consider in assessing the codefendant's credibility as a witness.... Because of the potential for prejudice, cautionary instructions limiting the jury's use of the guilty plea to permissible purposes are critical.

> Petitioner asserts that even if the Government intended only to demonstrate the size of the enterprise via a guilty plea, a reasonable juror would understand that this also established the existence of the organization, and thus, counsel were ineffective in failing to object. Petitioner further asserts that the language used by the Government asserts that Kirby pled for his role in an existing enterprise-"this enterprise" that the jury was considering-and belies the benign purpose alleged.

"Any time a guilty plea of a co-offender is either directly or indirectly brought into a trial, trial courts must ensure it is *not* being offered as substantive proof of the defendant's guilt."[227] "Reference to such pleas obviously is capable of seriously prejudicing the defendant's right to a fair trial."[228] The factors a court must consider in reviewing such reference are as follows: (1) whether the court gave the jury a limiting instruction; (2) whether there was a proper purpose in introducing the fact of the guilty plea; (3) whether the plea was improperly emphasized or used as substantive evidence of guilt; and (4) whether the introduction of the plea was invited by the defense counsel.[229]

The Court agrees with the Government that the purpose in introducing the fact of Kirby's guilty plea was to point out that several people joined the criminal organization that Chevie created. The plea was not emphasized. If Petitioner's counsel had objected, the Court would have given essentially the same instruction it later in fact gave regarding this issue, *to wit:*

> Kirby Kehoe was charged in certain counts and entered a plea of guilty pursuant to a negotiated agreement with the government in which he received sentencing considerations and the dropping of certain charges in return for his plea of guilty and his agreement to assist in the prosecution of this case.
>
> ...
>
> You are instructed not to consider the legal effect or consequences of Kirby Kehoe's plea ... in your deliberations on these charges as they relate to the defendants Kehoe and Lee. [230]

Also, the Court instructed the jury multiple times that the statements and arguments by the attorneys were not evidence. [231]

 **\*35**  The Court concludes that Petitioner's claim fails because he cannot establish *Strickland* prejudice due to the limiting instruction given, and the fact that there was overwhelming evidence of the existence of the RICO enterprise and Petitioner's involvement therein regardless of the Government's statement in closing argument . [232]

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE SENTENCING PHASE

### A. Failure to Challenge the Multiple Killings Aggravating Factor

Petitioner asserts that the multiple-murder statutory aggravating factor should not have been submitted to the jury as an aggravating factor with regard to the murders of William and Nancy Mueller. Petitioner states that the multiple killings aggravating factor, found at 18 U.S.C. § 3592(c)(16), did not become part of the Federal Death Penalty Act until April 24, 1996, while the Government's theory was that the Muellers were killed on January 11, 1996. Petitioner contends that counsel's failure to move to strike the factor constitutes ineffective assistance of counsel.

The Government contends that even if defense counsel had timely objected, the Court's improper submission of the "multiple killings" aggravating factor to the jury is harmless beyond a reasonable doubt because the jury properly found at least one other statutory aggravating factor as to each murder. [233] Specifically, the Government states that the death sentences for William and Nancy Mueller's murders were adequately supported by the "pecuniary gain" statutory aggravating factor, and the sentence for Sarah Powell's murder was adequately supported by the "vulnerable victim" factor. The Government further states that the jury can properly consider the "multiple killings" aspect of the offense, even if not as a statutory aggravating factor.

In reply, Petitioner asserts that the decision in *Sanders,* upon which the Government relies, does not support the Government's contention. In reviewing a death sentence imposed under the California statutory scheme, the Supreme Court in *Sanders* held that "a[n] invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process unless one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." [234] The Court further stated that "the death sentence must be set aside if the jury's consideration of the invalidated eligibility factor allowed it to hear evidence that would not otherwise have before it." [235] Petitioner contends that the evidence of multiple murders was not properly before the jury as relevant to any of the remaining aggravating factors as to any of the murders.

For a jury to return a sentence of death, the Federal Death Penalty Act requires the finding of at least one statutory aggravating factor. [236] However, "[t]he jury ... may consider whether any other aggravating factor for which notice has been given exists." [237] Before the jury may consider the nonstatutory factors, the jury must find at least one statutory aggravating factor beyond a reasonable doubt. [238]

 **\*36**  As discussed below, the pecuniary gain factor, a statutory aggravating factor which the jury found beyond a reasonable doubt, applied to the factual circumstances of the case. Therefore, even if counsel had objected to the multiple killings factor due to its enactment date, the Court simply would have allowed the jury to consider the multiple killings aggravating factor as a nonstatutory factor, as Petitioner had

adequate notice thereof. The submission of the "multiple killings" aggravating factor to the jury is harmless beyond a reasonable doubt. Therefore, Petitioner's claim fails because he cannot demonstrate the required *Strickland* prejudice. [239]

### B. Failure to Challenge the Pecuniary Gain Aggravating Factor

Petitioner asserts that his counsel were ineffective for failing to bring to the Court's attention authority limiting the applicability of the pecuniary gain factor to situations where the murder was the direct and indispensable key to the pecuniary gain, such as a killing done for hire or a killing done to gain an inheritance or insurance proceeds. He also asserts that his counsel were ineffective for failing to move to strike the pecuniary gain factor. Petitioner notes that in a letter to the Court dated April 22, 1999, his counsel objected to the submission of the pecuniary gain factor on the basis that "this aggravator was meant to be used in cases of murder for hire." Counsel further stated that she only had committee comments to the Eighth Circuit Model Death Penalty Instructions and dicta in *United States v. Davis* [240] to support her theory. However, Petitioner states that six weeks before the letter was written a district court in New York had so held in *United States v. Cuff*. [241]

The Government asserts that there was ample evidence to sustain the jury's finding beyond a reasonable doubt that Lee committed the murders for pecuniary gain. Thus, the Government contends that any challenge to the pecuniary gain factor would have lacked merit, especially in light of subsequent case law construing the factor, and Petitioner cannot show that his counsel's performance was deficient or prejudicial. The Government further asserts that counsel in fact timely objected on the ground that this factor was limited to cases involving murder for hire and cited the most directly applicable authorities available. The Government contends that counsel's failure to cite an additional district court opinion was hardly deficient or prejudicial, especially in light of the number of federal appellate decisions deciding the issue to the contrary.

Petitioner and Chevie took cash, gold, guns and gun parts from the Muellers. Kehoe kept $50,000 in cash and gold, and guns and gun parts valued at $30,000. [242] Kehoe gave Lee between $3,000 and $4,000 and one handgun for his involvement in the Mueller murders. [243] The Government asserts that pecuniary gain motivated Lee's participation in the murders, not just the robbery. Furthermore, the murders were essential to complete the robbery, as Lee told Gloria that William Mueller resisted vigorously. The Government states that this left Lee and Kehoe with no doubt that they would have to kill him to succeed with the robbery.

**\*37** 18 U.S.C. § 3592(c)(8), the pecuniary gain factor, provides:

> In determining whether a sentence of death is justified for an offense described in section 3591(a)(2), the jury ... shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:

> ...

> The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value.

The Ninth Circuit has held that "[t]he plain reading of § 3593(c)(8) is that it applies 'in the murder-for-hire scenario ... or in the robbery scenario (if the defendant committed a concomitant *murder* 'in the expectation of the receipt of anything of pecuniary value')." [244] "Limiting § 3592(c)(8) to murders-for-hire would read the second clause out of the statute." [245]

In *Mitchell,* the defendant murdered the owner of a vehicle and her granddaughter to obtain the vehicle to use in a subsequent robbery. [246] There, the Ninth Circuit held that the victims "were not murdered incidentally, or solely to cover up a crime, but because 'pecuniary gain was expected to flow directly from the homicide.'" [247] The court in *Mitchell* distinguished the facts from those in *Bernard,* [248] where the Fifth Circuit held that it was error to instruct on pecuniary value as an aggravating factor where the defendant shot the victims to prevent them from reporting their crimes and carjacked and robbed the victims before killing them and burning the car. [249] The court in *Mitchell* noted that in the case before it, the defendant's crime spree was ongoing and he needed to kill the victims so the vehicle to be used in the subsequent robbery could not be traced to him. [250] The court also found that the case was distinguishable from *United States v. Chanthadara* [251] because the instruction

specified that the "Defendant committed the killing as consideration...."[252]

Additionally, in *United States v. Brown,*[253] the Eleventh Circuit held:

> Neither *Chanthadara* nor *Bernard* supports the argument that the pecuniary gain factor is somehow inapplicable in cases involving a robbery or that the factor is limited to cases of murder-for-hire. Rather, they simply stand for the unremarkable proposition that the murder itself, and not an underlying robbery, must be committed in expectation of something of pecuniary value.[254]
>
> ...
>
> Quite simply, the "pecuniary gain" aggravating factor may apply in the "murder-for-hire" scenario (*if the* defendant committed the murder "*as consideration for the receipt of ...* anything of pecuniary value") or in the robbery scenario (if the defendant committed a concomitant *murder* "in the expectation of the receipt of anything of pecuniary value"). *See* ⚑ 18 U.S.C. § 3592(c)(8). The "consideration" and "expectation" clauses are two separate ways by which the pecuniary gain factor may be satisfied, and they both must have meaning. *See* ⚑ *Cooper,* 91 F.Supp.2d at 105 (discussing the two separate prongs). The pecuniary gain factor will not necessarily apply to every robbery/murder scenario, however, and, therefore, we must examine the facts of this case.

 **\*38** In *Brown,* the defendant stated that during the robbery of the post office he "accidentally" cut the murder victim prior to gaining control of the money orders, but that he had no recollection of any stabbing after the initial wound.[255] The medical examiner testified that the victim was stabbed ten times, two of which could have been fatal, but was unable to determine the order in which the wounds occurred.[256] The court found that "because that first wound [inflicted on the murder victim] may have been one of the two fatal wounds, the jury could reasonably have found that [the defendant] killed [the victim] before he had control of the money orders, and that the killing was necessary so that [the defendant] could complete the robbery (which, obviously, carried with it the expectation of pecuniary gain)."[257] Additionally, the court

noted that due to the defensive wounds on the victim, the jury "could reasonably have concluded that [the victim] was struggling and that [the defendant] had to kill her in order to successfully complete the robbery."[258]

In his reply, Petitioner contends that *Allen I*[259] supports his argument that the pecuniary gain factor applies only where the murder is a necessary condition to the expected pecuniary gain. There, a panel of the Eighth Circuit stated that "the application of the pecuniary gain aggravating factor is limited to situations where pecuniary gain is expected to follow as a direct result of the [murder]."[260] The court also stated that "[t]o hold otherwise would convert every felony murder in which the underlying felony had a pecuniary object or benefit into a federal capital offense," and there is "nothing in the statute or legislative history to suggest that Congress intended such a result."[261]

In *Allen I,* the defendant killed a security guard during an armed robbery of a bank.[262] The court found that the indictment could not be read to state the essential facts which would constitute the pecuniary gain aggravator because "[n]othing in either count necessarily links the murder of [the security guard] to the receipt of, or expectation of the receipt of, pecuniary gain."[263] Because the defendant's indictment could not be reasonably construed to charge a statutory aggravating factor, as required for imposition of the death penalty, the Eighth Circuit held that the indictment was constitutionally deficient to charge a capital offense.[264] The Eighth Circuit granted rehearing en banc and vacated the panel's judgment in *Allen II.*[265]

In *Allen II,* the Eighth Circuit found that the defendant's indictment suffered from a Fifth Amendment defect.[266] However, the court declined to treat the defect as a structural error requiring automatic reversal without a showing of prejudice to the defendant.[267] After limiting itself to the evidence presented to the grand jury at the time of indictment, the court concluded that the defect in the indictment did not prejudice the defendant, and thus, was harmless beyond a reasonable doubt.[268] With regard to the statutory aggravating factors, the court found that any rational jury, including the defendant's grand jury, would have found probable cause to charge one of the statutory aggravating factors-that the defendant knowingly created a grave risk of death to persons other than the murder victim while committing the bank

robbery or in escaping apprehension. [269] The Court did not address the pecuniary gain factor.

**\*39** Even assuming *Allen I* has precedential value, the court simply held that *the facts contained in the indictment* alone did not support the pecuniary gain factor. [270] *Allen I* expressed no opinion as to whether the facts of the case supported the applicability of the pecuniary gain aggravating factor.

As in *Brown,* [271] the evidence at trial indicated that William Mueller strongly resisted the robbery. Therefore, the jury could reasonably have concluded that Lee and Kehoe had to kill him in order to successfully complete the robbery, which obviously carried with it the expectation of pecuniary gain. Also, as in *Mitchell,* [272] the Muellers "were not murdered incidentally, or solely to cover up a crime, but because 'pecuniary gain was expected to flow directly from the homicide.' "

The Court further finds that counsel in fact timely objected on the ground that this factor was limited to cases involving murder for hire, and counsel's failure to cite an additional district court opinion does not constitute deficient or prejudicial conduct. Even if counsel had not challenged the pecuniary gain aggravating factor, Petitioner cannot demonstrate prejudice because any challenge would have been rejected. [273]

### C. Failure to File Pre-Trial Motions Challenging Constitutionality of the Federal Death Penalty

This is the first of Petitioner's three claims challenging the FDPA-two in the context of ineffective assistance claims (pre-trial and on appeal) and one direct claim. Because the claims are so related, the Court will address all three claims together, *infra,* in the section of the opinion addressing Petitioner's direct constitutional challenge. [274]

The Court notes that Lee's trial counsel in fact filed a pre-trial motion challenging the constitutionality of the death penalty. [275] The Court did not rule on the motion until after trial, at which time it rejected Petitioner's pre-trial constitutional challenge. [276] Additionally, to the extent that the proposed constitutional challenge differs from those challenges made by Petitioner's trial counsel and rejected by this Court previously, Petitioner is unable to demonstrate prejudice because the Court finds no merit in

the argument that the proposed pre-trial motions challenging the constitutionality of the death penalty would have been successful.

### D. Failure to Challenge Penalty Phase Jury Instruction

Petitioner claims that counsel were ineffective for failing to note or object to this Court's penalty-phase instructions regarding the range of punishments for the capital counts under the Violent Crimes in Aid of Racketeering Activity ("VICAR") statute found at 18 U.S.C. § 1959, which provides in pertinent part:

> (a) Whoever, ... for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders ... shall be punished-
>
> (1) for murder by death or life imprisonment....

**\*40** Specifically, Petitioner states that the Court instructed the jury as follows:

> Based upon this weighing process, you must determine whether a sentence of death is justified. If you cannot unanimously agree upon a sentence of death, you must then decide whether to return a sentence of life in prison without the possibility of release. Again, your finding with respect to a sentence of life in prison without the possibility of release must be unanimous.
>
> If you unanimously agree upon a sentence of death or a sentence of life in prison without the possibility of release, the Court is required to impose that sentence. If you cannot unanimously agree upon either a sentence of death or a sentence of life in prison without the possibility of release, the Court will impose the sentence required by law. [277]

Petitioner asserts that the instruction is erroneous because if the jury was unable to reach unanimous agreement on a sentence of death, its deliberations were concluded and, as a matter of law, because of the mandatory life sentence required by the Violent Crimes in Aid of Racketeering Activity ("VICAR") statute itself, the Court would be required to impose a life sentence. Furthermore, Petitioner asserts that the instruction is erroneous because assuming a lack of agreement on death, the Court had no authority to impose any sentence other than life imprisonment.

Petitioner asserts that leaving the jury to speculate on the meaning of "the sentence required by law" may result in the conclusion that if the jury cannot agree on death or life, the Court may impose some lesser sentence. Petitioner further asserts that, as a result, jurors in a minority may be convinced to vote for a death sentence in the face of arguments from jurors favoring a death sentence that if they do not all agree on something, Petitioner might be released at some point.

In response, the Government contends that the Court appropriately instructed the jury in accordance with the law. In a similar situation, the Supreme Court held that the Eighth Amendment does not require that the jurors be instructed as to the consequence of their failure to agree, i.e., that the Court would sentence the defendant to life without the possibility of release. [278] The Supreme Court stated:

> We have never suggested, for example, that the Eighth Amendment requires a jury be instructed as to the consequences of a breakdown in the deliberative process. On the contrary, we have long been of the view that "[t]he very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves." ... We further have recognized that in a capital sentencing proceeding, the Government has "a strong interest in having the jury express the conscience of the community on the ultimate question of life or death." ... We are of the view that a charge to the jury of the sort proposed by petitioner might well have the effect of undermining this strong governmental interest. [279]

 **\*41**  Such an instruction would be "an open invitation for the jury to avoid its responsibility and to disagree." [280]

Petitioner replies by stating that he does not argue that the Court should have instructed the jury on the consequences of a failure to agree unanimously on a verdict of death. Rather, Petitioner asserts that the Court erroneously viewed the capital charges as carrying a potential punishment of death, life, or some other "sentence required by law," and erroneously instructed the jury on the issue of potential punishment. Petitioner states that *Jones* did not forbid an instruction in which the jury is told of the consequences of their failure to agree; it simply held that it was not required under the constitution. [281]

The Court notes that in *Jones,* the Supreme Court rejected the argument that "the jury was led to believe that if it could not

reach a unanimous sentence recommendation [the defendant] would receive a judge-imposed sentence less severe than life imprisonment, and his proposed instruction as to the consequences of the deadlock was necessary to correct the jury's erroneous impression." [282]  The Supreme Court also rejected the petitioner's argument that the "alleged confusion independently warrant[ed] reversal of his sentence under the Due Process Clause, the Eighth Amendment, and the Act itself." [283]  The Supreme Court stated that the district court "did not expressly inform the jury that it would impose a lesser sentence in case of a deadlock[,]" but "simply told that jury that, if it recommended a lesser sentence, the court would impose a sentence 'authorized by the law.' " [284]

The Court concludes that Petitioner's argument is without merit. [285]  The Court gave the following instruction in written form to the jury for their deliberations:

> At the end of your deliberations, if you determine that the defendant be sentenced to death or to life imprisonment without possibility of release, the court is required to impose that sentence.
>
> > If you cannot unanimously agree whether the defendant should be sentenced to death or life imprisonment without possibility of release, the court will impose a sentence of life imprisonment or a sentence of life imprisonment without possibility of release, as required by law. [286]

During deliberations, the jury sent the Court two notes. In response, the Court brought the jury back to the courtroom and read this instruction to the jury. [287]  The Court did not erroneously instruct the jury on the issue of potential punishment, as it clearly stated that it would impose a sentence of life imprisonment or a sentence of life imprisonment without possibility of release, as required by law. Therefore, the Court concludes that the failure of Petitioner's counsel to object to said instructions was not error. Furthermore, even if error occurred, Petitioner cannot show prejudice.

### E. Failure to Challenge Indictment

Petitioner asserts that his trial counsel erred by failing to make the standard challenge to the indictment based on the argument that the aggravating factors and *mens rea* functioned as elements of offense, and thus, had to be included

in the indictment. Petitioner states that the United States Supreme Court vindicated this view in *Ring v. Arizona* [288] several years after Petitioner's trial and sentencing. Petitioner further states that due to counsel's failure to challenge the indictment on this basis, the issue was reviewed under a plain-error standard, rather than a more relaxed standard under which his death sentence would have been vacated.

 **\*42**  In response, the Government states that at the time of Petitioner's trial and sentencing, binding precedent made clear that there was no requirement for the indictment to include eligibility factors, such as statutory intent factors and statutory aggravating factors. [289]

Petitioner replies by stating that whether raising this issue was standard practice at the time will have to await a hearing, and, likely, expert evidence. Petitioner states that similar arguments were presented in *United States v. Nguyen* [290] and *United States v. Spivey.* [291]  In the cases cited by Petitioner, the district courts rejected such arguments.

First, the Court notes that racketeering acts 4, 5, and 6 in Count One of the Superseding Indictment allege that Petitioner "caused the death[s] of" William Mueller, Nancy Mueller, and Sarah Powell "with the purpose of causing the death [s] of" William Mueller, Nancy Mueller, and Sarah Powell. The statutory intent factors found in 18 U.S.C. § 3591(a)(2) are as follows:

  (a) A defendant who has been found guilty of-

  ...

  (2) any other offense for which a sentence of death is provided, if the defendant, as determined beyond a reasonable doubt at the hearing under section 3593-

  (A) intentionally killed the victim;

  (B) intentionally inflicted serious bodily injury that resulted in the death of the victim;

  (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or

  (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act,

shall be sentenced to death if, after consideration of the factors set forth in section 3592 in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is justified, except that no person may be sentenced to death who was less than 18 years of age at the time of the offense.

Also, Counts 4, 5, and 6 of the Superseding Indictment allege that Petitioner "as consideration for the receipt of anything of value from an enterprise engaged in racketeering activity, and to increase or maintain their position in the enterprise, as described in Count I of the indictment, and pursuant to and in furtherance of the conspiracy described in Count II of the indictment, murdered" William Mueller, Nancy Mueller, and Sarah Powell. The pecuniary gain factor reads: "The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value." [292]  Therefore, the Court finds that the Superseding Indictment was not defective since it adequately charged the statutory intent factor and the pecuniary gain statutory aggravating factor.

 **\*43**  Furthermore, even if the Superseding Indictment was defective, the failure of Petitioner's trial counsel to anticipate a change in the law does not establish that counsel performed below professional standards. [293]  Finally, even if the Superseding Indictment was defective and Petitioner's counsel preserved the issue for direct appeal, his argument is without merit because such error was harmless.

In *Allen II,* the Eighth Circuit held that "the Fifth Amendment requires at least one statutory aggravating factor and the mens rea requirement to be found by the grand jury and charged in the indictment." [294]  Because the objection was preserved, the Court reviewed the case under harmless error analysis by determining whether any rational grand jury would have found the existence of the requisite mental state and one or more of the statutory aggravating factors found by the petit jury if the grand jury had been asked to do so. [295]  The court chose to make this determination utilizing the narrowest

method by limiting review to the evidence presented to the grand jury at the time it was asked to indict the defendant, which satisfied the court "beyond a reasonable doubt that the error in the case was harmless." [296] The court also set forth two other methods of harmless-error review: (1) "to review the entire record, including the evidence presented to the petit jury at the trial and penalty phase," and (2) "to view the petit jury's verdict, which unanimously found the existence of the mens rea requirement and the aggravating factors beyond a reasonable doubt, as proof that the grand jury in this case would have charged the requisite mental state and the aggravating factors in the indictment." [297]

Upon review of the petit jury's verdict, the Court is convinced beyond a reasonable doubt that any such claimed error in this case was harmless. With regard to the *mens rea* issue, the petit jury found that the Government established beyond a reasonable doubt that Petitioner "intentionally killed" William and Nancy Mueller, and "intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death" to William Mueller, Nancy Mueller, and Sarah Powell, and that "participation in the act constituted a reckless disregard for human life" and William Mueller, Nancy Mueller, and Sarah Powell "died as a direct result of the act." [298] With regard to the statutory aggravating factors, the petit jury found beyond a reasonable doubt that the Government established that Petitioner "committed the offense of murdering" William Mueller, Nancy Mueller, and Sarah Powell "in the expectation of receiving something of pecuniary value" and "intentionally killed more than one person in a single criminal episode." [299] The petit jury also found beyond a reasonable doubt that the government established that "Sarah Powell was a particularly vulnerable victim due to her youth, that being eight years old." [300]

 **\*44** Furthermore, as in *Allen II,* Petitioner "had complete and timely notice of the allegations against him, through the combination of the indictment and the notice of intent to seek the death penalty," and his "defense during both the guilt and penalty phases was in no way prejudiced." [301] "Nor is there any dispute that the indictment was sufficiently clear to allow [Petitioner] to use it as a bar to being prosecuted again for the same conduct." [302] Thus, Petitioner was not prejudiced, as the two primary purposes of an indictment-to give the defendant clear notice of the allegations that he will have to defend himself against at trial, and to allow him to plead prior prosecution as a bar to future prosecution-were satisfied.

Additionally, the two primary purposes of the grand jury are "the protection of citizens against unfounded criminal prosecutions" and "to make 'the determination whether there is probable cause to believe a crime has been committed.' " [303] As in *Allen II,* there is no suggestion in this case that the Government "engaged in hasty, malicious, or oppressive persecution of an innocent man," that "the prosecution was unreasoned," or that the Government singled Petitioner "out for prosecution because of personal ill will toward him, racial animus, or any other discriminatory reason." [304] Also, the Court is persuaded beyond a reasonable doubt that the grand jury would have charged Petitioner with the statutory intent factors and the pecuniary gain statutory aggravating factor. As noted above, the evidence at trial indicated that William Mueller strongly resisted the robbery, and thus, a jury could reasonably have concluded that Lee and Chevie had to kill him in order to successfully complete the robbery, which obviously carried with it the expectation of pecuniary gain. With regard to the statutory intent factors, the evidence at trial clearly indicates that Lee's participation in the Mueller murders satisfies said factors.

Therefore, even if the Superseding Indictment was defective, the Court concludes that any rational grand jury would have found probable cause to charge Petitioner with the statutory intent factor and the pecuniary gain statutory aggravating factor. Thus, any failure to charge said factors in the Superseding Indictment was harmless error. The Court also notes that on direct appeal the Eighth Circuit held that "[e]ven if the indictment was defective, Lee cannot show plain error," noting Lee's receipt of an amended death penalty notice and that "the petit jury's findings confirmed the soundness of the judicial proceedings and rendered harmless any conceivable error in the charging decision." [305] Therefore, Petitioner's argument that counsel was ineffective for not challenging the Superseding Indictment's omission of the aggravating factors & *mens rea* allegations fails because Petitioner cannot show prejudice.

### F. Failure to Conduct Complete and Adequate Investigation of Lee's True Role in the Wavra Murder
 **\*45** Petitioner asserts that his counsel were ineffective for failing to conduct a complete and adequate investigation of the circumstances of his true role in the murder of Joey Wavra, which occurred when Petitioner was 17 years old.

Petitioner states that one of the Government's primary arguments for sentencing him to death, and for distinguishing

his case from Kehoe's, was the role played by Petitioner in the Wavra murder. Petitioner further states that the state criminal case against him was resolved by plea of guilty to a charge that he had either taken keys or a bicycle from the victim by force. Petitioner asserts that he made statements that ascribed to himself a greater role in the crime than was actually true in a misguided effort to help his cousin David Patton-the true perpetrator of the murder. Petitioner contends that a properly-conducted investigation of the circumstances of the Wavra murder would have revealed his true role, which would have placed his actions in an entirely different light and would have led to a different result because one or more jurors would have voted for a life sentence.

The Court agrees with Petitioner that the testimony regarding his role in the Wavra murder was powerful and likely contributed to or influenced the jury's ultimate decision. However, there is nothing before the Court to indicate that Petitioner's "true role" in the murders was anything other than as portrayed during the sentencing trial. The Government asserts, and the Court agrees, that counsel's investigation into the matter was entirely reasonable and caused no prejudice to Petitioner. Importantly, Petitioner provides no evidence of his alleged "true role." Furthermore, the Court notes that Petitioner's counsel attempted unsuccessfully to suppress some of Lee's statements offered by the Government.

Petitioner's argument is without merit.

### G. Trial Counsel Erred in Stipulating to the Receipt of Evidence Presented at Chevie Kehoe's Penalty Phase Without Obtaining a Waiver of Petitioner's Confrontation Rights

Petitioner argues that his Sixth Amendment confrontation rights were compromised by his counsel's stipulation to a portion of the Kehoe penalty evidence. Further, Petitioner contends that by stipulating to such evidence, the error was not preserved on appeal causing the issue to be reviewed under the more stringent plain error standard. But for such error, Petitioner contends, he would have prevailed on appeal under the less stringent appellate standard and his death sentence would have been vacated. [306]

On appeal, the Eighth Circuit rejected this identical argument under a plain error review based on its finding that "Lee was aware of the stipulation prior to the penalty phase and waived his confrontation rights when he did not object to the stipulation in court." [307] Whether Lee personally

and knowingly waived his confrontation rights may not be revisited on collateral review.

The argument fails for the additional reason that Petitioner can not demonstrate that his counsel's decision to stipulate to a portion of the Kehoe penalty evidence, which consisted of testimony by three witnesses (Agent Duvall, Monical Gurel, and Michael Marmaduke) covering a total of fifteen transcript pages, [308] was professionally deficient or that it prejudiced him in any way. The decision was clearly a tactical one. By stipulating to the evidence, Petitioner's counsel avoided again placing before the jury powerful evidence of Petitioner's crimes, through gruesome photographs and evidence related to the Mueller murders, through the testimony of Aaron Duvall, and powerfully sympathetic evidence through Sarah Powell's first cousin Monica Gurel and family friend Michael Marmaduke. Most of Agent Duvall's penalty phase testimony and evidence already had been before the jury once during the guilt phase, when Petitioner had the opportunity to confront such evidence as well as Agent Duvall's testimony. So, Petitioner was not deprived of his right to confront such evidence. With regard to the two other witnesses, both of whom testified about Sarah Powell, their statements were not testimonial in nature and arguably triggered no confrontation rights. [309] But even assuming they did, the Court can not fathom how cross-examining either of these two witnesses could possibly have altered the outcome.

### H. Trial Counsel Erred in Failing to Object During Government's Cross-Examination of Dr. Cunningham Regarding Future Dangerousness Based on the Hare Psychopathy Checklist

**\*46** This argument relates to the testimony of Dr. Mark Cunningham, a forensic psychologist and Lee's mental health expert. Petitioner argues that his counsel erred in allowing the Government to exceed the scope of cross-examination and make Dr. Cunningham a witness for the prosecution as to Lee's future dangerousness. Petitioner contends that counsel "failed to fully and continuously object during the government's cross-examination" and further failed "to immediately move and renew their [request for] access to the DOJ materials in order to rehabilitate Dr. Cunningham and present what could have been compelling mitigating information to rebut the government's claim." [310]

The subject of Dr. Cunningham's testimony has received extensive scrutiny, both post-trial and on appeal. This Court set aside the death verdict based on its conclusion that the

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Government's use of Dr. Cunningham to make "an expanded encore presentation" of its case for future dangerousness was "fundamentally unfair" to Lee and required that he be given a new penalty phase trial. [311] In doing so, this Court noted that Petitioner's trial counsel timely and properly objected to the alleged improper cross-examination of Dr. Cunningham. [312] The Eighth Circuit reversed, finding that this Court abused its discretion in setting aside the death verdict based on the claimed evidentiary errors. [313] The Eighth Circuit accepted this Court's conclusion that Petitioner's counsel had sought and received a continuing objection to the cross-examination of Dr. Cunningham concerning future dangerousness issues. [314]

Petitioner's argument is without merit. Trial counsel performed exactly as Petitioner now argues that they should have-by interposing a continuing objection to said cross-examination of Dr. Cunningham. Additionally, the merits of this issue, which have been ruled on by the Eighth Circuit, may not be revisited on collateral review.

Petitioner's remaining contention is that his trial counsel erred in failing to seek access to "DOJ materials in order to rehabilitate Dr. Cunningham and present what could have been compelling mitigating information to rebut the government's claim." [315] Presumably, Petitioner is referring to certain materials to which his counsel were denied access in a pre-trial ruling by United States Magistrate John F. Forster, Jr. Petitioner's counsel later claimed that the denial of these materials prevented Dr. Cunningham from obtaining all the information he needed to complete a proper risk assessment. [316] This Court in its prior opinion quoted from Dr. Cunningham's affidavit in which he identified the requested information as including "specific statistical data and procedures, including the rate of assaults among white supremacists in BOP," "a tour of several U.S. Penitentiaries and a more detailed tour of ADX Florence," which tours "would have allowed [Dr. Cunningham] additional specific perspectives regarding confinement, rehabilitation, and treatment programs for Mr. Lee." [317]

 **\*47** Contrary to Lee's suggestion, such materials could not have been used as a mitigating factor at trial. [318] To the extent that such evidence could have been used by Petitioner to undercut Dr. Ryan's testimony, the Court disagrees that the requested tours and generalized statistical data could have changed the outcome of the sentencing trial.

### I. Ineffectiveness in Utilizing Dr. Cunningham as a Family and Social History Witness

Petitioner contends that his trial counsel's decision to use Dr. Cunningham to report or narrate Petitioner's life and family history opened the door to the Government's cross-examination on the inflammatory issue of "psychopathy." The better course, Petitioner contends, would have been to present such history by using the defense mitigation specialist, Gloria Settles, and lay witnesses. The Government counters that the decision to have Dr. Cunningham forego any specific diagnosis of Lee, but instead to have him present Lee's family and social history including a history of prior mental diagnoses was a reasonable trial strategy. The Court agrees.

Trial counsel's strategy provided Lee with the benefit of having a certified forensic psychologist detail his family and social history, which allowed the expert to summarize such history with broad sweeping opinions which were difficult to counter. For example, Dr. Cunningham concluded his direct testimony as follows: "Danny Lee experienced many traumatic and adverse life experiences that fundamentally shaped him. It shaped him neurologically, psychologically, socially, emotionally and ethically, and that I think contributed to his involvement in this offense." [319] While Settles may have been able to give a factual accounting of Lee's history, she could not have offered the opinions that Dr. Cunningham gave and her testimony would have lacked the credibility Dr. Cunningham's credentials provided.

Additionally, Petitioner's trial counsel may not be faulted because their best efforts to limit Dr. Cunningham's testimony on cross-examination failed. Trial counsel attempted to limit the risk of damaging cross-examination of Dr. Cunningham by not having him perform any risk assessment or offer any testimony on direct as to a formal diagnosis or future dangerousness. It was certainly not foreseeable that this Court would allow the Government to expand the cross-examination as far as it did.

The Court rejects, as completely unfounded, Petitioner's challenge to his counsel's decision to use Dr. Cunningham. His counsel's performance was objectively reasonable under any definition of the phrase.

### J. Failure to Object to Dr. Ryan's Testimony and Report

Petitioner argues that his trial counsel erred by not objecting to the Government's use of a rebuttal witness, neuropsychologist Thomas Ryan, Ph.D., since Dr. Cunningham never diagnosed Lee. Petitioner also contends that counsel erred by allowing Dr. Ryan's report, which contained a risk assessment, to be admitted. Finally, Petitioner states that he is prepared at a hearing to offer evidence that Dr. Ryan no longer stands by his testimony based on the Hare Psychopathy Checklist because it is no longer an appropriate instrument for predicting the future dangerousness of capital defendants. [320] The Government argues that these issues were addressed previously by the Eighth Circuit. The Eighth Circuit concluded that Lee was not unfairly prejudiced by the evidence from Dr. Ryan as to Lee's lack of remorse. [321]

 **\*48**  Since it appears most of Petitioner's claims related to Dr. Ryan's testimony are likely foreclosed by the Eighth Circuit's prior ruling, the Court considers such claims solely to the extent they raise broader issues than those previously presented and rejected by the Eighth Circuit.

First, Petitioner's premise that Dr. Ryan was offered as a rebuttal witness to Dr. Cunningham is flawed, since a fair reading of Dr. Ryan's testimony indicates that he was called primarily to counter the opinion testimony of Petitioner's expert, Kevin Joseph Bianchini, Ph.D. Dr. Bianchini diagnosed Lee with "nonpsychotic mental disorder following organic brain damage." [322] Dr. Ryan countered that Lee suffered from no brain damage. [323] In any event, Petitioner's counsel were not ineffective for failing to object to Dr. Ryan being called to testify. Such objection, had it been made, would have been overruled.

Second, when Dr. Ryan started to offer testimony as to Lee's "level of remorse," Petitioner's counsel objected, arguing that such testimony was "a part of the nonstatutory aggravating factor of future dangerousness" which the Court had excluded. [324] The Eighth Circuit subsequently held that Petitioner's counsel had preserved this issue, but rejected it on the merits. [325] To the extent Petitioner's counsel in fact objected to Dr. Ryan's testimony, Lee's ineffective assistance claim obviously fails.

Finally, to the extent that Petitioner claims counsel should have raised additional objections to Dr. Ryan's testimony, Petitioner can not demonstrate prejudice. In light of this Court's prior decision to set aside the death verdict and the Eighth Circuit's subsequent holding that the evidence

presented through Dr. Cunningham and Dr. Ryan as to Lee's psychopathy and lack of remorse did not unfairly prejudice Lee, it is difficult to see how any additional objection that Petitioner's counsel could have made to Dr. Cunningham's or Dr. Ryan's testimony could have altered the outcome.

### K. Failure to Investigate and Present Available Mitigation Evidence

Petitioner asserts that his trial counsel were ineffective for failing to place before the jury the fact that the Government had, on more than one occasion, offered Lee a sentence of less than death and, in fact, had tried to have the death penalty withdrawn as an option following the life sentence imposed upon his co-defendant Kehoe. Petitioner further asserts that his trial counsel were ineffective for failing to call Marty Barker as a witness to solidify the fact that Kehoe was the one who killed the child, Sarah Powell, not Lee. Petitioner vaguely asserts that "[t]here was additional readily available mitigating evidence that defense counsel failed to discover or present." [326]

The Government asserts that evidence that the local United States Attorney's office had sought Department of Justice approval to withdraw the death penalty notice as to Lee, or offers to permit Lee to plead guilty to a life sentence, were no more admissible against the Government than offers by Lee to plead guilty would have been admissible against him to prove his death penalty eligibility. The Government also asserts that any decision to withdraw the death penalty notice unilaterally required the approval of the Attorney General or Deputy Attorney General. That approval was denied.

 **\*49**  The Court agrees that evidence of the Government's plea proposals and attempts to remove the death penalty was not admissible because it did not relate to Lee's character or background or to the circumstances of the offense. [327] Therefore, Petitioner's arguments in this regard are without merit.

As to the decision not to call Barker, the Government asserts, and the Court agrees, that said decision was a legitimate trial strategy. Evidence had already been presented that Kehoe killed Sarah Powell. If Petitioner's counsel would have called Barker to "solidify" this point, Petitioner would have arguably waived any *Bruton* protection regarding testimony that Kehoe told Barker he was with a man named "Daniels." Although Petitioner's guilt had already been determined at that point, additional inculpatory statements surely would not have

benefitted Lee in the sentencing phase. Petitioner fails to satisfy either prong of the *Strickland* test.

### L. Failure to Object to Improper Closing Argument during Penalty Phase

Petitioner asserts that his trial counsel were ineffective for failing to object to certain statements made by the Government during closing arguments during the penalty phase and failing to preserve the errors for appellate review. Petitioner identifies the following allegedly improper remarks:

1. The Government presented numerous arguments related to psychopathy and Movant's alleged propensity for violence that had been improperly introduced through cross-examination of Dr. Cunningham and the direct examination of Dr. Ryan.

