IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

DANIEL LEWIS LEE,
                    Petitioner-Appellant,        Case No. 20-2128

v.                                               CAPITAL CASE
                                                 EXECUTION SCHEDULED FOR
UNITED STATES OF AMERICA                         JULY 13, 2020
                    Respondent-Appellee.

MOTION FOR STAY OF EXECUTION

## I.     INTRODUCTION

Petitioner Daniel Lee respectfully requests a stay of execution pending the

Court's consideration of his appeal now before this Court.

In his appeal, Mr. Lee seeks redress for grave constitutional violations that

he has never had a meaningful opportunity to remedy. First, he has set out well-

supported allegations to establish that his Sixth Amendment rights were violated

when his trial counsel failed to challenge inflammatory "junk science" purporting to

show Mr. Lee was a "psychopath," which the Government used to persuade jurors

he would be a danger in the future.[1] He has also established prejudicial

constitutional violations, one in contravention of *Brady v. Maryland*, 373 U.S. 83

(1963), and the other of *Napue v. Illinois*, 360 U.S. 264 (1959), both related to the

Government's false and misleading assertions that Mr. Lee committed a prior

---

[1] As required by Seventh Circuit Rule 22(h)(3)(ii) and (iv), Mr. Lee's cites are to the
documents that have already been incorporated and filed with this Court as part of
the record. A certificate of appealability (COA) is not attached per Circuit Rule
22(h)(3)(i) because the appeal is from a § 2241 petition, which has is no COA
requirement. Any additional materials are attached as Exhibits to this motion.

murder and got away with it. The prosecution relied on this fabricated claim as well to prove to jurors Mr. Lee would be dangerous if not put to death. These are the two pillars on which Daniel Lee's death sentence rests, and they are both hollow.

Mr. Lee has diligently sought to vindicate his rights. Two federal judges in separate proceedings found that these infirmities tainted the outcome of his sentencing; yet both were precluded from granting relief because of structural problems in the §2255 statute. The appeal before this Court will decide whether a man should be executed on Monday despite an unconstitutional death sentence.

As discussed below, granting Mr. Lee's request for a stay poses minimal harm to the Government and none at all to the public. The words of another court faced with a looming execution date and important unresolved questions are on point here: "[N]o significant harm to the public interest could arise from the proper, informed, deliberate adjudication" of Mr. Lee's claims. *See Harris v. Johnson*, 323 F. Supp. 2d 797, 810 (S.D. Tex. 2004). Rather, in a case like his, where the local prosecutors who tried the case, the respected federal judge who presided over the trial, and the family members of the victims have all voiced their belief that a death sentence is not the just punishment for him, the equities weigh heavily in Mr. Lee's favor. In light of the imminent, irrevocable harm to Mr. Lee that would result from his unjust execution and for the additional reasons discussed below, Mr. Lee believes issuance of a stay of execution is warranted.

## II.     MR. LEE IS ENTITLED TO A STAY OF EXECUTION

A stay of execution is an equitable remedy, and, this Court has explained that "[t]he law governing stays of death sentences is, in general, the same as that employed in other situations." *Williams v. Chrans*, 50 F.3d 1358, 1360 (7th Cir. 1995). Thus "the moving party must demonstrate" four facts: (1) "a likelihood of success on the merits"; (2) "a lack of an adequate remedy at law"; (3) that "an irreparable harm will result if the injunction is not granted"; and (4) "that a balancing of the equities falls in [the movant's] favor," with the "critical factor" being "whether the inmate has delayed unnecessarily in bringing the claim." *Lambert v. Buss*, 498 F.3d 446, 451-452 (7th Cir. 2007) (citation omitted). These factors favor staying Mr. Lee's execution while this Court resolves his appeal.

### A. Mr. Lee Can Demonstrate a Significant Possibility of Success on the Merits of His Claims.

As noted previously, Mr. Lee has raised three compelling grounds for relief: that he was deprived of a meaningful opportunity to vindicate his Sixth Amendment trial rights; that the prosecution suppressed material information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and that the prosecution presented testimony it knew or should have known was false and misleading to jurors at his sentencing in violation of *Napue v. Illinois*, 360 U.S. 264 (1959) and *Giglio v. United States* (1972). *Lee v. Warden USP Terre Haute, et al.,* No. 2:19-cv-00468-JPH-DLP (S.D. Ind.)[2] at Dkt. 1. He has been denied relief on these claims,

---

[2] Citations to documents and pleadings filed in the district court below, and part of the record in this appeal, are "Dkt. [#]".

3

not because of their merits but because the §2255 statute was interpreted in such a way as to preclude review entirely of the claims. This Court may issue the requested stay of execution if Mr. Lee shows the likelihood of success on the merits of any one of these.