2. The Government improperly characterized defense counsel's arguments for life as "smoke and mirrors;" or "that's like the kid who killed his parents who walked into court, said, 'Take mercy on me. I'm an orphan' "; or that displaying photographs of Movant was an act of "manipulation" by defense counsel.

3. The Government improperly argued that there had been a nexus between the mitigation evidence presented and the commission of the crime.

4. The Government improperly characterized evidence of Movant's family background and development as an effort to "figuratively" blame others for the murders.

5. The Government resorted to inflammatory and unfairly prejudicial emotional pleas by arguing that "we" have the right to be safe in our homes-"our sanctuary." "Doesn't an eight year-old girl, damn it, have that right?"

6. The Government improperly denigrated the protections afforded a criminal defendant on trial for his life by arguing that it was somehow relevant to the jury's sentencing decision that Movant received more due process than the Muellers received.

7. The Government improperly argued that the difference between Movant's case and Chevie Kehoe's was that, as argued by Kehoe's counsel during his penalty phase, [ ] Kehoe could receive "grace." The government then argued that it was privy to defense counsel's state of mind and that Ms. Compton "realized that she couldn't sell

grace to you" because Movant had already had a shot at "grace," a reference to the Oklahoma murder case. It was also improper to denigrate counsel's efforts to bring appropriate mitigating circumstances to the jury's attention as an attempt by defense counsel to "sell" the jury something.

**\*50** 8. The Government improperly argued to the jury that Movant should be sentenced to death on the basis of Chevie Kehoe's actions.

The Government asserts that the challenged arguments were consistent with its customary strategy. Such strategy seeks to hold the defendant responsible for his voluntary and criminal actions and to discount defense efforts to blame others or to excuse defendant's crimes based on unrelated mitigating factors, such as upbringing.

The Court notes that it has rejected Petitioner's objections to Dr. Cunningham's cross-examination and Dr. Ryan's testimony. Petitioner's counsel did not err in failing to object to the mention of said testimony during the Government's closing arguments. As for the remaining statements by the Government, the Court concludes that had counsel objected, the Court would not have sustained such objections as the statements were not improper. The Court also notes that the closing statements of Petitioner's counsel eloquently rebutted many of the arguments of the Government. Furthermore, even assuming that the arguments of the Government were improper, Petitioner has failed to demonstrate prejudice. Therefore, Petitioner's argument is without merit.

### M. Failure to Ascertain Whether a "Hold-Out" Juror Was Coerced to Reach a Death Verdict

Petitioner contends that his trial counsel were ineffective in failing to request *voir dire* to determine whether a hold-out juror was coerced into agreeing to the death penalty verdict.

After the jury retired to consider its verdict in Lee's penalty phase trial, two notes were received by the Court. The first, signed by the foreperson, read, "We have a juror who does not believe in the death penalty-*no matter what the crime!* " The second note, signed by another juror, stated, "I think we need more time to discuss it." After discussing with counsel how to respond to the notes, the Court brought the jury back in and reminded the jurors of its earlier instructions concerning their duty to deliberate. [328] The death verdict was returned slightly over one hour after the jury received

the supplemental charge. [329] Defense counsel requested that the jurors be polled. This was done, the result being that each juror individually confirmed his/her agreement with the verdict previously returned. [330]

🚩 Federal Rule of Evidence 606(b) provides:

> Upon inquiry into the validity of a verdict ..., a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict ... or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be preluded from testifying.

 **\*51** Petitioner presents no evidence of any extraneous prejudicial information, outside influence, or mistake affecting the jury's deliberations or the entry of the jury's verdict. Therefore, there was no basis for further inquiry. The Court agrees with the Government that Petitioner's claim fails because defense counsel requested and received all of the inquiry that was proper under the circumstances. Counsel's failure to request more was neither deficient nor prejudicial.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL

To prevail on his ineffective assistance of appellate counsel claims, Petitioner must establish both prongs of *Strickland*- that counsel's performance was objectively unreasonable, and

"that counsel's ineffective assistance was prejudicial, that is, there was 'a reasonable probability that the outcome of the appeal would have been different if counsel had raised the claim.' " [331] The same "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" applies to appellate counsel's conduct. [332]

"[T]he Sixth Amendment does not require that appellate counsel raise every colorable or non-frivolous issue on appeal." [333] " 'Absent contrary evidence,' [the Court] assume[s] that appellate counsel's failure to raise a claim was an exercise of 'sound appellate strategy.' " [334] "When appellate counsel competently asserts some claims on a defendant's behalf, it is difficult to sustain a ineffective assistance claim based on allegations that counsel was deficient in failing to assert some other claims." [335] Because one of appellate counsel's important duties is to focus on those arguments that are most likely to succeed, counsel will not be held to be ineffective for failure to raise every conceivable issue. [336] "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." [337] "The decision to forgo a plain error claim is usually the result of a reasonable winnowing of weaker appellate claims," and thus, rarely leads to the conclusion of ineffective assistance. [338]

### A. Failure to Raise Issue of Improper Closing Argument

In Sections III-J and IV-L, *supra,* the Court rejected Petitioner's arguments that trial counsel were ineffective for failing to object to certain statements made by the Government during closing arguments in the guilt and penalty phases of the trial. For the same reasons, the Court concludes that appellate counsel's failure to raise such issues on appeal is harmless beyond a reasonable doubt. Petitioner cannot demonstrate that appellate counsel's failure to raise such issues was objectively unreasonable or prejudicial.

### B. Failure to Raise Erroneous Submission of the Multiple Killings Aggravating Factor

In Section IV-A, *supra,* the Court rejected Petitioner's argument that trial counsel's failure to object to the submission of the multiple killings statutory aggravating factor to the jury constituted ineffective assistance of counsel. Because the pecuniary gain factor applied to the facts of the case, and the jury need only find one statutory aggravating factor

to impose the death penalty, the Court found that Petitioner could not demonstrate prejudice. The Court stated that even if trial counsel had objected to the multiple killings factor due to its enactment date, the Court simply would have allowed the jury to consider the multiple killings aggravating factor as a nonstatutory factor, as Petitioner had adequate notice of said factor, and that the submission of the "multiple killings" aggravating factor to the jury was harmless. For the same reasons, the Court concludes that appellate counsel's failure to raise this issue on appeal is harmless beyond a reasonable doubt. Petitioner cannot demonstrate that appellate counsel's failure to raise this issue was objectively unreasonable or prejudicial.

### C. Failure to Raise Erroneous Submission of Pecuniary Gain Aggravating Factor

**\*52**  In Section IV-B, *supra,* the Court rejected Petitioner's argument that trial counsel's failure to argue that the pecuniary gain statutory aggravating factor should not have been submitted to the jury constituted ineffective assistance of counsel. The Court found that trial counsel in fact timely objected on the ground that this factor was limited to cases involving murder for hire, and counsel's failure to cite an additional district court opinion did not constitute deficient or prejudicial conduct. The Court further found that even if trial counsel had failed to challenge the pecuniary gain aggravating factor, Petitioner cannot demonstrate prejudice because any challenge would have been rejected. For the same reasons, the Court concludes that Petitioner cannot demonstrate that appellate counsel's failure to raise the issue was objectively unreasonable or prejudicial.

### D. Failure to Raise Issue of Erroneous Penalty Phase Instructions

Petitioner claims that appellate counsel were ineffective for failing to raise on appeal this Court's erroneous penalty-phase instructions regarding the range of punishments for the capital counts under the VICAR statute. In Section IV-D, *supra,* the Court concluded that it did not erroneously instruct the jury on the issue of potential punishment, as it clearly stated that it would impose a sentence of life imprisonment or life imprisonment without the possibility of release as required by law. For the same reasons stated above, the Court concludes that the failure of appellate counsel to raise this issue on direct appeal was not error. Furthermore, even if error occurred, Petitioner cannot show prejudice since Petitioner cannot demonstrate that the outcome of the appeal would have been different if counsel had raised the claim.

### E. Failure to Challenge Constitutionality of the Federal Death Penalty on Appeal

This is the second of Petitioner's three claims challenging the FDPA-two in the context of ineffective assistance claims (pre-trial and on appeal) and one direct claim. Because the claims are related, the Court will address all three claims together, *infra,* in the section of the opinion addressing Petitioner's direct constitutional challenge. For the reasons discussed in that section, [339] Petitioner is unable to demonstrate prejudice because the Court concludes that the proposed appellate challenges to the constitutionality of the death penalty were either made and rejected (and are therefore not reviewable on collateral review) or would have failed if made.

### F. Failure to Challenge Death Sentence Imposed as to the Murder of Sarah Powell Since the Jury Did Not Find that Lee Committed Deliberate Murder

Petitioner states that the jury found that Lee had not deliberately taken Sarah Powell's life, but still imposed sentence of death. Petitioner asserts that this presents a substantial Eighth Amendment challenge not raised by appellate counsel. The Court notes that trial counsel failed to preserve this argument for appeal.

**\*53**  The verdict forms reflect that the jury did not find that the Government had established beyond a reasonable doubt that Petitioner "intentionally" killed Sarah Powell or that Petitioner "intentionally participated in an act, contemplating that the life of Sarah Powell would be taken, or intending that lethal force would be used against Sarah Powell, and that Sarah Powell died as a direct result of that act." However, the jury found that the Government established beyond a reasonable doubt that Petitioner "intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to Sarah Powell, and that participation in the act constituted a reckless disregard for human life and Sarah Powell died as a direct result of the act."

18 U.S.C. § 3591(a)(2)(D) provides:

(a) A defendant who has been found guilty of-

...

(2) any other offense for which a sentence of death is provided, if the defendant, as determined beyond a reasonable doubt at the hearing under section 3593-

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

...

(D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act,

shall be sentenced to death if, after consideration of the factors set forth in section 3592 in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is justified, except that no person may be sentenced to death who was less than 18 years of age at the time of the offense.

Clearly, neither 18 U.S.C. § 3591 nor the Constitution require an intent to kill the victim. [340] The Court agrees with the Government that appellate counsel's performance was neither deficient nor prejudicial.

## VI. ERRONEOUS SUBMISSION OF LEE'S JUVENILE CONVICTION

Petitioner contends that it was error to admit Petitioner's conviction as a juvenile for an offense related to the Wavra murder. Petitioner notes that in *Roper v. Simmons,* [341] the Supreme Court struck down death penalty as applied to those under age 18.

The Government asserts that Petitioner's claim is barred by procedural default and non-retroactivity doctrines because this is the first time he has raised the present argument. "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." [342] The Government asserts that Petitioner cannot show that trial and direct appeal counsel's failure to pursue this argument was due to a factor external to his defense. The Government also asserts that Petitioner cannot show that no reasonable juror would have found Petitioner eligible for death but for the error because Lee's participation in the Wavra robbery and murder was relevant solely as a non-statutory aggravating factor, not to Lee's eligibility for the death penalty. The Court agrees. Additionally, it is clear that Petitioner has failed to

demonstrate actual innocence. Therefore, Petitioner's claim is barred by the procedural default doctrine.

**\*54** As to the non-retroactivity issue, the Government contends that *Teague* bars Petitioner's claim because Petitioner proposes to extend the holding in *Roper* to bar the introduction of evidence, at a capital defendant's penalty hearing, of non-capital crimes that the defendant committed as a juvenile. However, *Teague's* rule of non-retroactivity applies only "to those cases which have become final before the new rules are announced." [343] *Roper* was decided on March 1, 2005. [344] Lee's petition for a writ of certiorari was filed on February 18, 2005. Notice of the petition was filed in this Court on March 3, 2005. The Supreme Court denied Lee's certiorari petition on June 27, 2005. [345] A conviction becomes final "for purposes of retroactivity analysis when the availability of direct appeal ... has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally decided.' " [346] Thus, arguably, *Teague* does not apply here.

The Court notes that even if Petitioner's claim is not barred by the procedural default doctrine, Petitioner's claim is without merit. The circumstances in *Roper* are not present in this case, as Petitioner was over the age of eighteen at the time of the conduct making up the charges in this case for which the Government alleges the death penalty is appropriate. Furthermore, the Government did not rely on Petitioner's conduct as a juvenile to cause Petitioner to be "eligible" for the death penalty, but as evidence supporting the non-statutory aggravating factor of future dangerousness. Thus, the Court concludes that the Government's use of the Defendant's adult conviction for actions taken while he was a juvenile are not precluded by the principles in *Roper.* [347]

## VII. COUNSEL NOT "LEARNED IN THE LAW APPLICABLE TO CAPITAL CASES"

Petitioner asserts that his trial counsel did not meet the statutory definition of "learned in the law applicable to capital cases" and, therefore, his sentence of death was illegal. 18 U.S.C. § 3005 provides in pertinent part:

> Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant

is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases ...."

Additionally, 18 U.S.C. § 3599(b) (formerly 21 U.S.C. § 848(q)(5)) reads:

> If the appointment [in a death penalty eligible case] is made before judgment, at least one attorney so appointed must have been admitted to practice in the court in which the prosecution is to be tried for not less than five years, and must have had not less than three years experience in the actual trial of felony prosecutions in that court.

The Court agrees with the Government that Petitioner's claim is barred by the procedural default doctrine because this is the first time he has raised the present argument. "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent."[348] The Government correctly asserts that Petitioner cannot show that appellate counsel's failure to pursue this argument was due to a factor external to his defense or that no reasonable juror would have found Petitioner eligible for death but for the error. Additionally, Petitioner has failed to demonstrate actual innocence.

 **\*55** Furthermore, Petitioner's claim fails on the merits because, by Petitioner's own admission, his trial counsel "had some experience in capital cases." Petitioner's counsel are two of the most highly respected, experienced, and competent criminal defense attorneys in Arkansas. At the time of appointment, Magistrate Judge Forster stated that "[b]oth Mr. Lassiter and Ms. Compton are experienced criminal defense attorneys, who are learned in the law applicable to capital cases." Furthermore, in an affidavit submitted by Mr. Lassiter in support of his legal fees, Mr. Lassiter outlined his extensive legal experience, including his participation in several capital murder cases.[349] Both attorneys had been

admitted to practice in this Court for over a decade prior to the trial in this case. Petitioner's claim that his counsel, Mr. Lassiter and Ms. Compton, were not "learned in the law" is frivolous.

## VIII. NEWLY DISCOVERED EVIDENCE

Petitioner adopts by reference the arguments presented by Kehoe, in his amended motion for § 2255 relief, that newly discovered evidence exists regarding Kirby Kehoe's whereabouts at the time of the Mueller murders. As the Court discusses in its Memorandum Opinion denying § 2255 relief to Kehoe, filed on this same date, Kehoe failed to come forward with any newly discovered evidence which would place Kirby in Arkansas during the time of the Mueller family murders.[350] This claim therefore fails.

## IX. DEATH PENALTY IS UNCONSTITUTIONAL FACIALLY AND AS APPLIED

Petitioner contends that the "federal death penalty is sought and imposed in an arbitrary and capricious manner"[351] and violates the Eighth Amendment's prohibition against cruel and unusual punishment. Petitioner makes similar challenges in the context of ineffective assistance claims, contending that his counsel should have challenged the constitutionality of the death penalty before trial and on appeal. As noted *supra,* the Court addresses all three claims together.[352]

As a threshold matter, the Court after reviewing all of Petitioner's submissions concludes that there is no need for an evidentiary hearing. Thus, Petitioner's repeated assertion that he will show "at a hearing" how and why the death penalty is unconstitutional puts the cart before the horse. Petitioner's attorneys are obligated to describe the evidence they have to support their constitutional challenges *now.* They are not entitled to a hearing for the purpose of presenting evidence unless and until they make a threshold showing that a hearing is necessary. The Court concludes, for the reasons described below, that Petitioner has failed to make such showing.

Many constitutional issues related to the FDPA, and the death penalty in general, previously have been addressed in this case by this Court and the Eighth Circuit of Appeals. Before trial, Petitioner's counsel filed a comprehensive challenge to the constitutionality of the FDPA and the death penalty in general.[353] This Court did not rule on the motion until after sentencing at which time it rejected all constitutional arguments.[354] While Petitioner's pre-trial

motion, for obvious reasons, did not argue that the death sentence was arbitrarily and unconstitutionally applied to Lee in light of the fact that the more culpable defendant, Kehoe, was sentenced to life, this argument was made on appeal and rejected. The Eighth Circuit specifically rejected Lee's claim that his death sentence was "arbitrarily imposed in violation of 18 U.S.C. § 3595(c)(1), [355] the Fifth Amendment, and the Eighth Amendment because Kehoe, the more culpable defendant, [356] did not receive the death penalty." [357] The Eighth Circuit also held that the FDPA does not require "proportional review of sentences." [358]

**\*56** Claims expressly raised and rejected on appeal may not be relitigated on collateral review. [359] This Court may not revisit the constitutional issues resolved by the Eighth Circuit. Additionally, to the extent that any constitutional claims were not ruled on by the Eighth Circuit, such claims are foreclosed by existing legal principles.

Petitioner relies generally on *Furman v. Georgia* [360] for the proposition that the Eighth Amendment "will not tolerate the arbitrary and capricious infliction of capital punishment." [361] Underlying Petitioner's argument is the suggestion that a sentence of death is *per se* unconstitutional because of the lack of predictability, *i.e,* the arbitrariness as to who will be sentenced to death and the infrequency with which the federal death penalty is sought and imposed. Petitioner's reliance on *Furman* is misplaced. As the First Circuit has noted:

> In the thirty-four years since *Furman* was decided, the Court has made clear that its decision was not based upon the frequency with which the death penalty was sought or imposed. Rather, the primary emphasis of the Court's death penalty jurisprudence has been the requirement that the discretion exercised by juries be guided so as to limit the potential for arbitrariness. [362]

As the Supreme Court has observed, *Furman* along with *Gregg v. Georgia,* [363] establish that a capital sentencing scheme, to pass constitutional muster, must:

> (1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime . [364]

Petitioner does not contend that the FDPA does not satisfy this minimum constitutional threshold. The Court finds no authority in existing law for the proposition that either the FDPA or the death penalty in general are facially unconstitutional.

Petitioner also complains that the death penalty is unconstitutional as applied "in light of the life sentence Chevie Kehoe received." [365] As noted, to the extent this argument was addressed and rejected on direct appeal, it may not be relitigated here. Additionally, even if the argument is considered on the merits, it must be rejected.

To place this argument in context, there is no question here that the evidence was sufficient to justify the death sentence imposed on Lee. Lee's death sentence is not out of line or disproportionate when one considers the cold-blooded murders in which he participated. "The criminal acts with which we are confronted are ugly, vicious, reprehensible acts. Their sheer brutality cannot and should not be minimized." [366] Rather, it is the disparity between penalties that this Court finds so troubling. If Kehoe and Lee had both received death sentences, there would be no need to inquire into the proportionality of the penalties imposed. But, the Eighth Circuit has resolved this issue adversely to Petitioner and this Court may not revisit it.

**\*57** Recently, in *United States v. Johnson,* [367] the Eighth Circuit specifically rejected the contention that "the Eighth Amendment requires not only proportionality between a sentence and a particular category of crime, but also proportionality between codefendants' sentences." [368] While Johnson received the death penalty for aiding and abetting her boyfriend in killing four people, a separate jury in a separate trial imposed a life sentence on her boyfriend for committing the same murders. The Eighth Circuit held that the disparity between the two sentences did not violate the Eighth Amendment. [369]

Similarly, in *Getsy v. Mitchell* [370] the court considered and rejected the defendant's argument that the Eighth Amendment was violated because the more culpable co-defendant, who masterminded the crime and hired Getsy, received a life sentence while Getsy, who carried out the hit, received the death penalty. [371] Getsy was constitutionally protected from irrational conviction, the court held, "by the due process

requirement that a conviction must be supported by sufficient evidence." [372]

This case is different from *Johnson* and *Getsy* in that the same jury imposed the arguably inconsistent results. Certainly, Lee's argument would appear to carry more weight. However, the hallmark of a constitutional capital sentencing scheme is that any decision to impose death must be made following an individualized inquiry. [373] Lee and Kehoe are different individuals. Each had his separate penalty phase trial, albeit before the same jury. Their aggravating and mitigating factors were different. Can it be said that the jury's decision to find Lee deserving of death, but to spare Kehoe, violated Lee's constitutional rights?

There is obviously an inherent tension in requiring that every death sentence, to pass constitutional muster, be based on an individualized determination as to the suitability of death, but then concluding that constitutional principles are violated because a jury making such determinations finds death suitable for one guilty defendant, but not for another found guilty of the same crime(s). It is also ironic that while in non-death cases judges at sentencing are admonished to consider the need for the sentence "to avoid unwarranted sentence disparities among defendants ... who have been found guilty of similar conduct," analogous proportionality considerations appear to be irrelevant in reviewing death cases. [374] Perhaps the Eighth Circuit on appeal will provide more guidance on this important issue.

While this Court, having heard all the evidence at trial, continues to believe it is unfair to impose the death penalty on Lee, but not Kehoe, for the murders of the Muellers, any ruling that Lee's death sentence is *unconstitutionally* arbitrary, irrational, cruel or unusual in light of the life sentence that the "mastermind" Chevie Kehoe received would qualify as a "new" rule of constitutional criminal law which is foreclosed by *Teague v. Lane.* [375]

 **\*58** Petitioner additionally contends that the FDPA, the federal death penalty in general, and the application of the death penalty in this particular case are unconstitutional because the death penalty is sought and imposed in a racially and regionally discriminatory fashion. First, Petitioner is procedurally barred from his direct constitutional challenge on this basis because he failed to present the claim previously and he has made no effort to show "cause" and "prejudice" to excuse the default. [376] Thus, such claims may be considered

solely in the context of his ineffective assistance of counsel claims. Second, no matter the context, the claim fails on the merits as a matter of law.

To support his claims that the death penalty is unconstitutional, Petitioner states that he is prepared to demonstrate racial bias in an evidentiary hearing during which he will show that in the past 18 years the United States has used the federal death penalty to target minority defendants "at a rate of 70% or more." [377] Similarly, Petitioner proposes to demonstrate regional bias by showing that more than 70% of the federal death verdicts returned in the last 18 years are from Southern states. Finally, Petitioner proposes to demonstrate a "white-victim effect," although it is less clear what evidence he would offer to support this argument.

The proposed statistical showings as to racial bias, regional bias, and white-victim effect, assuming they can be made, are insufficient to merit any relief as a matter of law. The Supreme Court has made clear that statistical evidence alone can not prove an equal protection violation. In addition to statistical evidence, Petitioner must also adduce "exceptionally clear proof" that "the decision makers in *his* case acted with discriminatory purpose." [378] Petitioner has failed to proffer any evidence specific to his own case that the decision makers in this case sought to impose the death penalty on him based at least in part on constitutionally prohibited factors.

It is not that Petitioner's trial counsel failed to make inquiry into whether his race influenced the Government's decision to proceed with the death. After the jury returned its death verdict, Lee's counsel sought to question Deputy Attorney General Holder as to whether race played any role in the decision to continue to seek death against Lee. The issue was not fully developed at the trial court level because it was rendered moot by the Eighth Circuit's reversal of this Court's decision to allow limited discovery into the death protocol issue. [379]

A showing of discriminatory effect and intent is generally required to justify discovery on a claim of selective prosecution. [380] In *United States v. Minerd,* [381] the court rejected the defendant's claim that he was selected for prosecution under the FDPA because he was white and the DOJ was attempting to "balance its statistics by selecting more white defendants for death penalty prosecution." Minerd's motion to dismiss the government's death penalty

notice was denied in part because he could not produce any evidence that the Attorney General's decision with regard to him was made with discriminatory intent. [382] In any event, Petitioner has produced no evidence that Mr. Holder's decision to proceed with the death penalty was influenced in part by Petitioner's race (or other improper factors) and, therefore, the Court reluctantly concludes that he is not entitled to a hearing on the issue. Petitioner therefore cannot prevail on such claim. [383]

 **\*59**  More troubling to the Court is Petitioner's argument that the Government violated his constitutional rights by insisting on proceeding with the death penalty against him after the jury spared Kehoe's life. The Government, apparently acting through Deputy Attorney General Eric Holder, made the decision. Unfortunately, the Court did not learn until too late that a so-called "death penalty protocol" existed or that the Government had failed to follow it. [384] While this Court subsequently ruled that Lee was entitled to a new penalty phase trial based, *inter alia,* on the Government's failure to follow its own protocol, the Eighth Circuit reversed that ruling, holding that Lee had no right to enforce compliance with what it described as DOJ's "internal" death penalty protocol. [385]

While much has been said about the DOJ's disregard of its own protocol for making death decisions, little has been said about the fact that the DOJ exercised its prosecutorial discretion in disregard of the recommendation of the local U.S. Attorney and her assistants involved in the case (including lead counsel), the case agents, and even the victims' family that a death sentence should not be pursued against Lee if the jury spared Kehoe's life. As this Court noted in a letter to the parties shortly after the death verdict was returned:

> Before the jury determined that Mr. Lee should die, all of the attorneys in the case appeared to be of a mind that the death penalty would be inappropriate in the case of Mr. Lee because the jury had failed to sentence Mr. Kehoe to death. Everyone seemed to be in agreement that the death penalties for both defendants would have been a possible and appropriate

> outcome, and life without parole for both defendants would have been a possible and appropriate outcome; but no one believed that it would be appropriate to seek the death penalty for Lee if the death penalty had not been imposed upon Mr. Kehoe. Nevertheless, this is the result that the jury has handed us. [386]

In the eyes of this Court, the DOJ's insistence on continuing to seek the death penalty as to Lee, under the circumstances, casts a pall over the case. But, is it a taint of constitutional proportion for which a legal remedy exists on collateral review?

Petitioner relies on *United States v. Littrell* [387] to support his position. In *Littrell,* the district court held that the Government's decision to continue to seek the death penalty against the defendant was unconstitutional. [388] Littrell was 1 of 40 defendants charged in "the largest capital murder indictment in American history." [389] The indictment targeted an Aryan Brotherhood prison gang and alleged 13 murders, 11 attempted murders, and 3 additional conspiracies to murder. [390] In concluding that the Government's continued intention to seek the death penalty against Littrell was arbitrary and capricious, the court focused on the lack of proportionality between Littrell and the leaders of the organization who had ordered Littrell to kill and several others who had committed "identical crimes" but who would not face a death sentence, either because a jury rejected a death sentence or the Government decided not to seek the death penalty. [391] The court held that the Government's discretionary decision to continue to attempt to impose a sentence of death on Littrell was "arbitrary and capricious" because "no rational decision-maker" would continue to seek the death penalty under such circumstances. [392]

 **\*60**  While this Court may agree with Petitioner that Deputy Attorney General Holder's decision to require the Government to continue to seek the death penalty against Lee was unreasonable, unfair, and possibly even an abuse of prosecutorial discretion, the question is whether that decision violated the Constitution. The Court concludes that it did not. *Littrell* is the only case of which the Court is aware where a district court has overruled and stricken a prosecutor's

decision to refuse to withdraw its notice of intent to seek the death penalty because more culpable defendants were given life sentences.

Had Petitioner's trial counsel here moved to strike the Government's notice of intent on this basis at trial, the Court, while sympathizing with the result in *Littrell,* concludes that it would have been obligated to reject such a motion based on separation of powers principles. A prosecutor, as a representative of the Executive Branch, has the discretion to decided charging issues in the absence of constitutionally impermissible motives (such as race).

The Court concludes that Petitioner has failed to prove that the federal death penalty, facially or as applied, is unconstitutional under applicable legal principles as set forth by the Supreme Court and the Eighth Circuit Court of Appeals. Accordingly, Petitioner's ineffective assistance claims and direct claim based on the alleged unconstitutionality of the death penalty are denied. That Petitioner's death sentence is not redressable under existing legal principles does not mean that it constitutes a fair and rational result under the peculiar and special circumstances of this particular case. Perhaps more than anything else, this case illustrates that the most carefully crafted capital punishment regime in the hands of the humans who must carry it out can never be completely free of arbitrariness in all of its implementations.

## CONCLUSION

After considering Petitioner's claim for relief, the record, and the applicable law, the Court concludes that application of existing legal principles requires the denial of any post-conviction relief. Accordingly,

IT IS HEREBY ORDERED THAT Petitioner Daniel Lewis Lee's Motion to Set Aside, Reduce or Vacate Sentence under 28 U.S.C. § 2255 [Doc. No. 1188] be, and it is hereby, DENIED. All claims asserted are hereby DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4079315

## Footnotes

1　Docket Number ("Doc.No.") 1118, hereinafter referred to as "Petitioner's motion."
2　Doc. No. 1126.
3　Doc. No. 1134.
4　Doc. No. 1135, consisting of a compact disk of verdict sheets in capital cases.
5　Doc. No. 1138 & 1139.
6　Doc. No. 1144 & 1145.
7　Doc. No. 1151.
8　Doc. No. 1158.
9　Doc. No. 1160.
10　Doc. No. 1161.
11　During the sentencing phase, the jury had only two options: life imprisonment or death. Because the jury rejected a death sentence for Kehoe, he was left with the most lenient sentence available for the offenses of conviction. For obvious reasons, Chevie Kehoe did not challenge the jury's decision to impose life rather than death.
12　Throughout this opinion, "Kehoe" refers to Chevie Kehoe. To avoid confusion, the Court will refer to other members of the Kehoe family (primarily, Kirby, Gloria and Cheyne Kehoe) by either their full names or their first names only.
13　Kirby is the father of Chevie Kehoe.

WESTLAW　© 2020 Thomson Reuters. No claim to original U.S. Government Works.

A fourth defendant, Faron Loveless, was charged in the racketeering count in the original Indictment. The Government dismissed Loveless prior to filing the Superseding Indictment.

Co-defendant Chevie Kehoe was charged in all ten racketeering acts.

*In re United States,* 197 F.3d 310 (8th Cir.1999).

*United States v. Lee,* 89 F.Supp.2d 1017 (E.D.Ark.2000).

*United States v. Lee,* 274 F.3d 485 (8th Cir.2001), *cert. denied,* 537 U.S. 1000 (2002).

*United States v. Lee,* 374 F.3d 637 (8th Cir.2004). Kehoe's conviction was also affirmed. *United States v. Kehoe,* 310 F.3d 579 (8th Cir.2002).

*Lee v. United States,* 545 U.S. 1141 (2005).

Tr. 1317-18. (Unless otherwise noted, the transcript referenced is the trial transcript beginning on February 26, 1999, through May 14, 1999). Matthews's activities are described in a book authored by him entitled "The Silent Brotherhood." Tr. 1310. Kehoe gave a copy of this book to Lee and to others. Tr. 1310, 4964.

Tr. 1316, 1433.

Tr. 1433-34.

Tr. 1435.

Tr. 1440.

Tr. 1319-20, 1375-76.

Tr. 1320, 1321.

Tr. 5370.

Danny Lee was not charged in this racketeering act.

Tr. 4950.

*Id.*

Tr. 1760, 4951.

Tr. 4952-54.

Tr. 4955-56.

Danny Lee was not charged in this racketeering act.

Tr. 4139-4147.

Tr. 4963.

Tr. 4143-47.

Tr. 5299-5301.

Tr. 4137.

Tr. 5300-02.

Tr. 4963.

Tr. 4189-97, 4199.

Sean Haines, Danny Lee's former roommate, testified that Chevie Kehoe and Danny Lee first met at his apartment in late August or early September in 1995. Tr. 2773, 2776-77. Danny Lee moved in with Chevie Kehoe in April of 1996. Tr. 2791.

Tr. 2778-79, 2898.

Gloria Kehoe is the mother of Chevie Kehoe.

Tr. 5126-27, 5132-33.

Tr. 2617-18.

Tr. 2618-20.

Tr. 5127. The Court notes a minor discrepancy in the record regarding the GMC's model year. Gloria repeatedly referred to it as a model year 1985, but Cheyne described it as being a model year 1984. Tr. 5356. The Court does not know which is correct.

While the exact date of the murders was disputed at trial, there was substantial evidence to support the Government's theory that the Mueller family was murdered on January 11, 1996.

52    There was testimony that Kehoe and Lee shocked the Muellers with stun guns, causing them to pass out, before suffocating them. Tr. 4974.

53    Tr. 5328.

54    Tr. 5327-29.

55    Tr. 5330.

56    Tr. 2610, 2620-22.

57    Tr. 2894-98.

58    Tr. 5319.

59    Tr. 4969-70, 5603, 5138.

60    Tr. 4971.

61    Tr. 4971-74.

62    Tr. 4975.

63    Tr. 3190.

64    Tr. 3165-66, 3176-77.

65    Tr. 3182.

66    While Karena Kehoe, a/k/a Karena Gunn, was Kehoe's wife and the mother of his children, Kehoe briefly had a second wife. From August through November of 1995, Kelly Kramer lived with Kehoe and Karena in Priest River, Idaho, in a polygamous relationship. (Tr. 4251-52, 4256-57, 4267).

67    Tr. 3178-79.

68    Tr. 3074-75.

69    Tr. 3104, 3118.

70    Tr. 3044-56.

71    Tr. 5356.

72    Tr. 2794.

73    Tr. 2794-98.

74    Tr. 2799.

75    Tr. 4978-80.

76    Tr. 4469-73.

77    Tr. 4980.

78    Danny Lee was not charged in this racketeering act.

79    Tr. 5317.

80    Tr. 5317-20.

81    Tr. 5318.

82    Tr. 5321.

83    Tr. 5323.

84    Tr. 5325.

85    Tr. 5326-30.

86    Tr. 5329.

87    Tr. 5332-33.

88    Tr. 5342.

89    Tr. 5343-48.

90    Tr. 4568-69.

91    Tr. 4573-76, 4594-85, 4612.

92    Tr. 4600-04.

93    Tr. 4633-98 (Officer who conducted search of Suburban describing vehicle contents).

94    Tr. 4722. The Court notes that Lee was recently excluded by DNA testing as the source of the hair from the "raid cap."

95    Tr. 5354-56.

96    Tr. 5356.

97 Tr. 5357-60.

98 Tr. 5368.

99 Tr. 5374.

100 Tr. 5374-76, 5378.

101 Tr. 3658-60, 3678-84.

102 Tr. 3476-77, 4980.

103 Tr. 3377-78, 3478.

104 Tr. 3385, 3401-02.

105 Tr. 3390-92, 3527-30.

106 Tr. 3479-80.

107 Tr. 3646-50.

108 Tr. 3651-52.

109 Tr. 3708-12 (The fingerprint analyst testified that he found three matching fingerprints for Danny Lee and one for Chevie Kehoe).

110 Tr. 3479, 3610-28.

111 28 U.S.C. § 2255.

112 *See Kafo v. United States,* 467 F.3d 1963 (7th Cir.2006); *Porcaro v. United States,* 832 F.2d 208, 212-13 (1st Cir.1987) (per curiam).

113 *Driscoll v. Delo,* 71 F.3d 702, 706 (8th Cir.1995).

114 *United States v. Robinson,* 301 F.3d 923, 925 (8th Cir.2002).

115 *Pryor v. Norris,* 103 F.3d 710, 713 (8th Cir.1997).

116 *Graham v. Domire,* 212 F.3d 437, 440 (8th Cir.2000).

117 466 U.S. 668 (1984).

118 *Id.* at 690.

119 *Id.* at 689.

120 *Id.* at 690.

121 *Battle v. Delo,* 19 F.3d 1547, 1554 (8th Cir.1994).

122 *Henderson v. Norris,* 118 F.3d 1283, 1287 (8th Cir.1997).

123 *Strickland,* 466 U.S. at 694.

124 *Lockhart v. Fretwell,* 506 U.S. 364, 369-70 (1993).

125 *United States v. Cronic,* 466 U.S. 648, 658 (1984).

126 *United States v. Apfel,* 97 F.3d 1074, 1076 (8th Cir.1996).

127 *United States v. Staples,* 410 F.3d 484, 488 (8th Cir.2005) (internal citations omitted).

128 *Kramer v. Kemna,* 21 F.3d 305, 309 (8th Cir.1994).

129 *Id.*

130 *See Sanders v. Trickey,* 875 F.2d 205, 210 (8th Cir.1989) (appellant who filed a § 2255 motion indicating that an uncalled witness "might" have testified appellant was innocent but produced no affidavit from the witness in question or any other independent support for his claim failed to show prejudice).

131 *Id.* at 210 (quoting *Strickland,* 466 U.S. at 694).

132 Affidavit of Jack Lassiter, Exh. D to Govt.'s Resp., at ¶ 1.

133 *Griffin v. Delo,* 33 F.3d 895, 901-02 (8th Cir.1994).

134 The Court notes that Chevie Kehoe's brief states that this occurred in early February 1996.

135 Affidavit of Mark Hampton, Exh. C to Govt.'s Resp., at ¶ 2.

136 Affidavit of Jack Lassiter, Exh. D to Govt.'s Resp., at ¶ 2.

137 33 F.3d at 901-02.

138    In reviewing the record, it is clear that the defense attorneys for Kehoe and Lee worked together on common issues.

139    Affidavit of Agent Jordan, Exh. A to Govt.'s Resp., at ¶ 2.

140    184 F.3d 1083 (9th Cir.1999).

141    *Id.* at 1093.

142    *Id.* at 1093-94.

143    *Id.* at 1094.

144    Tr. 5823-26.

145    Tr. 5825-26.

146    Tr. 5832-33.

147    Tr. 6364.

148    Affidavit of Mark Hampton, Exh. C to Govt.'s Resp., at ¶ 1.

149    Affidavit of Jack Lassiter, Exh. D to Govt.'s Resp., at ¶ 3.

150    *Strickland,* 466 U.S. at 687.

151    *Henderson,* 118 F.3d at 1287 (omitting citations and internal quotations).

152    Tr. 4948-5209.

153    Both bench conferences were transcribed and filed under seal. *See* Docket No. 692 (April 8, 1999) and Docket No. 693 (April 7, 1999).

154    Doc. No. 692, at pp. 13-14.

155    Tr. 5205-06.

156    Order dated May 15, 2008, Doc. No. 1154.

157    Based upon the Government's response, it appears that "AD" stands for "Aaron Duvall," a Deputy Sheriff. "GK" stands for "Gloria Kehoe." *See* Doc. No. 1160, p. 1 n. 1.