### 1. It is highly likely that Mr. Lee will prevail on his Sixth Amendment claim.

Mr. Lee has a strong case that the court below erred in holding that his IAC claim was foreclosed by §2255. Unlike the petitioner in *Purkey v. United States*, 2020 WL 3603779 (7th Cir. July 2, 2020), Mr. Lee is not contending that the §2255 process was inadequate because his postconviction counsel performed ineffectively. Nor is he asking this Court to permit him to raise a new claim under §2241. His situation is a very different one: the §2255 court had Lee's IAC claim before it during the initial postconviction proceeding, but the court found it was foreclosed from considering the claim due to §2255 counsel's procedural errors. When the subsequent decision[3] in *Trevino v. Thaler,* 569 U.S. 413 (2013) created a remedy for those errors, courts nationwide in §2254 and §2255 cases held that the remedy could be presented to them via a Rule 60(b) motion. In Mr. Lee's case, however, the Eighth Circuit issued a universal edict that Rule 60(b) would not be available to federal prisoners in the identical position. Supp.App.117 & 121.[4] That determination rendered a part and parcel of the §2255 proceedings ineffective and

---

[3] The Supreme Court's decision was issued after Mr. Lee's initial §2255 was denied.

[4] Citations to "Supp.App." refer to Petitioner-Appellant's Supplemental Appendix which was filed with the opening brief on July 8, 2020.

4

inadequate to vindicating trial level violations of the Sixth Amendment. *See Purkey*, 2020 WL 3603779 at \*7 (ruling against Purkey but recognizing that "a federal prisoner could seek to reopen an action under Section 2255 using Federal Rule of Civil Procedure 60(b) on reasoning that is analogous to *Martinez* and *Trevino*.").

Mr. Lee's argument before this Court is likely to prevail. In fact, the Government itself has agreed: in the recent *Purkey* argument it told this Court that it understands access to 60(b) is a necessary part of §2255 to correct an error like the one that occurred in Mr. Lee's case:

> Well, I do think there are other equitable remedies and I think if you are really talking about there being some procedural bar, something about counsel performance created a procedural bar to hearing the claim, then I think 60(b) is the avenue.

Oral Arg. Available at http://media.ca7.uscourts.gov/sound/external/mn.19-3318.19-3318_06_16_2020.mp3 (last visited July 6, 2020).

But, through no fault of his own, this equitable remedy was not made available to Daniel Lee. Under the very particular circumstances of his case, §2241 must be available to rectify the absence of a corrective process.

Mr. Lee's underlying IAC claim is also meritorious. Mr. Lee has presented a substantial claim of trial ineffectiveness based on trial counsel's unreasonable failure to properly challenge the Government's use at the penalty phase of a deeply unreliable and misleading forensic tool—the Psychopathy Checklist (PCL-R)—to prove future dangerousness for a capital defendant. Dkt. 1. at 6 et seq. Mr. Lee has also demonstrated that trial counsel's failure was prejudicial.

Although it was standard practice by the defense bar at the time of the Mr. Lee's trial to contest this use of the PCL-R, defense counsel failed to investigate and challenge the Government's expert, Dr. Ryan, on these grounds. Dkt. 1 at 14. Had they done so, it is clear that the jury would never have heard the damning PCL-R evidence because Dr. Ryan would have withdrawn his opinion on the matter entirely, as he had in two other federal capital cases cited by Mr. Lee. *United States v Haynes,* No 8:98-cr-00520-PJM-1 (D. Md.), and *United States v. Stitt,* No. 2:98-cr-00047-RAJ-RJK-1 (E.D. Va.).

This was a grievous error. And as Eastern District of Arkansas Judge G. Thomas Eisele, the judge who presided over the trial, has found, it is very questionable whether absent that evidence the jury would have sentenced Mr. Lee to die. Supp.App.12.

Based on the unique facts and circumstances of his case, it is clear that a structural problem precluding effective §2255 review has occurred. Given the compelling circumstances of his case and the judicial finding that without the PCL-R evidence Mr. Lee would not likely have been sentenced to death, Mr. Lee must have access to a forum to receive at least one meaningful opportunity to present the claim. This is one of those rare situations where the §2255 remedy has proved inadequate to "test the legality" of his sentence of death; as such, this Court has—as his §2241 petition sets forth—jurisdiction to both consider and provide a remedy for the violation of his Sixth Amendment right to effective trial counsel. Dkt. 1 at 30-41; *see Barefoot v. Estelle*, 463 U.S. 880, 895 (1983); *see also, Garza v. Lappin,* 253 F.3d

918, 920-21 (7th Cir. 2001) (quoting *Delo v. Stokes*, 495 U.S. 320, 321 (1990)). In light of the legal and factual complexity of Mr. Lee's case, this Court should grant a stay to ensure careful appellate review before Mr. Lee is executed.

### 2. It is highly likely that Mr. Lee will prevail on his *Brady* and *Napue* claims.

Mr. Lee has, in his §2241 petition, also made a compelling case for relief based on the Government's suppression of favorable, material evidence that would have rebutted a predicate fact alleged at trial as a central part of the future dangerousness aggravator—that Mr. Lee was legally responsible for the murder of Joseph Wavra in Oklahoma when he was a teenager but that he had "gotten away" with it when he was allowed by state prosecutors to plead guilty to robbery. Dkt. 1 at 44, 52.

As Mr. Lee has explained in his §2241 petition, newly-discovered facts show that the robbery plea was not a "gift" from the state prosecutors as the Government told Mr. Lee's capital jury but rather was mandated by an Oklahoma judge who found lack of probable cause to support the charge altogether. Dkt. 1 at 45-47; Supp.App.218. Mr. Lee has made credible allegations that the Government knew this fact because federal agents worked closely with Oklahoma law enforcement officials in the investigation and presentation of the Wavra evidence at Mr. Lee's federal capital sentencing (where those same Oklahoma agents testified). In addition, once again, an Arkansas federal district court (J. Leon Holmes presiding) has already determined that if it was true that "the Okahoma state court held a preliminary hearing that the evidence was insufficient to establish probable cause

7

that Lee was guilty of murdering Joey Wavra, that evidence is material." Supp.App.137.