158    Doc. No. 1158-1, at pp. 66-67.

159    While they were not formally married, trial testimony indicated that Chevie considered Kelly his second wife. Kelly left Chevie after a brief period.

160    Affidavit of Agent Jordan, Exh. A to Govt.'s Resp., at ¶ 3.

161    Tr. 5953-54.

162    *Id.*

163    Affidavit of Agent Jordan, Exh. A to Govt.'s Resp., at ¶ 4.

164    Tr. 4108.

165    Affidavit of Agent Jordan, Exh. A to Govt.'s Resp., at ¶ 1.

166    *Id.*

167    *Id.*

168    *Lee,* 374 F.3d at 652.

169    Transcript, Telephone Conference, November 19, 1998, Doc. No. 1012 (Under Seal).

170    *Lee,* 374 F.3d at 652.

171    *Becht v. United States,* 403 F.3d 541, 549 (8th Cir.2005).

172    Section 3432 provides for the disclosure of witnesses at least three days before trial, "except that such list ... need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person."

173    *See Lee,* 374 F.3d at 651-52 (rejecting argument that Lee's defense was prejudiced by the disclosure of Dee and James Wanker less than 48 hours before their appearance).

174    *Becht,* 403 F.3d at 549.

175    Affidavit of Agent Jordan, Exh. A to Govt.'s Resp., at ¶ 5.

176    The Analytical Report actually states that the control hair is from "Danny Graham," which is an alias for Petitioner.

177    Analytical Report, Attachment A to Supplemental Submission (Doc. No. 1138), at p. 4.

178    Tr. 4722.

179    Tr. 4722-23.

180    Tr. 4724.

181    *Id.*

182    Tr. 7000-01.

183    Affidavit of Agent Jordan, Exh. A to Govt.'s Supplement to Its Supplemental Memorandum in Opposition to Motion (Doc. No. 1145), at ¶ 2; Affidavit of Chantelle Bequette, Exh. B to Govt.'s Supplemental Memorandum in Opposition to Motion (hereinafter "Govt.'s Supp.") (Doc. No. 1144), at ¶ 3.

184    *Id.*

185    *Id.*

186    FBI Mitochondrial DNA Sequencing Protocol, Exh. C to Govt.'s Supp. (Doc. No. 1144, at 3.1.2.3); Affidavit of Dr. Melton, Exh. D to Govt.'s Supp. (Doc. No. 1144), at ¶ 4; Affidavit of Meghan Clement, Exh. E to Govt.'s Supp. (Doc. No. 1144), at ¶ 3.

187    Affidavit of Brian Wraxall, Exh. A to Petitioner's Supplemental Reply (Docket No. 1151), at ¶ 8-9; Affidavit of Meghan Clement, Exh. E to Govt.'s Supp. (Docket No. 1144), at ¶ 4.

188    The jury's racial composition was 9 blacks and 3 whites.

189    Affidavit of Mark Hampton, Exh. C to Govt.'s Resp., at ¶ 4.

190    *Georgia v. McCollum,* 505 U.S. 42, 59 (1992).

191    *Id.* at 48-49.

192    *Henderson,* 118 F.3d at 1287.

193    Karen Coleman is now known as Karen Whatley.

194    Hearing, December 7, 1998, Doc. No. 948.

195    Hearing, December 22, 1998, Doc. No. 1030; Excerpted Testimony from Hearing, December 12, 1998, Doc. No. 987.

196    Hearing, December 22, 1998, Doc. No. 1030, at p. 17.

197    Affidavit of Petitioner, Exh. 1 to Petitioner's Motion, at ¶ 4-36.

198    Hearing, December 7, 1998, Doc. No. 948, at 52.

199    Affidavit of Karen (Coleman) Whatley, Exh. E to Govt.'s Resp., at ¶¶ 1-4.

200    *See* Doc. No. 433.

201    *See* Doc. No. 454.

202    *United States v. Reed,* 179 F.3d 622, 624 (8th Cir.1999) (quoting *United States v. Acty,* 77 F.3d 1054, 1056 (8th Cir.1996)).

203    *Id.* at 624-25 (quoting *Cuyler,* 446 U.S. at 348).

204    *Id.* at 625.

205    *Id.* (quoting *Cuyler,* 466 U.S. at 350).

206    *Id.*

207    *Dawan v. Lockhart,* 31 F.3d 718, 721 (8th Cir.1994).

208    *Reed,* 179 F.3d at 625.

209    *See* Section III. D. *supra.*

210    *Payne v. United States,* 78 F.3d 343 (8th Cir.1996).

211    *United States v. Goodman,* 590 F.2d 705, 712 (8th Cir.1979).

212    Tr. 5514.

213    Tr. 5514-18.

214    Tr. 5541.

215    Tr. 6808.

216    Tr. 6821.

Tr. 5134.

*Id.*

*See* Fed.R.Evid. 804(b)(3).

Tr. 6821.

477 U.S. 168 (1986).

*Id.* at 182.

Tr. 6822.

Tr. 4975.

Tr. 6823-24.

703 F.3d 453, 455 (10th Cir.1983). *See also* *United States v. Dougherty,* 810 F.2d 763, 767-68 (8th Cir.1987) (holding that it was error for the prosecutor to refer to a codefendant's conviction related to the investigation at issue in opening statements, but that there was no prejudice to the defendant due to the curative instruction given, the jury found the defendant not guilty of the only transaction regarding the prosecutor's improper statement, and there was overwhelming evidence of guilt of those counts defendant was convicted of regardless of the prosecutor's statement). *But see* *United States v. Little Boy,* 578 F.2d 211, 212-13 (8th Cir.1978) (granting a new trial based upon the prosecutor's closing argument that improperly served as substantive evidence of defendant's guilt when the court did not give a limiting instruction and the prosecutor strongly implied in closing argument that two co-defendant witnesses must have told the truth because they were honest enough to plead guilty and accept responsibility for their actions and that defendant must have been lying about his participation in the rape).

*United States v. Rogers,* 939 F.2d 591, 594 (8th Cir.1991) (citing *United States v. Wiesle,* 542 F.2d 61, 62 (8th Cir.1976) (finding a co-defendant or co-conspirator's guilty plea may not be used as evidence of the defendant's guilt)).

*Id.*

*Id.* (citing *United States v. Fleetwood,* 528 F.2d 528, 532 (5th Cir.1976); *United States v. Kroh,* 915 F.2d 326, 337 (8th Cir.1990) (en banc) (Lay, C.J., dissenting)).

Tr. 7016-17.

Tr. 7013, 7020.

*See* *Lee,* 374 F.3d at 647-48 ("There was sufficient evidence for a reasonable jury to find that both a conspiracy and a RICO enterprise existed and that Lee intentionally joined and participated in each.").

*See* *Brown v. Sanders,* 546 U.S. 212, 222-24 (2006); *United States v. Higgs,* 353 F.3d 281, 300 (4th Cir.2003).

546 U.S. at 218-19.

*Id.* at 219.

*See* 18 U.S.C. § 3593(d).

18 U.S.C. § 3592(c).

18 U.S.C. § 3592; *United States v. Mitchell,* 502 F.3d 931 (9th Cir.2007).

Because the Court finds that Petitioner's argument is without merit, it need not consider whether *Teague* bars this claim.

904 F.Supp. 554, 558 (E.D.La.1995).

38 F.Supp.2d 282, 288 (S.D.N.Y.1999) ("The sections in question appear to be directed at a murder for hire or to collect insurance proceeds, or at least the sort of murder in which pecuniary gain can be expected to follow as a direct result of the crime.").

Tr. 5330.

Tr. 5329-30.

*United States v. Mitchell,* 502 F.3d 931, 975 (9th Cir.2007) (quoting *United States v. Brown,* 441 F.3d 1330, 1370 (11th Cir.2006)).

*Id.* (rejecting the defendant's argument that the pecuniary gain factor is unconstitutional because it fails to narrow the class of offenders, is unconstitutionally vague and overbroad, and it automatically triggers capital eligibility for every carjacking that results in death).

*Id.*

*Id.* (quoting *United States v. Bernard,* 299 F.3d 467, 483-84 (5th Cir.2002) ("[T]he application of the 'pecuniary gain' aggravating factor is limited to situations where 'pecuniary gain' is expected 'to follow as a direct result of the [murder].' ")).

299 F.3d at 483-84.

*Mitchell,* 502 F.3d at 975.

*Id.*

230 F.3d 1237 (10th Cir.2000) (holding that the phrasing of the pecuniary value instruction given in that case was error because it "failed to specify the 'offense' to which it referred was the homicide, not the underlying robbery).

*Mitchell,* 502 F.3d at 975.

441 F.3d 1330, 1370 (11th Cir.2006).

Citing *United States v. Barnette,* 390 F.3d 775, 807-08 (4th Cir.2004), *vacated on other grounds,* 546 U.S. 803 (2005) (finding, in a case involving carjacking and murder, that the district court's instructions properly limited the pecuniary gain factor to the murder, and that the evidence supported the jury's finding that the murder itself was committed with the expectation of receiving pecuniary gain); *United States v. Roman,* 371 F.Supp.2d 36, 46 (D.P.R.2005) (rejecting the defendants' motion to strike the pecuniary gain aggravating factor because the murder and robbery were committed "practically simultaneous[ly]" and therefore a jury could properly infer that the murder was committed for the express reason to effect the robbery, rather than being incident to, or as an afterthought to the robbery); *United States v. Cooper,* 91 F.Supp.2d 90, 105-06 (D.D.C.2000) (denying defendant's motion to strike the pecuniary gain aggravating factor because a jury could reasonably infer that the murder of a store employee during an unsuccessful robbery could have been motivated by the fact that the employee was frustrating the robber's ultimate goal, which was to obtain money from the robbery).

441 F.3d at 1371.

*Id.*

*Id.*

*Id. See also United States v. O'Reilly,* 2007 WL 2420830, at *6-7 (E.D.Mich.2007) (holding that because the Government intended to prove that the guard was killed before the defendant and his co-defendants obtained any money, a jury could reasonably determine that the murder was motivated by pecuniary gain and was committed to complete the underlying robbery).

*United States v. Allen,* 357 F.3d 745, 750 (8th Cir.2004) (*Allen I* ).

*Id.* (internal quotes omitted) (citing *Bernard,* 299 F.3d at 483; *Chanthadara,* 230 F.3d at 1263; *Cuff,* 38 F.Supp.2d at 288).

*Id.*

*Id.* at 747.

*Id.* at 750.

*Id.* at 751.

*United States v. Allen,* 406 F.3d 940, 942 (8th Cir.2005) (*Allen II* ).

*Id.* at 943.

*Id.* at 945.

*Id.* at 946-47.

*Id.*

In *Allen I,* the court set forth the language of counts one and two of the Indictment as follows:

> Count one charged a violation of 18 U.S.C. §§ 2, 2113(a) and (e), and alleged that the defendants by force, violence, and intimidation did take from the person or presence of another, a quantity of United States currency, belonging to, and in the care, custody, control, management, and possession of the Lindell Bank & Trust Company, the deposits of which were then insured by the Federal Deposit Insurance Corporation; and in committing such offense did kill Richard Heflin.

> Count two charged a violation of 18 U.S.C. §§ 2, 924(c)(1) and (j)(1), and alleged that the defendants
> knowingly used and carried a firearm during and in relation to a crime of violence which may be prosecuted in a court of the United States, that is, bank robbery as alleged in Count I of this indictment

> and incorporated herein; and that in so doing [the defendants] committed murder as defined in 18 U.S.C. § 1111, that is, the unlawful killing of Richard Heflin with malice of forethought, such murder being willful, deliberate, malicious, premeditated, and committed in the perpetration of a robbery.

> *Allen I,* 357 F.3d 745, 749-50 (8th Cir.2004).

441 F.3d at 1370.

502 F.3d at 975.

Because the Court finds that Petitioner's argument is without merit, it need not consider whether *Teague* bars this claim.

*See* Section VI.

*See* Doc. No. 289.

*See* Order dated June 15, 1999, Doc. No. 854.

Tr. 7995-96.

*Jones v. United States,* 527 U.S. 373, 381 (1999).

*Id.* at 382.

*Id.* at 384 (quoting *Justus v. Virginia,* 220 Va. 971, 979, 266 S.E.2d 87, 92-93 (1980)).

*See Untied States v. Sampson,* 335 F.Supp.2d 166, 240-41 (D.Mass.2004) ("Declining to instruct the jury on the consequences of a deadlock could result in jurors deliberating based on a misunderstanding of the law rooted in speculation and incorrect assumptions.").

527 U.S. at 384, 390.

*Id.*

*Id.* at 390.

Because the Court finds that Petitioner's argument is without merit, it need not consider whether *Teague* bars this claim.

Doc. No. 815, Capital Final Instruction 11. The Court read a three-page summary of the penalty phase instructions, rather than the entire set of penalty phase instructions, as it had read the entire set of instructions in the Kehoe penalty phase and the entire set of actual instructions were be given to the jurors. Tr. 7955.

Tr. 7999-8000, 8008-09.

536 U.S. 584 (2002).

289    *See* *Jones v. United States,* 526 U.S. 227 (1999) (holding that serious bodily injury was an element of the offense, rather than a sentencing factor, which was required to be pled in the indictment and proven to a jury beyond a reasonable doubt, as it increased the statutory penalty from fifteen years to twenty-five years imprisonment); *Walton v. Arizona,* 497 U.S. 639, 648-49 (1990) (aggravating factors are not "separate ... offenses"), *overruled* by *Ring,* 536 U.S. 584 (2002); *Lewis v. Jeffers,* 497 U.S. 764, 782 (1990) (aggravating factors are not " 'elements' of any offense").

290    928 F.Supp. 1525, 1545 (D.Kan.1996) (rejecting the argument that the death notice be presented before a grand jury).

291    958 F.Supp. 1523, 1528 (D.N.M.1997) (rejecting the argument that § 848 violates the Indictment Clause of the Fifth Amendment because it permits the Government merely to give notice of the aggravating factors, rather than requiring a grand jury to charge those factors by way of indictment).

292    18 U.S.C. § 3592(c)(8).

293    *Fields v. United States,* 201 F.3d 1025, 1028 (8th Cir.2000).

294    406 F.3d at 943 (noting that *Ring* did not directly address the issue because it involved a state prosecution).

295    *Id.* at 945.

296    *Id.* at 946.

297    *Id.* at 945-46.

298    Doc. No. 816.

299    Doc. No. 816.

300    Doc. No. 816.

301    *Id.* at 946.

302    *Id.*

303    *Id.*

304    *Id.*

305    *Lee,* 374 F.3d at 651. *See also Becht,* 403 F.3d at 549 ("The standard for prejudice under *Strickland* is virtually identical to the showing required to establish that a defendant's substantial rights were affected under plain error analysis.").

306    Pet.'s Motion, Doc. No. 1118, at pp. 32-33.

307    *Lee,* 374 F.3d at 650.

308    Tr. 7185-7200.

309    At present, there is an unresolved issue of law as to whether defendants even have any Sixth Amendment confrontation rights during penalty phase proceedings. *See, e.g.,* *United States v. Fields,* 483 F.3d 313 (5th Cir.2007)("the Confrontation Clause does not operate to bar the admission of testimony relevant only to a capital sentencing authority's selection decision."); *United States v. Johnson,* 378 F.Supp.2d 1051, 1059-62 (N.D.Iowa 2005) (questioning whether the confrontation clause applies in capital sentencing phase).

310    Pet.'s Motion, Doc. No. 1118, at p. 33.

311    *Lee,* 89 F.Supp.2d at 1027-28, 1041-42.

312    *Id.* at 1023, n. 2.

313    *Lee,* 274 F.3d at 496.

314    *Id.* at 493-94.

315    Pet.'s Motion, Doc. No. 1118 at p. 33.

316    *See* *Lee,* 89 F.Supp.2d at 1019.

317 *Id.* at 1024, n. 3.

318 *See United States v. Johnson,* 223 F.3d 665, 675 (7th Cir.2000) (finding that evidence that maximum security federal prisons with control units would be sufficient to control defendant's dangerous propensities was not appropriate mitigating factor; mitigating factors are limited to factors specific to the defendant).

319 Tr. 7742.

320 Pet.'s Motion, Doc. No. 1118, at p. 34.

321 *Lee,* 274 F.3d at 495.

322 Tr. 7869.

323 Tr. 7907.

324 Tr. 7929.

325 *Lee,* 274 F.3d at 493-95.

326 Pet.'s Motion, Doc. No. 1118, at p. 35.

327 *See* 18 U.S.C. 3592(a)(8) ("In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, including the following: ... Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence."); *Oregon v. Guzek,* 546 U.S. 517 (2006) ("The Eighth Amendment ... insists that a sentencing jury be able 'to consider and give effect to mitigating evidence' about the defendant's 'character or record or the circumstances of the offense.' "); *Franklin v. Lynaugh,* 487 U.S. 164, 173 (1988) (holding that the Court's edict that, in a capital case, "the sentencer ... [m]ay not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense," does not mandate reconsideration by capital juries, in the sentencing phase, of their "residual doubts" over a defendant's guilt).

328 Tr. 8008-10.

329 Tr. 8010, 8015.

330 Tr. 8021-22.

331 *Roe v. Delo,* 160 F.3d 416, 418 (8th Cir.1998) (quoting *Chambers v. Bowersox,* 157 F.3d 560, 566 (8th Cir.1998)).

332 *Id.*

333 *Id.*

334 *Id.* (quoting *Sidebottom v. Delo,* 46 F.3d 744, 759 (8th Cir.1995)).

335 *Link v. Luebbers,* 469 F.3d 1197, 1205 (8th Cir.2006).

336 *Id.*

337 *Id.*

338 *Delo,* 160 F.3d at 418.

339 *See* Section IX, *infra.*

340 *See Tison v. Arizona,* 481 U.S. 137, 158 (1987) (holding that the constitution does not require an intent to kill to impose the death penalty for felony murder, and that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement").

341 543 U.S. 551 (2005).

342 *Becht,* 403 F.3d at 545 (quoting *Bousley v. United States,* 523 U.S. 614, 622 (1998)).

343 *United States v. Becker,* 502 F.3d 122, 129 (2d Cir.2007) (quoting *Teague,* 489 U.S. at 310).

344 543 U.S. 551 (2005).

345 *Lee,* 545 U.S. at 1141.

346 *Beard v. Banks,* 542 U.S. 406, 411 (2004).

347 *See United States v. Duncan,* 2008 WL 711603, \*6 (D.Idaho March 14, 2008) (holding that the Government's use of the defendant's adult conviction for actions taken as a juvenile as an aggravating factor to support a sentence of death is not precluded by the principles in *Roper* ); *United States v. Davis,* 2003 WL 1873088, \*5 (E.D. La. April 10, 2003) (holding that defendant's argument that the government cannot rely on criminal conduct committed by the defendant as a juvenile as an aggravating factor is without merit).

348 *Becht,* 403 F.3d at 545 (quoting *Bousley,* 523 U.S. at 622).

349 *See* Docket No. 96.

350 That portion of the Kehoe opinion, found in Section II, C, is hereby incorporated by reference.

351 Pet's Motion, Doc. No. 1118, at p. 39.

352 The Court notes that in his filings subsequent to the original § 2255 motion, Petitioner has discussed the theories together. *See, e.g.,* Pet.'s Reply Brief, Doc. No. 1134, pp. 42-49.

353 Doc. No. 289.

354 *See* Order dated June 15, 1999, Doc. No. 854.

355 This provision of the FDPA required the Eighth Circuit to consider, among other things, "whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor."

356 This Court, having heard the evidence in the case, agrees that Danny Lee is unquestionably "less culpable" than Chevie Kehoe in relation to the crimes alleged and proven in this case.

357 *United States v. Lee,* 374 F.3d 637, 652-53 (8th Cir.2004), *cert. denied,* 545 U.S. 1141 (2005).

358 *Id.* at 653.

359 *See Bear Stops v. United States,* 339 F.3d 777, 780 (8th Cir.), *cert. denied,* 540 U.S. 1094 (2003).

360 408 U.S. 238 (1972).

361 Pet.'s Reply, Doc. No. 1134, at p. 45.

362 *United States v. Sampson,* 486 F.3d 13, 23 (1st Cir.2007).

363 428 U.S. 153 (1976).

364 *Kansas v. Marsh,* 548 U.S. 163, 173-74 (2006).

365 Pet.'s Supp. Memo., Doc. No. 1144, at p. 1.

366 *Furman,* 408 U.S. at 315 (Marshall, J. concurring).

367 *United States v. Johnson,* 495 F.3d 951 (8th Cir.2007).

368 *Id.* at 961.

369 *Id.* at 960-61.

370 495 F.3d 295 (6th Cir.2007) (en banc).

371 *Id.* at 303-04.

372 *Id.* at 307.

373 *Buchanan v. Angelone,* 522 U.S. 269, 275 (1998).

374 18 U.S.C. § 3553(a)(6); *Compare Lee,* 374 F.3d at 652-53 (holding that proportional review of capital sentences is not required by the Eighth Amendment or the FDPA).

375 489 U.S. 288 (1989). The Court rejects Petitioner's argument that the rule announced in *Teague* does not apply to § 2255 motions based on the theory that such proceedings are not yet final. *See, e.g., United States v. Moss,* 252 F.3d 993, 997-98 (8th Cir .2001) (applying *Teague* in § 2255 context).

376 *United States v. Frady,* 456 U.S. 152, 170 (1982).

377  Reply Brief, Doc. No. 1134, at p. 47.

378  *McCleskey v. Kemp,* 481 U.S. 279, 292, 297 (1976) (emphasis in original).

379  *See* *U.S. v. Lee,* 274 F.3d 485 (8th Cir.2001).

380  *See, e.g.,* *United States v. Bass,* 536 U.S. 862 (2002)(reversing Sixth Circuit's opinion allowing discovery into whether race influenced decision to charge defendants with death-eligible offenses). The Court notes that in the underlying Sixth Circuit opinion, 266 F.3d 532 (2001), the court relied in part on public comments made by then-Attorney General Reno and then-Deputy Attorney General Holder that they were concerned over racial disparities uncovered by a DOJ survey.

381  182 F.Supp.2d 459, 461 (W.D.Pa.2002).

382  *Id.* at 463.

383  However, it is unclear to the Court how the Petitioner here could produce such evidence without being given the opportunity to inquire into the basis of the DOJ's decision.

384  Such protocol is found in § 9-10.000 et seq. of the United States Attorney's Manual. It contains procedures for seeking and withdrawing the death penalty notice and includes the requirement that the Attorney General is "the ultimate decisionmaker" on such issues. *See* *Lee,* 274 F.3d at 488-89 (discussing death penalty protocol).

385  *Lee,* 274 F.3d at 492-93.

386  Court's letter of May 17, 1999 at p. 4; attached as Court Exhibit A to Doc. No. 836.

387  478 F.Supp.2d 1179 (C.D.Cal.2007).

388  *Id.* at 1192.

389  *Id.* at 1180.

390  *Id.* at 1182.

391  *Id.* at 1192.

392  *Id.*

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 5347174
Only the Westlaw citation is currently available.
United States District Court,
E.D. Arkansas,
Western Division.

UNITED STATES of America, Plaintiff/Respondent
v.
Daniel Lewis LEE, Defendant/Movant.

No. 4:06–CV–1608 GTE.
|
Criminal No. 4:97–CR–243–02 GTE.
|
Dec. 22, 2010.

**Attorneys and Law Firms**

David A. Ruhnke, Ruhnke & Barrett, Montclair, NJ, for Defendant/Movant.

## *ORDER DENYING POST–JUDGMENT RELIEF*

EISELE, District Judge.

 **\*1** Currently before this Court is Petitioner's Amended Motion to Alter or Amend Judgment pursuant to Fed.R.Civ.P. 59(e) ("Rule 59 motion"). [1] Respondent opposes the motion, contending that it is a successive petition the Eighth Circuit Court of Appeals has not authorized. Alternatively, Respondent contends that the Rule 59 motion, to the extent it is not successive, is completely lacking in merit. The issues presented have been fully briefed. In addition to the Rule 59 motion, the record includes: Respondent's Response; [2] Petitioner's Reply; [3] Petitioner's Motion to Supplement the Record; [4] Affidavit of Petitioner Lee; [5] Respondent's Response to Affidavit; [6] and Petitioner's Notice of Additional Authority. [7]

After carefully considering the issues presented, the Court concludes that Petitioner's motion must be **DENIED.**

## I. **Rule 59(e)** Motion
"Rule 59(e) motions serve the limited function of correcting manifest errors of law or fact or to present newly discovered

evidence." *United States v. Metropolitan St. Louis Sewer Dist.,* 440 F.3d 930, 933 (8th Cir.2006) (omitting internal quotation marks and additional citation). "Such motions cannot be used to introduce new evidence, tender new legal theories, or raise arguments which could have been offered or raised prior to entry of judgment." *Id.* "A Rule 59(e) motion cannot be used to raise arguments which could, and should, have been made before the trial court entered final judgment."

*Bannister v. Armontrout,* 4 F.3d 1434, 1440 (8th Cir.1993) (omitting internal quotations); *see also Williams v. Norris,* 461 F.3d 999, 1004 (8th Cir.2006) (citing *Bannister* and observing that its holding is not weakened by the fact that it is a pre-AEDPA case). Finally, in the habeas context, a Rule 59(e) motion is subject to the well established restrictions on filing successive motions for postconviction relief. *United States v. Lambros,* 404 F.3d 1034, 1036, 1037 (8th Cir.2005), cert. denied, 516 U.S. 1135 (2005) (affirming the district court's dismissal of petitioner's Rule 59(e) motion as an effort to file a successive motion for post-conviction relief, observing that motion "sought ultimately to resurrect the denial of his earlier § 2255 motion").

It seems clear, based on existing case law and despite Petitioner's arguments to the contrary, that a district court should examine a Rule 59(e) motion filed in a § 2255 proceeding preliminarily, just as it would a Rule 60(b) motion, to ensure that it is not a successive petition. And it further seems clear that the substance of the allegations contained in the motion, rather than its caption, controls whether such allegations are deemed successive. See, e.g., *United States v. Nelson,* 465 F.3d 1145, 1149 (10th Cir.2006) (collecting cases) ("It is the relief sought, not [petitioner's] pleading's title, that determines whether the pleading is a § 2255 motion.").

## II. PETITIONER'S ARGUMENTS

### A. Failure to Have Evidentiary Hearing
 **\*2** Petitioner Lee argues that the Court committed legal error when it denied his § 2255 motion without indulging his request for an evidentiary hearing. Lee further contends that such denial raises to the level of a defect in the integrity of the habeas proceeding within the meaning of *Gonzalez v. Crosby,* 545 U.S. 524, 125 S.Ct. 2641, 162 L.Ed.2d 480 (2005) [8] and may not therefore be considered successive. [9] Although the issue of whether this should be considered a successive argument is not free from doubt, [10] the Court will

address this argument on the merits as Petitioner contends the Court applied the wrong standard in determining whether an evidentiary hearing was warranted.

An evidentiary hearing is required "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255. It is appropriate to deny § 2255 relief without a hearing if: (1) petitioner's allegations, if accepted as true, would not entitle petitioner to relief; or (2) the allegations cannot be accepted as true because they are contradicted by the record, are inherently incredible, or are conclusions rather than statements of fact. *Delgado v. United States,* 162 F.3d 981, 983 (1998). In *Delgado,* the denial of a hearing was affirmed. Delgado's ineffective assistance claims failed on both the performance and prejudice prongs because he "made no showing of what other witnesses were available, how they would have testified, and why such additional evidence would likely have affected the result." *Id.*

The Court was purposefully lenient in permitting the parties to expand the record as they wished before taking up the merits of Petitioner's motion. The Court permitted Petitioner to conduct any and all discovery that he requested prior to ruling on the § 2255 motion. For example, the Court granted Petitioner's request to conduct mitochondrial DNA testing (mtDNA) on a hair sample. [11] Later, in an Order dated May 15, 2008, the Court sought to clarify the record as to one of Petitioner's ineffective assistance allegations. The Court pointed out that the record was unclear as to whether an alleged tape-recorded interview of Gloria Kehoe existed and directed Petitioner to produce the interview referenced, but not produced. [12] Finally, in an Order dated May 22, 2008, the Court provided Petitioner with "one final opportunity to put before the Court additional legal authority or argument in support of the grounds for relief currently before the Court." [13]

The Court considered the entire record, as expanded, in making its ruling. The Court gave Petitioner the benefit of all allegations of fact, that is, the Court assumed that Petitioner could prove the substance of any factual assertion. The Court did not, however, engage in speculation about what witnesses, if called to testify, might have said. Nor did the Court credit Petitioner's conclusions. Because the Court concluded on the basis of all the submissions that Petitioner had failed to establish any legally cognizable basis for post-conviction relief, it declined to have an evidentiary hearing.

**\*3** Petitioner Lee raises numerous objections to the Court's failure to provide an evidentiary hearing. Petitioner contends that the Court erroneously grafted an "affidavit requirement" onto the standard for obtaining an evidentiary hearing. The Court agrees with Petitioner that there is no such requirement in the Eighth Circuit. That is, affidavits are one way, but not the only way, that a petitioner may present facts to support a claim that his counsel was constitutionally deficient.

Petitioner's obligation, however, is greater than simply placing the Court on notice of claims alleged to merit post-conviction relief. At the time he filed his petition for § 2255 relief, Petitioner was obligated to "specify all the grounds for relief available to the petitioner ... and state the facts supporting each ground." Rule 2(b) of the Rules Governing Section 2255 Proceedings. "Habeas corpus petitions must meet heightened pleading requirements." *McFarland v. Scott,* 512 U.S. 849, 856, 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994) (citing Rule 2(c) of the Rules Governing Section 2254 Proceedings, which is identical to Rule 2(b) of the Rules Governing Section 2255 Cases); *Mayle v. Felix,* 545 U.S. 644, 655, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005) (also citing Rule 2(c)).

In the context of his ineffective assistance of counsel claims, Petitioner was obliged to state the facts showing both that his counsel's performance was deficient and explaining how such deficiencies prejudiced his defense. Petitioner failed to adequately present facts sufficient to support his ineffective assistance of counsel claims. For example, Petitioner contended that his trial counsel were ineffective in failing to locate, interview, effectively examine or present a total of 19 witnesses. The Court noted in denying § 2255 relief that Petitioner "failed to include supporting affidavits *or other independent support* " in connection with some of these witnesses. [14] Some of Petitioner's contentions were too vague to raise any issue about either his counsel's performance or prejudice as a result thereof. For example, Petitioner identified Peter Langan as a member of the Aryan Republican Army serving a life sentence in federal prison. Petitioner alleged that "efforts should have been made to locate and interview Mr. Langan who was, throughout most of the period leading up to this trial, incarcerated on federal charges." [15] Petitioner made no effort to explain how Langan possessed information relevant to the charges against him or how such information, if presented at trial, could have altered the outcome. Similarly, with respect to numerous other witnesses, Petitioner merely presented conclusory allegations.

The Court's point was simply that it was incumbent upon Petitioner to provide sufficient information about the alleged substance of any omitted testimony to permit the Court to evaluate both the performance and prejudice prongs of the *Strickland* ineffective assistance standard. 🔖 *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also *Williams v. United States,* 452 F.3d 1009, 1012 (8th Cir.2006) (referencing both *Strickland* requirements as necessary to prove ineffective assistance of counsel claims).

**\*4** In ⚠ *Paul v. United States,* 534 F.3d 832 (8th Cir.2008), the Eighth Circuit affirmed the district court's denial of a § 2255 petition in a death penalty case. The district court rejected the petitioner's ineffective assistance claims based on trial counsel's failure to call witnesses to bolster his defense, both at the guilt and sentencing phases. The Government in opposing the motion did not offer an affidavit from petitioner's trial counsel. Instead, it defended counsel's competence by observing that counsel had persuaded the jury to find several mitigating factors and proffering its own strategic reasons defense counsel might have declined to call witnesses. The district court denied § 2255 relief without conducting an evidentiary hearing. The Eighth Circuit affirmed the ruling even though the record on appeal was "not developed concerning counsel's contemporaneous rationale for the actions that [petitioner] now challenges." *Id.,* at 837. *Paul* reaffirms that ineffective assistance claims may be resolved without an evidentiary hearing or even an affidavit from trial counsel where "the record shows conclusively that [petitioner] did not suffer prejudice from what he now alleges was deficient performance by counsel." *Id.* at 838.

The Court did not apply an affidavit requirement in considering whether there was a need for an evidentiary hearing. Rather, it applied well established Eighth Circuit law. See, e.g., *Delgado, supra,* 162 F.3d at 983 (no evidentiary hearing necessary for Petitioner who "made no showing of what other witnesses were available, how they would have testified, and why such additional evidence would likely have affected the result.").

Petitioner's contention that the Court "never put Mr. Lee on notice that affidavits or other alternative measures would be considered, or imposed any scheduling order requiring that affidavits be submitted" rings hollow. Petitioner's counsel

was on notice of the law and pleading requirements for § 2255 motions. The Court specifically advised that it would determine based on the submissions whether an evidentiary hearing was required. [16] Subsequently, the Court directed Petitioner to produce certain information related to Gloria Kehoe because the Court recognized its potential importance. Finally, before ruling, the Court provided Petitioner with yet another opportunity to submit anything he wished in support of his Petition.

Additionally, Petitioner Lee argues the Court also improperly credited the affidavits proffered by counsel. The Court disagrees. The Government obtained and submitted affidavits from defense counsel. [17] Therein, counsel explained why they elected not to call certain witnesses, described matters that they investigated and provided other insights into trial strategies. [18] The Court evaluated all assertions made by both parties to determine whether there was any need for an evidentiary hearing. The Court did not weigh evidence or make credibility findings. There was no need to do so because Petitioner failed to present any facts which, if true, would have entitled him to relief. Petitioner's obligation was to present facts to demonstrate the need for an evidentiary hearing. He failed to do so. Petitioner failed completely to demonstrate that he suffered any prejudice as a result of his counsel's alleged deficiencies. There simply were no issues of fact that needed to be resolved in order to dispose of his post-conviction motion. Even without reviewing the affidavits proffered by trial counsel, the Court still would have found no need for an evidentiary hearing.

**\*5** In support of his Rule 59 motion, Petitioner has attached numerous affidavits, presented in 65 pages. Such affidavits are submitted by: (1) a private investigator, Daniel Clark, regarding his investigation into potential witnesses Faron Lovelace and Jeff Brown; (2) Kevin McNally, an attorney, opining on the jury selection strategy used by defense counsel; (3) Dr. Thomas Ryan, disavowing the use of PCL–R [19] for measuring future dangerousness and psychopathy; (4) John Edens, Ph.D., a licensed psychologist, opining on inappropriateness of using PCL–R to predict future dangerousness; (5) a group of 5 experts opining on the inappropriateness of relying on the PCL–R to predict future dangerousness, allegedly filed with a motion in limine seeking to exclude Dr. Ryan's testimony in another federal capital case; [20] and (6) Russell Stetler, an attorney, outlining deficiencies in defense counsel during the sentencing phase and their failure to develop mitigation evidence.

Petitioner offers no explanation for why such affidavits or other supporting information were not provided to the Court before it ruled on his original motion for § 2255 relief. Had they been, the Court might have determined that an evidentiary hearing was required. However, the Court is foreclosed by existing legal principles from considering the information now, absent permission and direction from the Eighth Circuit to do so.

### B. Ineffective Assistance of Counsel Standard

The Court rejects Petitioner's argument that it applied the wrong standard in resolving his ineffective assistance of counsel claims. Additionally, the Court finds that all other arguments related to such claims are successive.

Petitioner failed, both in his original petition and his Rule 59(e) petition, to make a sufficient showing that absent counsel's deficient conduct there is "a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith,* 539 U.S. 510, 537, 123 S.Ct. 2527, 156 L.Ed.2d 471(2003)(discussing that prejudice occurred when counsel failed to put into evidence Wiggins' "excruciating life history" during sentencing). Petitioner failed to make a sufficient showing that counsel's actions prejudiced him. He also failed to show what the evidence would have been had counsel completed further investigation or placed certain persons on the witness stand. He failed to show what the testimony would have been, the availability of persons and evidence, or whether the potential witnesses and evidence were credible.

The Court did not apply an incorrect standard. Petitioner simply failed to produce facts sufficient to warrant any relief.

### C. Recanted Testimony of Dr. Ryan

The Court comments specifically on Petitioner's arguments related to Dr. Ryan, Although such contentions should, in the Court's view, be deemed successive, they are also lacking in merit.

Petitioner contends that his counsel was ineffective for failing to fully and adequately object to the psychopathy evidence presented during the cross-examination of defense expert Dr. Mark Cunningham. The Government questioned Dr. Cunningham about the fact that Dr. Thomas Ryan, an expert for the prosecution, had concluded that Petitioner was a psychopath based upon his answers to the Hare Psychopathy Checklist–Revised (or PCL–R). Petitioner claims that Dr. Ryan later disavowed the use of the PCL–R in capital cases. Petitioner further claims that "the basis for challenging the use of psychopathy evidence as a valid predictor for further dangerousness existed at least as early as September of 1998" [21]

**\*6**  Lee's original § 2255 Petition included only one sentence referencing this argument. That lone reference appeared in a footnote and read:

> At a hearing, Movant's counsel are prepared to offer evidence that Dr. Ryan, in sworn testimony and affidavits filed after his testimony in this case, has stated that the Hare Psychopathy Checklist is not an appropriate instrument to be utilized in evaluating the future danger of capital defendants and that he no longer stands by such testimony or analysis. [22]

Petitioner now devotes over 25 pages to this argument. [23] Clearly, the theory is much more developed now than the cursory reference made in requesting 2255 relief. Again, Petitioner does not explain why the information he now includes was not included in connection with his original petition. Petitioner's conclusory statement that Dr. Ryan, subsequent to his testimony in this case, stopped using the PCL–R to evaluate future dangerousness was not sufficient to place the Court on notice of the full argument that Petitioner now presents.

However, the claim, even if considered on the merits, is problematic. Dr. Ryan's recently submitted declaration describes how, in the Spring of 2000, he concluded that it was inappropriate to rely on the PCL–R to assess the future dangerousness of capital defendants. The jury returned its verdict of death against Petitioner on May 14, 1999. Petitioner has not explained how counsel could have been expected, almost one year before Dr. Ryan himself rejected the PCL–R as an effective predictor of future conduct, to challenge the scientific underpinnings for his testimony.