Mr. Lee has also alleged, in connection with the Wavra matter, that the Government violated due process by presenting evidence that was false or that created a false impression and allowing this evidence to stand uncorrected in violation of *Napue*. He has set forth in his §2241 petition a well-supported basis for relief regarding this alleged constitutional violation and established credible allegations that the Government knew or should have known that the Wavra evidence was false and/or misleading. Dkt. 1 at 41 et seq. Given the centrality of this evidence to the Government's presentation at sentencing, it was reasonably likely that it affected the judgment of the jury.

Mr. Lee also has set out facts establishing that he has been unable to obtain judicial review of these claims through no fault of his own. Due to a separate structural problem with §2255—the statute does not allow him access to a remedy for these constitutional violations because the newly discovered evidence of misconduct undermines his sentence rather than conviction—review is foreclosed in the Arkansas district court and the Eighth Circuit.

Mr. Lee can thus show a strong likelihood that he will succeed on the merits of his *Brady* and *Napue* claims. He is facing imminent execution; he has proven that his death sentence was obtained through Government misconduct; and a federal court has determined that the misconduct was prejudicial in that he would have not otherwise been sentenced to death. Under these exceptional circumstances, and in

8

light of the inability of §2255 process to address these violations in his particular case, this Court should stay his execution pending appeal in this Court.

### B. Mr. Lee Has No Adequate Remedy at Law.

This Court has recognized that "'a stay of execution is an equitable remedy,'" and Mr. Lee has "no adequate remedy at law." *See Lambert*, 498 F.3d at 452 (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)). "This factor weighs in [Mr. Lee's] favor." *Id.*

### C. Mr. Lee Will Suffer Irreparable Injury Without a Stay.

Mr. Lee would suffer irreparable injury if the Court were to deny his motion for a stay of execution. In the absence of a stay, Mr. Lee would face the irreversible taking of his life by the Government, without ever having had a meaningful opportunity to remedy the grave constitutional violations that infected his trial, including those Mr. Lee alleges were perpetrated by the Government itself. *See, e.g., Wainright v. Booker*, 473 U.S. 935, 935 n.1 (1985) (Powell, J., concurring in decision to vacate stay of execution) ("The third requirement—that irreparable harm will result if a stay is not granted—is necessarily present in capital cases."); *Evans v. Bennett*, 440 U.S. 1301, 1306 (1979) (granting stay of execution in light of the "obviously irreversible nature of the death penalty"); *Williams v. Chrans*, 50 F.3d 1358, 1360 (7th Cir. 1995) (in acknowledging that "[t]here can be no doubt that a defendant facing the death penalty at the hands of the state faces irreparable injury," court notes importance of "substantial grounds" upon which relief may be

9

granted). Mr. Lee's harm is imminent and would be beyond remediation if a stay did not issue.

### D. The Balance of Harms Weighs in Mr. Lee's Favor.

On the other hand, the Government's interest in carrying out the execution of Mr. Lee on July 13, 2020, before he has a fair opportunity for full appellate review of the merits of his claimed constitutional violations, does not, as explained below, constitute "substantial harm."

As an initial matter it should be noted that Mr. Lee is not requesting a permanent injunction. *See, e.g. Harris*, 323 F. Supp. 2d at 809 (finding "little potential for injury" as a result of a delayed execution date). He is merely requesting that the Court stay his execution so that his substantial grounds for relief may be properly considered.

Moreover, Mr. Lee has diligently pursued relief for the alleged constitutional violations every step of the way in the Arkansas district court, the Eighth Circuit, the U.S. Supreme Court, and the court below. He filed his motion pursuant to Fed. R. Civ. P. 60(b) raising the PCL-R issue on September 27, 2013, within months of *Trevino* being decided, and while his petition for writ of *certiorari* from the denial of his initial §2255 motion was still pending in the Supreme Court. *See also, Lee v. United States*, 135 S.Ct. 72 (2014) (Mem.) (denying petition October 6, 2014). When undersigned were appointed in August 2014[5], they undertook review of the

---

[5] *See United States v. Lee*, No. 14-2853 (8th Cir. Aug. 7. 2014) (Order Appointing Counsel).

voluminous trial and subsequent record—this was a complex case brought under the Racketeering Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. §§1961-1968, involving co-defendants and co-conspirators, and investigation by multiple state and federal law enforcement agencies—and, as soon as practically possible after the facts came to light, timely filed a motion pursuant to §2255 raising the issues stemming from the Wavra matter. In the district court and on appeal, Mr. Lee attempted—unsuccessfully—to utilize the §2255 vehicle to vindicate his rights.

Mr. Lee's §2241 petition has been pending in the district court since September and only became ripe for appellate review on June 26, 2020.

Throughout the course of this prior litigation, the Government, with apparently little sense of urgency, took several filing extensions, including nine lengthy extensions in the Supreme Court,[6] before it responded to his petition for writ of *certiorari* seeking review of the denial of his 60(b) motion.