## III. CONCLUSION

The Court rejects Petitioner's contention that it applied incorrect legal standards or committed error which rises to the level of a defect in the integrity of the federal habeas proceedings. Nor has Petitioner presented anything that would require the Court to revisit a previously asserted claim, such as showing manifest errors of law or fact. The remainder of Petitioner's contentions are successive. They are either reiterations of previous arguments or attempts to introduce new evidence or legal theories which could have been raised prior to the entry of judgment.

The Court is required by the 2009 Amendments to Rule 11(a) of the Rules Governing 2255 Proceedings to "issue or deny a certificate of appealability when it issues a final order adverse to the applicant." [24] After considering the matter, the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c). The Court therefore declines to grant a certificate of appealability.

For the reasons stated above,

IT IS HEREBY ORDERED THAT Petitioner's Rule 59 motion (Doc. 1165) be, and it is hereby, **DENIED.**

IT IS FURTHER ORDERED that Petitioner is hereby denied a certificate of appealability as to all claims for relief.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5347174

## Footnotes

1   Doc. 1165. All references to docket entries ("Doc.# ") refer to filings in this case, Case No. 4:97–CR–00243 (2) GTE.
2   Doc. 1170.
3   Doc. 1172.
4   Doc. 1174.
5   Doc. 1178.
6   Doc. 1181.
7   Doc. 1182.
8   Assuming *Gonzalez* applies to Rule 59(e) motions in § 2255 proceedings, which Petitioner disputes.
9   See Petitioner's Reply, Doc. No. 1172, at 14–16.
10  See, e.g., *In re Lindsey,* 582 F.3d 1173, 1175–76 (10th Cir .2009) (per curiam) (holding that Rule 60(b) challenge that district court erred in denying § 2255 motion without an evidentiary hearing necessarily was an attack on court's analysis of the merits and therefore successive).
11  See Petitioner's motion, Doc. 1118, at 20 ("This Court has recently approved a request by Movant's present counsel to fund mtDNA testing and arrangements are being made" for such testing).
12  Order, Doc. 1154.
13  Order, Doc. 1156.
14  Order denying § 2255 relief, Doc. 1163, at 18 (emphasis added). The Court subsequently stated that Petitioner's failure to provide affidavits was an "arguably fatal" omission. This was probably overstated, but in the context of the entire opinion it was or should have been clear that the Court did not reject Petitioner's contentions without a hearing solely because he failed to include affidavits.
15  Original petition, Doc. 1118, at 14.
16  Order dated February 29, 2008, Doc. 1153.
17  The Government submitted two affidavits, one from an attorney for Petitioner Lee and another from an attorney for co-defendant Chevie Kehoe. See Exhibits C and D to Government's response, doc. 1126.

18 Because of these affidavits, the record in this case is far more developed than in *Paul,* where the Government defended counsel's trial strategy and no affidavits were tendered.

19 The PCL–R refers to the Hare Pscyhopathy Checklist–Revised. "The PCL–R is a 20–item instrument intended to assess traits associated with the construct of psychopathy." See Affidavit of John Edens, at ¶ 5, attached to Rule 59 motion, Doc. No. 1165.

20 Petitioner contends the affidavits were submitted in support of a motion in limine filed in the case of *United States v. Willis Haynes,* No. PJM–98–0520 (D.Md.) On May 24, 2000.

21 Petitioner's Rule 59 motion, Doc. 1165 at 22.

22 Petitioner's Motion, Doc. 1118 at 34, n. 14.

23 Petitioner's Rule 56 motion, Doc. 1165 at 19–45.

24 This rule was not in effect at the time the Court entered Judgment denying Petitioner's § 2255 motion.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

715 F.3d 215
United States Court of Appeals,
Eighth Circuit.

UNITED STATES of America, Plaintiff–Appellee

v.

Daniel Lewis LEE, also known as Danny Lee,
also known as D L Graham, also known as
Daniel Lewis Graham, Defendant–Appellant.

No. 11–1380.
|
Submitted: March 13, 2013.
|
Filed: April 29, 2013.
|
Rehearing and Rehearing En
Banc Denied Jan. 8, 2014.[*]

**Synopsis**

**Background:** Defendant, whose convictions in the United States District Court for the Eastern District of Arkansas of conspiring to violate and violating the Racketeer Influenced and Corrupt Organizations (RICO) Act, and of three murders in aid of racketeering, and death sentence were affirmed by the Court of Appeals, Murphy, Circuit Judge, 374 F.3d 637, petitioned for habeas corpus relief. The United States District Court for the Eastern District of Arkansas, Garnett Thomas Eisele, J., denied petition, but granted defendant a certificate of appealability (COA).

**Holdings:** The Court of Appeals, Murphy, Circuit Judge, held that:

trial counsel's purportedly deficient performance did not prejudice defendant, thereby precluding ineffective assistance claim;

defendant could not seek postconviction relief based on purported Eighth Amendment violation, since claim had already been ruled on and rejected on direct appeal; and

defendant's arguments regarding government's reliance on aggravating factors accepted by jury was beyond scope of COA.

Affirmed.

**Attorneys and Law Firms**

**\*217** Laurence E. Komp, argued, Manchester, MO, Julie Brain, FPD, Karl Schwartz, AFPD, Wilmington, DE, David A. Ruhnke, Montclair, NJ, on the brief, for Appellant.

John Michael Pellettieri, argued, Washington, DC, for Appellee.

Before MURPHY, SMITH, and GRUENDER, Circuit Judges.

**Opinion**

MURPHY, Circuit Judge.

Daniel Lewis Lee and codefendant Chevie Kehoe were convicted of conspiring to violate and violating the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. §§ 1962(c)-(d), and of three murders in aid of racketeering in violation of 18 U.S.C. § 1959. The government sought the death penalty for both Lee and Kehoe, but only Lee received a death sentence. Kehoe was sentenced to life imprisonment without the possibility of release. After Lee's conviction and sentence were affirmed on direct appeal, United States v. Lee, 374 F.3d 637 (8th Cir.2004), cert. denied, 545 U.S. 1141, 125 S.Ct. 2962, 162 L.Ed.2d 892 (2005), Lee brought this action seeking habeas corpus relief under 28 U.S.C. § 2255. Lee claims in part that he received ineffective assistance of counsel during voir dire and that his sentence violated the United States Constitution. The district court[1] denied his petition, but granted him a certificate of appealability on "whether the death penalty is being unconstitutionally applied" in this case. We then expanded Lee's certificate to include the question of whether he received ineffective assistance based on counsel's use of peremptory strikes during voir dire. We now affirm.

I.

The facts of the offenses for which Lee was convicted in this case are reported in our affirming opinion. *See Lee,* 374 F.3d at 641–43. Lee was a member of the Aryan

Peoples' Republic or the Aryan Peoples' Resistance, a white supremacist organization formed by codefendant Kehoe. Its goal was to establish an independent nation of white members of the Christian Identity faith in the Pacific Northwest. With robbery in mind, Lee and Kehoe traveled to the Arkansas home of gun dealer William Mueller in January 1996. They waited there until Mueller returned home with his wife and her eight year old daughter. Kehoe and Lee then incapacitated the couple and asked the child where they could find cash, guns, and ammunition. After that Kehoe and Lee killed Mueller and his wife, and Kehoe killed the young girl.

Kehoe and Lee were indicted on several charges including racketeering in violation of 18 U.S.C. § 1962(c), conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d), and three counts of murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1). The government noticed its intent to seek the death penalty against both defendants. 18 U.S.C. § 3593(a). Lee and Kehoe were tried together.

Jury selection took place over five days in March 1999, and defense counsel for Kehoe and Lee were given thirty peremptory **\*218** strikes. A consultant assisted the defense with "jury composition, selection and statistical breakdown." The record does not reflect whether the jury consultant assisted counsel for both Lee and Kehoe. It also does not conclusively show the extent to which counsel for the two defendants worked together to create a jury selection strategy. The district court explained to the jurors during voir dire that the defendants were alleged to "hold white supremacist, white separatists and race-based opinions and attitudes." It advised the venire members to "please raise [their] hand" if they had "such strong feelings against [a] person who possesses such race-based beliefs or opinions that you could not give that person a fair trial based upon the law and the evidence in the case." One venire member was dismissed by the district court after he explained that "the racial undertones of the case would bias [him] toward the state and [he] would not be able to give [the defendants] a fair evaluation."

Kehoe and Lee jointly exercised all of their thirty peremptory strikes against Caucasian venire members, and the government exercised two of its twenty peremptory strikes against African American venire members. The equal protection clause forbids a prosecutor from exercising peremptory challenges based on race because that harms the rights of defendants, the rights of excluded jurors, and

the integrity of the criminal justice system. *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). That prohibition has been extended to race based challenges made by defense counsel because the exercise of a racially motivated peremptory challenge in a criminal case by any party is state action which violates the United States Constitution. *Georgia v. McCollum,* 505 U.S. 42, 54–55, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).

Defense counsel in this case explained that while "the government struck two African Americans" and the "defense struck none," it was choosing not to challenge the constitutionality of the peremptory strikes under *Batson.* The district court observed that there was "not any under-representation" because nine of the twelve seated jurors were African American, as were three of the six alternates. The district court nevertheless asked the government to provide a rationale for its two strikes of African American venire members. The government explained that one had given "relatively nonresponsive" answers at times and the other had "expressed deep religious convictions." The district court accepted those explanations. The government then noted that Kehoe and Lee had only stricken Caucasian venire members and that under *McCollum* and *Batson* "the right being safeguarded ... is equal protection under the laws." The district court stated that it could "get into a whole thing of having [the defendants] justify every white strike," but since "[n]o one has made a *Batson* challenge," it was "not going to do it." The court concluded that the trial "will just go forward."

An attorney who represented Kehoe has since signed an affidavit explaining that the Caucasian venire members were stricken from the jury as a strategic choice. He explained that

> [s]electing a jury with as many black jurors as possible was a strategic decision made by defense counsel ... because (1) blacks are more likely than whites to discredit government testimony, (2) research of attitudes indicates that blacks are generally less likely to give the death penalty, and (3) it was felt that blacks were less likely

to give the death penalty than whites in this particular case.

 **\*219**  The case proceeded to trial before the seated jurors. Kehoe's mother testified that Lee and Kehoe had confessed to the murders. She related that Kehoe had told her that Lee had participated in murdering the adults, but that Kehoe had killed the child himself because Lee refused to do it. The government also introduced physical evidence, including a hair similar to Lee's which had been found on a cap allegedly used during the murders. Photographs of racially offensive tattoos on Lee's body were also introduced by the government. At the close of trial the jury returned a guilty verdict against both defendants on all counts.

 Lee and Kehoe had separate sentencing hearings before the same jury, and the government indicated its intent to seek the death penalty for both. Under the Federal Death Penalty Act, 18 U.S.C. §§ 3591–93, a jury may impose the death penalty only if it determines that aggravating factors proved by the government sufficiently outweigh any mitigating facts proved by the defense. *See United States v. Purkey,* 428 F.3d 738, 749 (8th Cir.2005). At the hearings for both Kehoe and Lee the government argued that five aggravating factors supported a death sentence: (1) the murders had been committed for pecuniary gain, (2) more than one person had been killed during a single criminal episode, (3) substantial planning and premeditation for the murders had occurred, (4) each defendant would be a future danger, and (5) the eight year old girl had been a vulnerable victim.

Kehoe's sentencing proceeded first, and he argued that 16 mitigating circumstances weighed against death. One or more jurors found the existence of each of the 16 mitigating factors, including that Kehoe was the product of a dysfunctional family, that he was influenced by his parents to accept extremist political views, and that he could live a productive life in prison. The jury also rejected several of the aggravating factors put forward by the government, including that Kehoe would be a future danger and that he had committed the murders after substantial planning. The jury unanimously decided against a death sentence for him and in favor of life imprisonment without the possibility of release. Each juror certified that Kehoe's race and religious beliefs had not influenced his or her decision. *See* 18 U.S.C. § 3593(f).

The United States Attorney for the Eastern District of Arkansas then informed the district court that she no longer wished to seek the death penalty for Lee, but the Department of Justice's death penalty protocol required the prosecutor to request withdrawal of a death notice from the Attorney General's Review Committee on Capital Cases. Since Attorney General Janet Reno was unavailable at that time, Deputy Attorney General Eric Holder convened the other members of the review committee and determined that the death notice against Lee would not be withdrawn. Thereafter the government presented its position that death was the appropriate sentence for Lee because he would be a future danger and he had a history of committing other violent crimes. Lee cited 14 mitigating factors before the jury, including that he suffered from mental impairment and had a troubled upbringing. He also argued that he should not receive the death penalty because Kehoe was more culpable than he and Kehoe had received a sentence of life imprisonment.

The jury unanimously sentenced Lee to death for each of the capital murders. Each juror certified that Lee's race and religious beliefs had not influenced his or her decision. *See* 18 U.S.C. § 3593(f). Although the jury did not find that Lee had **\*220** committed the murders after substantial planning and preparation, it did find that Lee would be a future danger, that he had committed the offenses with the expectation of receiving something of pecuniary value, and that he had killed more than one person in a single criminal episode. The jury also largely rejected Lee's mitigation case, deciding that Lee could not appreciate the wrongfulness of his conduct and that he could not conform his conduct to the requirements of the law. The district court granted Lee's motion for a new sentencing phase after concluding that Lee could force the Department of Justice "to comply with [its] death penalty protocol" and reconsider the prosecutor's request to withdraw Lee's death notice. We reversed after concluding that the government's death penalty protocol was unenforceable by individuals. *United States v. Lee,* 274 F.3d 485, 493 (8th Cir.2001). We also decided that it had not been improper for the district court to permit the government to elicit testimony at sentencing from mental health experts regarding Lee's past acts and his future dangerousness. *Id. at 496.*

Lee directly appealed his conviction and sentence on a number of grounds, including that his sentence violated his constitutional rights. Lee did not raise any allegations in his direct appeal relating to counsel's racially motivated strategy

in selecting a jury. We affirmed after concluding in relevant part that Lee had cited "no case indicating that imposition of the death penalty on one defendant but not the other violates § 3595(c)(1)." *Lee, 374 F.3d at 653.* Citing *United States v. Paul, 217 F.3d 989, 999–1000 (8th Cir.2000),* we also concluded that the death penalty had not been arbitrarily imposed on Lee despite the jury's refusal to consider Kehoe's sentence of life imprisonment as a mitigating factor. *Lee, 374 F.3d at 653.* We pointed out that "Lee [had] not provided support for his claim that the death penalty was arbitrarily imposed on him." *Id.* The Supreme Court then denied Lee's certiorari petition. *Lee v. United States, 545 U.S. 1141, 125 S.Ct. 2962, 162 L.Ed.2d 892 (2005).*

Lee then moved for postconviction relief under 28 U.S.C. § 2255, arguing among other points that he had received ineffective assistance of counsel during voir dire and that his sentence of death was unconstitutional. He also presented information about mitochondrial DNA testing on a hair the government had used against him at trial. Lee explained that the analytical report on that hair had concluded that the "mitochondrial DNA sequence data from the hair ... *differs* from that of the hair from Danny [Lee]." The district court denied Lee's petition for postconviction relief without a hearing, concluding there was an "abundance of evidence supporting the guilt phase convictions." The court also stated that it was "highly unlikely that counsel for Kehoe and Lee would not have consulted on jury selection strategies." While such a strategy offends the jurors' constitutional rights, *McCollum, 505 U.S. at 48–49, 112 S.Ct. 2348,* Lee had not shown that his counsel was ineffective because of it or that any prejudice had resulted. The district court also concluded that Lee could not raise a constitutional challenge to his death sentence because that argument had already been rejected on his direct appeal.

Lee then moved under Federal Rule of Civil Procedure 59(e) to alter and amend the district court's judgment denying his motion for post conviction relief pursuant to 28 U.S.C. § 2255. For the first time in that motion he argued that his counsel's use of a race based jury selection strategy was a "structural defect" that affected the "entire conduct of the trial from beginning to end." **\*221** *Arizona v. Fulminante, 499 U.S. 279, 309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).* He contended that prejudice against him by trial counsel's errors could thus be presumed. The district court denied his Rule 59 motion in its entirety.

The district court first declined to grant Lee a certificate of appealability on any issue, and Lee sought reconsideration. The court then granted him a certificate on the question of "whether the death penalty is being unconstitutionally applied" in this case. We later expanded Lee's certificate of appealability to include the question of whether he received ineffective assistance when his trial counsel exercised peremptory challenges based on race in violation of the Constitution. We declined to expand Lee's certificate to include other issues, including whether he received ineffective assistance of counsel relating to the submission of aggravating factors to the jury to support his death sentence. We review de novo the denial of a § 2255 motion and review any underlying factual findings for clear error. *Davis v. United States, 673 F.3d 849, 852 (8th Cir.2012).*

## II.

Lee argues that he received ineffective assistance when defense counsel exercised peremptory challenges based on race. Ineffective assistance of counsel claims are governed by *Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),* which generally requires proof that trial counsel's representation "fell below an objective standard of reasonableness" and that the deficient representation prejudiced the defense. *Id. at 688–92, 104 S.Ct. 2052.* "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id. at 686, 104 S.Ct. 2052.* "Failure to establish either *Strickland* prong is fatal to an ineffective-assistance claim." *Worthington v. Roper, 631 F.3d 487, 498 (8th Cir.2011)* (citation omitted). We need not "address the performance prong if petitioner does not affirmatively prove prejudice." *Boysiewick v. Schriro, 179 F.3d 616, 620 (8th Cir.1999)* (citation omitted).

The district court determined that it was unclear on the record whether Lee's counsel had joined the racially motivated jury selection strategy, but it "appear[ed] highly unlikely that counsel for Kehoe and Lee would not have consulted on jury selection strategies." The district court found it unnecessary to resolve the issue, however, because it concluded that the use of race based peremptory challenges by defense counsel did "not offend *Petitioner's* constitutional rights." To the extent

that Lee's attorney approved of the jury selection strategy, the district court concluded that counsel's performance did not fall below an objective standard of reasonableness. To the extent that Lee's counsel did not participate in or authorize the strategy, the district court concluded that Lee could not show that he was prejudiced because no evidence suggested that "a jury with a different racial composition would have returned a different verdict."

Lee concedes in his brief that his counsel joined Kehoe's counsel in exercising all thirty peremptory strikes based on the racial stereotype that "African–American jurors are less likely to impose death and are more distrustful of the Government than white jurors." Lee cites Supreme Court case law which indicates that a strategy by defense counsel to choose jurors on the basis of race offends the equal protection clause of the United States Constitution by harming the rights of defendants, the rights of excluded jurors, and the integrity of the criminal justice system. *See* **\*222** *McCollum,* 505 U.S. at 55, 112 S.Ct. 2348. He further contends that when counsel violates *McCollum* by choosing jurors on the basis of race, it amounts to a "structural error" in the trial where we presume that counsel's actions prejudiced the defendant. *See Neder v. United States,* 527 U.S. 1, 7, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). That is because such a structural error corrupts the entire fact finding process by raising a question about the composition and integrity of the jury.

Codefendant Kehoe's petition for postconviction relief under § 2255 raised the same *McCollum* issue as Lee does on appeal, arguing that "prejudice should be presumed because his trial counsel's decision to purposefully strike only Caucasian venire members in violation of *McCollum* was a 'structural error.'" *United States v. Kehoe,* No. 11–1382, 712 F.3d 1251, 1253, 2013 WL 1707338, at \*2 (8th Cir. Apr. 22, 2013). We disagreed, citing *Young v. Bowersox,* 161 F.3d 1159, 1160–61 (8th Cir.1998), where we had rejected the argument that an ineffective assistance of counsel claim premised on a *Batson* error should be considered a structural error entitled to a presumption of prejudice. *Kehoe,* 712 F.3d at 1252–54, 2013 WL 1707338, at \*2–3. Although *Young* had addressed the requisite proof for an ineffective assistance claim related to a *Batson* violation, we concluded "that the holding of *Young* must apply with equal force to a claim premised on a *McCollum*

violation." *Id.* at 1253, 2013 WL 1707338, at \*2. We noted that the Seventh Circuit had concluded that a *McCollum* violation was a structural error, *id.* at 1255 n. 4, 2013 WL 1707338, at \*4 n. 4 (citing *Winston v. Boatwright,* 649 F.3d 618, 632–34 (7th Cir.2011)), [2] and that the Eleventh Circuit had acknowledged the "troubling application of the *Strickland* prejudice prong to *Batson*-type claims," *id.* (quoting *Eagle v. Linahan,* 279 F.3d 926, 943–44 n. 22 (11th Cir.2001)). We concluded in *Kehoe* however that "whether defense counsel's decision to select the jury in a racially discriminatory manner should result in a presumption of prejudice is a question that is foreclosed by our holding in *Young.*" *Id.* at 1255, 2013 WL 1707338, at \*4.

In addressing Kehoe's postconviction petition we concluded that under *Young,* a *McCollum* violation is not a structural error and that a showing of prejudice is thus required to make out an ineffective assistance claim. *Id.* That conclusion also applies in Lee's case. Kehoe and Lee were tried together, and their counsel jointly decided to use all thirty of their peremptory strikes against Caucasian venire members. We agree with the district court that in these circumstances it would be highly unlikely that counsel for Lee and Kehoe did not work together to create the racially motivated jury selection strategy. As Lee points out in his briefing before this court, it "is not in dispute" that his counsel "engaged in racial discrimination when selecting his jury." Lee, like Kehoe, must thus show that he was prejudiced by counsel's racially motivated jury selection strategy in order to succeed on his ineffective assistance claim.

The term "prejudice" is defined as "a reasonable probability that the outcome of the trial would have been different." *White v. Al Luebbers,* 307 F.3d 722, 728 (8th Cir.2002) (citing *Strickland,* 466 U.S. 668, 104 S.Ct. 2052). Such a reasonable probability "is shown if the reviewing court, after surveying the entire record, lacks confidence in the outcome." *Id.* "In articulating the prejudice component of the *Strickland* analysis, the Supreme Court provided that in certain circumstances the requisite showing of prejudice may be presumed **\*223** due to the nature of the deficient performance." *McGurk v. Stenberg,* 163 F.3d 470, 473 (8th Cir.1998). In *Kehoe* we concluded that no prejudice could be shown because Kehoe had not been "denied counsel entirely, nor was the assistance of counsel denied entirely during a

critical stage of the proceeding." 712 F.3d at 1254, 2013 WL 1707338, at *3. While we acknowledged that "trial counsel's strategy may have been misguided," we concluded that it could not "be said that it denied entirely Kehoe the assistance of counsel during voir dire." *Id.*

Lee argues that he can establish prejudice by counsel's decision to use all his peremptory strikes against Caucasian venire members. He contends that throughout "the guilt and penalty phases of [his] trial, the jury was subjected to an unrelenting barrage of accusations of abhorrent racist beliefs." He argues that in light of the "overwhelming amount of evidence of [his] particular antipathy towards people of color, the inference that the nine African–American members of the jury were affected by that evidence and that it influenced their decision to convict [him] and sentence him to death is inescapable." Lee finally contends that he can prove prejudice because he was sentenced to death while Kehoe was only sentenced to life imprisonment.

The record evidence does not show that any of the jurors who served were biased by trial counsel's decision to strike Caucasian venire members. *See* *Sanders v. Norris,* 529 F.3d 787, 794 (8th Cir.2008). Bias will not be presumed simply because some jurors were of a different race than the defendant. *See United States v. Pospisil,* 186 F.3d 1023, 1028 (8th Cir.1999). One venire member in Lee's case was excused after he expressed concern that he would be biased by the defendants' racism, but the other empaneled jurors confirmed their impartiality. While some of Lee's body tattoos were visible to the jury and the government introduced photographs of others, the record does not indicate that "the individual jurors who tried [Lee] were not impartial." *Young,* 161 F.3d at 1161 (citation omitted). Nothing in the record shows that the jury made its decisions on anything other than the evidence presented. Lee's counsel was "present and active" during voir dire and actively involved throughout trial. *Kehoe,* 712 F.3d at 1254, 2013 WL 1707338, at *3. Lee has not shown that his defense counsel's use of racially motivated peremptory strikes entirely denied him of the assistance of counsel. We conclude that Lee has not shown that his counsel's offensive use of peremptory strikes during voir dire resulted in prejudice to him.

The difference between Lee's sentence of death and Kehoe's sentence of life imprisonment does not show that Lee was prejudiced by counsel's actions. The evidence against Lee and Kehoe was not identical, and the fact that the jury sentenced

the two defendants differently supports that the jury was not simply motivated by racism to impose the death penalty. The jury accepted Kehoe's mitigation case, believing that he had been indoctrinated from a young age and would not be a future danger. By contrast, the jury rejected Lee's arguments for mitigation and instead found that he would be a future danger. The district court explained to the jury that both defendants had strong racist beliefs, and the differing sentences for the two men shows that the jury impartially weighed the aggravating and mitigating factors to determine the appropriate sentence for each defendant.

Counsel's race based jury selection strategy was designed to produce a jury that would closely scrutinize the government's case and be less likely to impose **\*224** the death penalty. While this strategy did not create the desired result, no evidence has been provided to show that the resulting jury was biased against Lee. We therefore conclude that Lee's claim for ineffective assistance of counsel fails.

### III.

Lee also argues in his § 2255 petition that the district court should have set aside his death sentence because it was imposed in violation of the United States Constitution and the laws of the United States. Lee contends that the disparity between his sentence and that of Kehoe shows that his sentence of death was arbitrarily imposed. Lee further argues that the finding of his guilt was undercut because (1) DNA testing after the trial concluded that the hair at the crime scene was not his and (2) the jury was tainted by the government's multiple references to his tattoos. Whether a sentence violates the Eighth Amendment is reviewed de novo. *United States v. Martin,* 677 F.3d 818, 821 (8th Cir.2012). Claims that "were raised and decided on direct appeal cannot be relitigated on a motion to vacate pursuant to 28 U.S.C. § 2255." *Davis v. United States,* 673 F.3d 849, 852 (8th Cir.2012) (citing *Bear Stops v. United States,* 339 F.3d 777, 780 (8th Cir.2003)).

We have already rejected Lee's constitutional challenges to his sentence. In ruling on his direct appeal, we concluded that Lee had "not provided support for his claim that the death penalty was arbitrarily imposed on him." *Lee,* 374 F.3d at 653. Lee had not cited any case which indicated that "imposition of the death penalty on one defendant but not the other violates § 3595(c)(1)." *Id.* Nothing in the

Case: 20-2128     Document: 7     Filed: 07/08/2020     Pages: 227

Federal Death Penalty Act "require[s] proportional review of sentences." *Id.* We observed that the death penalty is not "arbitrarily imposed on a capital defendant despite the jury's refusal to consider the accomplice's sentence of life imprisonment as a mitigating factor." *Id.* (citing *United States v. Paul,* 217 F.3d 989, 999–1000 (8th Cir.2000)). Since this claim was "raised and decided on direct appeal," it cannot be relitigated by Lee in his petition for postconviction relief under § 2255. *Davis,* 673 F.3d at 852.

Lee also challenges the government's reliance on three aggravating factors which were accepted by the jury. Lee argues that the pecuniary gain aggravating factor was inappropriate because he did not expect pecuniary gain from the murders, the multiple murder aggravating factor was improper because it was not part of 18 U.S.C. § 3592 until three months after the murders, and the government's evidence of future dangerousness was premised on junk science. Lee raised these arguments in his motion to expand his certificate of appealability, but we declined to grant him a certificate on the issues.

In "the collateral context of a § 2255 motion," the issues "are limited by the grant and scope of a certificate of appealability." *United States v. Alaniz,* 413 F.3d 877, 879 (8th Cir.2005). These issues raised by Lee are beyond the scope of our certificate of appealability and are therefore not properly before the court. *See Fields v. United States,* 201 F.3d 1025, 1026 n. 2 (8th Cir.2000). Furthermore, we have previously concluded that there was no "threat of unfair prejudice" from the elicitation in this case of psychopathy evidence by the government during sentencing. *Lee,* 274 F.3d at 495. We conclude that the jury properly considered the aggravating factors advanced by the government in determining that Lee should be sentenced to death.

**\*225** IV.

Accordingly, we affirm the order dismissing the petition for habeas corpus relief.

**All Citations**

715 F.3d 215

**Footnotes**

\*       Judge Kelly would grant the petition for rehearing en banc.

1       The Honorable Garnett Thomas Eisele, United States District Judge for the Eastern District of Arkansas, presided over the trial as well as the postconviction matters.

2       *But see United States v. Boyd,* 86 F.3d 719, 725 (7th Cir.1996).

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1093197
Only the Westlaw citation is currently available.
United States District Court,
E.D. Arkansas,
Western Division.

UNITED STATES of America, Plaintiff
v.
Daniel Lewis LEE, Defendant.

No. 4:97CR00243–02 JLH.
|
Signed March 18, 2014.

**Attorneys and Law Firms**

John M. Pellettieri, Washington, DC, Linda B. Lipe, U.S. Attorney's Office, Little Rock, AR, for Plaintiff.

David A. Ruhnke, Ruhnke & Barrett, Montclair, NJ, Laurence E. Komp, Attorney at Law, Manchester, MO, Jennifer A. Merrigan, Karl Schwartz, Federal Public Defender's Office, Wilmington, DE, for Defendant.

### MEMORANDUM OPINION

J. LEON HOLMES, District Judge.

 **\*1**  Daniel Lewis Lee is a federal death row inmate. In a 1999 trial over which the Honorable G. Thomas Eisele presided, Lee and a co-defendant, Chevie Kehoe, were convicted of conspiring to violate and violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), and of three murders in aid of racketeering in violation of 18 U.S.C. § 1959. During the penalty phase of the trial, the jury first determined that Kehoe should be sentenced to life imprisonment and then, separately, that Lee should be sentenced to death. Now pending before the Court is Lee's "Motion for Relief from a Judgment or Order Pursuant to Fed.R.Civ.P. 60(b)," [1] in which he asks the Court to set aside a previous order denying his habeas petition so that he can present evidence that his trial lawyers were ineffective for failing to present a proper challenge to evidence introduced during the penalty phase to show that he is a psychopath.

Prior to trial, the government filed a motion for discovery of mental health evidence that Lee would introduce during the penalty phase of the proceeding. In that motion the government stated that it would not introduce mental health evidence during its case-in-chief in the penalty phase. Document # 627 at 2. Judge Eisele granted the motion, ordered Lee to submit to an examination by the government's expert, Dr. Thomas Ryan, and ruled that Dr. Ryan could not be called in the government's case-in-chief during the penalty phase but could only be used as a rebuttal witness. Document # 665.

During the penalty phase, the government introduced evidence concerning the aggravating factor of future dangerousness but did not introduce any psychological evidence. Lee then presented evidence regarding mitigating factors through Dr. Mark Cunningham, a forensic psychologist. Dr. Cunningham did not testify concerning future dangerousness during his direct examination. On cross-examination, however, the government asked Dr. Cunningham about Dr. Ryan's report in which Dr. Ryan, using the Hare Psychopathy Checklist–Revised ("PCL–R"), concluded that Lee was a psychopath and as such presented a future danger of violence in prison. Defense counsel objected on the ground that the cross-examination on this point went beyond the scope of direct examination. Judge Eisele overruled the objection but, after hearing the testimony on cross-examination, concluded that he had erred in doing so. He then prohibited Dr. Ryan's report from being used during the government's rebuttal case; and, after the jury returned a verdict sentencing Lee to death, he set aside the death penalty and ordered a new sentencing trial. United States v. Lee, 89 F.Supp.2d 1017 (E.D.Ark.2000).

The government appealed Judge Eisele's decision setting aside the death penalty, and the Eighth Circuit reversed, stating "Even if the government's examination of Dr. Cunningham about psychopathy exceeded the scope of his direct, we fail to find a threat of unfair prejudice." United States v. Lee, 274 F.3d 485, 495 (8th Cir.2001). After the judgment and commitment order was entered imposing the death penalty, Lee appealed his convictions and the death sentence. The Eighth Circuit affirmed. United States v. Lee, 374 F.3d 637 (8th Cir.2004).

 **\*2**  After the United States Supreme Court denied Lee's petition for writ of certiorari, Lee sought habeas relief pursuant to 28 U.S.C. § 2255. Document # 1118. In that petition, Lee argued that he had been denied effective assistance of counsel at the guilt phase of the trial, the penalty

phase of the trial, and on appeal, arguing that his lawyers were ineffective in numerous respects at each phase of the proceeding. As one aspect of his argument that his lawyers were ineffective during the penalty phase, Lee argued that his trial lawyers failed to object to Dr. Ryan's testimony and report. That portion of Lee's section 2255 petition was presented in a single paragraph that stated:

> The government presented the testimony of Dr. Ryan and his report as rebuttal testimony at Movant's mitigation phase. Defense counsel failed to object to Dr. Ryan's testimony as improper rebuttal given that Dr. Cunningham never offered a diagnosis. Further, defense counsel failed to object to the submission of Dr. Ryan's report especially since it included a risk assessment, something that Dr. Cunningham had not included in his testimony.

Document # 1118 at 34. A footnote to this paragraph stated:

> At a hearing, Movant's counsel are prepared to offer evidence that Dr. Ryan, in sworn testimony in affidavits filed after his testimony in this case, has stated that the Hare Psychopathy Checklist is not an appropriate instrument to be utilized in evaluating the future danger of capital defendants and that he no longer stands by such testimony or analysis.

*Id.* at n. 14.

In denying Lee's section 2255 petition, Judge Eisele ruled that Lee's argument that his trial lawyers had failed to object to the use of Dr. Ryan's report in the cross-examination of Dr. Cunningham was without merit.

> Trial counsel performed exactly as Petitioner now argues that they should have—by imposing a continuing objection to said cross-examination of Dr. Cunningham. Additionally, the merits of this issue, which have been ruled on by the Eighth Circuit, may not be revisited on collateral review.

*United States v. Lee,* 2008 WL 4079315, at *46 (E.D.Ark. Aug.28, 2008). Further, Judge Eisele noted, "In light of this Court's prior decision to set aside the death verdict and the Eighth Circuit's subsequent holding that the evidence presented through Dr. Cunningham and Dr. Ryan as to Lee's psychopathy and lack of remorse did not unfairly prejudice Lee, it is difficult to see how any additional objection that Petitioner's counsel would have made to Dr. Cunningham's or Dr. Ryan's testimony could have altered the outcome ." *Id.* at *48. Judge Eisele did not address the footnote in which Lee stated that he was prepared to offer evidence that Dr. Ryan had recanted his statements that the PCL–R checklist is an appropriate instrument for evaluating the future dangerousness of capital defendants.

Lee responded by filing a motion to alter and amend the judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. Document # 1165. That motion was presented in eighty-one pages and accompanied by eighty-five pages of exhibits. Much of the eighty-one pages was devoted to arguing that the PCL–R checklist has no scientific validity as it relates to predicting future dangerousness of capital defendants. The exhibits included an affidavit submitted by Dr. Ryan on May 12, 2003, in a separate federal capital case, in which Dr. Ryan stated that he had concluded in the spring of 2000 that his opinion regarding the use of the PCL–R in capital cases had been erroneous. Document # 1165–4. Another affidavit stated that experts in the field had known as early as 1998 that there was no scientific basis for using the PCL–R to identify individuals as likely to commit acts of violence in prison. Document # 1165–6 at 3.

**\*3** Judge Eisele denied the Rule 59(e) motion, stating:

> Petitioner offers no explanation for why such affidavits or other

supporting information were not provided to the Court before it ruled on his original motion for § 2255 relief. Had they been, the Court might have determined that an evidentiary hearing was required. However, the Court is foreclosed by existing legal principles from considering the information now, absent permission and direction from the Eighth Circuit to do so.

2010 WL 5347174, at *5 (E.D.Ark. Dec.22, 2010). Specifically with respect to the arguments related to Dr. Ryan, Judge Eisele said that the arguments should be deemed successive and that they were lacking in merit. *Id.*

Judge Eisele initially denied a certificate of appealability, but, after Lee moved for reconsideration of that issue, he granted a certificate of appealability on the issue of whether the death penalty was unconstitutionally applied to Lee. Document # 1204. Lee's argument that the death penalty was unconstitutionally applied to him was based in part on the disparity between his sentence and Kehoe's.[2] Lee then filed a lengthy motion in the Eighth Circuit asking that court to expand the certificate of appealability. In twenty-five pages of that motion, Lee argued that the certificate of appealability should be expanded to include the issue of whether his trial lawyers were ineffective for failing to make an adequate challenge to the evidence presented through Dr. Cunningham regarding Dr. Ryan's conclusion that he is a psychopath. The Eighth Circuit granted the motion to expand the certificate of appealability on another issue—whether Lee received ineffective assistance of counsel because the trial lawyers exercised peremptory challenges based on race—but refused to expand the certificate of appealability to include Lee's claims regarding the evidence that he is a psychopath. Though the Eighth Circuit refused to expand the certificate of appealability to include Lee's arguments regarding the evidence of psychopathy, he nonetheless included those arguments in his brief on the issue of whether the death penalty was arbitrarily imposed on him. The Eighth Circuit affirmed Judge Eisele's denial of Lee's section 2255 petition, as well as the denial of Lee's Rule 59(e) motion. *United States v. Lee,* 715 F.3d 215 (8th Cir.2013). As to the arguments regarding the evidence that he is a psychopath, the court first noted that those issues were beyond the scope of the certificate of appealability and therefore not properly before the court. *Id.* at 224. Then, the court added, "Furthermore, we

have previously concluded that there was no 'threat of unfair prejudice' from the elicitation in this case of psychopathy evidence by the government during sentencing." *Id.* (citing *Lee,* 274 F.3d at 495).

Lee's present motion asks that the judgment denying his section 2255 motion be set aside and his section 2255 proceedings reopened. Lee contends that the lawyers who represented him in his section 2255 proceedings[3] were ineffective for failing to present facts in support of the claim that the evidence that he is a psychopath should never have been introduced into evidence. Their ineffectiveness during the section 2255 proceeding, Lee contends, justifies reopening those proceedings so the Court can consider whether his trial lawyers were ineffective in failing to object to the psychopathy evidence on the grounds that the PCL–R had no scientific validity in predicting future dangerousness in prison.