While he was in the process of appealing the denial of his §2255 motion raising the issues pertaining to the false presentation on the Wavra matter, the U.S. Department of Justice, on July 25, 2019, set an execution date for Mr. Lee and

---

[6] *See e.g., United States v. Lee, No. 4:97-CR-0243-KGB-2 (E.D. Ark.)* Doc. 1234 (order granting Government request for extension); Doc. 1302 (order granting Government request for extension); Doc. 1306 order granting Government request for extension) (attached as Exhs. C, D, & E). The *cert* petition was filed in the Supreme Court on April 13, 2016. The Government's Brief in Opposition was not filed until March 13, 2017. *See Lee v. United States*, No. 15-8942.

11

four other men under a new execution protocol, with Mr. Lee's scheduled first.[7]

These actions were especially surprising because the DOJ had been, for more than

ten years, engaged in a lawsuit in a district court in the District of Columbia

brought by several men under federal death sentence challenging the federal lethal

injection protocol.[8] The Department had, for eight years, been providing regular

joint status updates regarding the Federal Bureau of Prisons (BOP)'s execution

protocol and assuring the D.C. District Court judge that the DOJ was still in the

process of creating a new protocol.[9] Rather than announcing the new protocol in the

lethal injection litigation and defending it in the ongoing and transparent process in

federal court in Washington, D.C., the DOJ issued a press release simultaneously

announcing a new protocol and setting execution dates for five individuals,

including Mr. Lee.

Last December, the Government was enjoined from executing Mr. Lee and

four others based on legal challenges to the issuance of the BOP's lethal injection

protocol. On April 7, 2020, in a fractured 2-1 opinion, the United States Court of

---

[7] *See* Press Release, U.S. Department of Justice, Federal Government to Resume Capital Punishment After Nearly Two Decade Lapse (July 25, 2019), available at https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse (last visited November 7, 2019); *see also* Notice of Adoption of Revised Protocol, *Roane v. Barr*, Civ. No. 05-2337, (D. D.C. July 25, 2019) (Doc. No. 385) (notifying plaintiffs in ongoing litigation challenging federal lethal injection protocol of revised protocol).

[8] *See, generally, Roane v. Barr*, Civ. No. 05-2337, (D. D.C. July 25, 2019).

[9] *See, e.g.,* Parties' Joint Status Report, *Roane v. Barr*, Civ. No. 05-2337 (D.D.C. May 1, 2019) (Doc. No. 383).

Appeals for the District of Columbia Circuit ruled against the four plaintiffs, subsequently denied rehearing on May 15, 2020 and issued its mandate on Friday June 12, 2020. *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020) (per curiam) ("*In re FBOP*"). The very next working day, the F.C.C. Terre Haute Complex Warden issued a letter notifying Mr. Lee that his execution date had been set for July 13, 2020.

It is under these extenuating circumstances of the Government's own making that have essentially short-circuited Mr. Lee's pursuit of justice. It cannot now credibly claim substantial harm will be done if the Court stays his July 13th execution date in order to consider his claims. This is not an eleventh-hour stay request like those that have been denied due to a prisoner's delay. *See, e.g., Hill*, 547 U.S. at 584 ("A court considering a stay must also apply a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.") (internal quotation marks and citations omitted). Rather, it is a case with substantial grounds for relief alleged, and compelling equities at its core; when the Government's lack of harm is compared to the irreparable injury that Mr. Lee would suffer in the absence of a stay, the balance of hardships tips decidedly in his favor and strongly supports the issuance of the stay of execution.

### E. The Public Interest Weighs in Favor of a Stay.

The public interest also weighs in favor of a stay of Mr. Lee's execution. There is no public interest in an unconstitutional execution: a stay would vindicate the

13

public's interest in making sure that the federal government does not violate the U.S. Constitution. Mr. Lee seeks a stay to have a meaningful opportunity to have this Court consider the serious allegations that without *either* the ineffective representation provided him *or* the government misconduct there would have been no death sentence here. A short delay of the hastily-set execution for this purpose would not disserve the public interest. *See e.g., Harris*, 323 F. Supp. 2d at 810.

In Mr. Lee's case, however, the actual interests of the public in going forward with an execution now are well-documented and starkly different from the abstract interests the Government may try to assert, despite knowing better. The Eastern District of Arkansas Judge who presided at trial has always been opposed to Mr. Lee's execution. Long before the new evidence in this appeal came to light, he had written:

> That Petitioner's death sentence is not redressable under existing legal principles does not mean that it constitutes a fair and rational result under the peculiar and special circumstances of this particular case….the end result leaves me with the firm conviction that justice was not served in this particular case, solely with regard to the sentence of death imposed on Daniel Lewis Lee.

Exh. A (Letter from Mr. Lee's trial and initial §2255 Judge Eisele to A.G. Holder et al.).

Former Assistant United States Attorney and lead prosecutor in Mr. Lee's case, Dan Stripling, also opposes Mr. Lee's execution. He is convinced that the disparate sentencing outcomes in this case—Mr. Lee's death sentence, compared with his more culpable co-defendant's life-without-parole sentence—were the result of arbitrary factors given the evidence against the two men:

14

> There is simply no knowing why, under the facts before the jury, Lee was given a death sentence and Kehoe not. Kehoe is intelligent, appeared clean cut, and had support of convincing witnesses who genuinely supported him. Lee had none of those benefits. If this was the reason for the jury's decision, life should not be taken because of these disparities.