**\*4** When a habeas petition has been denied and the inmate files a motion that purports to be a Rule 60(b) motion, the district court must first determine whether the motion in fact amounts to a second or successive collateral attack under section 2255. *Boyd v. United States,* 304 F.3d 813, 814 (8th Cir.2002). If it does, the petitioner must obtain authorization from the court of appeals in order to proceed, 28 U.S.C. § 2255(h), absent which the district court lacks jurisdiction. *Blackwell v. United States,* No. 4:99–CV–1687 CAS, 2014 WL 340231, at *12 (E.D.Mo. Jan.30, 2014). Thus, if the motion is actually a second or successive habeas petition, the district court must dismiss it for failure to obtain authorization from the court of appeals or transfer it to the court of appeals. *Boyd,* 304 F.3d at 814.

In *Gonzales v. Crosby,* the Supreme Court explained:

> In some instances, a Rule 60(b) motion will contain one or more "claims." For example, it might straightforwardly assert that owing to "excusable neglect," Fed. R. Civ. Proc. 60(b)(1), the movant's habeas petition had omitted a claim of constitutional error and seek leave to present that claim. *Cf.* Harris v. United States, 367 F.3d 74, 80–

81 (C.A.2 2004) (petitioner's Rule 60(b) motion sought relief from judgment because habeas counsel had failed to raise a Sixth Amendment claim). Similarly, a motion might seek leave to present "newly discovered evidence," Fed. R. Civ. Proc. 60(b)(2), in support of a claim previously denied. *E.g., Rodwell v. Pepe,* 324 F.3d 66, 69 (C.A.1 2003). Or a motion might contend that a subsequent change in substantive law is a "reason justifying relief," Fed. R. Civ. Proc. 60(b)(6), from the previous denial of a claim. *E.g., Dunlap v. Litscher,* 301 F.3d 873, 876 (C.A.7 2002). Virtually every Court of Appeals to consider the question has held that such a pleading, although labeled a Rule 60(b) motion, is in substance a successive habeas petition and should be treated accordingly.

545 U.S. 524, 530–31, 125 S.Ct. 2641, 2647, 162 L.Ed.2d 480 (2005). [4] The Supreme Court in *Gonzales* agreed with the circuit courts that these Rule 60(b) motions were in reality second or successive habeas petitions. *Id.* at 531, 125 S.Ct. at 2647. The Court explained that a Rule 60(b) motion that seeks to add a new ground for relief, or a motion that attacks a federal court's previous resolution of a habeas claim on the merits, is a second or successive habeas petition, whereas a motion that "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings[,]" is not a second or successive habeas petition but rather an appropriate Rule 60(b) motion. *Id.* at 532, 125 S.Ct. at 2648. The Court noted that "an attack based on the movant's own conduct, or his habeas counsel's omissions ... ordinarily does not go to the integrity of the proceedings, but in effect asks for a second chance to have the merits determined favorably." *Id.* at n. 5. *See also Ward v. Norris,* 577 F.3d 925, 933–35 (8th Cir.2009) (following *Gonzales* in holding that a Rule

60(b) motion based on previous habeas counsel's omissions is a second or successive habeas petition for which the inmate must obtain authorization from the court of appeals). Judge Eisele's ruling that Lee's Rule 59(e) motion was in reality a successive motion under section 2255 (2010 WL 5347174 at *5) is consistent with *Gonzales* and *Ward.*

**\*5** Lee attempts to avoid this conclusion by arguing that Judge Eisele's decision, like *Gonzales* and *Ward,* predate *Martinez v. Ryan,* 566 U.S. 1, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), and *Trevino v. Thaler,* ——U.S. ——, 133 S.Ct. 1911, 185 L.Ed.2d 1044 (2013). The difficulty with Lee's argument is that neither *Martinez* nor *Trevino* addressed the issue of what constitutes a second or successive habeas petition. Rather, those two cases arose in a different procedural context than *Gonzales, Ward,* and this case, and the Supreme Court's opinions in those two cases addressed a different procedural issue.

In *Martinez* and *Trevino,* the federal courts were asked to review state criminal proceedings to determine whether the defendants had been convicted in violation of the United States Constitution. The issues addressed by *Martinez* and *Trevino* arose because federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 2553–54, 115 L.Ed.2d 640 (1991). "This rule applies whether the state law ground is substantive or procedural." *Id.,* 111 S.Ct. at 2554. Thus, as a general rule, federal habeas relief is barred "when the state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Id.* at 729–30, 111 S.Ct. at 2554. As a corollary to the proposition that federal habeas relief is barred when a state court has declined to reach the merits because the prisoner failed to meet a state procedural requirement, "a state prisoner's federal habeas petition should be dismissed if the prisoner has not exhausted available state remedies as to any of his federal claims." *Id.* at 731, 111 S.Ct. at 2554. Nevertheless, even when "a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule," the prisoner can obtain federal habeas review if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental

miscarriage of justice." *Id.* at 750, 111 S.Ct. at 2565. In *Coleman,* after the prisoner's habeas petition was denied, his lawyer waited thirty-three days after entry of the judgment to file the notice of appeal, which was due, under the state-court rules, thirty days after entry of the judgment. *Id.* at 727, 111 S.Ct. at 2552–53. The state supreme court dismissed the appeal because the notice was untimely. *Id.* at 727–28, 111 S.Ct. at 2553. The United States Supreme Court held that the error by the prisoner's lawyer did not constitute cause to excuse the procedural default. *Id.* at 752, 111 S.Ct. at 2566.

In *Martinez,* the Court modified *Coleman,* holding:

> **\*6** Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Martinez,* 132 S.Ct. at 1320. In *Trevino,* the Court expanded the holding in *Martinez* to cases in which the state procedures, by reason of their design and operation, make it "highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Trevino,* 133 S.Ct. at 1921.

Lee argues that the circumstance of a prisoner seeking habeas relief based on ineffective assistance of counsel in a federal case is similar to the circumstance contemplated by *Trevino,* in that, as a practical matter, the first opportunity for presenting an ineffective assistance of counsel claim in a federal criminal case typically is during the initial collateral review. *Cf. Lee,* 374 F.3d at 654 ("A defendant's claims of ineffective assistance of counsel are generally not cognizable on direct appeal") Furthermore, Lee argues, the injustice addressed in *Martinez* and *Trevino*—that a substantial claim of ineffective assistance of trial counsel may never be adjudicated on the merits because of the ineffectiveness of counsel on initial collateral review—is equally present in a federal case in which counsel on initial collateral review is ineffective for failing to raise a claim of ineffective assistance of counsel at trial.

Perhaps so. Nevertheless, section 2255 provides that, before a prisoner can bring a second or successive habeas petition, he must obtain authorization from the court of appeals; and, as noted, neither *Martinez* nor *Trevino* changed the law as to what constitutes a second or successive petition. Lee has not obtained authorization from the Eighth Circuit to file a second or successive section 2255 petition. [5]

For the reasons stated, and as Judge Eisele held in denying Lee's Rule 59(e) motion, Lee's Rule 60(b) motion is a second or successive habeas petition under section 2255 for which Lee needs but has not obtained authorization from the Eighth Circuit. Therefore, the motion is denied without prejudice.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1093197

---

**Footnotes**

1       Lee filed this motion after the Eighth Circuit issued an Opinion affirming the denial of his section 2255 motion but before the mandate issued. Because this Court lacked jurisdiction to rule on the motion at the time it was filed, Lee filed a motion for indicative ruling pursuant to Rule 62.1 of the Federal Rules of Civil Procedure and simultaneously filed a motion in the Eighth Circuit to stay the proceedings to give this Court an opportunity to

Case: 20-2128          Document: 7          Filed: 07/08/2020          Pages: 227

rule on the motion for indicative ruling. The Eighth Circuit denied the motion to stay and subsequently issued its mandate. The motion for indicative ruling is therefore moot. Document # 1231.

2    Even though the evidence established that Kehoe was the more culpable of the two defendants, the jury sentenced him to life imprisonment and Lee to death. The penalty phase as to Kehoe was conducted before the penalty phase as to Lee, and before the jury returned a verdict during the penalty phase of the Kehoe case, the government announced *in camera* that if the jury sentenced Kehoe to life imprisonment, it would not seek the death penalty for Lee. *See* 89 F.Supp.2d at 1032. Nevertheless, after the jury returned a sentence of life imprisonment for Kehoe, the United States Attorney for the Eastern District of Arkansas was unable to obtain permission from the Attorney General to withdraw the request for the death penalty as to Lee. *Id.* at 1032–35.

3    Lee's current lawyers did not represent him during his initial section 2255 proceedings.

4    In *Gonzales,* the Supreme Court limited its consideration to the extent to which Rule 60(b) applies to habeas proceedings under 28 U.S.C. § 2254. *Id.* at 529 n. 3, 125 S.Ct. at 2646. Nevertheless, the circuits have held that *Gonzales* applies to section 2255 proceedings. *Gilbert v. United States,* 640 F.3d 1293, 1323 (11th Cir.2011) ("We join every other circuit that has addressed the issue in concluding that the standard announced in *Gonzales* applies to federal prisoner cases as well."); *Williams v. Thaler,* 602 F.3d 291, 302 and n. 4 (5th Cir.2010) (same); *United States v. Washington,* 211 F. Appx. 550 (8th Cir.2007) (citing *Gonzales* as authority for dismissing section 2255 motion on the grounds that it was a successive motion filed without authorization).

5    Lee's argument would require the Court to read into sections 2254 and 2255 a distinction that is unsupported by the text. According to Lee, if a section 2255 petition were to omit a substantial claim of ineffective assistance of trial counsel, a subsequent motion under Rule 60(b) would not be a second or successive petition, but if a section 2254 petition were to omit a substantial claim of ineffective assistance of trial counsel, a subsequent motion under Rule 60(b) would be a second or successive petition. Lee points to no portion of the statutes or Rule 60(b), however, as a textual basis for such a distinction.

---

**End of Document**                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

792 F.3d 1021
United States Court of Appeals,
Eighth Circuit.

UNITED STATES of America, Plaintiff–Appellee

v.

Daniel Lewis LEE, also known as Daniel
Lewis Graham, also known as Danny Lee, also
known as D L Graham, Defendant–Appellant.

No. 14–2853.
|
Submitted: April 16, 2015.
|
Filed: July 13, 2015.
|
Corrected: Dec. 14, 2015.

**Synopsis**
**Background:** Following denial of federal inmate's motion to vacate, set aside, or correct sentence, 2008 WL 4079315, the United States District Court for the Eastern District of Arkansas, J. Leon Holmes, J., 2014 WL 1093197, denied inmate's motion for relief from judgment, and inmate appealed.

The Court of Appeals, Murphy, Circuit Judge, held that inmate's motion was second or successive motion that had to be certified by Court of Appeals.

Affirmed.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

**\*1021** George G. Kouros, AFPD, argued, Chicago, IL (Karl Schwartz, AFPD, Wilmington, DE, Morris H. Moon, AFPD, on the briefs, Houston, TX) for Defendant–Appellant.

John Michael Pellettieri, argued, Washington, DC, for Plaintiff–Appellee.

Before MURPHY, COLLOTON, and KELLY, Circuit Judges.

**Opinion**

MURPHY, Circuit Judge.

Daniel Lewis Lee appeals the district court's denial of his Rule 60(b) motion seeking relief from the final judgment entered in his 28 U.S.C. § 2255 habeas petition. In his initial habeas petition, Lee had asserted that his trial counsel was ineffective, but he failed to attach any evidence to support that claim. The petition was denied, and Lee subsequently filed a Rule 60(b) motion arguing that his initial habeas counsel had been ineffective for failing to present available evidence. The district court [1] characterized Lee's motion as a second or successive habeas motion **\*1022** filed without the required precertification by our court, *see* 28 U.S.C. § 2255(h), and denied it. Lee appeals, and we affirm.

I.

Lee and codefendant Chevie Kehoe, members of a white supremacist group, killed a gun dealer, his wife, and their eight year old daughter during a robbery in January 1996. Lee was convicted on four racketeering charges, including three murders in aid of racketeering, and was sentenced by a jury to death. We affirmed his conviction and sentence. *United States v. Lee,* 374 F.3d 637 (8th Cir.2004).

In 2006, Lee moved for postconviction relief under 28 U.S.C. § 2255. Lee's § 2255 petition alleged that his trial counsel had provided ineffective assistance during the penalty phase by not adequately objecting to testimony by government expert witness Dr. Thomas Ryan, and to Dr. Ryan's report regarding the Hare Psychopathy Check List-Revised. Evidence based on the checklist had been introduced at the penalty phase of Lee's trial and that evidence had indicated he was a "psychopath" and a future danger in prison if he were to receive life imprisonment. A footnote in Lee's habeas petition stated that Dr. Ryan had signed a sworn declaration repudiating his reliance on the Hare checklist, but neither that declaration nor supporting exhibits were attached to the § 2255 petition. The district court [2] denied the § 2255 petition without granting an evidentiary hearing.

After Lee's § 2255 petition was denied, he filed a Rule 59(e) motion for reconsideration in 2008. Attached for the first time were affidavits supporting his ineffective assistance claim. They purport to show that the Hare checklist

was scientifically invalid and unreliable for predicting future dangerousness in prison. Also included was a sworn declaration of Dr. Ryan stating that he should not have relied on the Hare checklist in his expert assessment of another defendant, and indicating that the basis for challenging that evidence had been available in 1998, before Lee's 1999 trial. Although Judge Eisele denied the motion for reconsideration, he commented that had counsel timely presented these affidavits, the court "might have determined that an evidentiary hearing was required." Our court denied Lee's request for a certificate of appealability on whether he had "received ineffective assistance of counsel relating to the submission of aggravating factors to the jury to support his death sentence." *United States v. Lee,* 715 F.3d 215, 221 (8th Cir.2013). We also affirmed the denial of Lee's § 2255 petition. *Id.* at 217.

Lee filed this Rule 60(b) motion in 2013 seeking relief from the judgment in his § 2255 case. He argued that under the Supreme Court decisions in *Trevino v. Thaler,* —— U.S. ——, 133 S.Ct. 1911, 185 L.Ed.2d 1044 (2013), and *Martinez v. Ryan,* —— U.S. ——, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), he was entitled to challenge the denial of his habeas claim that trial counsel had been ineffective for failing to make an adequate challenge to the use of the Hare checklist at sentencing. The district court decided that it lacked jurisdiction to hear the 60(b) motion because it was a second or successive § 2255 motion filed without appellate authorization, but granted Lee a certificate of appealability on the issue of whether Lee's 60(b) motion was a second or successive habeas petition. Lee now appeals the district court's denial of his Rule 60(b) motion.

**\*1023** II.

After concluding that Lee's Rule 60(b) motion was a second or successive habeas petition, the district court denied the motion without prejudice because Lee had not obtained the required precertification from our court. Lee now presents the same issue to our court—was his motion a second or successive habeas petition?

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2244(b), imposes three requirements on second or successive habeas petitions. First, any claim "that was presented in a prior application shall be dismissed." *Id.* at § 2244(b)(1). If a claim was not already adjudicated, § 2244(b)(2) requires its dismissal unless it relies on "a new and retroactive rule of constitutional law or new facts showing a high probability of actual innocence." *Gonzalez v. Crosby,* 545 U.S. 524, 530, 125 S.Ct. 2641, 162 L.Ed.2d 480 (2005). Finally, before filing a second or successive petition in district court, a habeas applicant must receive an order authorizing it from the court of appeals. *Id.* at § 2244(b)(3). Under the statutory scheme, a second or successive habeas motion filed by someone in federal custody must also "be certified as provided in section 2244 by a panel of the appropriate court of appeals." 28 U.S.C. § 2255(h).

The Supreme Court has decided that AEDPA's procedural requirements for second or successive habeas petitions apply to motions for relief from a judgment filed under Federal Rule of Civil Procedure 60(b). *Gonzalez,* 545 U.S. at 531, 125 S.Ct. 2641. The *Gonzalez* Court explained that Rule 60(b) motions often contain claims which are "in substance a successive habeas petition and should be treated accordingly." 545 U.S. at 530–31, 125 S.Ct. 2641. The Court gave examples of such motions, one being an assertion that owing to excusable neglect "the movant's habeas petition had omitted a claim of constitutional error" and an accompanying request to present the claim. *Id., citing Harris v. United States,* 367 F.3d 74, 80–81 (2d Cir.2004). Another example is a motion attacking a "previous resolution of a claim *on the merits* " 545 U.S. at 532, 125 S.Ct. 2641 (emphasis in original).

A Rule 60(b) motion is not treated as second or successive under AEDPA, however, if it does not raise a merits challenge to the resolution of a claim in a prior habeas proceeding, but instead attacks "some defect in the integrity of the federal habeas proceedings." *Gonzalez,* 545 U.S. at 532–33, 125 S.Ct. 2641. Thus, the Rule 60(b) motion in *Gonzalez* which sought to challenge a statute of limitations ruling which had prevented review of an initial habeas petition, did not require precertification under § 2244(b)(3). *Id.* at 533, 538, 125 S.Ct. 2641. Lee argues that his Rule 60(b) motion was wrongly denied because it sought to remedy a defect in

the initial habeas proceeding caused by counsel's having not adequately raised trial counsel's ineffectiveness.

After consideration, we conclude that Lee's Rule 60(b) motion was correctly denied for lack of precertification since it was seeking to reopen a claim which had been raised in his initial habeas petition and decided by the district court. *See* Gonzalez, 545 U.S. at 532, 125 S.Ct. 2641. Lee acknowledges that his counsel made the claim in his initial § 2255 petition, but he points out that counsel had omitted the required evidentiary support to establish prejudice. We have previously interpreted *Gonzalez* to provide that omissions by federal habeas counsel are not procedural defects. In Ward v. Norris, 577 F.3d 925, 931 (8th Cir.2009), the appellant had filed a Rule 60(b) motion asserting that he had been incompetent at the time of his earlier **\*1024** habeas proceeding. He contended that his incompetency claim concerned a defect in his earlier habeas proceeding rather than a challenge to a merits resolution. Id. at 932. Although evidence of the alleged incompetency had been available at that stage, habeas counsel had not moved for a stay. Id. at 934. We concluded that "the substance of Ward's motion [wa]s a claim for ineffective assistance of federal habeas counsel, and thus was correctly dismissed by the district court." *Id.* Dismissal was proper given the Supreme Court's teaching that "the movant's own conduct, or his habeas counsel's omissions, ordinarily does not go to the integrity of the proceedings, but in effect asks for a second chance to have the merits determined favorably." Id. at 933, *quoting* Gonzalez, 545 U.S. at 532 n. 5, 125 S.Ct. 2641 (internal quotation marks omitted).

None of the cases Lee relies upon would save him from a dismissal. His primary focus is on Trevino v. Thaler, ––– U.S. ––––, 133 S.Ct. 1911, 185 L.Ed.2d 1044 (2013), and Martinez v. Ryan, ––– U.S. ––––, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), which he argues permitted the district court to have acted on his Rule 60(b) motion. Those cases are inapposite, however, since they involved federal habeas review of state court decisions under § 2254. In *Martinez,* the Supreme Court carved out a "limited qualification" to procedural default, explaining that a procedural default occurs when a state court declines to hear a claim based on a party's failure to comply with state procedural rules. Id. at 1316,

1319. A federal habeas court will normally not entertain such defaulted claims on a § 2254 motion, but a default may be overcome if the habeas applicant is able to show cause and prejudice for it. Id. at 1316. Under the *Martinez* rule, state collateral counsel's ineffectiveness in failing to raise a viable claim of ineffective assistance by trial counsel can serve as cause to overcome the procedural default. Id. at 1315. If the habeas claimant can also show prejudice, the procedural default may be excused and the merits of the trial level ineffectiveness claim may be reached by the habeas court. Id. at 1320.

The Court limited its ruling in *Martinez* to state jurisdictions where ineffective assistance claims must be raised on initial collateral proceedings rather than on a direct appeal from a conviction. 132 S.Ct. at 1320. In *Trevino,* the Court expanded this concept to cover state review processes which make it "virtually impossible" to present a claim of improper assistance of trial counsel on direct appeal. 133 S.Ct. at 1915 (internal quotation marks omitted). Our court concluded after *Martinez* that a Rule 60(b) motion seeking relief from a judgment on the grounds that a claim was not reached in an earlier federal habeas due to state court procedural default is not second or successive. *Williams v. Delo,* No. 13–2058 (8th Cir. Sept. 23, 2013).

Lee argues for an extension of *Trevino* and *Martinez* to federal review of claims not adequately raised in an initial § 2255 proceeding. He relies on the concern expressed in *Trevino* that failure to overcome a procedural default in a § 2254 proceeding may deprive a petitioner "of any opportunity at all for review" of a claim for ineffective assistance of trial counsel. Trevino, 133 S.Ct. at 1921. According to Lee, his current Rule 60(b) motion alleges a procedural defect in his initial habeas proceeding caused by counsel's ineffectiveness by not attaching important affidavits and other supporting evidence to his § 2255 petition.

These arguments fail. In both *Trevino* and *Martinez,* the habeas petitioners adequately raised their claims of ineffective assistance of trial counsel in their initial federal habeas petitions. Trevino, 133 S.Ct. at 1915–16; Martinez, 132 S.Ct. at 1314. Here in contrast, Lee's § 2255 motion **\*1025** did not have supporting evidence to establish prejudice, but only indicated in a footnote that such evidence

Case: 20-2128　　　Document: 7　　　Filed: 07/08/2020　　　Pages: 227

could be provided at a later date. The district court went on to reach and deny Lee's claim on the merits. The subsequent denial of Lee's Rule 59(e) motion did not involve a procedural default of the type discussed in *Trevino* and *Martinez*. Rather, in denying the motion the district court relied upon our circuit rule that "Rule 59(e) motions cannot be used to introduce new evidence ... which could have been offered or raised prior to the entry of judgment," *United States v. Metro. St. Louis Sewer Dist.,* 440 F.3d 930, 934 (8th Cir.2006). It also denied a certificate of appealability as did our court.

No evidentiary omission by counsel in Lee's first § 2255 petition amounted to a procedural defect in the integrity of his habeas proceeding, *see Gonzalez,* 545 U.S. at 532, 125 S.Ct. 2641, and any attempt to relitigate the merits denial of the petition would count as a second or successive petition subject to AEDPA's precertification demands, 28 U.S.C. § 2255(h). For all these reasons, the judgment of the district court is affirmed.

**All Citations**

792 F.3d 1021

## Footnotes

1　　The Honorable J. Leon Holmes, United States District Judge for the Eastern District of Arkansas.
2　　At that time the case was before the Honorable G. Thomas Eisele, United States District Judge for the Eastern District of Arkansas.

**End of Document**　　　© 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works. SUPP.APP.120　4

811 F.3d 272
United States Court of Appeals,
Eighth Circuit.

UNITED STATES of America, Appellee

v.

Daniel Lewis LEE, also known as Daniel
Lewis Graham, also known as Danny Lee,
also known as D L Graham, Appellant.

No. 14–2853.
|
Dec. 14, 2015.

Appeal from U.S. District Court for the Eastern District of
Arkansas–Little Rock (4:06–cv–01608–GTE).

**Attorneys and Law Firms**

George G. Kouros, Asst. Fed. Public Defender, argued,
Chicago, IL (Karl Schwartz, Asst. Fed. Public Defender,
Wilmington, DE, Morris H. Moon, Asst. Fed. Public
Defender, on the briefs, Houston, TX), for appellant.

 **\*273**  John Michael Pellettieri, argued, Washington, DC, for
appellee.

**ORDER**

The petition for rehearing by the panel is denied. Judge Kelly
dissents from the denial of the petition for rehearing by the
panel.

KELLY, Circuit Judge, dissenting from the denial of panel
rehearing.

I respectfully dissent from the denial of Lee's petition for
rehearing by the panel, because the petition—and the recent
Seventh Circuit decision it brings to our attention—provide
convincing reasons for us to revisit the issues raised in this
case. *See* Ramirez v. United States, 799 F.3d 845 (7th
Cir.2015). In particular, I think it is appropriate to reconsider
whether Martinez v. Ryan, ––– U.S. ––––, 132 S.Ct. 1309,
182 L.Ed.2d 272 (2012), and Trevino v. Thaler, ––– U.S.
––––, 133 S.Ct. 1911, 185 L.Ed.2d 1044 (2013), should be
limited to petitions for post-conviction relief filed by state

prisoners under 28 U.S.C. § 2254, or whether, perhaps
under limited circumstances, these two cases may also apply
to similar petitions filed by federal prisoners under 28 U.S.C.
§ 2255.

If *Martinez* and *Trevino* have an animating principle, it is that
a prisoner must have at least one opportunity to present a
claim that trial counsel was ineffective—and to present it with
the assistance of effective counsel. *Martinez* pointed out that
"if counsel's errors in an initial-review collateral proceeding
do not establish cause to excuse [a] procedural default in a
federal habeas proceeding, no court will review the prisoner's
claims," 132 S.Ct. at 1316, and *Trevino* reiterated that
"failure to consider a lawyer's 'ineffectiveness' during an
initial-review collateral proceeding as a potential 'cause' for
excusing a procedural default will deprive the defendant of
any opportunity at all for review of an ineffective-assistance-
of-trial-counsel claim," 133 S.Ct. at 1921. In this case, if
one grants that Lee's § 2255 counsel was ineffective in failing
to attach the evidence in support of his ineffectiveness claim
to his petition, Lee will have completed his journey through
the court system without ever having had a chance to present
a colorable ineffective assistance of trial counsel claim to a
court with the aid of an effective lawyer—which seems to
be exactly the problem that *Martinez* and *Trevino* sought to
remedy.

Whether the concerns that motivated *Martinez* and *Trevino*
apply equally to the post-conviction procedures afforded
to federal prisoners is a question worth examining. *See*
Ramirez, 799 F.3d at 854. Like the state systems
that *Trevino* discussed, the federal system also strongly
discourages ineffectiveness of trial counsel claims on direct
appeal. *See* Ramirez, 799 F.3d at 852–53. In our circuit,
"[w]e only review ineffective assistance of counsel claims
on direct appeal in 'exceptional cases.' " *United States v.
Mathison,* 760 F.3d 828, 831 (8th Cir.2014). As a result,
the § 2255 motion Lee brought was effectively his first
opportunity to bring an ineffective assistance of trial counsel
claim. *Martinez* was clear that habeas review for similarly-
situated prisoners convicted in state court should not be
foreclosed unless the prisoners had the benefit of attorney
representation in bringing their ineffectiveness claims, and
that representation was effective. Martinez, 132 S.Ct. at
1317 ("To present a claim of ineffective assistance at trial in

accordance with the State's procedures, ... a prisoner likely needs an effective attorney."). [1]

**\*274** How the doctrine outlined in *Martinez* and *Trevino* would apply as a practical matter in the federal context is the next question. Unlike state collateral review proceedings, § 2255 proceedings lack a subsequent layer of review by another judicial system. Lee filed a Rule 60(b) motion, but treating his Rule 60(b) motion as the equivalent of a state prisoner's § 2254 petition potentially implicates the restrictions placed on such motions in the habeas context by the Supreme Court's decision in *Gonzalez v. Crosby. See* 545 U.S. 524, 532 & n. 5, 125 S.Ct. 2641, 162 L.Ed.2d 480 (2005). Yet while *Gonzalez* held that a Rule 60(b) motion that is in effect a second or successive habeas petition is subject to the strict requirements of § 2244(b), it also recognized that "Rule 60(b) has an unquestionably valid role to play in habeas cases." *Id.* at 534, 125 S.Ct. 2641. Even post-*Gonzalez,* there remains no bar to filing a Rule 60(b) motion that "attacks ... some defect in the integrity of the federal habeas proceedings." *Id.* at 532, 125 S.Ct. 2641. [2] And *Gonzalez* stated only that a Rule 60(b) movant's "habeas counsel's omissions ... *ordinarily* do [ ] not go to the integrity of the proceedings," *Gonzalez,* 545 U.S. at 532 n. 5, 125 S.Ct. 2641 (emphasis added). It did not hold that they can never do so. Perhaps this limiting language in *Gonzalez,* combined with our long-standing precedent that "Rule 60(b) is to be given a liberal construction so as to do substantial justice and 'to prevent the judgment from becoming a vehicle of injustice,' " *MIF Realty L.P. v. Rochester Assocs.,* 92 F.3d 752, 755–56 (8th Cir.1996), would permit a limited Rule 60(b) motion to reopen an initial-review collateral proceeding: when the Rule 60(b) motion was the prisoner's first opportunity to present an ineffective assistance of trial counsel claim, where the prisoner was otherwise diligent, and where the claim has "some merit."

*See* *Martinez,* 132 S.Ct. at 1318; *see also* *Ramirez,* 799 F.3d at 851; *Cox v. Horn,* 757 F.3d 113, 123–24 (3d Cir.2014) (holding that Rule 60(b) requires consideration of defendant-specific equitable principles even post-*Gonzalez* ). Whether this type of Rule 60(b) motion, post-*Martinez* and *Trevino,* would attack a defect in the federal habeas proceedings' integrity and therefore constitute a "true" Rule 60(b) motion merits a closer look. *Gonzalez,* 545 U.S. at 532, 125 S.Ct. 2641; *see also* *Ramirez,* 799 F.3d at 850

(finding valid a Rule 60(b) motion based in part on post-conviction counsel's failure to attach documents necessary to support his ineffectiveness of trial counsel claims). [3]

**\*275** Even if, as our panel opinion holds, *Gonzalez* precludes Lee's Rule 60(b) motion on the particular facts of this case, I question whether we should foreclose application of *Martinez* and *Trevino* to other § 2255 cases where the petitioner may bring a more clearly valid Rule 60(b) motion: for example, cases where the petitioner's counsel entirely abandoned him or her, as opposed to simply omitting necessary evidentiary support when filing the petition as Lee's counsel did. *See Williams v. Delo,* No. 13–2058 (8th Cir. Sept. 23, 2013) (unpublished) (holding that prisoner filed a "true Rule 60(b) motion" and not a successive § 2254 petition when he alleged his post-conviction counsel was ineffective in presenting an ineffectiveness of trial counsel claim); *Mackey v. Hoffman,* 682 F.3d 1247, 1253 (9th Cir.2012) (holding that "when a federal habeas petitioner has been inexcusably and grossly neglected by his counsel in a manner amounting to attorney abandonment in every meaningful sense that has jeopardized the petitioner's appellate rights, a district court may grant relief pursuant to Rule 60(b)(6).").

Lee's case presents a difficult procedural issue, with a potentially meritorious claim of effective assistance of counsel underlying it. Whether a Rule 60(b) motion such as his, filed in the course of § 2255 proceedings, could ever provide a means for bringing meritorious ineffectiveness of counsel claims to the courts' attention for the first time is an important question—one that another court of appeals has answered in the affirmative. *Ramirez,* 799 F.3d at 850–52. I recognize that, in order to succeed in his appeal, Lee would have to prevail on various other issues—like whether the district court abused its discretion in denying his Rule 60(b) motion, and whether his ineffectiveness claim has "some merit." *See* *Martinez,* 132 S.Ct. at 1318. I do not express a position on these issues here. I merely suggest that by granting Lee's request for rehearing, we could give the issues he raises the consideration I think they warrant.

For these reasons, I respectfully dissent from the denial of the petition for rehearing by the panel.

### All Citations

811 F.3d 272 (Mem)

## Footnotes

1      It may be even less problematic to excuse procedural defaults in federal post-conviction proceedings, since doing so does not implicate concerns about thwarting the states' interests in the finality of their judicial processes. *Coleman v. Thompson,* 501 U.S. 722, 747–48, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *see also United States v. Doe,* 806 F.3d 732, 753 (3d Cir.2015) (noting that § 2255 differs from § 2254 in that "comity and federalism are irrelevant"). In this case, the procedural rule that arguably barred Lee's attempt to bring the evidence omitted from his § 2255 petition to the court's attention was a judicially-created federal one. If we were to excuse it, the only framework of procedural rules we would impinge on is our own, not another sovereign's.

2      As an initial matter, it remains an open question whether *Gonzalez,* which was decided in the context of § 2254 proceedings, applies to the same extent to § 2255. *Gonzalez* itself explicitly stated that it was limiting its consideration only to § 2254, rather than § 2255, cases. *Id.* at 529 n. 3. And while the majority of the courts of appeals have extended *Gonzalez* to the § 2255 context, *see United States v. Arrington,* 763 F.3d 17, 22 (D.C.Cir.2014) (collecting cases), those courts were not considering the narrow application of Rule 60(b) to provide for *Martinez-* and *Trevino*-like remedies.

3      It is true that Ramirez's post-conviction counsel also abandoned him on appeal, causing him to miss the deadline for appealing the denial of his § 2255 motion. *Id.* at 849. But his counsel's evidentiary omission must have been independently sufficient to support the Seventh Circuit's conclusion that his Rule 60(b) motion was valid, because the court did not simply reinstate the appeal of the denial of his § 2255 motion, but instead instructed the district court to reopen the § 2255 proceedings so that he could cure the evidentiary omission. *Id.* at 856.

**End of Document**      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**CAPITAL CASE**

UNITED STATES OF AMERICA                                              PLAINTIFF

v.                                    NO. 4:97CR00243-02 JLH

DANIEL LEWIS LEE                                                     DEFENDANT

**OPINION AND ORDER**

Daniel Lewis Lee is a federal death row inmate.  In a 1999 trial over which the Honorable G. Thomas Eisele presided, Lee and co-defendant, Chevie Kehoe, were convicted of conspiring to violate and violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), and of three murders in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1).  During the penalty phase, the jury first decided that Kehoe should be sentenced to life imprisonment and then, separately, that Lee should be sentenced to death.  The Eighth Circuit affirmed Lee's conviction and sentence.  *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004), cert. denied 545 U.S. 1141 (2005).

Lee has now filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255, or, in the alternative, for relief under Rule 60 of the Federal Rules of Civil Procedure.  In his § 2255 motion – his third such motion – Lee contends that newly discovered evidence demonstrates due-process violations under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), as well as *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), and *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).  The newly discovered evidence is contained in the declaration of James Wanker (Document #1297-2) and an Oklahoma court record – the fee application for a lawyer who represented Lee in a preliminary hearing before a district judge (Document #1297-4).

SUPP.APP.124

At trial, Wanker testified that Lee told him that he had committed murder, describing a crime factually similar to the one at issue. In his present declaration, he says that he did not believe Lee, that he told federal law enforcement agents, as well as the federal prosecutor, that he did not believe Lee, that he was instructed to limit his testimony to what he was asked, and that he was instructed not to give personal opinions. This information was not disclosed to defense counsel.

During the sentencing phase, the United States introduced an Oklahoma court record showing that Lee had been convicted of robbery. A man named Joey Wavra was killed in connection with that robbery, and the Government argued that Lee had committed murder. The fee application, beneath the itemized time records, summarizes the proceeding and states in that summary that the court found the evidence insufficient to support a charge of first-degree murder.

The initial issue is whether Lee's motion is second or successive within the meaning of § 2255(h) and therefore is subject to that provision's requirement of authorization by the circuit. 28 U.S.C. § 2255(h); 28 U.S.C. § 2244(b)(3)(A). It is. Because Lee has not obtained authorization from the Eighth Circuit to file a second or successive § 2255 motion and because he is not entitled to relief under Rule 60, his motion is denied.

## I.      PROCEDURAL HISTORY

Lee has unsuccessfully pursued both direct and collateral review of his conviction and sentence. After the jury returned a verdict sentencing Lee to death, Judge Eisele granted Lee's motion for a new penalty-phase trial based, in part, on the admission of improper future-dangerousness evidence. *United States v. Lee*, 89 F. Supp. 2d 1017 (E.D. Ark. 2000). Judge Eisele determined that, based on the scope of direct examination and the Court's instructions, the Government improperly cross-examined the defense expert mental-health witness, Dr. Mark Cunningham, about Lee's prior bad acts and psychopathy diagnosis. Judge Eisele referred to

2

Dr. Cunningham's testimony that Dr. Thomas Ryan, the Government's mental-health expert, used the Hare Psychopathy Checklist-Revised (PCL-R) to determine Lee was a psychopath and therefore presented a propensity for future dangerousness in prison.  Judge Eisele also found that the Government's questioning of Dr. Ryan about Lee's violent nature was improper rebuttal.  *Id*. at 1027-32.  The Circuit reversed and reinstated the death sentence, holding that the testimony did not exceed the permissible scope and that, even if the Government's examination of expert witnesses was improper, Lee was not unfairly prejudiced.  *United States v. Lee,* 274 F.3d 485, 494-96 (8th Cir. 2001).

In 2006, Lee filed his first motion to vacate his conviction and sentence under 28 U.S.C. § 2255, raising several grounds for relief:  he was denied effective assistance of counsel at various trial stages, including *voir dire*; his death sentence was unconstitutional; his juvenile conviction was erroneously admitted; his trial lawyers were unqualified to represent capital defendants; and there was newly discovered evidence related to a co-defendant, Kirby Kehoe.  Document #1118.  As part of an actual-innocence argument, Lee made a general, unsupported *Brady* allegation and asked the Government to review its files for any previously undisclosed *Brady* material.  In an ineffectiveness sub-claim, Lee challenged his trial lawyers' decision not to seek funding for mtDNA testing of a hair from a cap linked to the murders; Lee proffered a mtDNA report excluding the discovered hair as originating from Lee, Document #1138-2.  (The jury heard State Crime Laboratory testing showed the discovered hair was microscopically similar to Lee's.  TR 4722.)  In another ineffectiveness claim, Lee argued that a properly conducted investigation of his involvement in the 1990 murder of Joseph Wavra – upon which the Government relied to demonstrate Lee's future dangerousness at the penalty phase – would have revealed his actual role, placing his actions in a different light and therefore leading to a different sentence.  Judge Eisele denied the post-conviction motion without

a hearing. *United States v. Lee*, 2008 WL 4079315 (E.D. Ark. 2008). He held that the jury's finding of guilt would not have been different if the mtDNA evidence had been introduced because the evidence of guilt was overwhelming. *Id.* at *25. With respect to Lee's role in the Wavra murder, Judge Eisele determined "there is nothing before the Court to indicate that [Lee's] 'true role' in the murders was anything other than portrayed during the sentencing trial." *Id.* at *45. He held that Lee's arguments did not demonstrate that the federal death penalty was unconstitutional. *Id.* at *55-60. Judge Eisele also rejected Lee's ineffectiveness arguments that his trial lawyers should have raised additional objections to Dr. Cunningham's and Dr. Ryan's testimony, and to the introduction of the PCL-R. *Id.* at *46, 47-48. He recognized the Circuit's holding that Lee was not unfairly prejudiced by that evidence. *Id.* at *48. In a Rule 59(e) motion to alter and amend the § 2255 judgment, Lee revisited his ineffectiveness claim related to the psychopathy-diagnosis testimony, arguing the PCL-R has no scientific validity in predicting future dangerousness of capital defendants. Document #1165. For the first time, Lee attached supporting material, including an affidavit submitted by Dr. Ryan in support of a post-conviction motion in a separate federal capital case, stating he no longer believed the PCL-R is a reliable indicator of future dangerousness in prison. Document #1165-4. Denying the Rule 59(e) motion, Judge Eisele found the argument was successive and lacking in merit. *United States v. Lee*, 2010 WL 5347174, *5-6 (E.D. Ark. 2010).