Exh. B (Letter from Former AUSA Dan Stripling to A.G. Holder).

Although in its execution notice, Defendants unthinkingly invoked the interests of "the families left behind" when setting Mr. Lee's execution date, the actual family members of the victims, including Earlene Branch Peterson, mother of Nancy Mueller and grandmother of Sarah Elizabeth Powell, do not want Mr. Lee executed and has made her views known publicly. *See* Sadie Gurman, "First federal execution since 2003 is set for Monday," Wall Street Journal, July 9, 2020. (https://www.wsj.com/articles/first-federal-execution-since-2003-is-set-for-monday-11594292401) ("A conservative Trump supporter, Ms. Peterson sent the president a videotaped plea begging him to commute Mr. Lee's sentence to life in prison, the same punishment Mr. Kehoe received. 'We were hopeful that they had heard us and maybe listened to us, but that's not what they have done,' Ms. Peterson said in an interview. 'Putting Daniel Lee to death would dishonor my whole family. That's not how we live our lives.'").[10]

---

[10] Mrs. Peterson's request to the President was shared in a video that can be viewed at https://vimeo.com/user104267544 and is embedded in the article Max Brantley, "Murder victim's family urge Donald Trump to spare life of man facing execution," Arkansas Times, June 25, 2020 (https://arktimes.com/arkansas-blog/2020/06/25/murder-victims-family-urge-donald-trump-to-spare-life-of-man-facing-execution).

Given the concern voiced by members of the public who would usually be supporting a given sentence, it is fair to ask who in the public would be well served by executing Mr. Lee now, before he has had meaningful review of these strong claims. The rare opposition of the lead prosecutor and trial judge—one sought the death penalty and the other presided over both the trial and post-conviction proceedings—should give pause. Given the lack of expected support for executing Daniel Lee in this case, it is difficult to see in whose interest suddenly rushing this execution truly might be.

It is even harder to understand why, whatever minimal public interest may exist for executing Mr. Lee, that the moment must be now, in the middle of the worst pandemic and health crisis in over a century. The execution of Mr. Lee is no local, isolated event; roughly 150 employees of the Bureau of Prisons would converge on Terre Haute; no fewer than forty people from the Bureau and the Department of Justice will be involved in the execution; and members of the media, clergy, members of the execution team, and various other witnesses would arrive from around the country.[11] Undersigned counsel Moon, is stationed in Houston, Texas, which is reporting record-setting new cases (10,000+) daily. *See* J. Edward Moreno, "New Texas COVID-19 cases jump by more than 10K for first time," The Hill, July 7, 2020.[12] Undersigned counsel Kouros is responsible for the care of his

---

[11] *See* Exh. F (In Re FBOP, No. 1:19- mc-145-TSC, Declaration of Rick Winter, Doc. 54 (D.D.C. Nov. 21, 2019)).

[12] Available at: https://thehill.com/homenews/state-watch/506262-new-texas-covid-19-cases-jump-to-more-than-10k-for-first-time) (last visited July 8, 2020).

16

elderly mother and father, the latter of whom has Parkinson's disease, heart disease, diabetes, and kidney damage[13] and is reliant on the undersigned to prepare and sort his many daily medications. For either to attend their client's execution would mean risk to themselves, their families, and potentially the greater public as well. Despite any precautions that BOP claims to be employing to reduce the risk for witnesses to the execution, the very act of traveling to and from Terre Haute poses serious risks of being exposed to and contracting the virus.

Under these circumstances, where it benefits the public for Mr. Lee's constitutional rights to be fully considered; where the trial judge, the trial prosecutors, the family of the victims who attended the trial daily all oppose this execution; and where the public health and safety would be put in real jeopardy by going forward in the midst of a terrible and escalating national crisis, the public interest clearly weighs in favor of a stay.

## CONCLUSION

Mr. Lee has demonstrated that all of the relevant factors weigh heavily in favor of this Court issuing a stay of execution pending appeal in this Court so that Mr. Lee may vindicate his rights and have the merits of his substantial grounds for relief properly considered.

---

[13] Mr. Kouros obtained verbal authorization from his father to disclose this information in a public filing.

17

Respectfully submitted,

/s/ Morris H. Moon
MORRIS H. MOON
Bar Number 24032750 (TX)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

/s/ George G. Kouros
GEORGE G. KOUROS
Bar Number 420813 (CT)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

18

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A).

1. Exclusive of the exempted portions of the motion, as provided in Fed. R. App. P. 32(f), the motion contains 4,739 words.

2. The motion has been prepared in proportionally spaced typeface using Microsoft Word for Office Professional Plus 2016 in 12-point Century font. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied on the word count feature of this word processing system in preparing this certificate.

/s/ George G. Kouros
GEORGE G. KOUROS

July 10, 2020

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the Seventh Circuit using the CM/ECF system on July 10, 2020. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ George G. Kouros
GEORGE G. KOUROS
Bar # 420813 (CT)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (301) 821-0855
Email: George_Kouros@fd.org

Index of Exhibits

Exh. A:     Letter from Mr. Lee's trial and initial §2255 Judge Eisele to A.G. Holder et al.