Judge Eisele granted a certificate of appealability on whether the death penalty was constitutionally applied. The Eighth Circuit expanded the certificate to include the question of whether Lee received ineffective assistance based on his trial lawyers' use of race-based peremptory challenges during *voir dire*. The Eighth Circuit then affirmed Judge Eisele's denial of the § 2255 petition and the denial of the Rule 59(e) motion. *United States v. Lee*, 715 F.3d 215 (8th Cir. 2013).

SUPP.APP.127

Lee thereafter filed a Rule 60(b) motion to set aside the judgment denying his § 2255 motion. He argued that his habeas lawyers were ineffective for failing to challenge the validity of the PCL-R in predicting future dangerousness. Document #1230. This Court denied the motion without prejudice, finding the Rule 60(b) motion was a second or successive § 2255 motion for which Lee had not obtained the required authorization from the Eighth Circuit. *United States v. Lee*, 2014 WL 1093197 (E.D. Ark. 2014). The Eighth Circuit affirmed. *United States v. Lee*, 792 F.3d 1021 (8th Cir. 2015).

## II.   EVIDENCE AT TRIAL

Based on the trial record, the Eighth Circuit summarized the events that led to Lee's conviction as follows:

> The evidence presented at trial showed that Lee, Chevie Kehoe (Kehoe), his father Kirby Kehoe, his brother Cheyne Kehoe (Cheyne), and Faron Lovelace participated in a variety of criminal activities to promote and fund a white supremacist organization known as the Aryan Peoples' Republic or the Aryan Peoples' Resistance (APR). Kehoe formed the APR to establish an independent nation of white members of the Christian Identity faith in the Pacific Northwest. He patterned it after an antigovernment, white supremacist organization called the Order.
>
> Lee met Kehoe in 1995, and Kehoe recruited him into the APR. In January 1996, Lee and Kehoe left Spokane, Washington, and traveled to Arkansas where they dressed in police raid clothing and went to the home of William Mueller, a gun dealer near Tilly, Arkansas, who owned a large collection of weapons and ammunition. Kehoe and his father had robbed Mueller in February of 1995, and Kehoe expected to find valuable property at his house. The Muellers were not at home when Lee and Kehoe arrived so they waited. When the Muellers returned, Lee and Kehoe overpowered and incapacitated Mueller and his wife. Then they questioned Nancy Mueller's eight-year-old daughter, Sarah Powell, about where they could find cash, guns, and munitions. After finding $50,000 in cash, guns, and ammunition, they shot the three victims with a stun gun, placed plastic bags over their heads, and sealed the bags with duct tape. They took the victims in Kehoe's vehicle to the Illinois Bayou where they taped rocks onto them and threw them into the bayou. The bodies were discovered in Lake Dardanelle near Russellville, Arkansas, in late June of 1996.

5

Kehoe and Lee returned to Spokane with the stolen property around January 14, 1996. Kehoe traveled to several states to sell the Mueller property at gun shows. He and Lee were apprehended by law enforcement in 1997 after some of Mueller's guns had been traced to Kehoe.

*Lee*, 374 F.3d at 641-42.

Kehoe's mother, Gloria Kehoe, testified that Lee and Kehoe separately confessed the murders to her. She told the jury of the murder details that Kehoe described, and she testified that Lee told her that Kehoe paid him for his participation with $1000 and a rifle. TR 4971-75. Cheyne also testified that Kehoe confessed to him. He said Kehoe gave details of the murders, including Lee's role, and showed him the raid gear that he and Lee had worn. TR 5326-30. Both testified that Kehoe admitted killing the child by himself because Lee refused. TR 4974, 5328.

Lee's and Kehoe's former neighbors, James and Dalvine Wanker, also testified for the Government. On direct examination, James said that in May of 1996 he and his wife moved into an RV park at the Shadows Motel in Spokane, where Lee and Kehoe resided. TR 4078-79. He said that Lee told him in July of 1996 that "when he went down south somebody had . . . f*** with him and so he wrapped them up, taped them, and threw them in the swamp." TR 4081-83. When asked on cross-examination why he did not call the police after hearing Lee's claim, James said he "just kind of blew it off as [Lee] was talking to hear himself talk." TR 4088. Dalvine similarly testified that, in response to her concerns about a new tenant at the Shadows Motel, Lee retrieved a firearm from his trailer and told her that "he wasn't afraid to use it and that when he had gone down south and that some people had f*** with him, and that he had taken care of it." TR 4093.

The Government also presented physical evidence supporting Lee's conviction. Paint samples taken from Kehoe's GMC truck were "consistent, very similar" to metallic blue paint chips found in duct tape removed from the slain bodies. TR 3658-64, 3678-84. The jury heard that an

6

Idaho storage unit rented by Kehoe contained documents naming the Muellers, as well as paperwork naming Kehoe, or his wife.  TR 3479-80, 3610-28.  Fibers microscopically similar to the carpet in the Muellers' living room and a hair microscopically similar to William Mueller's were discovered on the Muellers' gun display case in the unit.  TR 3489-90, 3646-54.  Fingerprints inside and outside display cases matched Kehoe's and Lee's.  TR 3483-84, 3489-90, 3707-10.

During Lee's penalty phase, the Government sought to prove five aggravators supporting a death sentence: he murdered the victims with the expectation of receiving something of pecuniary value; he murdered the victims after substantial planning and premeditation; the crime involved the intentional killing of more than one person in a single criminal episode; the risk of future dangerousness; and the crime involved a particularly vulnerable victim based on her youth. Document #1297-11; TR 7373.

To justify a death sentence for Lee when Kehoe had been sentenced to life imprisonment, the Government's penalty-phase case emphasized the future-dangerousness aggravator.  The Government argued that Lee's past conduct showed that he was violent and volatile, and that he would present a danger in prison.  TR 7378-84, 7956-75.  Focusing on the Wavra murder, the Government introduced evidence showing Lee's role in that crime.  Brian Compton, who was at the party when Wavra was killed by John David Patton, testified about Lee's involvement, TR 7408-18; the transcript of Lee's testimony at John David Patton's Oklahoma preliminary hearing was read aloud, TR 7418-56; and the responding Oklahoma detective and the forensic pathologist described Wavra's wounds and cause of death, TR 7389-98, 7398-407.  The jury heard that, at a social gathering in 1990, Lee, then age seventeen, and his cousin, John David Patton, beat Wavra and forced him down a manhole into a storm sewer; that Patton went down into the manhole with Wavra, while Lee retrieved a plastic bag, rope, and knife that he handed down to Patton; that Patton

SUPP.APP.130

handed Wavra's clothes up to Lee, who put them in the plastic bag; and that Patton then used the knife to repeatedly stab Wavra and slit his throat. Patton was convicted of first-degree murder in an Oklahoma state court, while Lee pled to deferred adjudication on a robbery charge. TR 7470. Other future-dangerousness evidence included (1) Lee's threatening behavior toward a sheriff's deputy, while he was in jail awaiting trial, TR 7463-67, and (2) a 1995 Florida conviction for carrying a concealed weapon, TR 7469.

In both opening and closing argument, the Government told the jury that Lee "has an earlier murder under his belt." TR 7964. It argued that, even though Patton "wielded that knife," Lee helped him by giving him the knife and rope. TR 7382. The Government argued Lee knew what he was doing when he gave the knife to Patton, and that he both "legally and morally" had "the blood of Joey Wavra" on his hands. TR 7962-63. The Government contended the robbery plea offer was a "gift" from the Oklahoma prosecutor and an "incredible deal" – and a missed opportunity for Lee to turn his life around. TR 7383, 7963-64. The jury unanimously found the Government had established beyond a reasonable doubt the existence of each aggravating circumstance, except the substantial-planning-and-premeditation aggravator.

Both Judge Eisele and the Eighth Circuit recognized the Wavra evidence as an integral piece of the Government's penalty-phase case. In finding that Lee was not unfairly prejudiced by expert testimony and then reinstating the death penalty, the Eighth Circuit noted that, "none of the evidence elicited from Dr. Cunningham was likely to inflame the jury as much as testimony about Lee's involvement in the murder of Joey Wavra, which had been part of the government's case." *Lee,* 274 F.3d at 494. Similarly, in rejecting Lee's argument that his trial lawyers should have done more to investigate the Wavra murder, Judge Eisele acknowledged evidence of Lee's participation in that

8

SUPP.APP.131

crime was "powerful and likely contributed to or influenced the jury's ultimate decision" in favor of a death sentence. *Lee,* 2008 WL 4079315, at \*45.

### III. LEE'S CURRENT CLAIMS

Lee contends, first, that the Government suppressed material exculpatory evidence that his lawyers could have used to challenge James Wanker's guilt-phase testimony in violation of *Brady v. Maryland*, *Napue v. Illinois*, and *Giglio v. United States*, and, second, that the Government failed to disclose material exculpatory evidence contradicting the prosecutor's penalty-phase argument about his culpability in the Wavra murder in violation of the same three Supreme Court cases.

First, Lee argues the Government failed to disclose the entirety of Wanker's pretrial interviews and statements – specifically that Wanker told the investigating agents and the prosecuting attorney that he did not believe Lee's claims implicating himself in the Mueller murders. Lee asserts that his lawyers could have used this favorable evidence to challenge Wanker's testimony and that the Government knew or should have known that Wanker's testimony was misleading and failed to correct it. Wanker's guilt-phase testimony was that Lee told him that he had committed murders and described them as factually similar to the Mueller murders. In his present declaration, Wanker says that Lee had a habit of falsely claiming responsibility for criminal acts to make himself seem like a "tough guy." He says that he repeatedly told law enforcement and prosecutors that he did not believe Lee's claims were true. Document #1297-2. Lee proffers copies of the officers' reports that do not include Wanker's statements in which he stated that he doubted the truthfulness of Lee's confession. Document #1297-8, #1297-9. Wanker also says that, before he testified, the Government instructed him to "limit [his] testimony to only what was asked and not to give personal opinions." Document #1297-2. Wanker testified on cross-examination that he did not contemporaneously report Lee's claim to law enforcement because he thought Lee was "talking

SUPP.APP.132

to hear himself talk." TR 4088; Document #1297-2.  Lee's lead guilt-phase lawyer attests that if he

had known about Wanker's interview statements he would have aggressively questioned him further

on this point.  Document #1297-3.  Wanker says that if anyone had asked him about his beliefs at

trial he would have testified that he continued to hold that opinion, and that he still did not believe

that "[Lee's] story was anything more than just empty bragging."  Document #1297-2.

Second, Lee argues the Government suppressed the fact that an Oklahoma state court found

at a preliminary hearing that there was insufficient evidence for a first-degree murder charge against

him in the Wavra case.  He says this evidence contradicts the Government's penalty-phase argument

that prosecutors gave him a "gift" by not charging him with murder.  TR 7383.  Lee contends that,

because the Government consulted with Oklahoma law enforcement officials involved in the Wavra

case, it must have learned about the judicial finding or the officers' knowledge should be imputed

to the Government.  He attaches in support an "Application For Attorney Fees" and "Statement of

Time Expended" filed by the lawyer who represented him at the preliminary hearing.  The unsigned

Statement includes this paragraph:

> The matter came on for hearing before Judge Hall; District Attorney called witness;
> hearing held; Court finds crime of Murder I not established by evidence; Court
> recommends a Dismissal of Murder I charges and State consider refiling on charge
> of Robbery I.

Document #1297-4.

## IV.    WHETHER LEE'S MOTION IS SECOND OR SUCCESSIVE

A "second or successive" § 2255 motion to vacate, correct, or set aside a sentence must be

certified by the Circuit to include:

> (1) newly discovered evidence that, if proven and viewed in light of the evidence as
> a whole, would be sufficient to establish by clear and convincing evidence that no
> reasonable factfinder would have found the movant guilty of the offense; or

10

SUPP.APP.133

(2)  a new rule of constitutional law, made retroactive to cases on collateral review
by the Supreme Court, that was previously unavailable.

28 U.S.C. § 2255(h).  *See* 28 U.S.C. § 2244(b)(2).  Because this motion is not Lee's first-in-time

§ 2255 motion and because Lee has not obtained the certification required by § 2255(h), the

threshold question is whether it is a second or successive application for habeas relief.  If so, this

Court lacks jurisdiction to consider the motion.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) does not define the

term "second or successive."  *Crawford v. Minnesota*, 698 F.3d 1086, 1089 (8th Cir. 2012).  The

United States Supreme Court has recognized the term does not cover all motions "filed second or

successively in time."  *Panetti v. Quarterman*, 551 U.S. 930, 944, 127 S. Ct. 2842, 2853, 168 L. Ed.

2d 662 (2007).  That phrase instead is a "term of art" incorporating the pre-AEDPA abuse-of-the-

writ doctrine.  *Crawford,* 698 F.3d at 1089 (citing *Slack v. McDaniel*, 529 U.S. 473, 486, 120 S. Ct.

1595, 1605, 146 L. Ed. 2d 542 (2000)).  AEDPA codified some of the existing limits on successive

petitions and imposed new restrictions.  *Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 2340,

135 L. Ed. 2d 827 (1996).  *See Baranski v. United States*, 880 F.3d 951, 955 (8th Cir. 2018) ("In

[AEDPA], Congress imposed stricter limitations on the filing of second and successive § 2255

motions than the abuse-of-the-writ principles . . .").

In *Panetti v. Quarterman*, the Supreme Court held that a claim under *Ford v. Wainwright*,

477 U.S. 399, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986), that the defendant is incompetent to be

executed, is not subject to the gatekeeping provisions for second or successive applications for

habeas relief if the claim is promptly raised when ripe.  *Panetti*, 551 U.S. at 945, 127 S. Ct. at 2583.

Limiting its holding to *Ford* claims, the Supreme Court recognized that, because a petitioner's

mental condition at the time of the scheduled execution is at issue, *Ford* claims are generally not

ripe until after the time for filing an initial habeas petition has passed. *Id.* at 943, 127 S. Ct. at 2852. The Court held that its recognition of this exception did not thwart AEDPA's purposes or allow for abuse of the writ: "We are hesitant to construe a statute, implemented to further the principles of comity, finality, and federalism, in a manner that would require unripe (and, often, factually unsupported) claims to be raised as a mere formality, to the benefit of no party." *Id.* at 947, 127 S. Ct. at 2855.

Citing *Panetti*, Lee argues that his current § 2255 motion similarly cannot be considered second or successive because he was unable to raise his *Brady*[1] claims due to the Government's concealing the supporting evidence.  He also argues that in the Eighth Circuit *Brady* claims based on material evidence are not "second or successive" within the meaning of § 2255(h), citing *Crawford v. Minnesota*.  In *Crawford,* the Circuit held that a nonmaterial *Brady* claim raised in a second-in-time habeas petition was a second or successive application.  698 F.3d at 1090.  The Eighth Circuit recognized that other circuits had held that all second-in-time *Brady* claims are subject to § 2255(h)'s preauthorization requirement but did not reach that issue.  "While some courts have concluded that all *Brady* claims in second habeas petitions are second or successive regardless of their materiality, that question is not presented here because in this case there was overwhelming evidence of [guilt]."  *Id.*

Lee also cites *United States v. Lopez,* 577 F.3d 1053 (9th Cir. 2009), for the same point.  In that case, the Ninth Circuit, like the Eighth Circuit in *Crawford*, limited its holding to nonmaterial *Brady* claims.  *Lopez,* 577 F.3d at 1066-67.  More recently, the Ninth Circuit has held that all *Brady*

---

[1] Because the same analysis applies to *Brady* and *Napue/Giglio* claims, Lee's claims are collectively referred to as "*Brady* claims."

SUPP.APP.135

claims are subject to § 2255(b)'s preauthorization requirement. *Brown v. Muniz*, 889 F.3d 661, 668, 673 (9th Cir. 2018).

The new guilt-phase evidence upon which Lee relies as a basis for his present motion is that, when Wanker testified about Lee's claims related to the Mueller murders, he continued to hold the opinion that Lee was only posturing. Lee argues Wanker's testimony gave the false impression that, while he initially dismissed Lee's claims as "just talking," he later changed his assessment and felt compelled to come forward as a witness. The parties spar over the significance of Wanker's testimony in light of other guilt-phase evidence. Lee argues the Kehoes were not credible witnesses; he says the Government's timeline does not allow for Kehoe and Lee to murder the victims in Arkansas and then return to Washington; and he challenges fingerprint evidence, contending there were opportunities, other than during the Mueller murders, for Lee's contact with the gun display cases. These are not new arguments; the jury heard related evidence. Lee also points to the mtDNA testing conducted in 2007 in connection with his initial § 2255 motion showing that the hair linked to the crimes was not his. Document #1297-6.

There is no reasonable probability, however, that Wanker's testimony that he continued to be skeptical of Lee's claims would have resulted in a different verdict. The jury heard Wanker testify that he did not call the police when Lee claimed to have committed murder because he believed that Lee was "talking to hear himself talk." His present declaration that at trial he continued to believe that Lee's story was "empty bragging" does not materially change his testimony. Evidence of Wanker's continued opinion is not enough to overcome the overwhelming evidence of Lee's guilt. Thus, as to the Wanker testimony, Lee has not demonstrated that material evidence was withheld by the Government, so that part of his claim is second or successive under

SUPP.APP.136

*Crawford*.[2] 698 F.3d at 1089-90 (citing *Lopez*, 577 F.3d at 1066). Because the alleged due-process violations are not based on material evidence, the gatekeeping provision of § 2255(h) applies to Lee's claim based on the Wanker testimony.

On the other hand, assuming that the Oklahoma state court held at a preliminary hearing that the evidence was insufficient to establish probable cause that Lee was guilty of murdering Joey Wavra,[3] that evidence is material. In light of the government's reliance on the Wavra murder during sentencing, it is reasonably likely that, if it had been disclosed at trial that the Oklahoma court found the evidence insufficient to establish that Lee was guilty of murder, the outcome at sentencing would have been different. Therefore, the Court must address the issue of whether a *Brady* claim based on material evidence is subject to § 2255(b)'s preauthorization requirement.

Every circuit that has addressed this issue has held that a subsequent habeas application asserting a *Brady* violation, whether material or not, is a second or successive motion that requires

---

[2] Lee says *Carter v. Kelley*, No. 5:16CV00367-DPM-PSH (E.D. Ark. 2017), is instructive and urges this Court to order factual development on *Brady* materiality. In that case, the magistrate judge recommended dismissal of the petitioner's habeas petition as second or successive without analysis of the law surrounding second-in-time *Brady* claims. *No. 12.* The district court judge declined the recommendation and returned the case for a finding on *Brady* materiality, stating that "[i]f the [petitioner's] claim is material, then his petition *may* not be 'second or successive' within the meaning of AEDPA." *No. 14* (emphasis supplied) (citing *Crawford*, 698 F.3d at 1089-90 and *Lopez*, 577 F.3d at 1066-67). The district court judge thereafter reviewed the magistrate judge's fact findings and adopted the recommendation that the *Brady* claim was nonmaterial and therefore an unauthorized second or successive habeas application. *No. 28.* As in *Crawford*, the district court did not reach the issue of whether all second-in-time *Brady* claims are second or successive habeas applications.

[3] The only evidence presented on this point is the lawyer's cursory statement in his fee application. The Court is assuming that that statement is accurate and that Lee could prove its accuracy at an evidentiary hearing.

14

authorization by the Circuit.[4]  *Blackman v. Davis,* 909 F.3d 772, 778-79 (5th Cir. 2018); *In re Wogenstahl*, 902 F.3d 621, 626-28 (6th Cir. 2018);  *Brown*, 889 F.3d at 668-74; *Quezada v. Smith*, 624 F.3d 514, 522 (2d Cir. 2010); *In re Pickard,* 681 F.3d 1201, 1205 (10th Cir. 2012); *Tompkins v. Sec'y, Dep't of Corr.*, 557 F.3d 1257, 1259-60 (11th Cir. 2009); *Evans v. Smith*, 220 F.3d 306, 322-25 (4th Cir. 2000).  Distinguishing *Panetti*, the circuits have held that, unlike competency-to-be-executed claims, a *Brady* violation occurs at trial or at sentencing and is therefore ripe when the first habeas application is filed; and they have recognized that the statutory scheme governing second or successive petitions accounts for circumstances, such as a *Brady* claim, where new evidence is discovered after the first habeas petition.  *In re Wogenstahl*, 902 F.3d at 627-28; *Brown*, 889 F.3d at 668, 672-74; *Tompkins*, 557 F.3d at 1259-60.  *See Evans*, 220 F.3d at 323 ("[T]he standards that Congress has established for the filing of second or successive petitions account for precisely the type of situation Evans alleges.").  As the Ninth Circuit recently recognized, "whether a claim is ripe under AEDPA turns on whether the factual predicate existed, not whether the petitioner *knew* it existed at the time of his initial habeas petition."  *Brown*, 889 F.3d at 674 (emphasis in original) (citing *United States v. Buenrostro*, 638 F.3d 720, 725 (9th Cir. 2011)).

Lee cites *Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009), and *Scott v. United States*, 890 F.3d 1239 (11th Cir. 2018), but those cases are not on point.  In *Douglas*, the Tenth Circuit, under the "unique circumstances" presented, treated the *Brady* claim raised in a second habeas petition as a supplement to the related prosecutorial-misconduct claim in the pending habeas application.  560 F.3d at 1187-90.  Unlike the *Douglas* petitioner, Lee does not have an open or

---

[4] While 28 U.S.C. § 2255(h) governs second or successive habeas motions filed pursuant to a federal court judgment, it incorporates by reference § 2244 governing habeas petitions challenging state-court judgments.  In *Crawford*, a § 2254 case, the Eighth Circuit interpreted § 2254 as though it were identical to § 2255 when it relied on *Lopez*, which was a § 2255 case.

15

pending habeas application.  Since *Douglas,* the Tenth Circuit has recognized a second-in-time *Brady* claim as second or successive under § 2255(h).  *In re Pickard*, 681 F.3d at 1205; *see also Brown*, 889 F.3d at 673 n.10 (distinguishing *Douglas*).  In *Scott,* an Eleventh Circuit panel applied *Tompkins* to hold the petitioner's second-in-time § 2255 motion was barred as second or successive, but "urged the Court to take this case *en banc* so we can reconsider *Tompkins*' reasoning." 890 F.3d at 1249-589.  The Circuit, however, summarily denied the petition for rehearing *en banc*, with no Eleventh Circuit judge requesting the court be polled.  *Scott v. United States*, Nos. 15-1137, 16-11950 (11th Cir. Aug. 16, 2018).  *See also Jimenez v. Fla. Dep't of Corr.*, No. 18-15128, 2018 WL 6584113, *3 (11th Cir., Dec. 13, 2018) (following *Tompkins*).

Based on the unanimous authority from the circuits that have decided the issue, as well as the plain language of the statute, the *Brady* claims asserted in Lee's current § 2255 motion constitute a second or successive habeas application that requires authorization from the Eighth Circuit.  A *Brady* violation occurs when the evidence is favorable to the accused, that evidence was suppressed by the State, and prejudice ensued.  *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999).  A *Napue/Giglio* violation requires a new trial when the Government solicits or fails to correct false testimony, or makes a misleading argument, that is material.  *United States v. Bigeleisen*, 625 F.2d 203, 208-09 (8th Cir. 1980).  Because all these components occurred prior to or during Lee's trial, the alleged constitutional violations were ripe when his first habeas motion was filed.

That the circuits are unanimous is not surprising because the habeas statutory scheme expressly provides for cases in which newly discovered evidence is raised in a second or successive application.  28 U.S.C. § 2255(h); 28 U.S.C. § 2244(b)(2).  The statute does not except *Brady* claims.  Section 2255(h) therefore applies to Lee's claims; he is entitled to file a second or

16

successive habeas motion only if he receives certification from the Eighth Circuit.  Because Lee has not obtained the required authorization, this Court does not have jurisdiction to consider his application for relief.

## V.      WHETHER LEE IS ENTITLED TO RELIEF UNDER RULE 60

Lee alternatively asks this Court to consider his application as a motion for relief pursuant to Rule 60 of the Federal Rules of Civil Procedure and reopen his first § 2255 proceeding in light of new evidence.  Lee's § 2255 motion contends that the Government violated its duties under *Brady*, *Giglio*, and *Napue* at trial; his Rule 60 motion contends that the Government violated its duties during the § 2255 proceedings.  *Cf. Pickard*, 681 F.3d at 1205-06.

In evaluating a Rule 60(b) motion, the initial inquiry is whether the allegations amount to a second or successive habeas application under § 2255 or § 2244.  *Boyd v. United States*, 304 F.3d 813, 814 (8th Cir. 2002).  A Rule 60(b) motion is treated as a second or successive habeas application if it contains a claim, defined as an "'asserted federal basis for relief from a state court's judgment of conviction' or as an attack on the 'federal court's previous resolution of the claim *on the merits*.'"  *Ward v. Norris*, 577 F.3d 925, 933 (8th Cir. 2009) (emphasis in original) (quoting *Gonzales v. Crosby,* 545 U.S. 524, 530, 532, 125 S. Ct. 2641, 2647-48, 162 L. Ed. 2d 480 (2005)).  The motion is considered under Rule 60(b) when it challenges "'some defect in the integrity of the federal *habeas* proceeding.'"  *Id.*  Courts have applied this same analysis to Rule 60(d) motions.  *See United States v. Robinson*, No. 4:10CR00032-01, 2013 WL 6195749, *1 (E.D. Ark., Nov. 26, 2013).

Lee contends the Government committed "fraud . . . , misrepresentation, or misconduct" in violation of Rule 60(b)(3), or committed "fraud on the court" in violation of Rule 60(d)(3).  He says that the Government made misrepresentations in its habeas responsive brief:  (1) a footnote, stating

17

"[a] huge amount of 'discovery' materials were provided," Document #1126 at 45 n.16[5]; and (2) in response to Lee's ineffectiveness claim related to the Wavra murder, statements that the Government was "at a loss to understand that which Lee now argues his trial counsel should have done," and that it was "difficult to imagine" how more investigation would have placed Lee's role in the Wavra murder in a different light. Docket #1126 at 75-76. Lee argues that the Government's misrepresentations impeded the district court from evaluating his habeas claims and therefore created a defect in the integrity of his initial § 2255 proceeding. He argues that his general *Brady* allegation and ineffectiveness claim related to the Wavra murder would have been viable if the Government had disclosed supporting material: Wanker's opinion statements and the finding of the district judge at the preliminary hearing in the Wavra case. The district court denied relief on the ineffectiveness claim and did not address the unsupported *Brady* allegation; a certificate of appealability was not granted on either point. *Lee*, 2008 WL 4079315, at *45; *Lee*, 715 F.3d at 217.

Assuming that Lee has properly asserted a Rule 60 motion as opposed to a second or successive habeas petition, he is not entitled to relief under either Rule 60(b)(3) or (d)(3). A Rule 60(b)(3) motion must be filed no more than a year from the order or judgment that it seeks to set aside. Fed. R. Civ. P. (60)(c)(1). The Court has no authority to extend that deadline. Fed. R. Civ. P. 6(b)(2). As Lee argues, this time limit is not jurisdictional. *Dill v. Gen. Am. Life Ins. Co.*, 525 F.3d 612, 618-19 (8th Cir. 2008). But that means only that the benefit of the time limit may be forfeited if it is not timely raised. *Id*. If the time limit is properly raised, the rules assure that the time limit will be enforced. *Id*. The Government has properly asserted the one-year time limit. This

---

[5] Lee refers to Footnote 16 as being part of the Government's response to his general, unsupported *Brady* allegation. Document #1118 at 7. Footnote 16, however, was in the response to Lee's ineffectiveness claim challenging his trial lawyers' failure to oppose the Government's motion seeking restrictions on his personal discovery access. Document #1126 at 45, n.16.

18

Court entered the order denying Lee's first § 2255 petition in 2008.  *Lee*, 2008 WL 4079315.  Lee's request for relief under Rule 60(b)(3) therefore is untimely.

Lee, moreover, has not demonstrated the "exceptional circumstances" required for relief. *Atkinson v. Prudential Property Co., Inc.*, 43 F.3d 367, 371 (8th Cir. 1994) (quotations omitted). For Rule 60(b)(3) relief, Lee must show by clear and convincing evidence that the Government "engaged in fraud or other misconduct and that this conduct prevented [him] from fully and fairly presenting his case."  *Cook v. City of Bella Villa*, 582 F.3d 840, 855 (8th Cir. 2009) (quotations omitted).  Lee has not met this burden.  While failure to produce evidence requested in discovery may under some circumstances be grounds for vacating a judgment, the moving party must show that the failure was due to misconduct by the party that should have produced the evidence. *Atkinson*, 43 F.3d at 373.  Lee has not alleged facts to show that the omission of any evidence during his § 2255 proceeding was due to the Government's misconduct or that the Government intentionally misrepresented any facts.  Nor has he demonstrated that any failure to disclose Wanker's opinions or the Oklahoma judicial finding prevented him from fully and fairly litigating his initial § 2255 claim.  "This is not a case in which [the Government] withheld information that they alone possessed."  *Id.*  Lee could have interviewed Wanker before filing his first habeas petition; and the Oklahoma court record upon which he now relies is public information.

Likewise, Lee's allegations do not meet the standard for fraud on the court under Rule 60(d)(3).  Fraud on the court is narrowly defined as "fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury."  *Superior Seafoods, Inc. v. Tyson Foods, Inc.*, 620 F.3d 873, 878 (8th Cir. 2010) (quoting *United States v. Smiley*, 553 F.3d 1137, 1144-45 (8th Cir. 2009) (quotations omitted)).  "A finding of fraud on the court is justified only by the most egregious misconduct directed to the court itself,

19

such as bribery of a judge or jury or fabrication of evidence by counsel." *Greiner v. City of Champlin*, 152 F.3d 787, 789 (8th Cir. 1998) (quotations omitted). "[I]t is necessary to show a deliberately planned scheme designed to improperly influence the court in its decision." *Heim v. Comm'r of Internal Revenue*, 872 F.2d 245, 249 (8th Cir. 1989). Lee's allegations do not clear this high bar. *See Tyler v. Purkett*, 413 F.3d 696, 700-01 n.7 (8th Cir. 2005) ("Claims that a party did not disclose to a court certain facts allegedly pertinent to the matter before it, however, do not normally constitute fraud on the court.").

## CONCLUSION

Daniel Lewis Lee's *Brady* claims in his present motion constitute a second or successive habeas petition under 28 U.S.C. § 2255 for which Eighth Circuit authorization is required. Lee is not entitled to relief under Federal Rule of Civil Procedure 60. Therefore, the motion is denied without prejudice. No certificate of appealability will be issued.

IT IS SO ORDERED this 26th day of February, 2019.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

20

SUPP.APP.143

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

_____

No: 19-2432

_____

Daniel Lewis Lee

Petitioner - Appellant

v.

United States of America

Respondent - Appellee

4:97-cr-00243-02-KGB

_____

Appeal from U.S. District Court for the Eastern District of Arkansas - Little Rock
(4:18-cv-00649-JLH)

_____

## JUDGMENT

Before COLLOTON, KELLY, and ERICKSON, Circuit Judges.

The application for a certificate of appealability has been considered by the court and is denied.

November 04, 2019

KELLY, Circuit Judge, dissenting.

I would grant a certificate of appealability. I believe jurists of reason could disagree about whether Lee's newly discovered evidence is material for purposes of Brady. See United States v. Kehoe, 310 F.3d 579, 591 (8th Cir. 2002); Martin v. State, 57 S.W.3d 136, 139–40 (Ark. 2001). I also believe jurists of reason could disagree about whether a material Brady claim in a second habeas motion qualifies as a "second or successive motion" subject to the gatekeeping requirements of 28 U.S.C. § 2255(h). See Panetti v. Quarterman, 551 U.S. 930, 942–47 (2007); Scott v. United States, 890 F.3d 1239, 1243 (11th Cir. 2018); Crawford v. Minnesota, 698 F.3d

SUPP.APP.144

1086, 1090 (8th Cir. 2012); see also Barefoot v. Estelle, 463 U.S. 880, 893 (1983) (explaining that

in a death-penalty case, "the nature of the penalty is a proper consideration" in deciding whether

to certify an issue for appeal).

_____

Order Entered at the Direction of the Court:
Clerk, U.S. Court of Appeals, Eighth Circuit.

_____
          /s/ Michael E. Gans

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

*FILED*
*IN OPEN COURT*

*MAY 1 4 1998*

*U.S. DISTRICT COURT*
*EASTERN DISTRICT OF ARKANSAS*

UNITED STATES OF AMERICA

v.                              No. LR-CR-97-243(2)


DANIEL LEWIS LEE,
a/k/a Daniel Lewis Graham, et al.

**SPECIAL VERDICT FORM NO. 3**
**SARAH POWELL MURDER**

I.      **AGE OF DEFENDANT**

Instructions: Answer "YES" or "NO." Do you, the jury, unanimously find that

the government has established beyond a reasonable doubt that DANIEL LEWIS LEE

was eighteen years of age or older at the time he killed Sarah Powell, that being

January 11, 1996?

YES  ✓

NO  _____

Foreperson

Instructions: If you answered "NO" with respect to the determination in this

section, Section I, then stop your deliberations, cross out Sections II, III, IV, V, and VI

of this form, and proceed to Section VII. Each juror should then carefully read the

statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.

If you answered "YES" with respect to the determination in this section, Section I, proceed to Section II which follows.

## II.   REQUISITE MENTAL STATE

Instructions: Answer "YES" or "NO." You must find one or more of the requisite mental states.

(A)   Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that DANIEL LEWIS LEE intentionally killed Sarah Powell?

YES _____

NO __✔_____

Foreperson

-2-

**(B)**   Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that DANIEL LEWIS LEE intentionally participated in an act, contemplating that the life of Sarah Powell would be taken, or intending that lethal force would be used against Sarah Powell, and Sarah Powell died as a direct result of that act?

YES _____

NO _____

Foreperson


(C)   Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that DANIEL LEWIS LEE intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to Sarah Powell, and that participation in the act constituted a reckless disregard for human life and Sarah Powell died as a direct result of the act?

YES _____

NO _____

Foreperson

-3-

SUPP.APP.148

Instructions: If you answered "NO" with respect to all of the determinations in this section, Section II, then stop your deliberations, cross out Sections III, IV, V, and VI, and proceed to Section VII. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.

If you answered "YES" with respect to one or more of the mental state determinations in this section, Section II, then proceed to Section III which follows.

### III. STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO." Do you, the jury, unanimously find that the government has established the existence of the following aggravating factor or factors beyond a reasonable doubt:

(A) That DANIEL LEWIS LEE committed the offense of murdering Sarah Powell in the expectation of receiving something of pecuniary value?

YES ___✓___

NO _____

Foreperson

-4-

SUPP.APP.149

**(B)**     That DANIEL LEWIS LEE committed the offense of murdering Sarah

Powell after substantial planning and premeditation?

YES _____

NO _____

Foreperson _____

**(C)**     That Sarah Powell was a particularly vulnerable victim due to her youth,

that being eight years old?

YES _____

NO _____

Foreperson

**(D)**     That DANIEL LEWIS LEE intentionally killed more than one person in

a single criminal episode?

YES _____

NO _____

Foreperson

-5-

Instructions: If you answered "NO" with respect to all of the Statutory Aggravating Factors in this section, Section III, then stop your deliberations, cross out Sections IV, V, and VI, and proceed to Section VII of this form. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.

If you found the requisite age in Section I, one or more of the requisite mental states in Section II, and answered "YES" with respect to one or more of the statutory aggravating factors in this section, Section III, proceed to Section IV which follows.

## IV.   NON-STATUTORY AGGRAVATING FACTOR - FUTURE DANGEROUSNESS

Instructions: Answer "YES" or "NO." Do you, the jury, unanimously find that the government has established the existence of the following aggravating factor beyond a reasonable doubt:

That DANIEL LEWIS LEE's (a) involvement in the murder of Joseph John Wavra on or about July 24, 1990, in Oklahoma City, Oklahoma; (b) misdemeanor conviction of carrying a concealed weapon in Martin County, Florida, on May 3, 1995; and (c) lack of remorse, as evidenced by his statements made to Gloria Kehoe,

-6-

establish that DANIEL LEWIS LEE would be a danger in the future to the lives and

safety of other persons?

YES ___✓___

NO _____

Foreperson


Instructions: Regardless of whether you answered "YES" or "NO" with respect

to any Non-Statutory Aggravating Factor in this Section IV, proceed to Section V,

which follows.



V.    **MITIGATING FACTORS**

Instructions: For each of the following mitigating factors, indicate, in the space

provided, the number of jurors who have found the existence of that mitigating factor

to be proven by a preponderance of the evidence.

A finding with respect to a mitigating factor may be made by one or more of the

members of the jury, and any member of the jury who finds the existence of a

mitigating factor may consider such a factor established in considering whether or not

a sentence of death shall be imposed, regardless of the number of other jurors who

agree that the factor has been established.

-7-

SUPP.APP.152

Defendant DANIEL LEWIS LEE alleges the following mitigating factors:

1.  Mr. Lee's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge.

    Number of jurors, if any, who so find ___0___.

2.  Mr. Lee was under duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

    Number of jurors, if any, who so find ___0___.

3.  Mr. Lee does not have a significant prior criminal record, other than his juvenile record.

    Number of jurors, if any, who so find ___0___.

4.  Mr. Lee committed the killing or killings under mental or emotional disturbance.

    Number of jurors, if any, who so find ___0___.

5.  Another person, equally culpable in the crimes, will not be punished by death.

    Number of jurors, if any, who so find ___3___.

6.  Mr. Lee was subjected to emotional and physical abuse, abandonment, and neglect as a child and was deprived of the parental guidance and protection which he needed.