Exh. B:     Letter from Former AUSA Dan Stripling to A.G. Holder

Exh. C:     *United States v. Daniel Lee*, No. 4:97-cr-243 (E.D. Ark. Oct. 10, 2013), Doc. No. 1234 (Order granting USA motion for extension)

Exh. D:     *United States v. Daniel Lee*, No. 4:97-cr-243 (E.D. Ark. Oct. 1, 2018), Doc. No. 1302 (Order granting USA motion for extension)

Exh. E:     *United States v. Daniel Lee*, No. 4:97-cr-243 (E.D. Ark. Nov. 8, 2018), Doc. No. 1306 (Order granting USA motion for extension)

Exh. F:     Declaration of Rick Winter

# EXHIBIT A



# G. THOMAS EISELE

**Little Rock, AR**

November 7, 2014

Eric H. Holder, Jr.
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

Christopher R. Thyer
United States Attorney
Eastern District of Arkansas
P.O. Box 1229
Little Rock, Arkansas 72203

Re:    *United States v. Daniel Lewis Lee,*
       Eastern District of Arkansas, Court Case No. 4:97-cr-000243

Attorney General Holder and U.S. Attorney Thyer:

I am the federal judge who presided over the criminal trial of Daniel Lee ("Lee") back in 1999, the result of which was a penalty of death being imposed upon Lee, but not on the ringleader Chevie Kehoe ("Kehoe").  I am 91 years old, and I have not had an active docket for several years.

I was informed by counsel for Daniel Lee ("Lee") in a letter dated October 6, 2014, that settlement discussions were ongoing between the Government and Lee's current counsel regarding whether a life sentence "best serves the interests of justice."   I declined Lee's counsel's request for an in-person meeting, but took under advisement whether to write a letter. Since that time, I have given considerable thought to the matter.

 I obtained copies of and reviewed the prior opinions in the case for the purpose of squaring my memories of the case with the legal record.[1]  I feel compelled to write this letter, which I would not normally do, because I believe that requiring Lee to pay the ultimate penalty – death – is unjust under the peculiar circumstances of this case.  Of course, this is nothing more than my view, entitled to no weight other than that which you in your official positions deem appropriate.

All who review the record will recognize the unequal and disparate roles that Kehoe and Lee played in their horrific crime spree, which Kehoe directed and Lee joined intermittently.  Kehoe

---

[1]  The facts and opinions expressed herein are consistent with the record in this case and the views expressed in my post-trial rulings and opinions.

recruited Lee. Kehoe was the charismatic leader; Lee the obedient follower. Lee "participated in the murder of the adults, but would have no part in the killing of [8-year-old] Sarah Powell so Kehoe had done it alone."[2] There was no question that Kehoe was the more culpable of the two with regard to the criminal acts charged in the indictment and proved at trial.

This clear disparity in culpability was recognized when "the Government announced *in camera* [while the jury was considering the penalty phase in Kehoe's case] that if the jury sentenced Defendant Kehoe to life imprisonment, it would not pursue the death penalty for Defendant Lee."[3] As I wrote in a letter to the parties shortly after the death verdict was returned:

> Before the jury determined that Mr. Lee should die, all of the attorneys in the case appeared to be of a mind that the death penalty would be inappropriate in the case of Mr. Lee because the jury had failed to sentence Mr. Kehoe to death. Everyone seemed to be in agreement that the death penalties for both defendants would have been a possible and appropriate outcome, and life without parole for both defendants would have been a possible and appropriate outcome, but no one believed that it would be appropriate to seek the death penalty for Lee if the death penalty had not been imposed upon Mr. Kehoe.[4]

Initially, I set aside the death penalty based on two issues, both of which are addressed briefly below. The Eighth Circuit set aside my opinion and reinstated the death penalty.

**Death Penalty Protocol:**

I set aside the death penalty after concluding that the United States failed to follow its own "Death Penalty Protocol."[5] While this issue ultimately became about whether Lee had "standing" to require the Attorney General to follow her Death Penalty Protocol, this technical framing of the issue does not capture adequately the events leading up to the holding or its impact.

When the jury handed down its life sentence for Kehoe, whose sentencing phase was first, I believed that Lee's sentence was resolved as well, as had been represented. It was surprising to learn that this was not the case and that formal permission to withdraw the death penalty as to Lee had to be received from Washington, D.C. It was even more surprising to learn that permission was being denied, in direct conflict with the recommendation of the local United States Attorney and her assistants in Little Rock, all of them very capable prosecutors.

The chain of events moved swiftly after the Court was advised that the effort to seek death for Lee would in fact go forward. At that point, the trial had been underway for over two months.

---

[2] 374 F.3d 637 (8ᵗʰ Cir. 2004).
[3] 89 F. Supp. 2d 1017, 1032 (E.D. Ark. 2000), rev'd, 274 F.3d 485 (8ᵗʰ Cir. 2001).
[4] No. 4:97CR00243, 2008 U.S. Dist. LEXIS 109771, at * 182 (E.D. Ark. Aug. 28, 2008) (quoting letter).
[5] 89 F.Supp. 2d at 1041.

**Nov. 7, 2014 - Letter to Holder and Thyer**
**Page 3 of 3**

All were weary. After the announcement of the life sentence for Kehoe, but before the jury had decided Lee's fate, I allowed the jurors to return to their homes. I have often wondered whether I made a mistake in not sequestering the jurors for the entire penalty phase.