    Number of jurors, if any, who so find ___6___.

7.  Mr. Lee suffers from neurological impairments which were identified and

-8-

which could have been treated when he was a child and adolescent.

Number of jurors, if any, who so find ____0____.

8. Mr. Lee suffers from brain dysfunction which has impaired his ability to function in the absence of strong support and guidance.

Number of jurors, if any, who so find ____0____.

9. Mr. Lee was introduced to drugs and alcohol while still a child.

Number of jurors, if any, who so find ____0____.

10. Mr. Lee needs a structured environment and would likely benefit from the structure of a prison.

Number of jurors, if any, who so find ____1____.

11. Mr. Lee was only 22 years old when the murders were committed.

Number of jurors, if any, who so find ____0____.

12. Mr. Lee is a follower and was under the influence of Chevie Kehoe, and possibly others, at the time of the offense.

Number of jurors, if any, who so find ____0____.

13. Other persons were involved in this racketeering enterprise and conspiracy who will, under the law, receive no sentence or substantially less punishment or were not prosecuted.

Number of jurors, if any, who so find ____3____.

14. Kirby Kehoe was involved in the planning of the 1996 burglary of the Muellers.

Number of jurors, if any, who so find ____2____.

-9-

SUPP.APP.154

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more of the jurors. If none, write "NONE" and line out the extra spaces with a large "X." If more space is needed, write "CONTINUED" and use the reverse side of this page.

_____

_____

Number of jurors who so find _____.

_____

_____

Number of jurors who so find _____.

_____

_____

Number of jurors who so find _____.

_____

_____

Number of jurors who so find _____.

_____

_____

Number of jurors who so find _____.

-10-

SUPP.APP.155

Instructions: Proceed to Section VI and Section VII which follow.

## VI.   **DETERMINATION**

Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death:

**(A).   Death Sentence**

We determine, by unanimous vote, that a sentence of death shall be imposed for the murder of Sarah Powell.

YES  ✓

NO  _____

If you answered "YES," sign your names here, and then proceed to Section VII. If you answered "NO," the foreperson alone should sign, and you should proceed to Section VI, (B).

SUPP.APP.156

Date: _____5 - 14 - 14_____

**(B). Sentence of Life in Prison Without Possibility of Release**

We determine, by unanimous vote, that a sentence of life imprisonment without

possibility of release shall be imposed for the murder of Sarah Powell.

YES _____

NO _____

If you answered "YES," sign your names here, and then proceed to Section VII.

If you answered "NO," the foreperson alone should sign, and you should proceed to

Section VII.

_____   _____

-12-

SUPP.APP.157

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____
                                          Foreperson


Date:  _____


## VII.  **CERTIFICATION**

By signing below, each juror certifies that consideration of the race, color,

religious beliefs, national origin, or sex of the defendant or the victim was not involved

in reaching his or her individual decision, and that the individual juror would have made

the same recommendation regarding a sentence for the crime in question regardless of

the race, color, religious beliefs, national origin, or sex of the defendant or the victim.

-13-

SUPP.APP.158

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

UNITED STATES OF AMERICA

FILED
IN OPEN COURT

MAY 14 1998

EASTE... DISTRICT COURT
OF ARKANSAS

v.                                    No. LR-CR-97-243(2)

DANIEL LEWIS LEE,
a/k/a Daniel Lewis Graham, et al.

## SPECIAL VERDICT FORM NO. 1
## WILLIAM MUELLER MURDER

I.    **AGE OF DEFENDANT**

Instructions: Answer "YES" or "NO." Do you, the jury, unanimously find that

the government has established beyond a reasonable doubt that DANIEL LEWIS LEE

was eighteen years of age or older at the time he killed William Mueller, that being

January 11, 1996?

YES _____

NO _____

Foreperson

Instructions: If you answered "NO" with respect to the determination in this

section, Section I, then stop your deliberations, cross out Sections II, III, IV, V, and VI

of this form, and proceed to Section VII. Each juror should then carefully read the

SUPP.APP.159

statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.

If you answered "YES" with respect to the determination in this section, Section I, proceed to Section II which follows.

## II.   **REQUISITE MENTAL STATE**

Instructions: Answer "YES" or "NO." You must find one or more of the requisite mental states.

(A)   Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that DANIEL LEWIS LEE intentionally killed William Mueller?

YES ✔ _____

NO _____

Foreperson

-2-

**(B)** Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that DANIEL LEWIS LEE intentionally participated in an act, contemplating that the life of William Mueller would be taken, or intending that lethal force would be used against William Mueller, and William Mueller died as a direct result of that act?

YES _____

NO ____✔____

Foreperson

**(C)** Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that DANIEL LEWIS LEE intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to William Mueller, and that participation in the act constituted a reckless disregard for human life and William Mueller died as a direct result of the act?

YES

NO _____

Foreperson

-3-

SUPP.APP.161

Instructions: If you answered "NO" with respect to all of the determinations in this section, Section II, then stop your deliberations, cross out Sections III, IV, V, and VI, and proceed to Section VII. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.

If you answered "YES" with respect to one or more of the mental state determinations in this section, Section II, then proceed to Section III which follows.

## III.   STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO." Do you, the jury, unanimously find that the government has established the existence of the following aggravating factor or factors beyond a reasonable doubt:

(A) That DANIEL LEWIS LEE committed the offense of murdering William Mueller in the expectation of receiving something of pecuniary value?

YES ✓_____

NO _____

Foreperson _____

-4-

SUPP.APP.162

**(B)**     That DANIEL LEWIS LEE committed the offense of murdering William Mueller after substantial planning and premeditation?

YES _____

NO ____✓____

Foreperson

**(C)**     That DANIEL LEWIS LEE intentionally killed more than one person in a single criminal episode?

YES ____✓____

NO _____

Foreperson

Instructions: If you answered "NO" with respect to all of the Statutory Aggravating Factors in this section, Section III, then stop your deliberations, cross out Sections IV, V, and VI, and proceed to Section VII of this form. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.

-5-

SUPP.APP.163

If you found the requisite age in Section I, one or more of the requisite mental states in Section II, and answered "YES" with respect to one or more of the statutory aggravating factors in this section, Section III, proceed to Section IV which follows.

## IV.   NON-STATUTORY AGGRAVATING FACTOR - FUTURE DANGEROUSNESS

Instructions: Answer "YES" or "NO." Do you, the jury, unanimously find that the government has established the existence of the following aggravating factor beyond a reasonable doubt:

That DANIEL LEWIS LEE's (a) involvement in the murder of Joseph John Wavra on or about July 24, 1990, in Oklahoma City, Oklahoma; (b) misdemeanor conviction of carrying a concealed weapon in Martin County, Florida, on May 3, 1995; and (c) lack of remorse, as evidenced by his statements made to Gloria Kehoe, establish that DANIEL LEWIS LEE would be a danger in the future to the lives and safety of other persons?

YES __✓__

NO _____

Foreperson

-6-

Instructions: Regardless of whether you answered "YES" or "NO" with respect to the Non-Statutory Aggravating Factor in this Section IV, proceed to Section V, which follows.

## V.   MITIGATING FACTORS

Instructions: For each of the following mitigating factors, indicate, in the space provided, the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence.

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established.

Defendant DANIEL LEWIS LEE alleges the following mitigating factors:

1.     Mr. Lee's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge.

       Number of jurors, if any, who so find ___ $O$ ___.

-7-

SUPP.APP.165

2.   Mr. Lee was under duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

Number of jurors, if any, who so find _____ 0 _____.

3.   Mr. Lee does not have a significant prior criminal record, other than his juvenile record.

Number of jurors, if any, who so find _____ 0 _____.

4.   Mr. Lee committed the killing or killings under mental or emotional disturbance.

Number of jurors, if any, who so find _____ 0 _____.

⑤   Another person, equally culpable in the crimes, will not be punished by death.

Number of jurors, if any, who so find _____ 3 _____.

6.   Mr. Lee was subjected to emotional and physical abuse, abandonment, and neglect as a child and was deprived of the parental guidance and protection which he needed.

Number of jurors, if any, who so find _____ 2 _____.

7.   Mr. Lee suffers from neurological impairments which were identified and which could have been treated when he was a child and adolescent.

Number of jurors, if any, who so find _____ 0 _____.

8.   Mr. Lee suffers from brain dysfunction which has impaired his ability to function in the absence of strong support and guidance.

Number of jurors, if any, who so find _____ 0 _____.

9.   Mr. Lee was introduced to drugs and alcohol while still a child.

-8-

SUPP.APP.166

Number of jurors, if any, who so find ____0____.

10. Mr. Lee needs a structured environment and would likely benefit from the structure of a prison.

Number of jurors, if any, who so find ____1____.

11. Mr. Lee was only 22 years old when the murders were committed.

Number of jurors, if any, who so find ____0____.

12. Mr. Lee is a follower and was under the influence of Chevie Kehoe, and possibly others, at the time of the offense.

Number of jurors, if any, who so find ____0____.

13. Other persons were involved in this racketeering enterprise and conspiracy who will, under the law, receive no sentence or substantially less punishment or were not prosecuted.

Number of jurors, if any, who so find ____3____.

14. Kirby Kehoe was involved in the planning of the 1996 burglary of the Muellers.

Number of jurors, if any, who so find ____2____.

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more of the jurors. If none, write "NONE" and line out the extra spaces with a large "X." If more space is needed, write "CONTINUED" and use the reverse side of this page.

-9-

SUPP.APP.167

_____

_____

Number of jurors who so find _____.

_____

_____

Number of jurors who so find _____.

_____

_____

Number of jurors who so find _____.

_____

_____

Number of jurors who so find _____.

_____

_____

Number of jurors who so find _____.

Instructions: Proceed to Section VI and Section VII which follow.

SUPP.APP.168

## VI.  **DETERMINATION**

Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death:

## (A).  **Death Sentence**

We determine, by unanimous vote, that a sentence of death shall be imposed for the murder of William Mueller.

YES  _____

NO  _____

If you answered "YES," sign your names here and then proceed to Section VII. If you answered "NO," the foreperson alone should sign, and you should proceed to Section VI, (B):

-11-

_____
Foreperson

Date: ___5-14-99___

**(B). Sentence of Life in Prison Without Possibility of Release**

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed for the murder of William Mueller.

YES _____

NO _____

If you answered "YES," sign your names here, and then proceed to Section VII. If you answered "NO," the foreperson alone should sign, and you should proceed to Section VII.

_____   _____

_____   _____

_____   _____

_____   _____

_____   _____

-12-

SUPP.APP.170

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

~~FILED
IN OPEN COURT
MAY 14 1998
U.S. DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS~~

UNITED STATES OF AMERICA

v.                                        No. LR-CR-97-243(2)

DANIEL LEWIS LEE,
a/k/a Daniel Lewis Graham, et al.

### SPECIAL VERDICT FORM NO. 2
### NANCY MUELLER MURDER

I.    **AGE OF DEFENDANT**

Instructions: Answer "YES" or "NO." Do you, the jury, unanimously find that

the government has established beyond a reasonable doubt that DANIEL LEWIS LEE

was eighteen years of age or older at the time he killed Nancy Mueller, that being

January 11, 1996?

YES ✓ _____

NO _____

Foreperson

Instructions:  If you answered "NO" with respect to the determination in this

section, Section I, then stop your deliberations, cross out Sections II, III, IV, V, and VI

of this form, and proceed to Section VII.  Each juror should then carefully read the

SUPP.APP.171

statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.

If you answered "YES" with respect to the determination in this section, Section I, proceed to Section II which follows.

## II.   **REQUISITE MENTAL STATE**

Instructions: Answer "YES" or "NO." You must find one or more of the requisite mental states.

**(A)** Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that DANIEL LEWIS LEE intentionally killed Nancy Mueller?

YES _____

NO _____

Foreperson

-2-

**(B)**    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that DANIEL LEWIS LEE intentionally participated in an act, contemplating that the life of Nancy Mueller would be taken, or intending that lethal force would be used against Nancy Mueller, and Nancy Mueller died as a direct result of that act?

YES _____

NO ___✓_____

Foreperson

**(C)**    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that DANIEL LEWIS LEE intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to Nancy Mueller, and that participation in the act constituted a reckless disregard for human life and Nancy Mueller died as a direct result of the act?

YES ___✓_____

NO _____

Foreperson

-3-

Instructions: If you answered "NO" with respect to all of the determinations in this section, Section II, then stop your deliberations, cross out Sections III, IV, V, and VI, and proceed to Section VII. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.

If you answered "YES" with respect to one or more of the mental state determinations in this section, Section II, then proceed to Section III which follows.

## III.   STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO." Do you, the jury, unanimously find that the government has established the existence of the following aggravating factor or factors beyond a reasonable doubt:

(A) That DANIEL LEWIS LEE committed the offense of murdering Nancy Mueller in the expectation of receiving something of pecuniary value?

YES _____✓_____

NO _____

Foreperson

-4-

SUPP.APP.174

(B)    That DANIEL LEWIS LEE committed the offense of murdering Nancy Mueller after substantial planning and premeditation?

YES _____

NO ___✓___

Foreperson

(C)    That DANIEL LEWIS LEE intentionally killed more than one person in a single criminal episode?

YES ___✓___

NO _____

Foreperson

Instructions: If you answered "NO" with respect to all of the Statutory Aggravating Factors in this section, Section III, then stop your deliberations, cross out Sections IV, V, and VI, and proceed to Section VII of this form.  Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.

-5-

SUPP.APP.175

If you found the requisite age in Section I, one or more of the requisite mental states in Section II, and answered "YES" with respect to one or more of the statutory aggravating factors in this section, Section III, proceed to Section IV which follows.

IV.   **NON-STATUTORY AGGRAVATING FACTOR - FUTURE DANGEROUSNESS**

Instructions: Answer "YES" or "NO." Do you, the jury, unanimously find that the government has established the existence of the following aggravating factor beyond a reasonable doubt:

That DANIEL LEWIS LEE's (a) involvement in the murder of Joseph John Wavra on or about July 24, 1990, in Oklahoma City, Oklahoma; (b) misdemeanor conviction of carrying a concealed weapon in Martin County, Florida, on May 3, 1995; and (c) lack of remorse, as evidenced by his statements made to Gloria Kehoe, establish that DANIEL LEWIS LEE would be a danger in the future to the lives and safety of other persons?

YES ✓

NO _____

Foreperson

-6-

Instructions: Regardless of whether you answered "YES" or "NO" with respect to the Non-Statutory Aggravating Factor in this Section IV, proceed to Section V, which follows.

## V.   <u>MITIGATING FACTORS</u>

Instructions: For each of the following mitigating factors, indicate, in the space provided, the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence.

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established.

Defendant DANIEL LEWIS LEE alleges the following mitigating factors:

1.   Mr. Lee's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge.

Number of jurors, if any, who so find ___*0*___.

-7-

SUPP.APP.177

2.      Mr. Lee was under duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

Number of jurors, if any, who so find ___*0*___.

3.      Mr. Lee does not have a significant prior criminal record, other than his juvenile record.

Number of jurors, if any, who so find ___*0*___.

4.      Mr. Lee committed the killing or killings under mental or emotional disturbance.

Number of jurors, if any, who so find ___*0*___.

5.      Another person, equally culpable in the crimes, will not be punished by death.

Number of jurors, if any, who so find ___*3*___.

6.      Mr. Lee was subjected to emotional and physical abuse, abandonment, and neglect as a child and was deprived of the parental guidance and protection which he needed.

Number of jurors, if any, who so find ___*4*___.

7.      Mr. Lee suffers from neurological impairments which were identified and which could have been treated when he was a child and adolescent.

Number of jurors, if any, who so find ___*0*___.

8.      Mr. Lee suffers from brain dysfunction which has impaired his ability to function in the absence of strong support and guidance.

Number of jurors, if any, who so find ___*0*___.

9.      Mr. Lee was introduced to drugs and alcohol while still a child.

-8-

SUPP.APP.178

Number of jurors, if any, who so find ____0____.

10.   Mr. Lee needs a structured environment and would likely benefit from the structure of a prison.

Number of jurors, if any, who so find ____1____.

11.   Mr. Lee was only 22 years old when the murders were committed.

Number of jurors, if any, who so find ____0____.

12.   Mr. Lee is a follower and was under the influence of Chevie Kehoe, and possibly others, at the time of the offense.

Number of jurors, if any, who so find ____0____.

13.   Other persons were involved in this racketeering enterprise and conspiracy who will, under the law, receive no sentence or substantially less punishment or were not prosecuted.

Number of jurors, if any, who so find ____3____.

14.   Kirby Kehoe was involved in the planning of the 1996 burglary of the Muellers.

Number of jurors, if any, who so find ____2____.

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more of the jurors. If none, write "NONE" and line out the extra spaces with a large "X." If more space is needed, write "CONTINUED" and use the reverse side of this page.

-9-

SUPP.APP.179

_____

_____

Number of jurors who so find _____.


_____

_____

Number of jurors who so find _____.


_____

_____

Number of jurors who so find _____.


_____

_____

Number of jurors who so find _____.


_____

_____

Number of jurors who so find _____.


Instructions: Proceed to Section VI and Section VII which follow.

SUPP.APP.180

## VI.   <u>**DETERMINATION**</u>

Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death:

**(A).   Death Sentence**

We determine, by unanimous vote, that a sentence of death shall be imposed for the murder of Nancy Mueller.

YES ___✓___

NO _____

If you answered "YES," sign your names here and then proceed to Section VII. If you answered "NO," the foreperson alone should sign, and you should proceed to Section VI, (B):

-11-

SUPP.APP.181

Foreperson

Date: _5 - 14 - 99_

**(B). Sentence of Life in Prison Without Possibility of Release**

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed for the murder of Nancy Mueller.

YES _____

NO _____

If you answered "YES," sign your names here, and then proceed to Section VII.

If you answered "NO," the foreperson alone should sign, and you should proceed to Section VII.

_____   _____

_____   _____

_____   _____

_____   _____

-12-

SUPP.APP.182

_____   _____
                                            Foreperson


Date: _____


VII.   **CERTIFICATION**

By signing below, each juror certifies that consideration of the race, color,

religious beliefs, national origin, or sex of the defendant or the victim was not involved

in reaching his or her individual decision, and that the individual juror would have made

the same recommendation regarding a sentence for the crime in question regardless of

the race, color, religious beliefs, national origin, or sex of the defendant or the victim.


_____
                                            Foreperson

Date: ___5-14-99___


-13-

SUPP.APP.183

**G. THOMAS EISELE**
**24 Riverpoint**
**Little Rock, AR 72202**
**(501) 666-0786**

November 7, 2014

Eric H. Holder, Jr.
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

Christopher R. Thyer
United States Attorney
Eastern District of Arkansas
P.O. Box 1229
Little Rock, Arkansas 72203

Re:     *United States v. Daniel Lewis Lee,*
        Eastern District of Arkansas, Court Case No. 4:97-cr-000243

Attorney General Holder and U.S. Attorney Thyer:

I am the federal judge who presided over the criminal trial of Daniel Lee ("Lee") back in 1999, the result of which was a penalty of death being imposed upon Lee, but not on the ringleader Chevie Kehoe ("Kehoe").  I am 91 years old, and I have not had an active docket for several years.

I was informed by counsel for Daniel Lee ("Lee") in a letter dated October 6, 2014, that settlement discussions were ongoing between the Government and Lee's current counsel regarding whether a life sentence "best serves the interests of justice."  I declined Lee's counsel's request for an in-person meeting, but took under advisement whether to write a letter. Since that time, I have given considerable thought to the matter.

 I obtained copies of and reviewed the prior opinions in the case for the purpose of squaring my memories of the case with the legal record.[1]  I feel compelled to write this letter, which I would not normally do, because I believe that requiring Lee to pay the ultimate penalty – death – is unjust under the peculiar circumstances of this case.  Of course, this is nothing more than my view, entitled to no weight other than that which you in your official positions deem appropriate.

All who review the record will recognize the unequal and disparate roles that Kehoe and Lee played in their horrific crime spree, which Kehoe directed and Lee joined intermittently.  Kehoe

---

[1] The facts and opinions expressed herein are consistent with the record in this case and the views expressed in my post-trial rulings and opinions.

SUPP.APP.184

**Nov. 7, 2014 - Letter to Holder and Thyer**
**Page 2 of 3**

recruited Lee. Kehoe was the charismatic leader; Lee the obedient follower. Lee "participated in the murder of the adults, but would have no part in the killing of [8-year-old] Sarah Powell so Kehoe had done it alone."[2] There was no question that Kehoe was the more culpable of the two with regard to the criminal acts charged in the indictment and proved at trial.

This clear disparity in culpability was recognized when "the Government announced *in camera* [while the jury was considering the penalty phase in Kehoe's case] that if the jury sentenced Defendant Kehoe to life imprisonment, it would not pursue the death penalty for Defendant Lee."[3] As I wrote in a letter to the parties shortly after the death verdict was returned:

> Before the jury determined that Mr. Lee should die, all of the attorneys in the case appeared to be of a mind that the death penalty would be inappropriate in the case of Mr. Lee because the jury had failed to sentence Mr. Kehoe to death. Everyone seemed to be in agreement that the death penalties for both defendants would have been a possible and appropriate outcome, and life without parole for both defendants would have been a possible and appropriate outcome, but no one believed that it would be appropriate to seek the death penalty for Lee if the death penalty had not been imposed upon Mr. Kehoe.[4]

Initially, I set aside the death penalty based on two issues, both of which are addressed briefly below. The Eighth Circuit set aside my opinion and reinstated the death penalty.

**Death Penalty Protocol:**

I set aside the death penalty after concluding that the United States failed to follow its own "Death Penalty Protocol."[5] While this issue ultimately became about whether Lee had "standing" to require the Attorney General to follow her Death Penalty Protocol, this technical framing of the issue does not capture adequately the events leading up to the holding or its impact.

When the jury handed down its life sentence for Kehoe, whose sentencing phase was first, I believed that Lee's sentence was resolved as well, as had been represented. It was surprising to learn that this was not the case and that formal permission to withdraw the death penalty as to Lee had to be received from Washington, D.C. It was even more surprising to learn that permission was being denied, in direct conflict with the recommendation of the local United States Attorney and her assistants in Little Rock, all of them very capable prosecutors.

The chain of events moved swiftly after the Court was advised that the effort to seek death for Lee would in fact go forward. At that point, the trial had been underway for over two months.

---

[2] 374 F.3d 637 (8th Cir. 2004).
[3] 89 F. Supp. 2d 1017, 1032 (E.D. Ark. 2000), rev'd, 274 F.3d 485 (8th Cir. 2001).
[4] No. 4:97CR00243, 2008 U.S. Dist. LEXIS 109771, at * 182 (E.D. Ark. Aug. 28, 2008) (quoting letter).
[5] 89 F.Supp. 2d at 1041.

**Nov. 7, 2014 - Letter to Holder and Thyer**
**Page 3 of 3**

All were weary. After the announcement of the life sentence for Kehoe, but before the jury had decided Lee's fate, I allowed the jurors to return to their homes. I have often wondered whether I made a mistake in not sequestering the jurors for the entire penalty phase.

**Future Dangerousness (Hare "Psychopathy" Tool):**

I set aside the death penalty after concluding that I erred in allowing the introduction of evidence regarding Lee's future dangerousness during the penalty phase of the trial.[6] In making this finding, I held that introduction of the psychopathy evidence improperly emphasized Lee's "future dangerousness" during sentencing even though Lee "chose neither to perform a risk assessment analysis nor to present rebuttal evidence on the future dangerousness aggravating factor" and "was therefore ill-equipped to handle the Government's discussion of psychopathy."[7] Fifteen years later, there is more reason than ever to question the use of the Hare Psychopathy instrument or prejudicial labeling relied upon at sentencing.[8]

I frequently have second-guessed my own decisions in this case and wondered what, if anything, I could have done differently that might have resulted in a more rational outcome. I have no doubt that all involved did the best they could at the time with the knowledge that they had. Still, the end result leaves me with the firm conviction that justice was not served in this particular case, solely with regard to the sentence of death imposed on Daniel Lewis Lee.

Suffice it to say that, now, more than ever, I agree with my following statement, made in concluding that I was unable to grant Lee post-conviction relief under existing law:

> That Petitioner's death sentence is not redressable under existing legal principles does not mean that it constitutes a fair and rational result under the peculiar and special circumstances of this particular case. Perhaps more than anything else, this case illustrates that the most carefully crafted capital punishment regime in the hands of the humans who must carry it out can never be completely free of arbitrariness in all of its implementations.[9]

I wish you both the best. I remain,

Yours truly,

*G. Thomas Eisele*
G. Thomas Eisele

cc:   Karl Schwartz [Attorney for Daniel Lee]

---

[6] *Id.* at 1032.
[7] 89 F. Supp. 2d at 1030.
[8] *See, e.g.,* Kathleen Wayland & Sean D. O'Brien, Deconstructing Antisocial Personality Disorder and Psychopathy: A Guidelines-Based Approach to Prejudicial Psychiatric Labels, 42 Hofstra L. Rev. 519, 521 (2013).
[9] 2008 U.S. Dist. LEXIS 109771 at *185.

<u>Declaration of John F. Edens, Ph.D. Pursuant to 28 U.S.C. § 1746</u>

I, John F. Edens, Ph.D., hereby declare:

1.       I am a licensed psychologist in the state of Texas (license number 31105) and a tenured full professor in the Department of Psychology at Texas A&M University (TAMU), where I serve as the Director of Clinical Training for the Doctoral Program in Clinical Psychology. I received my doctoral degree in clinical psychology from TAMU in 1996, after which I completed a two-year postdoctoral fellowship in forensic psychology in the Department of Mental Health Law and Policy at the Louis de la Parte Florida Mental Health Institute at the University of South Florida. After my fellowship years, I joined the faculty at Sam Houston State University in 1998 and remained there until accepting an academic appointment at Southern Methodist University in 2004. In 2007, I accepted an appointment to return to TAMU. In my role as a faculty member in three Ph.D. training programs, I have been actively involved in the education and training of graduate students in the areas of research methodology, psychological assessment and forensic psychology. I have taught multiple courses in these areas to hundreds of graduate and undergraduate students. I also have conducted advanced training workshops in these and related areas for mental health and legal professionals.

2.       I have conducted research on psychological assessment and the prediction of human behavior since the 1990s and have published over 100 peer-reviewed journal articles, book chapters, and professional manuals related to these topics. Most of my research has focused on forensic and correctional assessment issues, such as the potential for engaging in future violence and other forms of socially deviant behavior. For example, from 2002 to 2006 I was a co-investigator on a $1.3 million research grant from the National Institute of Mental Health that examined the role of psychopathic personality disorder (psychopathy) in the adjustment and

future conduct of prison inmates and substance abusers. Additionally, I am the lead author of the *Personality Assessment Inventory Interpretive Report for Correctional Settings* (PAI-CS), which is an empirically derived, actuarial interpretive system designed to aid in the identification of inmates who have mental health problems and/or are likely to have difficulties adjusting to prison. Aside from scientific research on violence risk issues, I also have published extensively on controversies concerning risk assessment methods and procedures, both in general and in relation to capital murder cases specifically.

3.     Because of my background and expertise in forensic and correctional psychology in general and violence risk specifically, I am frequently called on to evaluate the work of other social scientists, particularly related to risk assessment issues. For example, I am a former Associate Editor for the peer reviewed scientific journal, *Assessment*. In this capacity, I was responsible for judging the scientific merit of research manuscripts submitted for publication and making editorial decisions - with input from peer reviewers - regarding whether these research reports were scientifically rigorous and warranted publication. *Assessment* routinely receives submissions concerning research on forensic and correctional topics, such as the prediction of institutional misconduct. These submissions typically were assigned to me for editorial review because of my experience in this area. I also have been appointed to the editorial boards of various psychology-law journals (*Law and Human Behavior, Behavioral Sciences and the Law, International Journal of Forensic Mental Health*) and journals specifically focused on psychological assessment and abnormal behavior (*Psychological Assessment, Journal of Personality Assessment, Journal of Abnormal Psychology*), where I serve as a peer reviewer of articles submitted for publication. In this capacity, I provide the Editor or Associate Editor with a review of the methodological rigor of the research and a recommendation concerning its overall

2

SUPP.APP.188

contribution to the scientific literature. Over the course of my career I have been asked to serve as an editor or reviewer for hundreds of scientific research reports submitted to a multitude of social science and medical journals.

4.     I am familiar with the published research literature regarding the Hare Psychopathy Checklist-Revised (PCL-R). I also have provided consultative services and training to legal, correctional, and mental health professionals regarding violence risk and the PCL-R and have testified as an expert witness concerning the use of the PCL-R and other risk assessment methods in the assessment of violence before federal and state criminal courts. Finally, I have used the PCL-R in some of my applied clinical work, which has included conducting risk assessments on convicted sex offenders who were being evaluated for possible civil commitment in the state of Texas.

5.     I have been asked in this declaration to provide an opinion as to whether at the time of Daniel Lee's trial, in May of 1999, there was a valid scientific basis to support the use of the PCL-R as an instrument to predict a capital defendant's future dangerousness, and whether the grounds for challenging the PCL-R as a reliable predictor of future violence in prison were available at the time of Mr. Lee's trial.

6.     As I will discuss more fully below, in 1999, at the time of Mr. Lee's trial there was no scientific basis to support the use of the PCL-R as a predictor of his future dangerousness in prison and the grounds for challenging its use for that purpose were known within the scientific and mental health communities.

7.     Scientific research studies were being performed as early as 1997 that examined the relationship between psychopathy scores and violent behavior in male U.S. prison inmates. None of these early studies reported a statistically significant relationship between the PCL-R

3

SUPP.APP.189

Case: 20-2128     Document: 7     Filed: 07/08/2020     Pages: 227

and acts of physical violence in prison, meaning that the state of the science was that scores from this instrument could not be used to identify to any meaningful degree of certainty which U.S. prison inmates were likely to engage in violence. Thus, in 1999 a claim that a high PCL-R score indicated a high risk of future violence in federal prison was not only made in the absence of any empirical support, it actually contradicted the published, available scientific evidence on the subject at that time. Under these circumstances, at the time of Mr. Lee's 1999 trial, an expert could not ethically and responsibly have asserted that a high PCL-R score was predictive of whether an inmate would be violent in a U.S. prison.

8.      In post-conviction proceedings in another federal death penalty case, *United States v. Richard Stitt*, I was asked a question very similar to the one posed here.  In that case, I provided a declaration explaining the reasons why reliance on the PCL-R was inappropriate in 1998—a year prior to Mr. Lee's trial—and explained that these reasons were known at the time. I provided a declaration summarizing the empirical literature regarding the relationship between psychopathy and U.S. prison violence and noted that the literature did not support a finding that a high PCL-R score was a reliable predictor of future violence in prison. I expressed my concern about the scientific and ethical impropriety of reliance on the PCL-R at Mr. Stitt's 1998 trial to identify him as likely to commit acts of violence in prison and stated that, had I been asked for a declaration to this effect at the time, I would have expressed the same reservations in 1998 that I stated in 2000, when I provided a declaration in another federal death penalty case, *United States v. Haynes*.  As such, I would assert the same conclusion with respect to Mr. Lee's case. In 1999, as in 1998, the available scientific research contradicted the claim that there is a link between a high PCL-R score and violence in U.S. prisons. Thus, the basis for a challenge to the PCL-R as a predictor of future prison violence existed at the time of Mr. Lee's trial in 1999.

SUPP.APP.190

Case: 20-2128     Document: 7     Filed: 07/08/2020     Pages: 227

9.     In conclusion, it is my opinion that it was not in 1999, nor is it today, scientifically or ethically defensible to claim that an individual offender with a high PCL-R score is more likely than the typical prison inmate to commit acts of violence in a U.S. prison, given the absence of a meaningful association between the PCL-R and U.S. prison violence.

I declare under penalty of perjury that the foregoing is true and correct.

John F. Edens, Ph.D.
September 13, 2013

5

SUPP.APP.191

Case: 20-2128   Document: 7   Filed: 07/08/2020   Pages: 227

## Declaration of Donald N. Bersoff, Ph.D., J.D.,  Pursuant to 28 U.S.C. § 1746

I, Donald N. Bersoff, Ph.D, J.D., hereby declare the following:

1. I am the 2013 President of the American Psychological Association (APA). I have been a member of the APA since 1965 and was elected a fellow in 1974. I was granted Diplomate status from the American Board of Professional Psychology in 1974. Since 1997 I have presented annual workshops on the ethics and professional standards of forensic testimony for the American Academy of Forensic Psychology. From 1980-1981 I served as president of the American Psychology-Law Society and I am a Fellow of that group.

2. I am currently a Professor Emeritus at the Drexel University's Earle Mack School of Law and an Adjunct Professor of Psychology at Drexel University.

3. From April 2007 to August 2012, I served as a tenured Full Professor at the Earle Mack School of Law and the Department of Psychology.  In those capacities I was the Director of the J.D./Ph.D. Program in Law & Psychology.  Since August of 2001 I have been Professor Emeritus at Villanova University School of Law.

4. From January 1990 to August 2001 I was a tenured Full Professor at the Villanova University School of Law and the Department of Psychology of MCP Hahnemann University (the latter, now merged with Drexel University).  In those capacities, I directed their J.D./Ph.D. Program in Law & Psychology.

5. I have been a faculty member at several other universities, including the University of Maryland School of Law, the Department of Psychology at the Johns Hopkins University, the University of Georgia, and Ohio State University.

SUPP.APP.192

6.     I received a Ph.D. in School Psychology from New York University in 1965 and a J.D. from Yale Law School in 1976.

7.     From 1979-1989 I served as general counsel to the APA during which time I attended every meeting of the APA Ethics Committee, and conducted all appeal hearings from decisions of the Ethics Committee. From 1991-1994 I served on the APA's legislative body, the Council of Representatives, which adopted the 1992 APA Ethical Principles of Psychologists and Code of Conduct (Code of Ethics). From 1994-1997 I served on the APA's eleven member elected Board of Directors. Part of my role was as a member of the Board's ethics subcommittee, reviewing all decisions of the Ethics Committee that led to expulsion or stipulated resignation of APA members. I served on the Council of Representatives again, between 1999-2001, and served as chair of the APA's Policy and Planning Board (1999-2000).

8.     I am the author of Ethical Conflicts in Psychology, originally published by the APA in 1995, and now in its fourth edition (2008).  I am about to prepare the fifth edition at the request of the publisher.  It is a textbook used by a number of graduate departments of psychology as the basic text for courses in ethics. In that book I devote an entire chapter to the standards and ethics of testifying as a psychological expert witness in legal proceedings.

9.     In all, I have published four texts, 26 chapters in texts, 47 articles in peer-reviewed journals, and presented at least 150 papers at major scientific and professional meetings. A great many of these publications and presentations concern ethical, legal, and policy issues in psychology.

SUPP.APP.193

10.     I also serve as an expert witness in cases involving the ethical conduct of psychologists. In that capacity I have been retained – at times on a *pro bono* basis – in civil and licensure board cases, and on occasion in death penalty cases.

11.     I have a particular interest in the use and misuse of social science evidence in the legal system. I have presented and written on this issue extensively.  In July 1997, at the invitation of the Federal Judicial Center, I gave an address at the National Workshop for Magistrate Judges in Denver, Colorado, on The Application of *Daubert* to Forensic and Social Science Evidence. In March and April of 1996, at the Sixth Annual National Symposium on Mental Health and the Law, and at the American Psychology-Law Society, I presented papers on the admissibility of expert psychological testimony. In March 2000, I served as chair of a symposium on the impact of *Daubert* on the admissibility of social science evidence, and I presented a paper on that topic at the biennial meeting of the American Psychology-Law Society.  In October 2000, I moderated an all-day session of a 3-day National Conference on Science and Law, co-sponsored by the National Institute of Justice, the Criminal Justice Section of the American Academy of Forensic Sciences, the National Center for State Courts, the National District Attorneys Association and the National Science Foundation, in collaboration with the National Academy of Sciences and the Federal Judicial Center. I was the counsel of record for a Group of American Law Professors, submitting an *amicus curiae* brief in the original *Daubert* case before the United States Supreme Court in 1993.  In June 2011, I presented a paper, Admissibility of Mental Health Testimony after *Daubert,* at a conference on Forensic Trends:  Psychiatric and Behavioral Issues, in Washington, DC.

12.     I have been retained by counsel for Daniel Lee in the instant matter, for the purpose of advising whether the basis for a legal challenge to government expert Dr. Thomas V.

3

SUPP.APP.194

Ryan's use of the PCL-R to predict Mr. Lee's future dangerousness in prison existed at the time of Mr. Lee's May 1999 penalty phase hearing. Counsel for Mr. Lee have informed me that in an earlier proceeding in this matter, a question arose regarding whether the basis for such a challenge existed in 1999, since Dr. Ryan did not reject the PCL-R as an effective predictor of future conduct until 2000, when a legal challenge was raised by counsel in a different case, *United States v. Willis Haynes*. As I played a role in the *Haynes* matter, having provided a declaration at the request of defense counsel, I address here the question of whether such a challenge could have been raised one year earlier, in 1999.

13. As I explain below, the basis for a challenge to the PCL-R existed at the time of Mr. Lee's trial in 1999.   In fact, Dr. Ryan himself has acknowledged that the basis for such a challenge existed *before* 1999. He did so in a sworn declaration I have reviewed, which was offered in post-conviction proceedings involving an even earlier death penalty trial, *United States v. Richard Stitt*. In Mr. Stitt's post-conviction proceeding, Dr. Ryan disavowed his trial testimony that Mr. Stitt's high PCL-R score rendered him likely to commit acts of violence in prison. The *Stitt* matter was tried in 1998.

14. In the *Stitt* declaration, Dr. Ryan stated that "the basis for a challenge to the use of the PCL-R existed at the time of the *Stitt* trial [in 1998]." Thomas V. Ryan, *Stitt* Declaration, paragraph 6.

15. Dr. Ryan explained further that in 1998, at the time he testified in *Stitt*,

> [i]t was not and still is not possible to conclude to a reasonable degree of scientific certainty, based on studies that were published at the time of the *Stitt* trial or on relevant research published since then, that a correlation exists between high PCL-R scores and federal prison violence."

(Ryan, *Stitt* declaration, paragraph 9).