**Future Dangerousness (Hare "Psychopathy" Tool):**

I set aside the death penalty after concluding that I erred in allowing the introduction of evidence regarding Lee's future dangerousness during the penalty phase of the trial.[6] In making this finding, I held that introduction of the psychopathy evidence improperly emphasized Lee's "future dangerousness" during sentencing even though Lee "chose neither to perform a risk assessment analysis nor to present rebuttal evidence on the future dangerousness aggravating factor" and "was therefore ill-equipped to handle the Government's discussion of psychopathy."[7] Fifteen years later, there is more reason than ever to question the use of the Hare Psychopathy instrument or prejudicial labeling relied upon at sentencing.[8]

I frequently have second-guessed my own decisions in this case and wondered what, if anything, I could have done differently that might have resulted in a more rational outcome. I have no doubt that all involved did the best they could at the time with the knowledge that they had. Still, the end result leaves me with the firm conviction that justice was not served in this particular case, solely with regard to the sentence of death imposed on Daniel Lewis Lee.

Suffice it to say that, now, more than ever, I agree with my following statement, made in concluding that I was unable to grant Lee post-conviction relief under existing law:

> That Petitioner's death sentence is not redressable under existing legal principles does not mean that it constitutes a fair and rational result under the peculiar and special circumstances of this particular case. Perhaps more than anything else, this case illustrates that the most carefully crafted capital punishment regime in the hands of the humans who must carry it out can never be completely free of arbitrariness in all of its implementations.[9]

I wish you both the best. I remain,

Yours truly,

*G. Thomas Eisele*
G. Thomas Eisele

cc:     Karl Schwartz [Attorney for Daniel Lee]

---

[6] *Id.* at 1032.
[7] 89 F. Supp. 2d at 1030.
[8] *See, e.g.,* Kathleen Wayland & Sean D. O'Brien, Deconstructing Antisocial Personality Disorder and Psychopathy: A Guidelines-Based Approach to Prejudicial Psychiatric Labels, 42 Hofstra L. Rev. 519, 521 (2013).
[9] 2008 U.S. Dist. LEXIS 109771 at *185.

# EXHIBIT B

Dan Stripling

Little Rock, Arkansas
October 28, 2014

Eric H. Holder, Jr.
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

Christopher R. Thyer
United States Attorney
Eastern District of Arkansas
PO Box 1229
Little Rock, Arkansas 72203

General Holder and US Attorney Thyer:

Re: Pending execution of Danny Lee

At the request of Danny Lee's representatives, I am writing you regarding my feelings about the pending execution of Danny Lee. I am pleased to honor their request.

As an Assistant United States Attorney, I was lead prosecutor in the investigation and trialof Chevie Kehoe, Danny Lee, and others who plotted to create an Aryan Nation free of other races or ethnic groups. In the course of numerous, varied criminal activities, the Muller family was killed. The investigation lasted two years, and the trial lasted many weeks. Kehoe was unquestionably the leader of the organization and plotter of the Muller murders. Lee's role was that of the "Aryan Hit Man." Evidence presented at trial established that Lee killed the two adults but was unable to execute the little girl. This Kehoe did after insulting Lee for his weakness.

The United States Attorney sought DOJ approval to seek the death penalty against both Kehoe and Lee. Certification was granted. At the time, and today, I thought this the correct decision. After conviction, the jury found that Kehoe should receive a life sentence rather than the death penalty. Following this jury decision, the United States Attorney sought DOJ decertification of Lee's death penalty request. This was denied. At the time, and today, I think decertification would have been the correct decision.

Kehoe was clearly the leader of the group. The robbery and murder of the Muller family were entirely his plan. Lee was the henchman Kehoe used to assist him in this ghastly undertaking.

The decision to seek DOJ approval to withdraw the capital designation in Lee's case was not lightly made. First Assistant Michael Johnson discussed the issue with the victim's family and those law enforcement officers and agents most involved in the investigation and prosecution. Prior to the return of the Kehoe penalty verdict, Johnson and United States Attorney Paula Casey had discussed the action to be taken should the jury not return a death verdict against Kehoe with line prosecutors. There was agreement that should Kehoe not receive a death sentence, none should be sought against Lee.

Prior to becoming an Assistant United States Attorney, I was a state prosecutor and, for fifteen years, in private practice defending most types of criminal cases. I was lead defense attorney in numerous cases in which a capital charge was a consideration and one that resulted in a capital charge, conviction, and defendant's execution. Over decades, my feelings about capital punishment have matured. I do not feel that capital punishment is inherently wrong or that death rows are teeming with innocent people. However, I find very disturbing the randomness with which defendants are charged, convicted, and sentenced in capital cases. This case perfectly illustrates this unexplainable randomness. It is this unpreventable disparity in outcomes that convinced me that the Lee capital designation should have been decertified. There is simply no knowing why, under the facts before the jury, Lee was given a death sentence and Kehoe not. Kehoe is intelligent, appeared clean cut, and had support of convincing witnesses who genuinely supported him. Lee had none of those benefits. If this was the reason for the jury's decision, life should not be taken because of these disparities.

May God bless you in your decision.

Sincerely,

Dan Stripling

Dan Stripling

cc: Karl Schwartz, Esq.

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

UNITED STATES OF AMERICA

v.                                    No. 4:97CR00243-02 JLH

DANIEL LEWIS LEE

### ORDER

Without objection, the United States' motion for an extension of time to file its response to

Lee's motion for indicative ruling is GRANTED.  Document #1233.  The United States must file its

response on or before November 15, 2013.