4

Case: 20-2128     Document: 7     Filed: 07/08/2020     Pages: 227

16. The reason that the basis for a challenge to the PCL-R existed in 1998 and persisted through 1999[1], rests on the fact that the scientific research conducted through those dates did not support using the PCL-R to predict an individual's future dangerousness in prison. Had a challenge to the use of the PCL-R for the purpose of predicting future dangerousness in prison been raised in 1999, I would have provided the same opinion I provided a year later in the 2000 case of *United States v. Willis Haynes* (mentioned above), i.e., that Dr. Ryan's reliance on the PCL-R to predict future dangerousness in prison was unsupported by empirical evidence, did not present an appropriate application of generally accepted ethical principles applicable to psychologists, and violated the generally accepted standards of forensic psychological practice.

17. In 2000, in the *Haynes* case, I, along with four other psychologists, provided expert opinions relating to Dr. Ryan's use of the PCL-R as a basis for predicting that the defendant would be a future danger in prison. The four other psychologists were all highly credentialed leaders in the field of forensic psychology whose expertise included violence risk assessment and who had deep knowledge of the research literature relating to the PCL-R. They offered opinions about the state of the science and whether it supported predictions of the sort offered by Dr. Ryan. Although their conclusions were based on the state of the science in the year 2000, as described above and detailed further below, their statements described equally well the state of the science in 1999, as they focused on the fact that Dr. Ryan's proposed testimony exceeded what the research done to date could support. I was asked to rely on their individual and collective expertise and determine whether Dr. Ryan's proposed testimony was consistent with prevailing

---

[1] In fact, to this day, the scientific research in this area does not support the use of the PCL-R in this manner.

5

Case: 20-2128   Document: 7   Filed: 07/08/2020   Pages: 227

professional standards governing forensic psychologists and whether such testimony could meet the legal requirements of *Daubert*.

18.     Each of the four risk assessment subject matter experts stated that while the PCL-R was useful for some purposes, it was not scientifically defensible to use it to predict the likelihood of an individual's future dangerousness in federal prison, due to the lack of empirical research establishing its reliability and validity for that purpose. Each explained that there was no research base to support the conclusion Dr. Ryan drew concerning the PCL-R and risk of future prison violence. Relevant portions of the *Haynes* declarations include the following.

a.  Dr. Stephen David Hart noted that "to date there are no published, peer-reviewed studies examining the predictive validity of the PCL-R with respect to institutional violence in correctional offenders in the (sic) North America;"

b.  Dr. Kirk Heilbrun stated that "[c]urrently, insufficient research has been conducted to justify the use of the PCL-R for assessing future dangerousness or future risk for aggression amongst populations of criminal offenders during their incarceration. Because of the lack of scientific empirical research on the PCL-R for prediction of institutional violence, we do not know whether an individual's score on the instrument is related to the likelihood that this individual will commit acts of violence or aggression while in a secure prison environment;"

c.  Dr. Norman Poythress knew of "no empirical research (e.g., survey of practitioners) that has attempted to establish a consensus in the psychological community as to the reliability and validity of using the PCL-R in the context of determining future dangerousness in a maximum security prison." He found "it is inappropriate to

6

SUPP.APP.197

conclude that sufficient research has been conducted at this time to reliably assess future behavior of the incarcerated based on PCL-R scores;"

d. Dr. John F. Edens expressed "significant concerns about the appropriateness of using the PCL-R to identify inmates who are highly likely to commit future acts of institutional violence, given the current scientific research base that exists to support the association between psychopathy and institutional aggression while incarcerated."

19. In forming my opinion in the *Haynes* matter I relied on the opinions of Drs. Hart, Heilbrun, Poythress and Edens, as well as the APA's Code of Ethics[2] ("Ethics Code"), the Specialty Guidelines for Forensic Psychologists[3] ("Specialty Guidelines"), and my research on the application of *Daubert* to forensic psychological testimony. One of the major purposes of the Ethics Code and the Specialty Guidelines is to safeguard against the misuse of science and to ensure that only empirically-supported and generally accepted scientific conclusions are presented to a court. The forensic psychologist's status as a credentialed expert can have a profound impact on jury decision-making. For this reason, and to protect the integrity of the profession, the forensic expert's opinion must be firmly grounded in science, based on objective empirical research which has yielded observable and measurable results. I concluded then, and affirm now, that linking a high PCL-R score to a greater likelihood of institutional violence did not represent an appropriate application of generally accepted ethical principles, and violated the generally accepted standards of psychological practice. I also concluded then, and affirm now, that Dr. Ryan's conclusions were inadmissible under *Daubert*.

---

[2] APA, Ethical Principles of Psychologists and Code of Conduct, 47 Amer. Psychologist 1597 (1992). The Ethics Code was revised in 2010 and is retrievable at http://www.apa.org/ethics/code/index.aspx.

[3] Committee on Ethical Guidelines for Forensic Psychologists, 15 L. & Hum. Behav. 655 (1991). The Specialty Guidelines were revised in 2012 and adopted as APA policy. They can be found at 68 Amer. Psychologist 7 (2013).

SUPP.APP.198

Case: 20-2128     Document: 7     Filed: 07/08/2020     Pages: 227

20.   It is my understanding that Dr. Ryan withdrew his report, and that no testimony about the PCL-R was offered at the *Haynes* trial.  To the best of my knowledge, after the litigation in *Haynes*, no prediction of future dangerousness predicated on the PCL-R has been admitted in any federal capital case.

21.   The absence of empirical support establishing a connection between a high PCL-R score and elevated risk of violent behavior in prison existed in May of 1999, at the time of Mr. Lee's penalty phase proceeding. For this reason, in May of 1999 there was a basis for a successful challenge to the use of the PCL-R as misleading and scientifically unsupportable.

I declare under the penalty of perjury that the foregoing is true and correct.

Donald N. Bersoff, Ph.D., J.D.
September 13 , 2013

8

SUPP.APP.199

I, Thomas V. Ryan Ph.D., ABPP, declare as follows:

1. I testified as an expert witness on the issue of future dangerousness in the case of *United States v. Richard Thomas Stitt.*

2. Based on the defendant's score on a psychological instrument called the Psychopathy Checklist-Revised (PCL-R), I testified that he met the criteria for psychopathy. I testified about the defining characteristics of psychopathy and about the utility of the PCL-R as a predictor of future violence in prison. Based upon the defendant's PCL-R score, I offered the opinion that he would be a future danger if sentenced by the jury to life without parole.

3. Based upon my current understanding of the literature and the obvious controversy about forensic clinicians' use of the PCL-R, I would choose not to use this instrument. Although I did not recognize it at the time, I am aware now that the PCL-R is not, and was not, appropriately relied upon to assess an individual's future dangerousness in federal prison. As an ethical and responsible clinician, I am informing all concerned that the statements about the defendant's future dangerousness that I made at trial were not grounded in current scientific literature and I do not stand by them now.

4. My testimony to the best of my recollection, without reviewing the transcript of my testimony about the defendant, included the following statements relating to the PCL-R and psychopathy:

   a) that based on his score on the PCL-R, the defendant presented a high risk of future violence even in the context of a maximum security federal prison;
   b) that because he was a psychopath as defined by the PCL-R, the defendant was essentially untreatable and not amenable to rehabilitation;
   c) that because he was a psychopath as assessed with the PCL-R, the defendant would not "burn out" after age forty like other violent offenders, but instead would continue to be violent;

5. The reasons why it is inappropriate to rely on the PCL-R for assessing the future dangerousness of a capital defendant became apparent to me in the Spring of 2000 when I was preparing to testify as an expert witness for the prosecution in the matter of *United States v. Willis Haynes.* In that case, after the written report of my evaluation was submitted, the defense filed a motion to preclude testimony about the PCL-R and psychopathy. The motion included opinions provided by a number of well-respected authorities on the PCL-R that the scientific literature did not establish a relationship between prison violence and a high PCL-R score that would support a future dangerousness determination. I reviewed those experts' opinions, re-evaluated the scientific literature and consulted with several other forensic psychologists. I then determined that I would withdraw my report. As a result, no testimony about psychopathy or the PCL-R was introduced at that trial.

6. Although the basis for a challenge to the use of the PCL-R existed at the time of the *Stitt* trial, no such challenge was brought by defense counsel. The challenge in *Haynes* rested on the fact that the existing scientific literature did not demonstrate a relationship between PCL-R scores and prison violence sufficient to conclude that a high scorer would likely be dangerous in prison. The *Haynes* motion was filed approximately 18 months after the trial in *Stitt*.

7. My experience in *Haynes* prompted me to review my future dangerousness testimony in the *Stitt* trial.

8. At the time I testified in Stitt, there was enthusiasm among psychologists about the PCL-R's potential use as a tool for assisting mental health professionals in determining whether mentally disordered individuals could safely be released into the community. Because it was a newly developed instrument, however, there were few published, peer reviewed studies examining the predictive validity of the PCL-R with respect to institutional violence in correctional offenders in North America. It was not and still is not possible to conclude to a reasonable degree of scientific certainty, based on studies that were published at the time of the *Stitt* trial or on relevant research published since then, that a correlation exists between high PCL-R scores and federal prison violence.

9. In a comprehensive review of the literature relating to institutional violence and the PCL-R that focused on the use of the PCL-R in capital sentencing proceedings, John Edens, a psychologist with extensive experience in the area of risk assessment, concluded, "the position that PCL-R scores for any one offender provide much useful information regarding his relative or absolute risk for future institutional violence while incarcerated clearly is untenable...." Edens, J., Petrila, J., & Buffington-Vollum, J.K, 2001, Psychopathy and the death penalty: can the PCL-R identify offenders who represent "a continuing threat to society?" Journal of Psychiatry and Law, 29, 433-481. Although other experts have expressed different opinions, I generally agree with Dr. Edens' conclusion, and believe it is an accurate summary of the prevailing view among forensic psychologists.

10. Since withdrawing my report in the *Haynes* case, I have been retained by the government in several other federal death penalty cases, and testified in those that went to trial. In no case have I relied on the PCL-R, because I no longer believe that the PCL-R is a reliable indicator of a defendant's future dangerousness in federal maximum-security prisons due to the lack of peer reviewed empirical studies. Indeed, to the best of my knowledge, the government has not introduced testimony about the PCL-R or psychopathy in any trial since *Haynes*. The government's continued confidence in my work speaks, I believe, to the integrity of my assessments and my professional decision-making.

11. In addition to the PCL-R, I based my testimony in the *Stitt* trial on documents pertaining to the defendant and his history provided by the government, my own clinical interview of Mr. Stitt, my administration and interpretation of both the PCL-R and another psychological instrument, the Minnesota Multiphasic Personality Inventory

(MMPI), and the psychological assessment of the defense psychologist, Dr. Thomas Pasquale, which was provided to me.

12. In the course of discussions with counsel assisting Mr. Stitt in his post-conviction proceedings, I have been advised of significant historical and background facts pertaining to Mr. Stitt that I did not know of at the time of my evaluation and testimony and were not brought to my attention. Had I known of these facts at the time of my evaluation, they may have caused me to arrive at conclusions different from the ones I testified to at trial. Had I not known of them at the time of my evaluation but simply been cross-examined based on assertions that such facts were true, I probably would have testified that such facts, if true, would cause me to question the conclusions that I had previously reached about this individual.

13. I am speaking specifically of information regarding the family history and upbringing of the defendant. I believed and testified that although the defendant was born to a mother who was young and unable to appropriately care for him, he had been raised by a warm and nurturing grandmother until the age of twelve, in a home that was across the street from his maternal and paternal grandfathers, who engaged in fatherly activities with the defendant during his childhood. I believed that the pattern of behavioral problems manifested by the defendant as a child were unexplained by any major mental illness or other factor and therefore that he had manifested a conduct disorder at an early age. This, together with the defendant's continued criminal conduct as an adult, and the psychological profile indicated by his MMPI results, led me to conclude that as an adult the defendant did not suffer from a major mental illness or other mental disorder and was best described as having an antisocial personality disorder.

14. Post-conviction counsel for Mr. Stitt have advised me that their investigation has indicated that in fact his grandmother's home was a chaotic, violent and frequently terrifying environment; that Mr. Stitt lost even that home when his grandmother died when he was eight years old; and, most significantly, that acute mental illness has been diagnosed in Mr. Stitt's mother and at least one (and possibly two) of her siblings.

15. Although all of this information would have been important for my evaluation, the information about the diagnoses of the defendant's mother and her first-degree relatives would be very helpful. I have been advised that the defendant's mother experienced repeated involuntary emergency psychiatric hospitalizations for acute episodes of bipolar disorder, and that at least one aunt has been diagnosed with bipolar disorder as well.

16. Bipolar and other mood disorders have a higher than normal genetic link, and are diagnosed on the basis of an individual's behavior and family history. With an awareness of Mr. Stitt's reportedly remarkable family history of bipolar disorder, his behavior could be cast in a dramatically different light. For example, Mr. Stitt scored high on the mania scale of the MMPI, leading to a recommendation in the report of his scores to consider a diagnosis of mood disorders including manic episodes, hypomanic states, and cyclothymia. I certainly would have seriously considered this result more heavily had I been aware of the diagnoses of Mr. Stitt's mother and his aunt. Instead, I focused on the

psychopathic deviance scale, on which Mr. Stitt also scored high, and emphasized personality qualities that were similar to the features of psychopathy that he had scored high for on the PCL-R.

17. Similarly, I would most likely interpret differently statements that Mr. Stitt made to me during our clinical interview. For example, when asked to rate himself on a scale of one to ten, Mr. Stitt awarded himself a fifteen. He told me that if released he would pursue an acting career in Hollywood, and that he could anticipate no difficulty in achieving such a goal. With an awareness of his bipolar family history, this could be alternatively viewed as those indicative of mania or hypomania, suggesting the possible presence of a mood disorder.

18. Furthermore, information about a bipolar family history would have caused me to question whether the early behavior problems manifested by Mr. Stitt were indications of early onset bipolar disorder. The out-of-control behavior described in the information I was provided about Mr. Stitt's childhood could be consistent with the behavior of children suffering from early onset bipolar disorder, and therefore could have been symptomatic of a mental illness rather than a volitional decision by Mr. Stitt not to conform to societal expectations. If, on cross-examination at trial, Mr. Stitt's counsel had questioned me in this area and informed me about the family history of bipolar disorder, I certainly would have conceded that it raised substantial concerns about the possibility of mental illness in Mr. Stitt.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and recollection at this time.

Thomas V. Ryan, Ph.D., ABPP
May 12, 2003

SUPP.APP.203

Case: 20-2128     Document: 7     Filed: 07/08/2020     Pages: 227

## DECLARATION OF LAURENCE KOMP, Esq.

I, Laurence Komp, declare as follows, pursuant to 28 U.S.C. § 1746:

1.     I am an attorney admitted to practice in Ohio, Kentucky and Missouri.

2.     I have been a practicing attorney for 20 years. The bulk of my practice involves appellate and post-conviction matters, in both state and federal courts. In many of my cases I represent individuals who have been sentenced to death.

3.     On January 19, 2006, I was appointed, *nunc pro tunc* (with the appointment effective as of August 26, 2005) as counsel for Mr. Lee in his 2255 proceeding. On the same date, and in the same manner, this Court also appointed my co-counsel, David Ruhnke.

4.     Mr. Lee had been sentenced to death in a federal capital trial held in the Eastern District of Arkansas in 1999.

5.     During the course of Mr. Lee's 1999 penalty phase hearing, the government sought to establish that Mr. Lee presented a future danger in prison if given a life sentence. The government based its theory in part on Mr. Lee's purported high score on the Hare Psychopathy Checklist-Revised (PCL-R) and the designation of him as a "psychopath" by government expert Thomas V. Ryan, Ph.D., a psychologist. Dr. Ryan evaluated Mr. Lee, assessing him with a high PCL-R score, and concluded that he represented a future danger even if confined to a maximum security prison.

Case: 20-2128   Document: 7   Filed: 07/08/2020   Pages: 227

6. On June 26, 2006, Mr. Ruhnke and I (hereafter "we") filed on Mr. Lee's behalf, a Motion Pursuant to 28 U.S.C. § 2255 to Vacate Conviction and Sentence. [Doc. 1] (hereafter Motion). Before filing the Motion we knew that numerous highly respected and highly credentialed forensic psychologists had declared that there was no scientific or psychological basis to support a link between a high PCL-R score and an individual's potential for engaging in institutional violence in the future, and that this information was known at the time of Mr. Lee's trial. We also knew that Dr. Ryan himself had come to accept these positions.

7. The 2255 raised two claims relating to the Government's and Dr. Ryan's use of the PCL-R.

   a. The first claim, at Point H in the Motion, addressed trial counsel's failure to object to the Government's cross-examination of a defense expert on the issue of psychopathy, based on the fact that the cross-examination was beyond the scope of direct examination. Motion at 33.

   b. The second claim, at footnote 14 in the Motion, asserted that:

   Dr. [Thomas] Ryan, in sworn testimony and affidavits filed after his testimony in this case, has stated that the Hare Psychopathy Checklist (PCL-R) is not an appropriate instrument to be utilized in evaluating the future danger of capital defendants and that he no longer stands by such testimony or analysis.

SUPP.APP.205

Case: 20-2128     Document: 7     Filed: 07/08/2020     Pages: 227

Motion at 34. In the footnote we stated that we "are prepared to offer evidence" in support of the claim. *Id.*

8.     The Motion provided no additional facts in support of the claim raised at footnote 14 (i.e., that the PCL-R was not an appropriate instrument for evaluating an individual's future dangerousness in prison).

9.     The Motion did not include affidavits from experts, or submissions of any kind, in support of the claim raised at footnote 14.

10.     We knew at the time the Motion was filed that there was available evidence from Dr. Ryan himself (i.e., Dr. Ryan's sworn testimony and affidavits) that supported the claim that trial counsel had been ineffective for failing to raise a *Daubert* challenge to the PCL-R evidence.

11.     We also knew, prior to the June 26, 2006 filing, that there was additional evidence that supported the claim, emanating from a wide array of experts in the field of forensic psychology. Prior to filing the Motion we reviewed materials relating to the PCL-R from colleagues experienced in federal death penalty practice. These materials informed us that a number of nationally regarded forensic psychologists with particular expertise in the use and application of the PCL-R had concluded that there was no empirical support for using the PCL-R to assess the likelihood of an individual's future violent conduct in prison. These

experts had rejected the concept that the PCL-R was a reliable evaluative tool for assessing the future dangerousness of an individual in custody.

12. The materials included a memorandum which discussed another death penalty case, *United States v. Willis Haynes,* in which Dr. Ryan had withdrawn an evaluation that had been based on the PCL-R following a challenge to its reliability. The memorandum identified several highly credentialed and nationally renowned forensic psychologists, with particular expertise in the administration and application of the PCL-R, who had challenged Dr. Ryan's use of the instrument to establish future dangerousness in prison. Some had conducted independent research on the PCL-R, and all were well versed in the research literature regarding its use. The materials also included the *Daubert* motion from the *Haynes* case. The *Daubert* motion provided detailed factual, scientific and legal analyses as to why the PCL-R could not reliably predict future dangerousness in prison. The motion also identified additional well-credentialed experts in the field who had submitted affidavits to the Court assailing the reliability of the PCL-R as a risk assessment tool for a person who would remain incarcerated for life. The common theme of these affidavits was that the results of what little research had been done on the relationship between a high PCL-R score and the likelihood of future violence in prison did not support the conclusion that one was related to the other.

SUPP.APP.207

13. Based on this information, we knew, before filing the Motion to Vacate, that leading figures in the field of forensic psychology were willing to author declarations or affidavits, and provide testimony explaining why the use of the PCL-R in the manner employed in Mr. Lee's case was scientifically unacceptable at the time of Mr. Lee's trial, and violated professional and ethical standards.

14. Prior to filing Mr. Lee's Motion to Vacate we did not reach out to any psychological experts, including those who had been identified to us, for the purpose of obtaining affidavits or declarations, or to secure their testimony at a possible hearing pursuant to 28 U.S.C. § 2255.

15. Although we had reviewed the materials containing the *Daubert* motion filed in *Haynes* we pled none of its detailed factual information in support of the claim asserted in footnote 14 of the Motion.

16. Following the District Court's denial of the Motion, and over two years after its initial filing, we filed a 59(e) Motion. In the 59(e) Motion, for the first time, we asserted additional facts in support of the claim raised in footnote 14 and submitted expert affidavits challenging Dr. Ryan's use of the PCL-R (although those affidavits had been prepared for, and submitted in, other cases). In rejecting our submissions as successive, the District Court held that:

> Lee's original § 2255 Petition included only one sentence referencing this argument. That lone reference appeared in a footnote . . . .

SUPP.APP.208

Case: 20-2128     Document: 7     Filed: 07/08/2020     Pages: 227

> Petitioner now devotes over 25 pages to this argument. Clearly, the theory is much more developed now than the cursory reference made in requesting 2255 relief. Again, Petitioner does not explain why the information he now includes was not included in connection with his original petition. Petitioner's conclusory statement that Dr. Ryan, subsequent to his testimony in this case, stopped using the PCL-R to evaluate future dangerousness was not sufficient to place the Court on notice of the full argument that Petitioner now presents.

*United States v. Lee*, No. 406-CV-1608-GTE, 2008 (E.D. Ark.) [Doc. 6 at 11].

17.    There was no strategic or tactical rationale for not asserting the readily available facts in support of our the claim asserted in footnote 14 that the "Hare Psychopathy Checklist (PCL-R) is not an appropriate instrument to be utilized in evaluating the future danger of capital defendants;" nor was there a strategic or tactical rationale for not obtaining and appending supporting documentation to our Motion from any of the forensic psychologists who had demonstrated their willingness to challenge Dr. Ryan's particular use of the PCL-R, based on the fact that such use was scientifically unsupportable, and violated professional and ethical standards. We thought that by pleading the issue we had met the requirements of § 2255.

I declare, under penalties of perjury, that the foregoing is true and correct.

Dated: 9/25/13

Laurence Komp, Esq.

SUPP.APP.209

Case: 20-2128   Document: 7   Filed: 07/08/2020   Pages: 227

## DECLARATION OF DAVID A. RUHNKE, Esq.

I, David A. Ruhnke, declare as follows, pursuant to 28 U.S.C. § 1746:

1.      I am an attorney admitted to practice in the states of New York and New Jersey, as well as in several federal district courts, several federal courts of appeal, and the United States Supreme Court.

2.      I have been a practicing attorney for 37 years. I have considerable experience in death penalty matters, at trial, on appeal and in post-conviction proceedings. I practice in both state and federal courts. I have been a member of the Federal Death Penalty Resource Counsel Project for the past seven years.

3.      On January 19, 2006, I was appointed, *nunc pro tunc* (with the appointment effective as of August 26, 2005) as counsel for Mr. Lee in his 2255 proceeding. On the same date, and in the same manner, this Court also appointed my co-counsel, Laurence Komp.

4.      Mr. Lee had been sentenced to death in a federal capital trial held in the Eastern District of Arkansas in 1999.

5.      During the course of Mr. Lee's 1999 penalty phase hearing, the government sought to establish that Mr. Lee presented a future danger in prison if given a life sentence. The government based its theory in part on Mr. Lee's purported high score on the Hare Psychopathy Checklist-Revised (PCL-R) and the designation of him as a "psychopath" by government expert Thomas V. Ryan,

SUPP.APP.210

Ph.D., a psychologist. Dr. Ryan evaluated Mr. Lee, assessing him with a high PCL-R score, and concluded that he represented a future danger even if confined to a maximum security prison.

6. On June 26, 2006, Mr. Komp and I (hereafter "we") filed on Mr. Lee's behalf, a Motion Pursuant to 28 U.S.C. § 2255 to Vacate Conviction and Sentence. [Doc. 1] (hereafter Motion). Before filing the Motion we knew that numerous highly respected and highly credentialed forensic psychologists had declared that there was no scientific or psychological basis to support a link between a high PCL-R score and an individual's potential for engaging in institutional violence in the future, and that this information was known at the time of Mr. Lee's trial. We also knew that Dr. Ryan himself had come to accept these positions. I had previously litigated this issue in a federal capital case in the District of Massachusetts.

7. The 2255 raised two claims relating to the Government's and Dr. Ryan's use of the PCL-R.

   a. The first claim, at Point H in the Motion, addressed trial counsel's failure to object to the Government's cross-examination of a defense expert on the issue of psychopathy, based on the fact that the cross-examination was beyond the scope of direct examination. Motion at 33.

   b. The second claim, at footnote 14 in the Motion, asserted that:

> Dr. [Thomas] Ryan, in sworn testimony and affidavits filed after his testimony in this case, has stated that the Hare Psychopathy Checklist (PCL-R) is not an appropriate instrument to be utilized in evaluating the future danger of capital defendants and that he no longer stands by such testimony or analysis.

Motion at 34. In the footnote we stated that we "are prepared to offer evidence" in support of the claim. *Id.*

8.     The Motion provided no additional facts in support of the claim raised at footnote 14 (i.e., that the PCL-R was not an appropriate instrument for evaluating an individual's future dangerousness in prison).

9.     The Motion did not include affidavits from experts, or submissions of any kind, in support of the claim raised at footnote 14.

10.     We knew at the time the Motion was filed that there was available evidence from Dr. Ryan himself (i.e., Dr. Ryan's sworn testimony and affidavits) that supported the claim that trial counsel had been ineffective for failing to raise a *Daubert* challenge to the PCL-R evidence.

11.     We also knew, prior to the June 26, 2006 filing, that there was additional evidence that supported the claim, emanating from a wide array of experts in the field of forensic psychology. Prior to filing the Motion we reviewed materials relating to the PCL-R from colleagues experienced in federal death penalty practice. These materials informed us that a number of nationally regarded forensic psychologists with particular expertise in the use and application of the

PCL-R had concluded that there was no empirical support for using the PCL-R to assess the likelihood of an individual's future violent conduct in prison. These experts had rejected the concept that the PCL-R was a reliable evaluative tool for assessing the future dangerousness of an individual in custody.

12.    The materials included a memorandum which discussed another death penalty case, *United States v. Willis Haynes,* in which Dr. Ryan had withdrawn an evaluation that had been based on the PCL-R following a challenge to its reliability. The memorandum identified several highly credentialed and nationally renowned forensic psychologists, with particular expertise in the administration and application of the PCL-R, who had challenged Dr. Ryan's use of the instrument to establish future dangerousness in prison. Some had conducted independent research on the PCL-R, and all were well versed in the research literature regarding its use. The materials also included the *Daubert* motion from the *Haynes* case. The *Daubert* motion provided detailed factual, scientific and legal analyses as to why the PCL-R could not reliably predict future dangerousness in prison. The motion also identified additional well-credentialed experts in the field who had submitted affidavits to the Court assailing the reliability of the PCL-R as a risk assessment tool for a person who would remain incarcerated for life. The common theme of these affidavits was that the results of what little research had been done on the relationship between a high PCL-R score and the likelihood of

future violence in prison did not support the conclusion that one was related to the other.

13.     Based on this information, we knew, before filing the Motion to Vacate, that leading figures in the field of forensic psychology were willing to author declarations or affidavits, and provide testimony explaining why the use of the PCL-R in the manner employed in Mr. Lee's case was scientifically unacceptable at the time of Mr. Lee's trial, and violated professional and ethical standards.

14.     Prior to filing Mr. Lee's Motion to Vacate we did not reach out to any psychological experts, including those who had been identified to us, for the purpose of obtaining affidavits or declarations, or to secure their testimony at a possible hearing pursuant to 28 U.S.C. § 2255.

15.     Although we had reviewed the materials containing the *Daubert* motion filed in *Haynes* we pled none of its detailed factual information in support of the claim asserted in footnote 14 of the Motion.

16.     Following the District Court's denial of the Motion, and over two years after its initial filing, we filed a 59(e) Motion. In the 59(e) Motion, for the first time, we asserted additional facts in support of the claim raised in footnote 14 and submitted expert affidavits challenging Dr. Ryan's use of the PCL-R (although

those affidavits had been prepared for, and submitted in, other cases). In rejecting our submissions as successive, the District Court held that:

> Lee's original § 2255 Petition included only one sentence referencing this argument. That lone reference appeared in a footnote . . . .
>
> Petitioner now devotes over 25 pages to this argument. Clearly, the theory is much more developed now than the cursory reference made in requesting 2255 relief. Again, Petitioner does not explain why the information he now includes was not included in connection with his original petition. Petitioner's conclusory statement that Dr. Ryan, subsequent to his testimony in this case, stopped using the PCL-R to evaluate future dangerousness was not sufficient to place the Court on notice of the full argument that Petitioner now presents.

*United States v. Lee,* No. 406-CV-1608-GTE, 2008 (E.D. Ark.) [Doc. 6 at 11].

17.    There was no strategic or tactical rationale for not asserting the readily available facts in support of our the claim asserted in footnote 14 that the "Hare Psychopathy Checklist (PCL-R) is not an appropriate instrument to be utilized in evaluating the future danger of capital defendants;" nor was there a strategic or tactical rationale for not obtaining and appending supporting documentation to our Motion from any of the forensic psychologists who had demonstrated their willingness to challenge Dr. Ryan's particular use of the PCL-R, based on the fact that such use was scientifically unsupportable, and violated professional and ethical standards. We thought that by pleading the issue we had met the requirements of § 2255.

SUPP.APP.215

I declare, under penalties of perjury, that the foregoing is true and correct.

Dated: 09.25.2013

David A. Ruhnke, Esq.

Case: 20-2128     Document: 7     Filed: 07/08/2020     Pages: 227

IN THE DISTRICT COURT OF OKLAHOMA COUNTY

STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,                )
                                      )
                Plaintiff,            )
                                      )
vs.                                   )   Case No.  CF-90-5292
                                      )
DANIEL LOUIS GRAHAM                   )
                                      )
                Defendant.            )

APPLICATION FOR ATTORNEY FEES

COMES NOW, Kenneth C.Watson, Attorney at Law, and shows to this Court that he was appointed by Judge Susan W. Bragg, Judge of the District Court of Oklahoma County, to represent the defendant, Daniel Louis Graham, in the above- captioned cause.

That on the 2nd, day of October, 1990, the defendant, Daniel Louis Graham was determined by this Court to be an indigent person and counsel was appointed same. Said defendant has been duly defended, and counsel respectfully requests that this Court grant compensation from the Court Fund of Oklahoma County in the amount of $750.00.

WHEREFORE, Kenneth C. Watson, attorney for defendant, prays this Court for an Order directing payment of the sum of $750.00 as and for compensation for appointed counsel in this case.

Respectfully submitted,

Kenneth C. Watson, OBA # 9393
Attorney for Defendant
217 N. Harvey, Suite 100
Oklahoma City, OK 73102
(405) 232-1515

SUPP.APP.217

STATEMENT OF TIME EXPENDED

District Court Case No.   CRF-90-5292

| Date | Service Performed | Time Expended |
|------|-------------------|---------------|
| 10-16-90 | Conference w/Client | 1.5 |
| 10-19-90 | Preliminary Hearing Announcement | 1.0 |
| 10-15-90 | Conference w/District Attorney | 1.0 |
| 11-08-90 | Conference w/Client & Parent | 2.0 |
| 12-07-90 | Preliminary Hearing Conference | 1.5 |
| 12-08-90 | Conference w/Client | 1.0 |
| 12-13-90 | Preliminary Hearing | 6.0 |
|  | TOTAL TIME EXPENDED | 14.0 |

The matter came on for hearing before Judge Hall; District Attorney called witness; hearing held; Court finds crime of Murder I not established by evidence; Court reccomends a Dismissal of Murder I charges and State consider refiling on charge of Robbery I.

SUPP.APP.218

(01/26/1998)

# FEDERAL BUREAU OF INVESTIGATION

Precedence:  ROUTINE                                    Date:  09/14/1998

To: Oklahoma City                    Attn:  SSA [                    ]          b6
                                                                                 b7C

From:  Little Rock
       Squad 2
       Contact:  SA [                                        ]                   b6
                                                                                 b7C

Approved By: [                        ]

Drafted By: [                              ]

Case ID #: 183C-LR-38261   (Pending)

Title: [                                    ]                                    b6
       ET AL;                                                                    b7C
       RICO - TERRORISM

## ARMED AND DANGEROUS

**Synopsis:**  To advise of travel of Little Rock SA [            ]            b6
[            ] to Oklahoma City, Oklahoma 09/17-18/1998, and                    b7C
Granite, Oklahoma week of 09/21/1998.

**Administrative:**  Reference telcall between SSA [              ]
Oklahoma City, and SA [              ]   09/14/1998.

**Details:**  Little Rock SA [                    ] will travel to              b6
Oklahoma City, Oklahoma 09/17-18/1998, and Granite, Oklahoma                    b7C
during the week of 09/21/1998, in support of captioned matter.
Little Rock is involved in pre-trial preparation and
investigation relative to the activities of [            ] and his
creation of an anti-Government, white supremacist group called
the Aryan People's Republic (APR).  Trial has been scheduled for
02/16/1999.

Subject Daniel Lee, aka Daniel Graham, an associate of
[          ] participated in a 1990 murder along with [            ]          b6
[          ] white male, DOB [            ]                                     b7C
[          ] confessed to solely committing the murder and was
sentenced to life imprisonment. [                    ]
                                 Granite, Oklahoma,
[                    ]

Little Rock is in possession of an Oklahoma City Police
Department report concerning the investigation into the incident.
Contacts made with investigators and [                    ]                     b6
telephone [                    ] determined other files and records            b7C
pertaining to the incident are being maintained at the

UPLOADED
W/TEXT ✓ W/O TEXT ___        AGENT COPY SENT
LEADS SET ___
BY [illegible]  DATE 9/15/98                                    9/14/98

2 [        ]      257JESO1.EC          1836-HE-28261-213        SUPP.APP.219 [initials]    b6
                                                                                           b7C

To:   Oklahoma City   From:   Little Rock
Re:   183C-LR-38261, 09/14/1998

prosecutor's office and at the Oklahoma Department of Human
Services, Juvenile Bureau, in Oklahoma City.

 Travel is necessary to review and obtain all records
relative to the 1990 murder in order to determine Lee's level of
participation.  Little Rock anticipates travel to Granite for
interview [          ] and may determine other interviews of
witnesses are warranted at a later date.

 Acting SAC [                    ] Little Rock, concurs with
the planned travel.

b6
b7C

**ARMED AND DANGEROUS**

♦♦

2

SUPP.APP.220

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription _____10/19/98_____

On October 15, 1998, a review was conducted of the prosecution file relative to the murder of JOSEPH JOHN WAVRA at the offices of the Oklahoma County District Attorney, 320 Robert S. Kerr Avenue, Oklahoma City, Oklahoma, telephone (405) 278-1600. The circumstances surrounding the murder, which occurred on July 24, 1990, involved JOHN DAVID PATTON and DANIEL GRAHAM (LEE).

Attached and made a part hereto are documents relative to JOHN DAVID PATTON: an educational and psychological history, guilty plea summary of facts, and an affidavit of JOHNNIE EDWARD ROMO. It should be noted that ROMO had been incarcerated with PATTON and had provided assistance in the filing of appeals.

Investigation on ___10/15/98___ at Oklahoma City, Oklahoma

File # 183C-LR-38261-288                      Date dictated ___10/19/98___

by ___SA JAMES E. SCHANANDORE:jes___

SUPP.APP.221

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

3-7-91: Investigation of case and [ ] background over last month has revealed justification to allow negotiated plea of Life w/o Parole. Δ has lengthy mental history, being prescribed Haldol at time of crime. [ ] only criminal contact in Canadian County is clearly a self Defense situation (by review of police reports and lengthy discussions w/ [ ] of the Mustang P.D.) Juvenile Co-Δ Graham was ultimately pled to a 5 yr D/S on Robbery by Force by previous prosecutor [ ] This was not in exchange for testimony or any other stated reason [ ] and Victim were highly intoxicated on LSD and alcohol. They became inebriated at a party they were jointly attending. [ ]
[ ] of OCPD all agree that LIFE w/o Parole is appropriate [ ]
[ ] agree with disposition and decision not to file a bill of particulars. Likewise, it is my assessment that justice in this case is best served by institutionalizing [ ] for Life w/o Parole possibility.
[ ]

b6
b7C

3-7-91 [ ] w/ atty. [ ] b/f Judge James Gullett enters Neg. Plea of Guilty to Murder I. No bill filed. Sentenced to Life w/o [ ] possibility of Parole. Costs @ $142, VCA @ $30~. No payment date set since [ ] will never gain release. Victim's family present. [ ] is primary representative & V's [ ] Have spent some time counseling with her about the case. She agrees w/ sentence. [ ]

b6
b7C

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

_____

No:  13-2058

_____

Ernest Cornelius Williams

Petitioner - Appellant

v.

Paul K. Delo

Respondent - Appellee

_____

Appeal from U.S. District Court for the Eastern District of Missouri - St. Louis
(4:13-cv-00137-JAR)

_____

## JUDGMENT

Missouri prisoner Ernest C. Williams seeks a certificate of appealability following the district court's order construing his Fed. R. Civ. P. 60(b) motion as a successive 28 U.S.C. § 2254 petition and denying it for lack of our authorization.  In his motion, Williams alleged ineffective assistance of state post conviction relief counsel excused the procedural default of his federal habeas claims in light of Martinez v. Ryan, 132 S. Ct. 1309 (2012) (ineffective assistance in initial-review collateral proceeding on claim of ineffective assistance at trial may provide cause for procedural default in federal habeas proceeding).  We conclude Williams's motion was a true Rule 60(b) motion.  See Gonzalez v. Crosby, 545 U.S. 524, 532 & n.4 (2005) (Rule 60(b) motion should not be treated as successive habeas motion if it asserts previous ruling precluding a merits determination, such as denial for procedural default, was wrong); Adams v. Thaler, 679 F.3d 312, 319 (5th Cir. 2012) (holding Rule 60(b) motion challenging rejection of § 2254 petition for procedural default in light of Martinez should not be construed as successive § 2254 petition, thus district court had jurisdiction to consider motion).  Accordingly, we grant a certificate, and reverse and remand for the district court to consider Williams's Rule 60(b)

SUPP.APP.223

motion in the first instance.  See Spitznas v. Boone, 464 F.3d 1213, 1219 (10th Cir. 2006) (if

court of appeals determines district court improperly characterized true Rule 60(b) motion as

successive petition, court of appeals ordinarily remands to permit district court to address true

Rule 60(b) issues).

September 23, 2013

Order Entered at the Direction of the Court:
Clerk, U.S. Court of Appeals, Eighth Circuit.

_____
/s/ Michael E. Gans

SUPP.APP.224