IT IS SO ORDERED this 10th day of October, 2013.

_____

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

UNITED STATES OF AMERICA

v.                                       No. 4:97CR00243-02 JLH

DANIEL LEWIS LEE

### ORDER

The motion of the United States for an extension of time to respond to Daniel Lewis Lee's motion to vacate, set aside, or correct his sentence is GRANTED.  Document #1301.  The government is given permission to file a response limited to the Court's jurisdiction.  That response is due on or before Monday, November 12, 2018.

IT IS SO ORDERED this 1st day of October, 2018.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

# EXHIBIT E

Case: 20-2128     Document: 12     Filed: 07/10/2020     Pages: 38

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

# CAPITAL CASE

UNITED STATES OF AMERICA                                                    PLAINTIFF

v.                                        No. 4:97CR00243-02 JLH

DANIEL LEWIS LEE                                                    DEFENDANT

## ORDER

The government's unopposed motion for extension of time to respond to Daniel Lewis Lee's

§ 2255 motion is GRANTED.  Document #1305.  The time within which the government must file

its response is extended up to and including November 26, 2018.

IT IS SO ORDERED this 8th day of November, 2018.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

# EXHIBIT F

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases, | |
| LEAD CASE: *Roane et al. v. Barr* | No. 1:19-mc-00145-TSC |
| THIS DOCUMENT RELATES TO: | |
| *Bourgeois v. Barr, et al.*, 12-cv-0782 *Lee v. Barr, et al.*, 19-cv-2559 *Purkey v. Barr, et al.*, 19-cv-03214 | |

DECLARATION OF RICK WINTER

I, Rick Winter, do hereby declare and state as follows:

1. I am employed by the United States Department of Justice, Federal Bureau of Prisons ("BOP"), as Regional Counsel for the BOP's North Central Region. I have held this position since October 2016. I have been employed by the BOP since 1994.

2. The statements I make hereinafter are made on the basis of my review of the official files and records of the BOP, my own personal knowledge, or on the basis of information acquired by me through the performance of my official duties.

3. The BOP, under the supervision of the United States Marshals Service, is responsible for implementing federal death sentences. See 18 U.S.C. § 3596(a); 28 C.F.R. Part 26. Currently, execution dates are in place for four inmates. Specifically, Daniel Lewis Lee's execution is scheduled to occur on Dec. 9, 2019; Wesley Ira Purkey's execution is scheduled to occur on Dec. 13, 2019; Alfred Bourgeois' execution is scheduled to occur on Jan. 13, 2020; and Dustin Lee Honken's execution is scheduled to occur on Jan. 15, 2020.

4. In advance of these dates, the BOP has been, and intends to continue, making necessary

A17

arrangements.

5.     Such arrangements include the activation of the execution team, which consists of over 40 BOP staff members. These staff members will, by necessity, be removed from their normal duties, which include a wide range of correctional and administrative positions within the BOP.  Pursuant to the current operational plan, these staff members are scheduled to cease their normal duties  several days in advance of a scheduled execution, in order to give the team time to practice and prepare for their role in an execution.  In addition to the team members, a number of BOP administrators will be present as well, also ceasing their normal duties in the days in advance of an execution.  Logistical items such as travel, lodging and personal arrangements have already begun for the two execution dates in December.

6.     Additionally, the BOP plans to use contractors who have made themselves available and presumably have made any necessary arrangements for personal and work related matters based on the executions scheduled in December.

7.     Executions are scheduled to take place at the Federal Correctional Complex at Terre Haute, Indiana (FCC Terre Haute). Accordingly, FCC Terre Haute is also mobilizing personnel in preparation of the currently scheduled executions. In preparation, FCC Terre Haute has also been coordinating with federal, state, and local law enforcement agencies, some of whom have indicated their plans to send personnel to FCC Terre Haute to help maintain security for the currently scheduled executions.

8.     Approximately 200 FCC Terre Haute staff will serve as institution security and support during an execution. With its staff pulled away from their normal duties, FCC Terre Haute will not be able to operate under normal conditions. For example, due to expected staffing issues and changes in security procedures, FCC Terre Haute will not be able to prepare

inmate meals in the ordinary fashion. Instead, the institution plans to prepare food in advance for its approximately 2,600 inmates.  This alteration in meal preparation comes at a greatly increased cost to the BOP.

9.      Additionally, FCC Terre Haute has made arrangements for specific needs related solely to an execution, for example contracting for buses which will be used to transport public demonstrators who wish to assemble.

10.      Schedules for FCC Terre Haute staff members are currently being created, allocating staff based on current execution dates. For additional security and support, specialized BOP teams such as Special Operations Response Teams (SORT) and Disturbance Control Teams (DCT) will travel to FCC Terre Haute from other BOP institutions. These teams consists of approximately 50 individuals. Again, logistical arrangements such as travel and lodging have already begun for the current execution dates.

11.      Additionally, BOP has made travel and lodging arrangements for the victims' family members to attend the December executions.

12.      Any adjustment to the execution dates would require significant planning and coordination such as that which already has been undertaken by BOP to date.

I declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 21st day of November, 2019.

Rick Winter
Federal Bureau of Prisons

A19